**Case No. 26-298**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY
and CENTER FOR FOOD SAFETY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,

Respondents,

SYNGENTA CROP PROTECTION, LLC,

Respondent-Intervenor.

---

On Petition for Review of an Order of the
United States Environmental Protection Agency

---

# PETITIONERS' OPENING BRIEF (REDACTED)

Stephanie M. Parent
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97221
T: (971) 717-6404
sparent@biologicaldiversity.org

Sharmeen Morrison
Gregory C. Loarie
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
smorrison@earthjustice.org
gloarie@earthjustice.org

*Additional Counsel for Petitioners listed below*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners Center for Biological Diversity and Center for Food Safety each certify that they have no parent corporation, nor are they owned, wholly or in part, by any publicly held corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF THE ISSUES .......... 5

STATUTORY ADDENDUM STATEMENT .......... 6

STATEMENT OF THE CASE .......... 6

I. Isocycloseram .......... 6

II. The Insect Pollinator Crisis .......... 8

STATUTORY AND REGULATORY FRAMEWORK .......... 10

PROCEDURAL BACKGROUND .......... 12

I. EPA's Ecological Risk Assessment .......... 12

II. EPA's Proposed Decision to Register Isocycloseram .......... 22

III. EPA's Final Decision to Register Isocycloseram .......... 25

SUMMARY OF ARGUMENT .......... 27

STANDARD OF REVIEW .......... 28

ARGUMENT .......... 29

I. EPA's conclusion that isocycloseram's demonstrated risk to insect pollinators is reasonable lacks substantial evidence .......... 29

A. Syngenta's colony-level studies are critically flawed and insufficient as a basis to discount the risk to insect pollinators. .......... 29

1. Colony-level studies had numerous critical shortcomings, including the failure to apply the maximum single application rate. .......... 29

2. Colony-level studies are not a rational basis for discounting demonstrated risk to native pollinators. .......... 36

B. EPA's conclusion that mitigation measures will sufficiently reduce risks to bees lacks substantial evidence. .......... 40

1. EPA's own analysis proves that its reduction of the maximum single application rate is not sufficient to reduce risk to bees. .......... 42

2. EPA did not explain the efficacy of its other pollinator mitigation measures, many of which are voluntary and unenforceable. .......... 44

3. The mitigation measures do not account for increased risk to solitary and bumble bees. .......... 49

C. EPA's conclusion that the costs of registration are outweighed by the benefits lacks substantial evidence. .......... 51

II. EPA's unlawful decision registering isocycloseram must be set aside. .......... 55

CONCLUSION .......... 57

CERTIFICATE OF COMPLIANCE FOR BRIEFS .......... 59

ADDENDUM OF STANDING DECLARATIONS .......... ADD-01

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)........................................................................ 4

*Love v. Thomas*,
858 F.2d 1347 (9th Cir. 1988)........................................................ 55

*Migrant Clinicians Network v. U.S. EPA*,
88 F.4th 830 (9th Cir. 2023)..........................................................30

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) ................................................................... 56

*Nat. Res. Def. Council v. U.S. EPA*,
735 F.3d 873 (9th Cir. 2013)...........................................................28

*Nat. Res. Def. Council v. U.S. EPA*,
857 F.3d 1030 (9th Cir. 2017)..........................................................28

*Nat'l Fam. Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020) ...........................................3, 47, 55, 56

*Pollinator Stewardship Council v. U.S. EPA*,
806 F.3d 520 (9th Cir. 2015)...................................................*passim*

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)...................................................................... 10

*Sierra Club v. Envtl. Prot. Agency*,
292 F.3d 895 (D.C. Cir. 2002)........................................................... 4

*Thomas v. Union Carbide Agric. Prod. Co.*,
473 U.S. 568 (1985) ...................................................................... 10

*Union Oil Co. of Cal. v. Fed. Power Comm'n*,
542 F.2d 1036 (9th Cir. 1976)..........................................................28

*United Farm Workers of Am., AFL-CIO v. Adm'r, EPA*,
592 F.3d 1080 (9th Cir. 2010) ..................................................... 4

*Wood v. Burwell*,
837 F.3d 969 (9th Cir. 2016) ..................................................... 56

## Statutes and Regulations

7 U.S.C. § 136(bb) ..................................................... 11, 55

7 U.S.C. § 136a(a) ..................................................... 10

7 U.S.C. § 136a(c)(1)(C) ..................................................... 10

7 U.S.C. § 136a(c)(2)(A) ..................................................... 10

7 U.S.C. § 136a(c)(5) ..................................................... 25, 26, 51, 52

7 U.S.C. § 136a(c)(5)(C) ..................................................... 11, 29, 56

7 U.S.C. § 136a(c)(5)(D) ..................................................... 11, 56

7 U.S.C. § 136a(c)(10)(B) ..................................................... 13

7 U.S.C. § 136n ..................................................... 55, 56

7 U.S.C. § 136n(b) ..................................................... 3, 5, 28

40 C.F.R. § 152.3 ..................................................... 7

40 C.F.R. § 158.1(b)(1) ..................................................... 11

40 C.F.R. § 158.630(b)(3) ..................................................... 11

40 C.F.R. § 158.630(d) n.1 ..................................................... 11

## Other Authorities

European and Mediterranean Plant Protection Organization ("EPPO") Test Guideline No. 170(4)........................................32

Kelsey Ott, *Buzzkill: How the EPA's Inaction Is Killing America's Bees*, 39 Wm. & Mary Envtl. L. & Pol'y Rev. 401 (2015)........................................53, 54

Mary Jane Angelo & Megan Lancaster, *The Insect Apocalypse:* Legal *Solutions for Protecting Life on Earth*, 49 Ecology L.Q. 1 (2022)........................................8

Organisation for Economic Co-operation and Development ("OECD") Guidance No. 75........................................32, 33

U.S. EPA, PRN 97-3: Guidelines for Expedited Review of Conventional Pesticides under the Reduced-Risk Initiative and for Biological Pesticides (Sept. 4, 1997)........................................13

## INTRODUCTION

This case challenges a November 18, 2025, decision by the U.S. Environmental Protection Agency ("EPA") to approve a powerful new insecticide called isocycloseram for use on millions of acres of farmland across the country. Isocycloseram is extraordinarily toxic. According to EPA, 0.26 *micro*grams—less than the weight of a single speck of household dust—is enough to kill a honey bee. Just 0.014 micrograms will kill freshwater insects. Because of its toxicity, EPA determined that use of isocycloseram is likely to have an adverse impact on 1,082 species that are protected under the Endangered Species Act. And to top it off, isocycloseram is a "per- and polyfluoroalkyl substance," or PFAS. Scientists refer to PFAS as "forever chemicals" because they are extremely persistent in the environment. All told, EPA's decision to approve isocycloseram will have severe and long-lasting environmental, agricultural, and human health impacts.

EPA's decision to approve isocycloseram is also illegal. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y, prohibits EPA from approving any pesticide that presents an unreasonable risk to the environment. Here, EPA determined that use of isocycloseram as proposed by Respondent-Intervenor Syngenta Crop

Protection, LLC ("Syngenta") would expose "non-target" organisms to levels of isocycloseram that eclipse EPA's thresholds of acceptable risk. Of particular consequence to native ecosystems, sustainable agriculture, and our nation's food supply, EPA concluded that use of isocycloseram will exceed its chronic risk thresholds for honey bees—which EPA treats as a proxy for all insect pollinators—by over three orders of magnitude. Indeed, EPA found that isocycloseram is as or more toxic to honey bees than 93 percent of existing alternative pesticides for important crops.

Having reached these alarming conclusions, EPA recommended that Syngenta reduce significantly the maximum permissible application rate for isocycloseram to address the risk to insect pollinators. But when Syngenta resisted, EPA caved. In the end, EPA accepted a token reduction in the application rate—a rate at which EPA concedes insect pollinators will still suffer exposure to isocycloseram well beyond EPA's own established levels of concern.

Resigned to approve isocycloseram, EPA looked for ways to downplay the results of its own risk assessment. Ultimately, EPA's conclusion that isocycloseram's undisputed risk to insect pollinators is "reasonable" rests on three key assertions, none of which is supported by substantial evidence in the record. First, EPA claims that a handful of honey bee colony-level

studies commissioned by Syngenta indicate that isocycloseram's impact on honey bee colonies will be only "transient." But each of those studies has fundamental flaws that render its results unreliable and insufficient. Second, EPA points to mitigation measures added to isocycloseram's label. But the efficacy of these mitigations is at best unexplained, or demonstrably insufficient. Third, EPA asserts that any remaining risk to pollinators is outweighed by the benefits to isocycloseram's users. But EPA's judgment in that regard is one-sided and utterly lacks explanation.

In the midst of an ongoing and accelerating pollinator die-off that threatens to unravel food webs and food supplies, there is no substantial evidence in the record to support EPA's assertion that the additional risk presented by isocycloseram is somehow reasonable. FIFRA requires more. Petitioners ask this Court to set aside EPA's approval of isocycloseram.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review EPA's November 18, 2025, decision registering isocycloseram and associated products under section 16(b) of FIFRA, which provides for review of EPA orders following a public hearing. 7 U.S.C. § 136n(b). EPA's November 18, 2025, decision qualifies as an "order" issued by EPA. *See Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120, 1132 (9th Cir. 2020). EPA's November 18, 2025, decision also follows

"public hearings," in that EPA solicited and reviewed public comments before registering isocycloseram. *See United Farm Workers of Am., AFL-CIO v. Adm'r, EPA*, 592 F.3d 1080, 1082–84 (9th Cir. 2010); 3-ER-482; 2-ER-75. And Petitioners were "part[ies] to the proceedings," because both submitted comments on EPA's proposed registration of isocycloseram. 2-ER-276–334 (Center for Biological Diversity Comments); 2-ER-261–75 (Center for Food Safety Comments).

The declarations that accompany this brief establish Petitioners' Article III standing to challenge EPA's decision registering isocycloseram. *See Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 900 (D.C. Cir. 2002) (requiring petitioner to "establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (listing the elements of standing). Petitioners have associational standing because the interests they seek to protect are germane to their organizational purposes, this litigation does not require their members' individual participation, and their members would have standing to sue in their own right. *See* Hartl Decl. ¶¶ 6–11; Wu Decl. ¶¶ 2–7. EPA's decision registering isocycloseram directly injures Petitioners' members' conservation,

recreational, aesthetic, and health interests in insect pollinators and the wildlife that depends on those pollinators. *See* Carlson Decl. ¶¶ 4–5, 7–8; Hartl Decl. ¶¶ 12–17; Hudson Decl. ¶¶ 4–5, 7–8; Tyler Decl. ¶¶ 4–10, 11; Wood Decl. ¶¶ 8–14, 18–21. In these ways, Petitioners' members are also "adversely affected" by EPA's registration of isocycloseram. 7 U.S.C. § 136n(b).

Finally, the Petition for Review is timely and venue is proper in this Court, because Petitioners filed this action within 60 days of EPA's approval of isocycloseram and Petitioners maintain places of business within this Circuit. *See* 7 U.S.C. § 136n(b); Dkt. No. 1.1 (Petition for Review); Hartl Decl. ¶ 6; Wu Decl. ¶ 2.

## STATEMENT OF THE ISSUES

1. Having determined that isocycloseram poses risks to insect pollinators far exceeding EPA's own established levels of concern, did EPA have substantial evidence to support its assertion that the risk is nevertheless reasonable, where: a) colony-level studies had critical flaws and serve as no basis to discount risk to insect pollinators; b) mitigation measures are unproven, or even demonstrably ineffective in reducing risk to insect pollinators; and c) EPA's cost-benefit analysis is one-sided and unexplained?

2. Does EPA's violation of FIFRA warrant that statute's default remedy of vacatur where the violations are serious, and vacatur is the most environmentally protective result?

## STATUTORY ADDENDUM STATEMENT

Pursuant to Ninth Circuit Rule 28-2.7, pertinent statutes and regulations are included in the addendum that accompanies this brief.

## STATEMENT OF THE CASE

### I. Isocycloseram

Isocycloseram is a new insecticidal active ingredient that binds to a particular receptor in the nervous system of insects, causing paralysis and death. 3-ER-583; 5-ER-759. Isocycloseram is a member of the isoxazoline class of chemicals and the first insecticide of its kind registered for outdoor use in the United States. 2-ER-113. Because it kills a wide variety of insects, isocycloseram is a broad-spectrum insecticide. 2-ER-113.

Isocycloseram is toxic not only to insect pests, but to many other non-target organisms, including freshwater and marine fish, aquatic insects, and honey bees. 2-ER-170–71. In fact, EPA classifies isocycloseram as "very highly toxic" to honey bees. 2-ER-170–71. EPA classifies a pesticide as "highly toxic" to honey bees where the acute median lethal dose ("$LD_{50}$")—defined as the single dose that is sufficient to kill half of the individual bees tested within a specified time period—is less than 2 micrograms of active

ingredient per bee ("µg ai/bee"). 4-ER-686; 40 C.F.R. § 152.3 (defining "Acute dermal $LD_{50}$" and "Acute oral $LD_{50}$"). The median lethal dose of isocycloseram for honey bees is many times lower than that: the "contact" (or "dermal") $LD_{50}$ for adult honey bees is 0.26 µg ai/bee, which means that half the bees that come into contact with 0.00000026 grams or more of isocycloseram die within 96 hours. *See* 2-ER-150, -213. Isocycloseram is similarly toxic to honey bees when they consume it: the acute "oral" (or "dietary") $LD_{50}$ for adults is 0.29 µg ai/bee. 2-ER-213. And isocycloseram degrades into a number of different compounds; one of these degradates, SYN549431, has been shown to be four times more toxic to honey bees than even the highly toxic parent compound. 2-ER-150.

Based on its molecular structure, isocycloseram is also a PFAS chemical as defined by scientists, the United States Congress, and the Organisation for Economic Co-operation and Development ("OECD"). 2-ER-280–81. EPA classifies isocycloseram as "moderately persistent to persistent" in soil based on its half-life in soil of up to 293 days. 2-ER-125. But it takes significantly longer for isocycloseram to degrade completely; in one study, for example, isocycloseram persisted in soil for over three years. 2-ER-130.

## II. The Insect Pollinator Crisis

Isocycloseram arrives on the scene at a moment when insect pollinators are already reeling from decades of precipitous declines due in large part to pesticide use. 3-ER-560; 5-ER-881–82. The decline of insect pollinators is part of a global insect die-off that researchers and onlookers have dubbed the "insect apocalypse." *See* Mary Jane Angelo & Megan Lancaster, *The Insect Apocalypse: Legal Solutions for Protecting Life on Earth*, 49 Ecology L.Q. 1, 6–13 (2022). The repercussions are vast, as insects are the most abundant and diverse class of animals on earth and provide a host of essential ecosystem services, such as pollination, water filtration, decomposition, and biological control of pests and disease vectors. *See* Angelo & Lancaster at 1. Indeed, insects serve as critical links in most aquatic and terrestrial food webs. 5-ER-795; 3-ER-639.

Pesticides are a major driving factor behind the documented declines of insects, including insect pollinators. 3-ER-644; 3-ER-630–31; 5-ER-881–82; 3-ER-627; 3-ER-641; 3-ER-560; 5-ER-795. Researchers studying insect declines point to significant increases in toxicity "loading" in the environment over time, as modern pesticides tend to be highly potent in their toxicity to insects and tend to persist in the environment for long periods. 3-ER-627; 3-ER-633.

The decline of insect pollinators has grave implications for human health and food security: not only do bees provide pollination services to an estimated 75 percent of cultivated crops worldwide, they also provide pollination services to 87 percent of wild flowering plants, which are the cornerstones of many terrestrial food webs. 5-ER-881; 3-ER-628; 3-ER-636. The European honey bee (*Apis mellifera*) is responsible for a significant share of agricultural pollination services, but native “non-*Apis*” bees are also significant contributors to pollination—and in some instances non-*Apis* bee species are the *only* pollinators of specific crops, such as tomatoes and eggplants. 4-ER-698; 5-ER-881; 3-ER-630; 3-ER-641–42. There are over 4,000 species of native bees in the United States, most of which are pollinators. 4-ER-698. And most of these native species have relatively little in common with the non-native European honey bee. For example, most native bee species are solitary, in that they do not live in a colony structure, and nest in the ground as opposed to a hive. 3-ER-629; 4-ER-693; *see generally* 4-ER-694–713. These distinct life histories, physiologies, and behavioral patterns mean solitary bees, bumble bees, and honey bees can face widely varying degrees of risk from pesticides. 4-ER-693; 3-ER-629; 3-ER-627; 4-ER-704; 5-ER-870–71.

## STATUTORY AND REGULATORY FRAMEWORK

The Federal Insecticide, Fungicide, and Rodenticide Act reflects "mounting public concern about the safety of pesticides and their effect on the environment." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991 (1984). To address such effects, FIFRA provides that a pesticide must be approved—or "registered"—by EPA before it can be sold or distributed in the United States. 7 U.S.C. § 136a(a).

Section 3 of FIFRA "establishes comprehensive procedures for the EPA's registration" of pesticides. *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1085 (9th Cir. 2017). At the outset of this process, "[e]ach applicant for registration of a pesticide" must file a "statement" with EPA that includes "a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use." 7 U.S.C. § 136a(c)(1)(C). The applicant must also "submit research data . . . concerning the product's health, safety, and environmental effects." *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 571 (1985).

FIFRA directs that EPA "shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time." 7 U.S.C. § 136a(c)(2)(A). Consistent with this mandate, EPA has promulgated

regulations specifying "the minimum data and information EPA typically requires to support an application for pesticide registration." 40 C.F.R. § 158.1(b)(1). The only insect pollinator data EPA's regulations require from applicants for all pesticides with outdoor uses—indeed, the only terrestrial invertebrate data EPA require for all pesticides—is a study determining the acute contact median lethal dose ($LD_{50}$) for an adult honey bee. 40 C.F.R. § 158.630(b)(3), (d) n.1. This limited data submission requirement reflects that EPA treats honey bees as a proxy for all insect pollinators, and EPA regulations do not require toxicity or exposure data for any terrestrial insect other than honey bees. 4-ER-686; 3-ER-646, -657–58.

Presented with an application to register a new pesticide, EPA is required under FIFRA to ensure that the pesticide "will perform its intended function without unreasonable adverse effects on the environment," and that "when used in accordance with widespread and commonly recognized practice, the product will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(C), (D). FIFRA defines "unreasonable adverse effects on the environment" to include "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). Thus, "FIFRA uses a cost-benefit

analysis to ensure that there is no unreasonable risk created for people or the environment from a pesticide." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 522–23 (9th Cir. 2015).

## PROCEDURAL BACKGROUND

### I. EPA's Ecological Risk Assessment

Syngenta applied to EPA to register the first pesticide products containing the new active ingredient isocycloseram on [redacted]. 5-ER-796; 3-ER-584. [redacted] Syngenta's application included proposed labels for each product, which specified several different methods for applying isocycloseram, including via spray onto a crop's foliage by air or from the ground ("foliar" application) and as a coating for crop seeds ("treated seeds"). *See, e.g.*, 3-ER-594–95 (listing methods of application of product A21550 CP). The labels also specified Syngenta's proposed "maximum single application rate," which is the maximum amount of isocycloseram permitted to be applied at one time, for each crop. *See , e.g.*, 3–ER-604 (listing maximum single application rates under "use restrictions" by crop for product A21550 CP); 2-ER-358 (summarizing maximum single application rates in registration application). The highest

maximum single application rate for any foliar outdoor use in Syngenta's registration package was 0.134 pounds active ingredient per acre ("lb ai/A"). 2-ER-359–60 & -360 n.5.

[redacted] *see also* 3-ER-462 (stating corn, cotton, peanut, and soybean fields total over 172 million acres in the United States). Here, Syngenta availed itself of a FIFRA process through which applicants may petition EPA for expedited review of a registration application by showing that the pesticide "may be reasonably expected" to "reduce the risks of pesticides" in any of various ways, including risk reduction to "nontarget organisms." 7 U.S.C. § 136a(c)(10)(B); *see also* U.S. EPA, PRN 97-3: Guidelines for Expedited Review of Conventional Pesticides under the Reduced-Risk Initiative and for Biological Pesticides (Sept. 4, 1997), https://www.epa.gov/pesticide-registration/prn-97-3-guidelines-expedited-review-conventional-pesticides-under-reduced.

On November 23, 2021, EPA granted Syngenta's reduced risk petition in part, finding reduced risk for cotton, soybean, and one other non-agricultural use. 3-ER-569; 3-ER-570–81. [redacted]

[redacted]

EPA's assessment of isocycloseram's risk to terrestrial invertebrates began with an analysis of acute and chronic risk to individual honey bees. Acute risk reflects isocycloseram's potential for adverse effects to a honey bee over a short period, usually 48 hours, following a single exposure. 3-ER-660, 4-ER-686. Chronic risk reflects the pesticide's potential for adverse effects to a honey bee following repeated exposures over a longer period, such as ten days for honey bee adults. 3-ER-663. EPA evaluated isocycloseram's risk to individual bees by calculating honey bee acute and chronic "risk quotients" in several steps. *See generally Pollinator Stewardship Council*, 806 F.3d at 524–25 (describing EPA's derivation of risk quotients). First, EPA used a model to estimate the amount of

isocycloseram to which a honey bee would be exposed based on Syngenta's proposed application rates. For pesticides applied via foliar spray, EPA considers the primary routes of exposure for honey bees to be through diet—*i.e.* the consumption of contaminated pollen or nectar—and through dermal contact with the pesticide. 3-ER-662. To calculate the acute risk quotient, EPA divided the modeled exposure value by the Syngenta-submitted acute median lethal dose. 3-ER-380–82. To calculate the chronic risk quotient, EPA divided modeled exposure by the Syngenta-submitted "no observable adverse effect level" ("NOAEL"), which represents the lowest isocycloseram dose at which no adverse effects from the pesticide were observed in a bee. 3-ER-381–82, 2-ER-344 (defining NOAEL); *see also* 3-ER-663 (explaining derivation of chronic risk quotients). Finally, EPA compares its risk quotients to the Agency's predetermined "levels of concern" for honey bees, which are 0.4 for acute risk and 1.0 for chronic risk. 3-ER-651. If the risk quotient exceeds EPA's level of concern, then EPA concludes use of the pesticide presents elevated risk. 3-ER-651; *see also* 4-ER-721–22 (levels of concern "are used to indicate when a pesticide use as directed on the label has the potential to cause adverse effects on non-target organisms").

Using this methodology, the risk quotients EPA generated for isocycloseram were astonishing: every honey bee risk quotient for contact and dietary exposure values exceeded the Agency's levels of concern, in a number of instances by factors of hundreds or even thousands. Isocycloseram's acute risk quotients for honey bees ranged between 1.01 and 53.8.[1] 2-ER-351, 3-ER-380–81. Isocycloseram's chronic risk quotients for honey bees ranged between 310 and 1,537. 2-ER-351, 3-ER-381, -406. In essence, a chronic risk quotient of 1,537—which is three orders of magnitude higher than the chronic level of concern of 1—means that a honey bee will be exposed to 1,537 times the amount of isocycloseram known to be safe. 2-ER-344, 3-ER-382; 3-ER-663.

EPA found that extraordinarily high risk to bees remained even after it substituted modeled exposure data with measured data of isocycloseram residues in nectar and pollen, a process EPA calls "refinement." 3-ER-651. At this step, EPA used measures of isocycloseram residues in nectar and pollen from studies commissioned by Syngenta. 3-ER-384–86. The maximum single application rate in those studies was 0.11 lb ai/A, so the measured residues of isocycloseram in pollen and nectar reflected the

[1] The upper end of this range represents the acute dietary risk quotient for isocycloseram degradate SYN549431, which is 3.6 times higher than the acute dietary risk quotient for the parent compound. *See* 3-ER-381–82.

isocycloseram measured in those media from that application rate, which was less than Syngenta's proposed maximum foliar application rate in its registration application. 3-ER-384–86 (discussing residue data from four semi-field studies: Master Record Identifier ["MRID"] numbers 51229440, 51229442, 51229443, and 51229530). Even then, the "refined" risk quotients derived from these studies were still higher than EPA's predetermined levels of concern in most cases, at times by large margins: the highest acute oral risk quotient was 0.79, exceeding the acute level of concern of 0.4, while the highest chronic oral risk quotient was 56, an order of magnitude higher than the chronic level of concern of 1. 3-ER-384–86, -384 Tbl. 10-1.

EPA also determined that isocycloseram's risk to bees extended well beyond the field where isocycloseram is sprayed. The Agency calculated risk quotients for honey bee exposures to isocycloseram "spray drift" and found that, even at the lowest proposed foliar application rates, the chronic level of concern was exceeded more than 1,000 feet from the treated field for aerial applications, and 423 feet from the treated field for ground applications. 3-ER-384.

Having found alarmingly high risk quotients for individual honey bees, EPA proceeded to analyze ten studies submitted by Syngenta

regarding isocycloseram's impacts on honey bee colonies. Nine of the ten studies were "semi-field" tunnel studies in which honey bee colonies were placed in tunnel enclosures and forced to feed on pesticide-treated crops. 2-ER-369–70, 3-ER-373, -423–37. One of the ten studies was a "colony feeding study" in which honey bees were fed isocycloseram at four different concentrations for nine consecutive days. 3-ER-373, -387, -410, -437–38. EPA rejected three of the semi-field studies outright due to significant methodological issues and irregularities. 3-ER-410, -423–26, -429–30 (MRIDs 51229437, 51229438, and 51229441). EPA concluded the remaining seven also suffered from at least one significant methodological issue, such as failure to apply the maximum application rate or failure to apply isocycloseram when bees were actively foraging. 2-ER-369–70, 3-ER-426–36. EPA nevertheless asserted on the basis of the seven studies that isocycloseram caused only "transient" impacts to honey bee colonies, and that overall "colony condition" was "not impact[ed]." 3-ER-387–88.

[redacted]

[redacted]

[redacted]

Even after EPA revoked reduced risk status for cotton and soybean, Agency staff continued to express concern that Syngenta's pending registration package presented unacceptable risks to bees, and by extension all insect pollinators. EPA attempted to mitigate these risks by asking Syngenta to lower the maximum single application rate for outdoor foliar uses from the rate in its registration package. In a July 19, 2024, email to a Syngenta representative, EPA pointed out that chronic risk quotients for adult and larval bees at the maximum proposed single application rate were 1,490 and 440, respectively[2]—far in excess of EPA's chronic level of concern

---

[2] Here, EPA appears to have been referencing the chronic risk quotients in Appendix K of its draft ecological risk assessment (the "Draft Assessment'), which states that the highest chronic dietary risk quotient is 1,491.50 for honey bee adults and 441.87 for honey bee larvae. *See* 3-ER-474–75. These numbers are slightly different from the highest dietary chronic risk quotients EPA repeatedly references elsewhere in the Draft Assessment and later in the Final Assessment. In both documents, the highest chronic risk quotient for adult honey bees is 1,537, while the highest chronic risk quotient for larval honey bees is 455. *See* 2-ER-351, 3-ER-381–83, -397, -405, -476 (Draft Assessment); 2-ER-105–06, -151–53, -171–72, -175, -177–179, -259. (Final Assessment).

of 1. 3-ER-401–02. EPA confirmed that "reducing application rates is one of the most effective ways to reduce chronic risks" to bees.3-ER-564. EPA stated that "[r]ate reductions [would] . . . allow EPA to align the label with the conditions used in the . . . [semi-field] studies" underlying Syngenta's registration proposal, observing that "[u]ncertainties in the interpretation of the field studies are introduced when the rates do not match the maximum proposed single application rate on the label." 3-ER-564. Furthermore, EPA noted that reduced application rates for isocycloseram would still be effective in controlling target insect pests, pointing out that "most of the foliar uses have a range of rates which suggests that lower rates are effective" against pests, and that "a comparison of Australia's registered [isocycloseram] application rates with those of the US for the same crops shows that the US rates are generally [two to four times] higher." 3-ER-564. EPA also wrote that, "While there are lines of evidence that actual risks to social bees may be lower than those estimated using laboratory-based studies on individual bees, EPA believes those laboratory-based studies are predictive of risks to solitary bees." 3-ER-564. Put differently, the laboratory-based studies—which showed that risk quotients for honey bees far exceeded levels of concern, 2-ER-155—also show that risk quotients for *solitary* bees would be expected to far exceed levels of concern, and the

colony-level studies are irrelevant to solitary bees. Ultimately, EPA "propos[ed] 25-80% rate reductions for all foliar applications," with a particular wish to see "significant (i.e., 50-80%)" rate reductions for the uses with the highest risk quotients for honey bees: turf, ornamental and nurseries, bulb vegetables, and fruiting vegetables. *See* 3-ER-564.

## II. EPA's Proposed Decision to Register Isocycloseram

On May 9, 2025, EPA announced its proposed decision to register isocycloseram and concurrently published its draft assessment of the ecological risks of registering isocycloseram. 3-ER-484–542 (the "Proposed Decision"); 3-ER-335-476 (the "Draft Assessment"). In addition to its proposed registration of the technical active ingredient, EPA proposed to register nine end-use products containing isocycloseram. 3-ER-486.

Recognizing that the proposed registration of isocycloseram presented "potential risks" to non-target terrestrial invertebrates, including bees and other insect pollinators, EPA articulated several mitigation measures in its Proposed Decision that purported to address these risks. 3-ER-522. Specifically, EPA claimed that risks to non-target terrestrial invertebrates had been mitigated by Syngenta's agreement to reduce the maximum single application rates, maximum number of annual applications, and maximum annual rates for some uses from its registration

application. 3-ER-522. EPA also proposed a few additional mitigation measures that EPA claimed would further reduce risk to insect pollinators on the treated field, including prohibiting application during bloom, for some crops, under certain circumstances. 3-ER-522. EPA proposed several measures to mitigate risks from spray drift, including prohibiting aerial application for all uses except corn, cotton, soybean, and potato. 3-ER-522. EPA also proposed to include voluntary label language to reduce insect pollinators' exposure to isocycloseram, including recommending that growers contain excess treated seeds and control abraded seed-coat "dust-off." 3-ER-522.

As to EPA's claim that risks to non-target terrestrial invertebrates had been mitigated by Syngenta's agreement to reduce the maximum single application rates, 3-ER-522, EPA did not specify which rate reductions it counted as mitigations of risk to insect pollinators. However, the record confirms that Syngenta refused EPA's requested rate reductions for isocycloseram's riskiest foliar uses. [redacted]

[redacted] Beyond that, a comparison of Syngenta's registration application and the Proposed Decision reveals only token reductions in the maximum single application

[3] [redacted]

[4] [redacted]

rate for foliar uses.[5] Thus, EPA proposed to register isocycloseram for use at levels that EPA's own analysis indicated would have significant adverse impacts on bees and other non-target organisms.

EPA's Proposed Decision ultimately concluded that the additional risk to insect pollinators associated with registering isocycloseram was outweighed by the benefits to isocycloseram's users. 3-ER-522–23. EPA therefore concluded that isocycloseram "will not cause unreasonable adverse effects on the environment." 3-ER-522–23 (citing 7 U.S.C. § 136a(c)(5)).

## III. EPA's Final Decision to Register Isocycloseram

On November 20, 2025, EPA published its final registration of isocycloseram and nine end-use products containing isocycloseram, as well as its final ecological risk assessment and biological evaluation in support of registration. 1-ER-3–70 ("Final Decision"); 2-ER-89–260 ("Final Assessment").

The draft and final ecological risk assessments and registration decisions are substantially identical. EPA made a few minor changes,

5 [redacted]

including reducing the maximum annual and single application rates for two treated seed uses and updating its analysis of spray drift impacts. 2-ER-100 (summarizing changes). EPA did not reduce the maximum single application rate for any foliar uses between the Proposed and Final Decisions. *Compare* 3-ER-488–500 (Table 1) *with* 1-ER-7–20 (Table 1). As in the Proposed Decision, EPA concluded in the Final Decision that the costs of registration are outweighed by the benefits, and the registration "will not cause unreasonable adverse effects on the environment." 1-ER-43 (citing 7 U.S.C. § 136a(c)(5)).

On January 15, 2026, Petitioners filed a petition for review asking this Court to set aside EPA's registration of isocycloseram, and all registered end-use products containing it, based on EPA's violation of governing statutory requirements. *See* Pet. for Review, Dkt. No. 1.1.[6]

---

[6] On April 23, 2026, EPA posted a "Memo to File" in the Regulations.gov docket for isocycloseram. See 2-ER-73. The memo states that EPA issued new notices of registration for all isocycloseram products on March 5, 2026, to address its inadvertent omission of a mandatory term of registration for isocycloseram. *See* 2-ER-74. Petitioners accordingly moved on May 1, 2026, to supplement their Petition for Review to include the notices of amended registration and labels for isocycloseram that EPA approved on March 5, 2026. *See* Dkt. No. 25.1. Petitioners' motion to supplement has been referred to the merits panel of this Court. Dkt. No. 27.1.

## SUMMARY OF ARGUMENT

Substantial evidence does not support EPA's conclusion that isocycloseram's demonstrated risk to insect pollinators is reasonable, in violation of FIFRA. First, EPA claimed on the basis of colony-level studies that the overwhelming risk to insect pollinators identified in laboratory studies will not translate into colony-level effects. But critical flaws in the colony-level studies, including application rates many times lower than EPA's final approved maximum single application rate, make them as an inadequate basis for that conclusion. Moreover, colony-level studies are irrelevant to the vast majority of bee species, which do not form colonies, or bees that have critical solitary life phases, such as bumble bees.

Second, EPA claimed that several mitigation measures address what it concedes to be potential risk to terrestrial invertebrates, including insect pollinators. But those mitigations are either demonstrably insufficient to reduce identified risks, or the Agency failed to support with substantial evidence its view that they will be sufficient.

Finally, EPA asserted that the remaining risk to pollinators is outweighed by the benefits of isocycloseram, but EPA's analysis of costs and benefits is one-sided and ignores the enormous costs of placing insect pollinators at increased risk in the midst of their accelerating declines.

There is simply no basis for EPA's claim that isocycloseram's purported benefits outweigh the risk to pollinators.

The foregoing flaws in EPA's ecological risk assessment compel the conclusion that EPA's registration of isocycloseram lacked substantial evidence in violation of FIFRA, and must therefore be set aside.

## STANDARD OF REVIEW

A pesticide registration under FIFRA "shall be sustained" only "if it is supported by substantial evidence when considered on the record as a whole." 7 U.S.C. § 136n(b). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nat. Res. Def. Council v. U.S. EPA*, 857 F.3d 1030, 1036 (9th Cir. 2017) (quoting *Nat. Res. Def. Council v. U.S. EPA*, 735 F.3d 873, 877 (9th Cir. 2013)). In general, "Congress expected greater scrutiny when the enabling statute contains a substantial evidence test." *Union Oil Co. of Cal. v. Fed. Power Comm'n*, 542 F.2d 1036, 1041 (9th Cir. 1976); *Pollinator Stewardship Council*, 806 F.3d at 533 (N.R. Smith, concurring) ("The substantial evidence standard affords an agency less deference than the arbitrary and capricious standard.").

# ARGUMENT

## I. EPA's conclusion that isocycloseram's demonstrated risk to insect pollinators is reasonable lacks substantial evidence.

EPA violated FIFRA in registering isocycloseram absent substantial evidence that the insecticide will not cause "unreasonable adverse effects" to insect pollinators. 1-ER-43; 7 U.S.C. § 136a(c)(5)(C). The Agency's own analysis made clear that laboratory studies indicated overwhelmingly high risk to bees from isocycloseram—over three orders of magnitude in exceedance of EPA's chronic level of concern. EPA's attempt to distance itself from those results is unsupported by substantial evidence.

### A. Syngenta's colony-level studies are critically flawed and insufficient as a basis to discount the risk to insect pollinators.

#### 1. Colony-level studies had numerous critical shortcomings, including the failure to apply the maximum single application rate.

EPA claimed on the basis of seven colony-level studies submitted by Syngenta—which included six "semi-field" studies and one colony feeding study—that high risks to honey bees identified in laboratory tests will not translate into colony-level effects. *See* 2-ER-157–59. This conclusion lacked substantial evidence, as Syngenta's colony-level studies had significant flaws that subvert EPA's ability to conclude that the demonstrated risk to pollinators is reasonable.

As an initial matter, four of the six semi-field studies did not apply the final maximum single foliar application rate for isocycloseram. *See* 2-ER-227–34. This Court has previously held that, where EPA relies on semi-field studies featuring "application rates . . . generally much lower than the maximum proposed application rate," the Agency's registration "lacks support." *Pollinator Stewardship Council*, 806 F.3d at 529–30; *see also Migrant Clinicians Network v. U.S. EPA*, 88 F.4th 830, 844–45 (9th Cir. 2023) (holding that "EPA never explained how it complied with its internal guidelines in its registration decision" so it cannot "justify its conclusion that no additional pollinator data [were] necessary"). Here, two of the semi-field studies applied a maximum single application rate of 0.07 lb ai/A, which represents only 65 percent of the maximum single application rate of 0.107 lb ai/A. 2-ER-227–29, -33–34 (describing MRIDs 51229442 and 51229530). Two of the semi-field studies applied a maximum single application rate of 0.04 lb ai/A, which represents only 37 percent of the final maximum single application rate of 0.107 lb ai/A. 2-ER-230–32 (describing MRIDs 51229443 and 51229444). EPA classified these studies as "supplemental"—declining to classify them as fully "acceptable"—due to these methodological issues. 2-ER-232 ("[I]t is unclear why the [application] rates . . . were used, and the study authors do not provide a

justification for [the] selection of rates."); *see also* 2-ER-232 (describing MRID 51229444), -31 (similar for MRID 51229443), -229 (similar for MRID 51229442). EPA admitted in the Final Assessment that the results of studies that did not assess the maximum label rate "are not predictive for applications at higher concentrations." 2-ER-232 (describing MRID 51229444), -234 (similar for MRID 51229530). Yet EPA approved application of isocycloseram at higher concentrations.

Moreover, the only two semi-field studies that applied isocycloseram at the final maximum single application rate of 0.11 lb ai/A had separate flaws that equally confounded their results. First, both studies applied isocycloseram at night, when bees were not actively foraging. 2-ER-224–26 (describing MRIDs 51229439 and 51229440); *see also* 2-ER-141 (suggesting that, while these two studies applied the final maximum application rate, both studies are limited by the fact that "bees were not actively foraging at the time of application").[7] [redacted]

[7] MRID 51229442, discussed above, did not apply the maximum single application rate *or* apply isocycloseram while bees were actively foraging for any treatment. *See* 2-ER-227–28 (all isocycloseram treatments were "in the evening after bee flight," "before bee flight," or "before colonies were placed in [the] tunnel").

[redacted]

Due to their numerous shortcomings, all six semi-field studies departed from the test guidelines to which they purported to conform. While MRID 51229439 purported to conform to the European and Mediterranean Plant Protection Organization ("EPPO") Test Guideline No. 170(4), *available at* https://pp1.eppo.int/standards/PP1-170-4, that guideline states that "[n]ormally, the products should be applied during the daytime when bees are foraging most actively." EPPO Test Guideline No. 170 at 315; [redacted]. Similarly, while MRID 51229440 purported to conform to OECD Guidance 75, that guidance instructs that "[t]he test chemical has to be applied during full bee flight . . . to ensure that the colony is exposed to the test chemical." OECD Guidance No. 75 at 16 *available at* https://www.oecd.org/content/dam/oecd/en/publications/reports/2014/09/guidance-document-on-the-honey-

bee-apis-mellifera-l-brood-test-under-semi-field-conditions_g1ghcc6e/978 9264085510-en.pdf; [redacted]. And while MRIDs 51229442, 51229530, 51229443, and 51229444 also purported to conform to OECD Guidance No. 75, that guidance instructs that "[t]est products should normally be applied at the highest field rate . . . intended for the registration of the product in order to produce a worst-case exposure for the bees." OECD Guidance No. 75 at 17; *see also* 2-ER-227–34. [redacted] Nor, critically, did EPA explain why these study results were nevertheless sufficiently reliable to allay concerns about isocycloseram's severe toxicity in the lab.

The single colony feeding study that EPA considered was also flawed. [redacted]

[redacted]

Ultimately, the record reveals that EPA acknowledged the colony studies' numerous shortcomings in its correspondence with Syngenta. [redacted]

[redacted]

[redacted]

[redacted] The same concern prompted EPA's July 2024 request to Syngenta to lower the maximum single application rate. 3-ER-564 ("Uncertainties in the interpretation of the field studies are

8 [redacted]

introduced when the rates [applied in those studies] do not match the maximum single proposed single application rate on the label.”).

[redacted] Nothing ever came of this, however, as no additional colony-level studies were ever submitted or reviewed.

Nevertheless, despite all of these stated misgivings and without further justification, EPA relied on these same studies in its Final Decision to determine that isocycloseram’s demonstrated risk to pollinators is reasonable. This conclusion lacked substantial evidence and violated FIFRA. In the end, the colony-level studies Syngenta submitted, with their host of methodological issues, do not amount to substantial evidence for EPA’s conclusion that isocycloseram will not cause more than “transient” effects to honey bee colonies. *See Pollinator Stewardship Council*, 806 F.3d at 528–31.

#### 2. Colony-level studies are not a rational basis for discounting demonstrated risk to native pollinators.

EPA’s reliance on Syngenta’s flawed colony-level studies to discount demonstrated risk to insect pollinators is unsubstantiated for another

reason. By their very nature, colony studies are simply irrelevant and inapplicable to bees and other insect pollinators that do not form colonies—which is to say the vast majority of insect pollinators. 3-ER-629.

EPA had no basis to assume that the demonstrated risk to individual insect pollinators exposed by Syngenta's studies will not result in population-level risk for solitary bees. The loss of a single solitary nesting adult bee can have an outsize impact on reproduction for the nest, compared to the loss of a single adult foraging honey bee. 3-ER-660, 4-ER-683, -693. This is explained by fundamental differences in life histories between these species: honey bee hives can number upwards of 50,000 bees with a highly sophisticated division of labor and roles within the colony, whereas solitary bee species persist through the work of individual female bees creating and provisioning their own nests, usually without outside support. 4-ER-693. Thus, honey bee colonies have organizational "redundancy" that can mitigate what might otherwise be a population-level threat. 3-ER-660, 4-ER-683, -693. Solitary bees have no such buffer.

EPA suggested in the Final Assessment that "the potential effects of isocycloseram on solitary non-*Apis* bees are "uncertain." 2-ER-160. But the record shows that EPA was, in fact, certain isocycloseram would have dire

impacts on solitary bees. In its July 2024 appeal to Syngenta to lower the maximum single application rate, EPA confirmed its "belie[f] [that] . . . laboratory-based studies," in which risk quotients exceed levels of concern by three orders of magnitude, "*are predictive of risks to solitary bees*." 3-ER-564 (emphasis added); [redacted] Thus, EPA admitted that there is no substantial scientific basis for dismissing isocycloseram's risk to solitary bees.

Nor does the record support EPA's attempt to dismiss isocycloseram's risk to bumble bees. EPA assumed that Syngenta's colony-level honey bee studies provide at least some insight into isocycloseram's impacts on bumble bees, because bumblebees form a colony for part of the year. EPA acknowledged that "no data are available for bumblebee colonies," but

"assume[d] that compensatory mechanisms [that] limit[] the toxicity of isocycloseram for honey bees are relevant for bumblebees as well." 2-ER-160. EPA did not explain what it means by "compensatory mechanisms." But to the extent the Agency is referring to the organizational redundancy inherent to the colony structure of bumble bees and honey bees, there is no basis in the record for EPA to assume that the colony structure will provide sufficient protection for bumble bees as it might for honey bees. While bumble bees, like honey bees, are social and form colonies for part of the year, their hives are many times smaller than honey bee hives, representing a much smaller buffer from adverse effects of pesticide exposure. 5-ER-871–72; 3-ER-560.

[redacted] Even before colony establishment, bumble bee queens can be exposed to pesticide residues in soil during their winter hibernation, whereas honey bee queens—and honey bees generally—have no comparable soil exposures. 5-ER-871–72; *see also* 3-ER-560, -62. Once the colony is established, honey bee queens do not leave it, but bumble bee queens spend significant time outside the colony foraging, during which time they may be exposed to

pesticide residues in pollen and nectar. 5-ER-871–72; 3-ER-560. And while honey bee queens consume only "royal jelly"—processed gland secretions produced by nurse bees—which contains lower pesticide residues than unprocessed nectar or pollen, bumble bee queens consume only unprocessed nectar and pollen, and thus may receive higher dietary pesticide doses than honey bee queens. 5-ER-872, -873, -875; 4-ER-683, -689. EPA therefore conceded, "Although bumblebees are social, only the queen overwinters and there is uncertainty regarding the relevancy of the colony-level studies on honey bees to this solitary phase of the bumblebee lifecycle." 2-ER-160. But this was actually an understatement; colony-level studies on honey bees cannot predict the risk isocycloseram poses to native bees. EPA's reliance on the colony-level studies was thus unjustified and violated FIFRA on this ground as well.

### B. EPA's conclusion that mitigation measures will sufficiently reduce risks to bees lacks substantial evidence.

EPA's assertion that mitigation measures will address the demonstrated risk to insect pollinators is also unfounded. These mitigation measures include a reduction in the maximum foliar application rates between Syngenta's submitted registration application and EPA's Proposed Decision for two crops; prohibition of aerial application for all uses except

corn, cotton, soybean, and potato; label language advising growers to contain excess treated seeds and control abraded seed-coat "dust-off"; and restrictions of application during and immediately before bloom, and between certain hours, for some uses. *See* 1-ER-42–43. The problem is that, while EPA purported to characterize the level of risk to terrestrial invertebrates without any mitigations, the Agency never re-calculated this risk to account for the mitigation measures. Thus, it is impossible to tell how much risk-reduction benefit EPA anticipates from each mitigation measure—let alone whether mitigations will, on their own or in the aggregate, reduce risk to reasonable levels. There is simply no substantial basis for EPA's assertion the mitigation measures will address the significant risk that to pollinators that EPA calculated.

Many of EPA's mitigation measures are demonstrably insufficient. First, EPA's own risk assessment reveals that its reduction of the maximum single application rate still yields risk quotients that vastly exceed levels of concern for bees. Second, a number of the mitigations are voluntary and unenforceable. Third, the mitigations do not address uniquely high risks faced by native bees. Overall, EPA's conclusion that mitigation measures will reduce risk to bees to reasonable levels lacks support.

#### 1. EPA's own analysis proves that its reduction of the maximum single application rate is not sufficient to reduce risk to bees.

EPA's invocation of Syngenta's agreement to reduce the maximum single application rate as a meaningful mitigation of risk to non-target terrestrial invertebrates is belied by the Agency's own analysis. 1-ER-42. As discussed previously, EPA's Final Assessment shows that the final approved maximum single application rate still yields risk quotients that far exceed levels of concern for bees. The Agency did not undertake any recalculation of modeled risk quotients with the Final Decision's new maximum single application rate 0f 0.11 lb ai/A. Instead, EPA wrote in the Final Assessment that because the maximum single rate for foliar applications "has decreased in the final registration, [the Agency's] analysis still covers the modified rates." 2-ER-148 n.41. However, EPA *does* have bee risk quotients for the final, "reduced" maximum single application rate of 0.11 lb ai/A. This is because this same application rate of 0.11 lb ai/A was the highest applied rate in the semi-field studies that EPA considered—and residue data from those semi-field studies featured in EPA's "refinement" of risk quotients. 2-ER-154–55. Yet even the "refined" risk quotients using the final approved maximum single application rate of 0.11 lb ai/A exceeded levels of concern: the highest acute oral risk quotient was 0.79, exceeding the acute level of

concern of 0.4, while the highest chronic oral risk quotient was 56, an order of magnitude higher than the chronic level of concern of 1. 2-ER-155. Accordingly, EPA ignored evidence in its own analyses that undermined any reliance on the final approved application rates to mitigate identified risks.

Ultimately, there is no substantial evidence that Syngenta's modest rate reductions for any use sufficiently reduce risk to bees. While a comparison of Syngenta's registration application and the Final Decision shows reductions in the foliar maximum single application rate for eight crops, these reductions were rarely more than marginal. And, in any event, they were a far cry from the 50 to 80 percent reductions EPA requested of Syngenta, [redacted]

---

9 [redacted]

EPA also claimed that reductions in the maximum annual number of applications and maximum annual application rates mitigated risks to non-target terrestrial invertebrates. 1-ER-42. But the only reductions of these types that EPA approved were for seed treatment uses, which by EPA's own assertion do not mitigate isocycloseram's risks to insect pollinators because the Agency does not expect isocycloseram residues in pollen and nectar from seed treatment. *Compare* 3-ER-488 (use summary in Proposed Decision) *with* 1-ER-7–20 (use summary in Final Decision); *see also* 2-ER-87. Thus, these reductions too failed to substantiate EPA's conclusion.

In sum, EPA itself stated that "reducing application rates is one of the most effective ways to reduce chronic risks" to bees. 3-ER-564. But Syngenta declined EPA's request to meaningfully reduce application rates, and the trivial rate reductions to which Syngenta did agree, between its registration application submission and EPA's Final Decision, demonstrably fail to mitigate unreasonable risk to bees.

#### 2. EPA did not explain the efficacy of its other pollinator mitigation measures, many of which are voluntary and unenforceable.

Aside from the reduction in maximum application rates, EPA enumerated a handful of other mitigation measures that purportedly reduce risk to bees to reasonable levels. However, the mitigation benefits

claimed by EPA are unsubstantiated, and EPA did not endeavor to show its work. There is therefore no substantial evidence in the record that would support EPA's reliance upon them to address isocycloseram's risk to pollinators.

The only mandatory pollinator mitigations prescribed by EPA beyond the maximum application rates concern application timing and spray drift restrictions. Specifically, as to application timing, EPA offered several mitigations that vary by crop group. For orchard crops, including citrus and tree nuts, EPA prohibited applications three days before and during bloom. 1-ER-43, -48. For some "indeterminate blooming crops,"[10] including soybean and cotton, EPA prohibited applications during bloom between 10 AM and 3 PM—purportedly "when pollinators are most active"—unless the application is being made at a time when the temperature at the application site is 50°F or less. 1-ER-43, -48. For other indeterminate-bloom crops, such as cucurbit vegetables, EPA prohibited applications during bloom between two hours after sunrise to two hours before sunset, again, unless the application is being made at a time when the temperature at the

[10] This refers to crops that "bloom "either continuously or intermittently for multiple weeks and/or for most of the crop's growing season or which bloom for longer than four consecutive weeks." 2-ER-180.

application site is 50°F or less. 1-ER-49.[11] As to spray drift, EPA prohibited aerial application for all uses except corn, cotton, soybean, and potato, due to the asserted "significant benefits" of this method of application for these uses, and required applicators to follow several other guidelines including several related to minimum droplet size for spraying and the maximum wind speed permitted for application. 1-ER-42–43, -49–53.

Every other mitigation measure announced by EPA is unenforceable and essentially voluntary. Labels counsel the importance of "clear[ly] communicat[ing] with local beekeepers to help protect bees," mowing understory weeds to limit attractiveness to bees during isocycloseram application, and leaving uncultivated land undisturbed to provide "nesting and forage sites" for ground-nesting bees. *See, e.g.*, 1-ER-48–49. EPA purported to address the risk posed by insect pollinator exposures to abraded seed-coat "dust off" during planting by including voluntary label language advising growers to "[a]void releasing dust that may have accumulated in bags and bulk seed containers during transport" and to

[11] There appears to be a typo in the description of this mitigation in the Final Decision. There, EPA describes this mitigation as follows: "[A]pplication . . . [must be] made between 2-hrs prior to sunset and 2-hrs after to the following sunrise." 1-ER-49. In the corresponding product label, however, the mitigation is written as: "[A]pplication . . . [must be] made between 2-hrs prior to sunset and 2-hrs after the following sunrise." 3-ER-481.

"[a]im to keep any dust in the treated seed bag by not shaking the bags when filling the planting machines." 1-ER-67–68. And some label language is not only unenforceable but appears difficult to follow, such as the suggestion to "avoid planting [treated seeds] if pollinators are foraging downwind." 1-ER-67–68; *see also Nat'l Fam. Farm Coal.*, 960 F.3d at 1139–43 (faulting EPA for failing to acknowledge risk of substantial non-compliance with pesticide label restrictions).

Moreover, EPA never explained the extent of risk reduction that can be expected from any of these proffered mitigations—either on their own or in combination—or to provide a reasoned explanation for how that risk reduction happens. EPA did not attempt to recalculate the sky-high honey bee risk quotients with the reduced exposures it promised due to these mitigations. And some of the compulsory mitigations are demonstrably unsupported by substantial evidence in the data that EPA considered. For example, the at-bloom application timing restrictions for indeterminate-blooming crops diverges greatly from the time of application in a number of the semi-field studies, in which isocycloseram was applied "at nightfall." 2-ER-224–25, -227–28 (describing MRIDs 51229439, 51229440, and 51229442); 1-ER-43, -48–49 (prohibition against application between 10 AM and 3PM, or between two hours after sunrise and two hours before

sunset, for indeterminate-blooming crops). Even taking as true EPA's unsupported conclusion that the semi-field studies showed only "transient" effects on colonies, EPA approved the application of isocycloseram far earlier in the day than the pesticide was applied in the only two studies to apply the final maximum single application rate. 2-ER-224–226. As such, the strength of this timing mitigation is undermined, yet EPA relied on it to mitigate known adverse effects.

Furthermore, EPA admitted that the application timing restrictions for indeterminate-blooming crops have historically been much more restrictive. Whereas in the Final Decision EPA prohibited application between 10 AM and 3PM during bloom for some uses, the Agency admitted that, for past registrations of other pesticides, application has been prohibited between two hours prior to sunrise and two hours prior to sunset for those uses. 2-ER-77. By way of illustration, this means that isocycloseram application on a blooming cotton crop, on a July day in Georgia, historically would be permitted between only 7 PM and 5 AM, a 10-hour application window. Now, that application is permissible between 3 PM and 10 AM, a 19-hour application window. In this example, even the narrower of the at-bloom restrictions for indeterminate-blooming crops that EPA required for isocycloseram—no application between two hours

after sunrise and two hours before sunset—still yields at a 14-hour application window. EPA stated that it expanded the application window to "provide flexibility to growers," 2-ER-77, but the Agency never explained how a 14- to 19-hour application window will suffice to protect bees at the same time.

As to the voluntary mitigation measures, absent substantial evidence providing a reason to believe growers will be able to act on these directives as EPA intends—let alone voluntarily comply with them—EPA's reliance on them as a factor to reduce risk to bees was unfounded. Such uncertain and speculative measures fail to provide substantial evidence supporting EPA's conclusion that the registration of isocycloseram does not cause unreasonable adverse effects to bees.

### 3. The mitigation measures do not account for increased risk to solitary and bumble bees.

Finally, even had EPA shown that the foregoing mitigation measures sufficed to reduce risk to honey bees to reasonable levels—which it did not—the Agency had no basis to assume that the mitigations will suffice to protect solitary and bumble bees as well, given considerable differences in life histories and physiologies between these species.

First, EPA's claim that application timing and spray drift restrictions will sufficiently "reduce exposure to social and solitary *Apis* and non-*Apis*

bees and other pollinators," 2-ER-85, lacks evidentiary support. EPA prohibited some isocycloseram applications between 10 AM and 3 PM because, it asserted, that window captures "peak [pollinator] foraging activity." 2-ER-77. As discussed, the power of this timing mitigation to sufficiently reduce risk to honey bees is already dubious, but it further disproportionately exposes non-*Apis* bees to isocycloseram. While honey bees tend to forage during the day, some non-*Apis* species forage only at dawn or dusk. For example, bumble bees' ability to forage at lower temperatures allows them to forage earlier and later in the day and season than honey bees. 4-ER-709–10; 5-ER-872. Permitting isocycloseram applications between sunrise and 10 AM, and between 3PM and sunset, disproportionately harms these non-*Apis* bees, yet EPA failed to consider their life histories and physiologies in its mitigation findings.

Second, EPA failed to mitigate risks to ground-nesting bees via isocycloseram residues in soil. Ground-nesting bee species, which constitute the majority of bee species, are exposed to pesticide-contaminated soil, unlike honey bees. 4-ER-693; 3-ER-629; 3-ER-627; 4-ER-704–707. Even those non-*Apis* bee species that are not ground nesting tend to use soil or leaf material to construct nests, which can yield uniquely prolonged contact with contaminated residues on treated foliage. 4-ER-

693; 4-ER-704–07. EPA did not analyze the risk from these unique non-*Apis* exposure pathways, so the Agency did not even purport to offer mitigation measures to address them.[12]

For these reasons too, EPA's reliance on mitigations lacks support.

### C. EPA's conclusion that the costs of registration are outweighed by the benefits lacks substantial evidence.

EPA's final rationale for its assertion that the registration of isocycloseram "will not cause unreasonable adverse effects on the environment" is that the costs of registration are outweighed by its benefits. 1-ER-43 (citing 7 U.S.C. § 136a(c)(5)). This conclusion too lacked substantial evidence. EPA failed to explain how it compared isocycloseram's identified benefits to growers against the significant

[12] EPA claimed offhand that, due to the chemical properties of isocycloseram, the insecticide's residues in soil will not be a major route of exposure for ground-nesting bees. EPA's support for this conclusion does not withstand scrutiny. First, EPA claimed that because isocycloseram is classified as only "slightly to hardly mobile in soil," the Agency considers isocycloseram residues "bound to the soil and not a potential source of exposure." 2-ER-81. But "slightly to hardly mobile in soil" is not the same as "immobile" in soil. *See* Food & Agriculture Organization of the United Nations ("FAO") Soil Classification Guidance (cited at 2-ER-123). This, coupled with the fact that isocycloseram is "moderately persistent to persistent" in soil based on a half-life of up to 293 days—and an even longer half-life for several isocycloseram degradates—renders EPA's conclusion that ground-nesting bees will not be exposed to appreciable levels in soil unsupported. 2-ER-125, -127–28. In other words, EPA did not consider that even limited isocycloseram mobility in soil over the course of the better part of a year, or longer, puts ground-nesting bees at risk.

ecological and human health costs of registration. The Agency further overestimated isocycloseram's purported benefits to growers.

EPA's cost-benefit analysis begins with a concession that "risks to non-listed species" remain. 1-ER-43. But the Agency claimed that these risks are "outweigh[ed]" by the "benefits of the registration," including that growers can manage the risk of pesticide resistance, and that this new active ingredient "is an alternative to pesticides that may pose higher risks to human health and/or the environment." 1-ER-43. EPA therefore concluded that the registration "will not cause unreasonable adverse effects on the environment." 1-ER-43 (citing 7 U.S.C. § 136a(c)(5)).

However, nowhere in the record did EPA endeavor to explain how it compared its identified costs and benefits of the registration of isocycloseram. To satisfy its duty under FIFRA to determine whether the benefits of isocycloseram registration outweigh the costs, EPA must have a basis for assessing the pervasiveness, severity, and consequences—*i.e.*, the cost—of each risk from the pesticide's use and from all the risks of concern aggregated together. Only with a full accounting of all costs and benefits can EPA determine whether the documented adverse effects are "unreasonable." 7 U.S.C. § 136a(c)(5).

Far short of that full accounting, the record shows that EPA's cost-benefit analysis featured much more prominent consideration of isocycloseram's asserted benefits to growers. The Agency appears to have considered Syngenta's detailed submissions on the economic costs of pest outbreaks borne by growers, and isocycloseram's asserted efficacy as compared to alternative pesticides. [redacted] 3-ER-543–56 (EPA review of Syngenta's claims of isocycloseram's benefits across crops and pests).

By contrast, nothing in the record indicates that EPA considered the costs—economic, social, environmental, or otherwise—of the increased risk to insect pollinators that EPA concedes will result from the registration of isocycloseram. Insect pollination services yield more than $34 billion in annual economic value for U.S. agricultural crops. 2-ER-296; 4-ER-699. Honey bees alone are responsible for up to $5.4 billion in agricultural productivity. 2-ER-296. "Colony collapse disorder," the phenomenon of substantial and sudden losses to honey bee colonies, has caused severe economic impacts to growers and consumers. *See* Kelsey Ott, *Buzzkill: How the EPA's Inaction Is Killing America's Bees*, 39 Wm. & Mary Envtl. L. &

Pol'y Rev. 401, 402 (2015) ("[I]n California, almond and blueberry farmers must now pay beekeepers double the traditional price per hive for pollination services because of the significantly limited honey bee supply."). In short, the risk to bees from isocycloseram entails significant costs, none of which EPA attempted to quantify.

As to isocycloseram's purported benefits, the record does not support EPA's claim that isocycloseram "is an alternative to pesticides that may pose higher risks to human health and/or the environment." 1-ER-43. During its reduced risk deliberations for corn, peanuts, cotton, soybean, ornamentals, and one other non-agricultural use, EPA compared isocycloseram's toxicity to terrestrial and aquatic invertebrates against the toxicity of alternatives for each of those uses. 3-ER-578–79. For no other uses did EPA conduct such an assessment. However, even just as to corn, peanuts, cotton, soybean, and ornamentals, EPA found that isocycloseram is "more toxic or of similar toxicity to adult bees than 93% of alternatives on an acute contact exposure basis." 3-ER-576. EPA also found that, for aquatic invertebrates, isocycloseram "generally appears to be more toxic than the alternatives except for acute exposure to freshwater invertebrates." 3-ER-575. These comparisons beg the question of how isocycloseram's toxicity to terrestrial and aquatic invertebrates would compare against

alternatives for all the other approved isocycloseram uses. Yet EPA did not consider this information.

Thus, EPA's methodology yielded, on the one hand, a detailed monetization of impacts to growers and, on the other, risk assessments that find numerous risks to the environment but do not indicate the magnitude or "economic, social, and environmental costs" associated with them. 7 U.S.C. § 136(bb). FIFRA requires more. *See Nat'l Fam. Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1138–44 (9th Cir. 2020) (vacating conditional registration of dicamba-based herbicides in part for EPA's failure to consider whole categories of risk in its cost-benefit analysis); *see also Love v. Thomas*, 858 F.2d 1347, 1361–62 (9th Cir. 1988) (faulting EPA for failing to consider economic costs of its pesticide decision). Substantial evidence does not support EPA's assertion in this case that isocycloseram's benefits to growers render the demonstrated risk to pollinators reasonable.

## II. EPA's unlawful decision registering isocycloseram must be set aside.

Because EPA's decision registering isocycloseram is unsupported by substantial evidence in the record, it must be set aside. *Nat'l Fam. Farm Coal.*, 960 F.3d at 1145 ("[T]he absence of substantial evidence to support the EPA's decision compels us to vacate the registrations."). Vacatur is the statutorily prescribed and default remedy under Section 16 of FIFRA, 7

U.S.C. § 136n, and this Court declines to vacate unlawful registration decisions "only in limited circumstances" and "only when equity demands." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal citations omitted); *see also Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016) ("[R]emand without vacatur is a remedy used sparingly in this circuit.").

No rare circumstances exist here that would justify a departure from the normal remedy of vacatur. EPA's decision to register isocycloseram in the absence of substantial evidence demonstrating there will be no unreasonable adverse effect on the environment is a fundamental violation of FIFRA that cuts to the core of EPA's statutory duties. *Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2006 (2026) ("To register a pesticide, EPA must conclude that the pesticide 'will not generally cause unreasonable adverse effects' on human health and the environment.") (quoting 7 U.S.C. § 136a(c)(5)(C), (D)). The "'fundamental flaws' in EPA's analysis are so substantial that it is exceedingly 'unlikely that the same rule would be adopted on remand.'" *Nat'l Fam. Farm Coal.*, 960 F.3d at 1145 (quoting *Pollinator Stewardship Council*, 806 F.3d at 532). By EPA's own assessment, isocycloseram's chronic risks to honey bees exceed the Agency's level of concern by three orders of magnitude, and the pesticide is as or more toxic to bees than 93 percent of alternatives for important crops.

2-ER-105; 3-ER-576. EPA had no substantial basis for dismissing this demonstrated risk. Only with a complete and accurate evaluation of isocycloseram's risk to pollinators and cost to the environment, agriculture, and human health, can EPA fulfil its duty under FIFRA to guard against unreasonable adverse effects. In the meantime, as in *Pollinator Stewardship Council*, "given the precariousness of bee populations, leaving the EPA's registration of [isocycloseram] in place risks more potential environmental harm than vacating it." 806 F.3d at 532.

## CONCLUSION

For the reasons set forth above, Petitioners respectfully ask this Court to vacate EPA's registration of isocycloseram.

Dated: August 21, 2026

Respectfully submitted,

s/Sharmeen Morrison
Sharmeen Morrison
Gregory C. Loarie
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
smorrison@earthjustice.org
gloarie@earthjustice.org

Stephanie M. Parent
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97221
T: (971) 717-6404
sparent@biologicaldiversity.org

Benjamin Rankin
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Ste. 1300
Washington, D.C. 20005
T: (202) 849-8402
brankin@biologicaldiversity.org

George A. Kimbrell
CENTER FOR FOOD SAFETY
2009 NE Alberta St., Suite 207
Portland, OR 97211
T: (971) 271-7372
gkimbrell@centerforfoodsafety.org

*Counsel for Petitioners*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-298

I am the attorney or self-represented party.

**This brief contains** 11,919 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Sharmeen Morrison **Date** August 21, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

## ADDENDUM OF STANDING DECLARATIONS IN SUPPORT OF PETITIONERS' OPENING BRIEF

Tab 1: Declaration of Heidi Carlson ........ ADD-02

Tab 2: Declaration of Brett Hartl ........ ADD-07

Tab 3: Declaration of Adrienne Hudson ........ ADD-17

Tab 4: Declaration of Jess Tyler ........ ADD-22

Tab 5: Declaration of Andrew Wood ........ ADD-34

Tab 6: Declaration of Sylvia Wu ........ ADD-49

# TAB 1

# Declaration of Heidi Carlson

# DECLARATION OF HEIDI CARLSON

I, Heidi Carlson, declare that if called as a witness in this action, I would competently testify of my own personal knowledge as follows:

1. I am a member of the Center for Food Safety (CFS). I joined CFS in 2016 and have been an engaged member for the past 10 years because I am concerned about the detrimental environmental and public health impacts of industrial agriculture. I support CFS's efforts to reduce the harmful effects of pesticides on the environment, wildlife, and public health.

2. I am a resident of Pine City, Minnesota, located in Pine County. I own 5 acres in a rural area surrounded by corn and soybean fields. I care deeply about the environment, and I am a butterfly lover. I purposefully grow pollinator-friendly plants and flowers around my property to attract butterflies and other pollinators. I also maintain a garden, where I grow many different types of fruits and vegetables. I enjoy spending time outdoors and watching wildlife around my property, and I have left most of my property wild to make it a more welcoming habitat for animals. I also own two health food stores where I sell local, organic, and sustainable products including produce, meat, dairy, supplements, and cleaning supplies. I bought the first of these stores in 2014 in Pine City. The other store is in North Branch, Minnesota.

3. I understand that the U.S. Environmental Protection Agency (EPA) has approved the registration of isocycloseram as a new active ingredient, allowing this toxic insecticide to be applied to crops in my area. EPA's decision to approve the registration for isocycloseram directly harms my aesthetic, recreational, personal, and property interests. I grow a variety of fruits and vegetables on my property, including tomatoes, cucumbers, peppers, apple trees, cherry trees, elderberry, service berry, and hazelnut.

4. I eat many of the plants that I grow on my property, and I spend a great deal of time outdoors, working in my garden and enjoying my property. My interest in maintaining my garden and growing fruits and vegetables on my property is directly harmed by EPA's decision to approve the registration of isocycloseram.

5. In addition to growing fruits and vegetables, I care deeply about pollinators (including native bees) and intentionally select plants that will attract pollinators to my property. I have a wild space of native plants behind my house. When selecting plants, I carefully choose ones that will help bees and butterflies, such as milkweed, nasturtium, and other native plants. I enjoy observing pollinators, and I have seen Monarch butterflies visiting the milkweed plants around my property. However, in recent years, I have observed a precipitous drop

in the number of bees, butterflies, birds, and other pollinators that visit my property.

6. In 2025, EPA approved the registration of isocycloseram, allowing the use of this new active ingredient on crops grown near my home. According to the most recent Agricultural Census, approximately 164,801 acres of crops are grown in Pine County.[1] My home is surrounded by agricultural fields, including hay, corn, and soybeans, all of which can be treated with isocycloseram as a result of EPA's challenged registration decision.[2]

7. EPA's decision to approve the registration for isocycloseram also directly harms my ability to grow fruits and vegetables by harming bees and other pollinators that I rely on to pollinate my apple trees and other plants. In addition, the use of isocycloseram in the fields surrounding my house adversely affects the bees, butterflies, and birds in my area, making it more difficult for me to observe and enjoy these species on my property.

8. My personal and aesthetic interests are, and will continue to be, adversely affected by EPA's failure to fully evaluate and mitigate the environmental risks posed by isocycloseram before approving its widespread use,

---

[1] USDA, 2022 Census of Agriculture, County Profile: Pine County, Minnesota, https://www.nass.usda.gov/Publications/AgCensus/2022/Online_Resources/County_Profiles/Minnesota/cp27115.pdf.

[2] USDA CroplandCROS, https://croplandcros.scinet.usda.gov.

which harms plants and wildlife, including bees and other pollinators. I enjoy spending time outdoors on my property and watching wildlife in their natural habitats. I have seen butterflies, rabbits, deer, bears, raccoons, gophers, wolves, coyotes, and lots of different birds in the wild areas around my property. EPA's challenged registration decision directly harms my ability to observe wildlife in their natural habitats because many of these wildlife species depend on insect-pollinated plants and habitats for food and shelter, and isocycloseram adversely affects these pollinators.

9. In sum, EPA's decision to approve the registration of isocycloseram directly harms my personal, property, aesthetic, and recreational interests by allowing the use of isocycloseram on crops grown on neighboring fields, which translates into negative impacts on my garden, the local environment, and local wildlife, particularly native pollinators. The adverse effects of isocycloseram, including harm to pollinators, directly harms the fruits and vegetables grown on my property, as well as my ability to enjoy watching pollinators on my property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2026, in Pine City, Minnesota.

Heidi Carlson

# TAB 2

# Declaration of Brett Hartl

# DECLARATION OF BRETT HARTL

I, Brett Hartl, declare as follows:

1. I am over 18 years of age, have personal knowledge of the matters asserted in this declaration and if called upon to testify would state the same.

2. I have an undergraduate degree in conservation biology from Prescott College, Arizona, and a law degree from Lewis and Clark Law School.

3. I am generally familiar with the EPA's approval of Isocycloseram, this litigation, and the EPA's statutory obligations under the Federal Insecticide, Fungicide and Rodenticide Act and other laws. I am very familiar with the impacts caused by pesticides to this nation's wildlife, ecosystems and biodiversity health. I am familiar with the EPA's ecological risk assessment on Isocycloseram.

4. I have been a member of the Center for Biological Diversity ("Center") since 2013. I started to work at the Center in 2013, starting as the Endangered Species Policy Director, and in 2017 was promoted to Government Affairs Director.

5. Prior to joining the Center, I worked on pesticide policy issues, including addressing the impacts of pesticides on endangered species. For example, in 2011 I was a Knauss policy fellow and worked for the Committee on Natural Resources in the U.S. House of Representatives for the Democratic professional staff and was the lead staffer during several hearings on pesticides that

ultimately led to the charter of a National Academy of Sciences review of pesticide regulatory processes as they apply to endangered species. In addition, I was a coauthor on the 2015 peer-reviewed paper entitled *Risk management decisions for pesticides and threatened and endangered species: The role of uncertainty analysis.*

6. The Center for Biological Diversity is a tax-exempt, nonprofit, membership organization headquartered in Arizona with offices, staff and members across the country. The Center currently has over 101,000 members. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and law. Based on the understanding that the health and vigor of human societies, plants and wildlife, and the natural environment are deeply intertwined, we work to protect and to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these ecosystems, including Center members. The Center's Environmental Health Program focuses on protecting ecosystems, wildlife and people's health from the dangers of dangerous and toxic substances including pesticides. The Environmental Health program works to reduce the threats posed by pesticides through scientific, legal, and policy mechanisms.

7. For example, in 2026 the Environmental Health Program assessed and reviewed over 90,000 pesticide product labels to determine the extent to which the EPA has required any type of cancer warning language to be included on a product label. This analysis determined that the EPA has instituted cancer warnings on only 69 of nearly 5,000 pesticide labels (1.4%) containing an active ingredient that the EPA had already determined was a "likely" human carcinogen.[1] The program has also developed reports and educational materials focusing on people's health assessing the potential harms of pesticides on public drinking water and surface waters.

8. The Center has devoted significant resources on ensuring that EPA approvals of pesticides do not harm biodiversity — including native wildlife, plants and threatened and endangered species. The Center has worked for many years to ensure that the EPA fully complies with the Endangered Species Act when registering pesticides. In addition, the Center has also advocated for the EPA to fully comply with the Migratory Bird Treaty Act, the National Wildlife Refuge Administration Improvement Act, and the public lands management laws when registering pesticides. The Center has worked to reform and improve the use of

[1]"Failure to Warn: EPA's Systematic, Long-term Failure to Warn the Public About Pesticides Linked to Cancer, available at https://biologicaldiversity.org/programs/environmental_health/pdfs/Failure-to-Warn.pdf

pesticides on the nation's national wildlife refuges and in grasshopper control programs conducted by the U.S. Department of Agriculture. These advocacy efforts all focus on reducing harm of pesticides on the nation's wildlife and ecosystems and ensuring that human health concerns are also properly addressed by the EPA.

9. The Center works at the state and local levels as well to better protect the environment and public health from the impacts of pesticides due to continued, systemic failures of the EPA to properly regulate pesticides. This work has included advocating for legislation in California to phase out rodenticides that harm mountain lions, other carnivores, and birds of prey, and in Oregon to pass legislation to restrict the use of neonicotinoid pesticides because of their impacts on pollinators.

10. The Center devotes substantial resources to address the impacts of pesticides on biodiversity, including outreach to our membership through emails, digital content, newsletters, and action alerts informing them about the impacts to wildlife and plants from the EPA's failure to comply with the law when registering pesticides. The Environmental Health Program has worked to educate the public, members of Congress and other policy makers about the risk of forever pesticides — pesticides that contain at least one fully fluorinated carbon atom — such as Isocycloseram. The program devotes significant resources to continue tracking all

approvals of forever pesticides and their potential long-term, persistent impacts on the environment.

11. EPA's decision to approve the registration of Isocycloseram harms the Center's organizational interests in protecting this nation's native biodiversity, its wildlife, native plants and ecosystems, and harms our efforts to ensure that people's health are not impacted by additional forever chemicals, which are known to cause substantial harms to the health of millions of people.

12. The registration of Isocycloseram harms me personally as well. As a result of my education and past experiences working in conservation prior to law school, including working with imperiled wildlife in California, Hawaii and elsewhere, I have developed a deep passion for observing wildlife, specifically mammals and birds. Over the past 25 years, I have routinely traveled around the United States and the world to look for wildlife, thus far observing 785 species of mammals and 4,900 species of birds, including 105 mammal species and 685 bird species inside the United States. I also enjoy searching for other native wildlife including butterflies, amphibians and reptiles during my travels.

13. I enjoy taking photographs and making videos of the wildlife I observe during my travels. I view and share my images and videos with my friends, colleagues and the public, including through my YouTube channel, which has over 3,000 subscribers. My videos have been viewed over 950,000 times on

YouTube, and clips from my videos have been used on television, in documentaries and news stories. I receive advertising revenue from YouTube which I in turn donate to wildlife-focused charities.

14. Scientists estimate that since 1970, the United States bird populations have dropped from approximately 10 billion individuals to 7 billion. I have personally noticed and experienced fewer birds when I go birdwatching compared to my travels a decade or more ago, especially species that primarily or exclusively feed on insects. For example, almost every year I go birdwatching in the spring in the Appalachian mountains of Virginia to look for warblers, including species like Cerulean Warbler, American Redstarts and Ovenbirds among other species. Ten years ago, there were days that I would observe 18-20 species of warblers, but now it is rare to see more than 10-12 species of warblers and the abundance of every species one might observe in a day has declined. While songbirds decline due to a number of factors, the presence of broad-spectrum, wide use pesticides in these species' breeding, wintering and migratory habitats reduces the food available to them, which helps drive further population declines.[2] Cerulean warblers have been

---

[2] *See, e.g.*, Perrot, T., et al., *Declines in insectivorous bird abundance are related to increasing agricultural insecticide use*. Agriculture, Ecosystems & Environment, 407, 110447 available at https://www.sciencedirect.com/science/article/abs/pii/S0167880926002343

a species of concern for many years, with substantial resources being invested to protect their habitats across the hemisphere, yet by EPA failing to properly address the population impacts of pesticides on these species, these types of bird species continue to decline. Below is a photograph of a Cerulean warbler I took in Pennsylvania this year:



15. I have experienced similar declines in the abundance of insectivorous birds elsewhere where I go birdwatching regularly. I first started birdwatching in 2002 in San Diego, the Imperial Valley and southern California. In the early days, it was relatively easy to observe Burrowing Owls in many parts of southern California. These species have declined throughout California and are now a candidate for protection under the California Endangered Species Act. These small

owls are primarily insectivorous and live in agricultural areas of California, but losses of insect populations and pesticides remain one of the main threats to the species. These owls are among my favorite species to photograph:



16. I am concerned that the widespread use of Isocycloseram, and its persistence in the environment, will further the decline of insect populations. This in turn will help further drive down bird populations in many parts of the United States and will impact species I enjoy observing. Declines in bird populations cause me distress and lessen my enjoyment when I am out in nature observing wildlife, which harms my recreational and aesthetic interest in this species.

17. The EPA's failures to assess the full environmental impacts and in particular impacts to native insect populations and the web of life that insect populations support harms my interests in seeing wildlife that I take deep personal satisfaction in observing. A court decision vacating the registration of Iscoycloseram would address the cause of my personal injuries and redress the failures of the EPA to properly protect bird species and their populations that I enjoy observing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this August 17, 2026, in Prescott, Arizona.

Brett Hartl

# TAB 3

# Declaration of Adrienne Hudson

## DECLARATION OF ADRIENNE HUDSON

I, Adrienne Hudson, declare that if called as a witness in this action, I would competently testify to my own personal knowledge as follows:

1. I am a member of the Center for Food Safety (CFS). I joined CFS because I am concerned about the adverse effects of industrial agriculture on public health and the environment. I support CFS's efforts to minimize the significant harms pesticides cause to the environment, wildlife, and public health.

2. I am a resident of Fort White, Florida, located in Columbia County. I own a large property in a rural area surrounded by agricultural fields, mainly corn, soybeans, hay, grass, and peanuts. I care deeply about the environment and animals. I plant pollinator-friendly flowers and plants in my garden to attract pollinators, such as sunflowers, roses, oakleaf hydrangea, mock orange trees, holly trees, and magnolias. I have a large garden where I grow many different types of fruits and vegetables. I enjoy spending time outdoors and watching wildlife around my property.

3. I understand that the U.S. Environmental Protection Agency (EPA) has approved isocycloseram as a new active ingredient, allowing this toxic insecticide to be applied to crops in my area. EPA's decision to approve the registration for isocycloseram directly harms my aesthetic, recreational, personal, and property interests. I grow a variety of fruits and vegetables on my property,

including sweet corn, tomatoes, cruciferous vegetables, squash, nectarines, apples, and peaches.

4. I spend a lot of time outdoors on my property, working in my garden and enjoying nature. I eat a number of the plants that I grow on my property, such as the fruits and vegetables listed above. My interest in maintaining my garden and growing fruits and vegetables on my property is directly harmed by EPA's decision to approve the registration of isocycloseram.

5. I care a lot about the welfare of pollinators, including native bees, and I am careful to choose plants that will attract pollinators to my property. I am aware that bees and butterflies are attracted to sunflowers, roses, oakleaf hydrangea, mock orange trees, holly trees, and magnolias, so I like to plant those in my garden. I have seen bees, fireflies, butterflies, and hummingbirds visit the plants around my property, and I love watching them when they visit.

6. In 2025, EPA approved the registration of isocycloseram, allowing the use of this new active ingredient on crops grown near my home. According to the most recent Agricultural Census, approximately 90,000 acres of crops are grown in Columbia County.[1] My home is surrounded by agricultural fields, including hay,

---

[1] USDA, 2022 CENSUS OF AGRICULTURE, COUNTY PROFILE: COLUMBIA COUNTY, FLORIDA, https://www.nass.usda.gov/Publications/AgCensus/2022/Online_Resources/County_Profiles/Florida/cp12023.pdf.

corn, and soybeans, all of which can be treated with isocycloseram as a result of EPA's challenged registration decision.

7. I rely on bees and other pollinators to pollinate my apple trees and other plants in my garden. EPA's decision to approve the registration for isocycloseram directly harms my ability to grow fruits and vegetables by these harming bees and other pollinators. I have noticed that my garden does better when I see more bees, butterflies, and other pollinators visiting. Because isocycloseram harms local pollinator populations, my garden is directly harmed by EPA's registration decision. Moreover, the use of isocycloseram in the fields surrounding my house adversely affects the bees, butterflies, and birds in my area, which means fewer of these species will visit my property, making it more difficult for me to enjoy them.

8. EPA's decision to approve isocycloseram, a PFAS insecticide, also directly harms my personal and property interests because we rely on a well for our water, and I fear that the use of isocycloseram on nearby crops will contaminate the shallow Floridan aquifer, and in turn, our water supply and health.

9. EPA's decision to approve the registration of isocycloseram directly harms my personal, property, aesthetic, and recreational interests. The use of isocycloseram on cropland around my home will adversely affect my garden, the local environment, and local wildlife. I am directly harmed by isocycloseram's

adverse impacts on the native pollinators where I live, as I enjoy watching these creatures when they visit my property, and I rely on them to pollinate the fruits and vegetables in my garden. I am also concerned that isocycloseram may contaminate my drinking water supply and damage my health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2026.

Adrienne Hudson

Adrienne Hudson

# TAB 4

# Declaration of Jess Tyler

**DECLARATION OF JESS TYLER**

I, Jess Tyler, declare that if called as a witness in this action, I would competently testify to my own personal knowledge as follows:

1. I have been a member of the Center for Biological Diversity (CBD) since 2019. I am also a staff scientist with CBD's Environmental Health Program. Much of my work involves studying insects that are at risk of becoming extinct due to use of pesticides, loss of habitat, and other threats. In addition to my work, I rely on and support CBD's efforts to reduce the use of pesticides to protect my life-long, personal, educational, recreational and aesthetic interests in insects and flowering plants.

2. I have a Bachelor of Arts degree in Philosophy from Montana State University and a Master of Science in Environmental Science from Portland State University. I cultivated a deep appreciation for and an interest in bees when I was in graduate school. Learning about their physiology, evolution, social behavior, cognition, and other aspects of their biology is of great personal and professional interest to me. For my Master's thesis research titled "Effectiveness of Pollinator Enhancements in Portland Community Orchards", I surveyed pollinator communities in Portland, Oregon at community orchards and gardens for the effects of insect and plant diversity on crop yields. Sites with greater plant diversity had greater numbers and varieties of pollinator species. Fruit trees bloom

early in the spring and are pollinated by certain ground nesting or honey bees. The later blooming plants did not impact yield, however, they sustained the pollinator community writ large.

3. I currently live in Glenwood Springs, Colorado where I have a community garden plot where I grow vegetables and flowers. This year the bees really enjoyed the larkspur that had volunteered in the garden.

4. As part of my professional work, I have studied in-depth seven native insect species that are at risk of extinction including the: American bumble bee, variable cuckoo bumble bee, Suckley's cuckoo bumble bee, Southern Plains bumble bee, Bethany Beach firefly, San Joaquin tiger beetle and the bleached sandhill skipper. I developed citizen petitions to list these species for protection under the Endangered Species Act. To develop these petitions, I reviewed scientific literature about their threats, consulted with other experts that have surveyed for species, including with the Xerces Society, and assessed observed population trends to connect credible evidence of declining populations with credible evidence of threats across their range. As a result of my listing petitions, the Fish and Wildlife Service has proposed to list Bethany Beach fireflies, Suckley's cuckoo bumble bees, and bleached sandhill skippers. None of these species have been fully protected by the Endangered Species Act. I have also contributed to efforts to rediscover the endangered, and potentially extinct,

Franklin's bumble bee for four years (2021-2024) in the mountains near Ashland, Oregon. I have also contributed scientific comments to the Fish and Wildlife Service regarding the designation of critical habitat for the rusty-patched bumble bee as well as comments on other federal actions that could harm vulnerable insect pollinators.

5. In my personal time, I continue educating myself on pollinators and how to best support them. I earned a Pollinator Steward Certification from the Pollinator Partnership, a national organization that promotes the health of pollinators through conservation, education, and research. As part of the training, I completed several educational and service requirements. I participated in a series of educational webinars about pollinator biology and how to support them. In June of 2026, I planned and installed 560 square feet of pollinator habitat at my mother's house in Billings, Montana. I installed twenty-five plant species native to Montana prairie and Rocky Mountain ecosystems, including shrubs, forbs, and grasses. Some of the pollinator-attractive plants were milkweed, black-eyed Susan (rudbeckia), purple prairie clover, penstemon, fireweed, native currant, and blue flax. Also, as part of this certification program, on July 12, 2026, I facilitated an outreach event at the community garden in Glenwood Springs, CO. At the event, I provided information to the public about the importance of pollinating insects and how to support them and answered questions.

6. While living in Portland, Oregon, in my personal time, I was a member of the Oregon State University Master Melittologist Program, where I learned more about the biology and life history of the bees of Oregon and conducted surveys for bees and submitted specimens to OSU for verification. I am currently at the Journey level, which means I have developed skills to assign species-level taxonomic determinations for many native bees. I intend to complete the Master level as I am able and intend to travel to Oregon in the future to conduct additional survey work required by the program.

7. I also volunteer my personal time with the Xerces Society Bumble Bee Atlas doing field surveys using catch-photograph-release methods to document bees. I have completed surveys in Fergus, Judith Basin and Stillwater counties in Montana as part of the Montana Bumble Bee Atlas. In June of 2026, I did a bumble bee survey in Judith Basin County on a native prairie remnant that is surrounded by cropland. I recorded three bumble bee species and 30 flowering plant species, including a patch of wild strawberries. This location is not far from where I grew up on my family's farm near Moore, Montana, which I had already surveyed for bumble bees.

8. Growing up on a farm influenced my chosen career path. My early connection to the environment informed my understanding of the effects of intensive, industrial agriculture on our environment. Part of my mission in life and

in my career is to work to make agriculture more sustainable. I am particularly concerned about the short-term and long-term effects of pesticides to soil health and to broader environmental health. Pesticides like isocycloseram where the ultimate breakdown product is a forever chemical is particularly concerning to long-term environmental health, and, therefore, of concern to me.

9. I have recreational interests in native pollinators and their habitats. My recreation activities often involve looking for bees on flowers whether it's while walking my dogs, hiking, or when I am on vacation. I travel regularly around the western United States and I often plan to visit places to observe the bees and other pollinators there. I return to Montana at least twice a year to visit family and while I am there I will look for native pollinators on the family farm and elsewhere. In the near future, I plan to visit the American Prairie Reserve lands in north central Montana to look for pollinators and the flowers they depend on to live. My travels also include regular trips to northern Idaho. I have visited Schweitzer Mountain Ski Resort the last several years where I have looked for bumble bees and other pollinators. I traveled there during the last weekend of July 2026 and looked for bees and the flowers they rely on.

10. I have aesthetic interests in pollinators and flowering plants. I find their colors, shapes, and behaviors on flowers beautiful and interesting. I am an amateur photographer, and I enjoy taking close up ("macro") photos of pollinators

and flowers. I took this first photo of a bumble bee (*Bombus sp.*) visiting a coral bells (*Heuchera cylindrica*) flower with mountains in the background on September 20th, 2022 on Schweitzer Mountain in Idaho.



I took this second photo of four bees (family Halictidae) visiting a bull thistle (*Circium vulgare*) on June 27th, 2020 at my family's farm in Judith Basin County, Montana.



I took this third photo of an American bumble bee (*Bombus pensylvanicus*) visiting prince's plume (*Stanleya pinnata*) on July 17th, 2025 at the Southern Plains Land Trust preserve in southeastern Colorado.



11. Pollinators are a symbol of mutually beneficial relationships in the natural world that people can take lessons from. Bees and many flowers coevolved together such that they thrive best when they cooperate and there is a diversity of flowers and bees. Humanity, too, thrives best when we cooperate with a diversity of plants and animals. Over-reliance on a single pollinator such as honey bees or on pesticides to kill pests leaves us vulnerable to erratic weather conditions and pest outbreaks. I want us to be on a path to a more sustainable agricultural system and that means appreciating and improving our mutually beneficial relationships

with the little animals that help make our food. If we support pollinators, we support ourselves.

12. I am aware that the U.S. Environmental Protection Agency (EPA) registered isocycloseram as a new insecticide active ingredient. I know that EPA determined that isocycloseram is highly toxic to insects (terrestrial invertebrates), except mollusks. EPA approved isocycloseram for use on just about every agricultural crop, including seed and foliar spray treatments, as well as turf, Christmas trees, and residential and commercial uses in the lower 48 states. The EPA-approved uses that may occur in the places I enjoy observing, studying, and photographing insect pollinators and flowers. Potential bumble bee survey sites in Montana, such as where I surveyed in June of 2026, are surrounded by fields where isocycloseram could be used as a seed treatment on small cereal grains, rapeseed, or dried peas. My apartment building in Glenwood Springs has large areas of turf where isocycloseram could be applied. The isocycloseram on the turf would end up in my apartment brought in on my shoes or drift or runoff from the lawn could contaminate semi-natural areas nearby and harm pollinators in the area where I live. Individuals at my community garden, or I may unknowingly purchase vegetable starts that come from nurseries that treat their plants with isocycloseram. Contaminated nursery plants may harm pollinators at the community garden. Drift and runoff from Christmas tree farms and nurseries could contaminate natural

areas in Oregon and elsewhere in areas where declining species like Suckley's cuckoo bumble bee may be present. On a professional level, isocycloseram applications to corn, soy, and in residential and commercial settings could harm the listed rusty-patched bumble bee within its critical habitat and elsewhere in its range. The EPA has not provided adequate general label mitigations or mitigations within pesticide use limitation areas needed to protect the rusty-patched bumble bee. These uses will result in unreasonable adverse effects to the "non-target" insects that I enjoy.

13. EPA's decision to approve these uses of isocycloseram directly harm my personal, professional, scientific, educational, aesthetic, and recreational interests in insects and the flowering plants, including my plants I grow for food, that rely on insects for pollination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this August 16, 2026 in Glenwood Springs, CO.

______________________________

Jess Tyler

# TAB 5

# Declaration of Andrew Wood

**DECLARATION OF ANDY WOOD**

I, Andy Wood, declare that if called as a witness in this action, I would competently testify to my own personal knowledge as follows:

1. I am over eighteen and currently reside in Hampstead, NC, where I have lived for 24 years. I live and work in the lower Cape Fear River basin located in the coastal plain of southeast North Carolina.

2. I have been a member of the Center for Biological Diversity since 2010. The Center is a non-profit organization committed to the preservation, protection, and restoration of native species and the ecosystems upon which they depend. As a member of the Center, I respond to action alerts and keep up with its North Carolina activities.

3. I rely in part upon the Center to represent my interests in protecting native and endangered species and their habitat. I appreciate the work the Center's Environmental Health Program has taken on to protect native species, including people, from pesticides, such as this lawsuit. For example, I supported the Center's successful challenge to the U.S. Fish and Wildlife Service's biological opinion on the effects of the insecticide malathion.

4. I have a Bachelor of Science degree in Wildlife Management from Texas A&M University (1981). From 1987-2000, I served as the Curator of Education for the North Carolina Aquarium at Fort Fisher and subsequently

worked for 11 years as the Education Director for Audubon North Carolina. I am now director of the Coastal Plain Conservation Group, a North Carolina non-profit organization established to provide environmental education, ecosystem research and habitat management, with special attention to protecting native species in southeastern North Carolina's longleaf pine, pocosin, and bottomland swamp forests.[1]

5. I am also Conservation Biologist with Habitats Gardens, LLC, an environmental conservation consulting company that provides services to business and industry involved in developing and maintaining our built environments and the infrastructures that support them. In addition to my professional career, I have provided nature commentaries for public radio station WHQR for more than 25 years, which were compiled into the book "Backyard Carolina: Two Decades of Public Radio Commentary" published in 2006.[2]

6. Part of my work has involved research into pollution and its impacts on wildlife. For example, from 2008-2012, I led an exhaustive study funded by the National Oceanic and Atmospheric Administration of derelict fishing gear with emphasis on impacts of ghost crab pots on diamondback terrapin (*Malaclemys terrapin*), a small saltmarsh turtle. One of my first assignments in the

[1] Coastal Plain Conservation Group, https://coastalplainconservationgroup.org
[2] https://www.whqr.org/people/andy-wood

environmental field in 1970 helped document pollution from a chemical plant discharging raw waste into a Connecticut stream. Currently, I am researching the impacts of a proposed wastewater treatment plant in rural Pender County, NC, that will discharge up to one million gallons of "treated" wastewater into an ephemeral stream that borders Holly Shelter Game Land, a public trust property owned and managed by the NC Wildlife Resources Commission. I am focusing on 1,4-dioxane and the synthetic "forever chemicals," PFAS (per- and polyfluoroalkyl substances), that will inevitably be in the wastewater stream because the plant's filtering system does not remove such compounds.

7. Since 1992, I have also led research and protection efforts to prevent the extinction of imperiled species of aquatic invertebrates and in particular freshwater snails once found in streams and beaver ponds in southeastern North Carolina. Specifically, I have studied and worked to protect the last living members of two freshwater species of snails: the magnificent ramshorn (*Planorbella magnifica*) and a related species called the Greenfield ramshorn (*Helisoma eucosmium*). My work studying and protecting some of the last known populations of these two snails has been recognized by the United States Fish and Wildlife Service for its importance in saving the species from extinction. [3]

---

[3] One Man's Mission to Save a Magnificent Mollusk, Sarah McRae, U.S. Fish and Wildlife Service, https://www.fws.gov/endangered/news/episodes/bu-Spring-Summer2014/story1/index.html

8. Currently, as part of my work with the Coastal Plain Conservation Group, I am conducting research on a number of species that will be adversely affected if exposed to isocycloseram. I am studying the pollinating role of swallowtail butterflies with regards to Pine Lily (*Lilium catesbaei*), a showy flower in the Lily family, in decline throughout its range due to loss of moist pine savannas. Of special interest to me is the population dynamics involving Palamedes Swallowtail (*Papilio palamedes)*, a large butterfly whose wings transfer male flower pollen to the female stigma. Due to its toxicity to all insects, use of isocycloseram is of particular concern to me and its use will harm my interests studying and conserving the Pine Lily and its pollinator the Palamedes Swallowtail. Below is a photo I took of a Palamedes Swallowtail on a Pine Lily on July 30, 2026 in New Hanover County, NC.



9. I also have been studying insect communities in longleaf pine flatwood habitats supporting rare plant species that require specific insect species for flower pollination and reproduction, including management of an isolated population of Federal Endangered Cooley's Meadowrue (*Thalictrum cooleyi*). Cooley's Meadowrue is currently imperiled by adjacent forest conversion to constructed development. Use of isocycloseram may lead to decline of this plant's pollinators, thereby harming my interests in it and making it more difficult to conserve.

10. In addition to my professional interests, I have deep personal appreciation for all wildlife. I have recreational and spiritual interests in native plants and wildlife that may be harmed by use of isocycloseram. I have explored many areas of the Cape Fear River basin, including much of the intact bottomland swamps extending from the piedmont to the coast, where I personally enjoy observing all wildlife and plants and often photograph them when I am able. I intend to continue visiting these areas in the future for my personal enjoyment and professional work. I have particular interests in the Rare Skipper (*Problema bulenta*), Swallow-tailed Kite (*Elanoides forficatus*), Mississippi Kite (*Ictinia mississippiensis*), and Prothonotary Warbler (*Protonataria citrea*).

11. The Rare Skipper is a small, orange butterfly that inhabits tidal freshwater marsh habitat supporting pickerelweed (*Pontederia cordata*), a wetland plant this butterfly uses as a nectar source for food. I have not yet observed a Rare Skipper alive in the wild, although I hope I will in the future. I search for them in pickerelweed colonies located in and around the Navassa railroad bridge over Cape Fear River, where the species has been observed in the past, and in pickerelweed colonies located in the lower reach of Northeast Cape Fear River, and I plan to continue do so in the future. I have a lifelong interest in entomology and a passion for butterflies, descending from two generations of entomologists, including my late father. I also search for the Rare Skipper to collect data of presence or absence

for the North Carolina Museum of Natural Science, the North Carolina Natural Heritage Program, and the North Carolina State University Insect Museum. Approved uses of isocycloseram include broadcast application to turf grass lawns and ornamentals in and around residential properties, which poses a threat to the Rare Skipper because recent developments have encroached into and are adjacent to habitats in the lower Cape Fear River basin where the presence of rare skipper has been confirmed. As an insect it will be directly harmed by use of isocycloseram if exposed to it, killing or harming individuals. The Rare Skipper is already rare; any loss of individuals due to isocycloseram harms my interests in searching for them and, hopefully, observing them.

12. Swallow-tailed Kites are stunning to watch gliding through the sky, moving with flicks of their forked tails. I enjoy observing their movements and taking photos, and I will continue to do so. They are migratory birds of prey that specialize in catching and eating flying insects, especially dragonflies and beetles. Swallow-tailed Kites are renowned for "kiting" over turf farms and other open crop fields where dragonflies are often found. My personal recreational and spiritual interests in them will be harmed by use of isocycloseram because their prey will be diminished, thereby harming my ability to enjoy their kiting in open areas. This is a photo I took of a Swallow-tailed Kite devouring a dragonfly while flying over a turf grass crop field in Pender County near Willard, North Carolina

on 6 May 2025.



13. Mississippi Kites are similar to Swallow-tailed Kites, in that I love to watch them soar through the air seeking flying insects for food, such as moths and bees, and I will continue to seek opportunities to do so. Mississippi Kites are now near year-round residents in North Carolina's southern coastal plain, a region where various kinds of turf grass are commercially grown as a farm crop. Several thousands of turf farm acres are currently in production, and this has created an unnatural ecological draw for birds specializing in hunting and eating large flying insects that use large open fields to hunt their smaller insect prey. These turf farms are established in rural counties of southeast North Carolina including, but not

limited to, Bladen, Brunswick, Columbus, Pender, and Onslow. Isocycloseram use will likely become widespread throughout this region, causing harm to insect-eating birds, such as the Mississippi Kite, due to loss or diminishment of prey. This in turn will harm my ability to observe and enjoy Mississippi Kite.

14. The Prothonotary Warbler is a striking gold and blue-gray songbird that I take pleasure in seeing in the wild and will continue to do so. Protonotary Warblers eat primarily insects throughout the year, especially caterpillars (larvae) of butterflies and moths, along with flies, beetles, and mayflies. Use of isocycloseram will kill non-target insects that this bird depends on, thereby harming my interests in being able to observe and photograph them. Below is a photo I took of a Prothonotary Warbler on May 14, 2026, in northeast New Hanover County, NC, just as it was flying off to collect moss for its nest under construction.



15. I am aware that agricultural activities negatively affect many native wildlife species. Agricultural activities have led to the conversion of natural habitat and resulted in elevated nutrient and pesticide levels in soils, streams, and ground water, from runoff or infiltration of manure, fertilizer, or pesticides. I know that EPA approved use of isocycloseram on most agricultural crops, plus turf/sod, nurseries and Christmas trees. Corn, soy, wheat, cotton, peanut, and Christmas trees are major crops in North Carolina where I live, conduct my research, and recreate. The pesticides, specifically isocycloseram, used on those crops can harm wildlife. I am concerned with the amount of pesticides used in North Carolina and the negative effects it has on wildlife.

16. I am concerned about and harmed by the negative impacts of pesticides, including this new insecticide isocycloseram, on native wildlife, their prey, and their habitats. Pesticides pose an insidious and often poorly understood threat to people, wildlife, and the habitats we share. Many pesticides are used without full understanding of their long-term impacts.

17. This new pesticide isocycloseram is, at a minimum, another broad-spectrum invertebrate neurotoxin and threat to non-target species, including those I study and enjoy recreationally and spiritually. I reviewed EPA's assessment and did not find a sound basis for EPA's conclusion about isocycloseram's persistence in the environment. EPA believes isocycloseram is not a PFAS, i.e., "forever chemical."[4] Whether that is accurate or not, it does not appear that EPA has considered the potential for isocycloseram to combine with other PFAS compounds to form new, unintended compounds in the environment. For example, pesticides have been proven to have endocrine disrupting impacts on wildlife and people, especially when different pesticides are used in the same area or mix in a waterbody such as a retention pond, river or lake. What we know for certain is that, as an insecticide, isocycloseram will harm "non-target" insects, including those that many birds rely upon for food and plants rely upon for pollination.

[4] I also appreciate the Center's work informing the public that EPA uses a different definition for forever chemicals than the widely accepted scientific definition. . https://tinyurl.com/h8jxhtaf

18. In the future, I will continue to seek out opportunities to observe native wildlife in North Carolina, including species such as the Rare Skipper, Swallow-tailed Kite, Mississippi Kite, and Prothonotary Warbler. My work as a conservation educator requires me to explore and observe habitats and the plants and wildlife they support in many areas in North Carolina, to help me write articles for popular and scientific journals, along with educational programs for other media including television and radio. I also lead outdoor explorations for organized groups to introduce people to the habitats and ecosystem services they provide to the benefit of people, plants and wildlife. In short, my livelihood depends on having access to intact and healthy habitats that support wild species in their natural environments, and I plan to continue visiting those natural areas in North Carolina for personal and professional benefit.

19. As an ecologist, I believe people have a responsibility to minimize our negative impacts on the environment, and when our activities are shown to be detrimental to the environment we inhabit, it is an ethical responsibility for people to correct the problems we create.

20. My spiritual connection to the environment is very personal. I have spent a lifetime exploring the natural world around me as a source of wonderment and knowledge. When species or habitats are negatively impacted or lost, I feel the loss as a librarian might feel the loss of a book, or a reader might feel the loss of a

chapter. Regardless of considerations pertaining to a Creator, as a species itself, thinking, sentient humans are smart enough to know we must protect the integrity of our planet's natural systems if we hope to survive into the future.

21. I find joy in knowing that I share this planet with species such as the Rare skipper, Swallow-tailed Kite, Mississippi Kite, and Prothonotary Warbler. When I see one in the wild, I know I am moved, in both a scientific and spiritual manner. As a conservation educator working to introduce people to nature outdoors, my programs are highlighted and made more meaningful when my program participants observe this wildlife.

22. I believe humans are the single greatest change agent in respect to habitats and the ecosystem services they provide to our benefit. I believe the future of humanity is tied to the future of biodiversity because we are at the top of all major multi-trophic ecosystem food chains. We depend on wild plants and animals for our continued survival; in contrast, few, if any, wild species are inextricably dependent on humans for their survival. Protecting the health and well-being of ecosystems and the plants and animals that inhabit them is only a moral obligation if we have a moral obligation to protect humanity. All species are an essential part of this biodiversity.

23. As someone who is deeply concerned about the fate of native wildlife and our own species, I am saddened and upset that EPA has approved

isocycloseram without fully taking into account the negative effects on native wildlife and plants. I believe that the EPA has a regulatory responsibility to investigate impacts of pesticides to the fullest of their abilities.

24. In sum, I have professional, aesthetic, spiritual, and scientific interests in the Rare skipper, Swallow-tailed kite, Mississippi Kite, Prothonotary Warbler, Pine Lily and its pollinator the Palamedes Swallowtail, Cooley's Meadowrue, and other native birds and insects where I live. My interests are harmed by the Environmental Protection Agency's failure to fully consider the adverse impacts of the registration of isocycloseram on these species. If EPA had acted in accordance with the science, EPA may not have registered this pesticide in the first place, or it could have resulted in protective measures aimed at reducing impacts of pesticides on native wildlife and plants, which is important to ensure that my interests in the species are preserved and remain free from injury, as well as ensuring the interests of human health are considered and held to account.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 19, 2026 in Hampstead, NC.

ANDY WOOD

Andy Wood

# TAB 6

# Declaration of Sylvia Wu

# DECLARATION OF SYLVIA WU

I, Sylvia Wu, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am the co-executive director of the Center for Food Safety (CFS). I submit this declaration in support of Petitioners' Opening Brief in this matter.

2. CFS is a nationwide, public interest organization that is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code and has fewer than 500 employees. CFS has offices in Washington, D.C.; San Francisco, California; and Portland, Oregon. CFS represents over a million members in every state throughout the country. CFS and its members are and will continue to be adversely affected by EPA's decision to approve the registration of isocycloseram.

3. CFS was founded in 1997 to protect and promote its staff and members' right to safe food and the environment. Since its inception, CFS's mission has been to protect human health and the environment from the harmful impacts of industrial agriculture, including the decline of pollinators and other beneficial invertebrates caused by toxic pesticides. CFS works to achieve its mission by challenging the adverse public health and environmental effects of industrial agriculture, and promoting organic, ecological, and sustainable alternatives.

4. As part of its broader mission, one of CFS's flagship programs has always been addressing the adverse environmental, health, and socioeconomic impacts of pesticides. CFS has multiple staff—scientific, policy, and legal—that work on this program.

5. CFS uses multiple tools to achieve its mission, including science-based policy advocacy, public education, grassroots outreach, and groundbreaking legal action. For example, CFS disseminates a wide array of informational materials to government agencies, lawmakers, nonprofits, and the general public regarding the effects of industrial food production, agricultural products, and pesticides, on human health and the environment. These educational and informational materials include, but are not limited to, news articles, policy reports, white papers, legal briefs, press releases, newsletters, product guides, action alerts, and fact sheets. CFS often has provided expert testimony to policymakers on the potentially harmful agrichemical impacts associated with industrial monoculture cropping systems, including the increased use of pesticides and chemical fertilizers.

6. Staff members regularly monitor the Federal Register and submit comments to EPA and other regulatory agencies via the public notice-and-comment process. CFS also regularly sends out action alerts to its members, encouraging them to participate in the notice-and-comment process, or to submit

letters to government officials related to the oversight of industrial agriculture, pesticide use, genetically engineered crops, and other issues affecting CFS's mission to build a sustainable food system. In June 2025, CFS submitted comments on EPA's proposed registration of isocycloseram, which raised several substantive concerns about EPA's assessment of the potential environmental and public health risks, mitigation measures, and perceived benefits (Docket No. EPA-HQ-OPP-2021-0641-0006).

7. When necessary, as here, CFS also engages in public interest litigation to address the harmful effects of pesticides on its members and the environment. As a party to this proceeding, CFS seeks to vindicate its members' interests that are, and will continue to be, adversely affected by the EPA's decision to approve the registration of isocycloseram.

8. As demonstrated in the individual CFS member declarations (filed concurrently), CFS members include farmers, gardeners, and conservationists who live in rural areas where isocycloseram will be applied to crops as a result of EPA's challenged registration decision. These members rely on pollinators, including native bees and butterflies, to pollinate their gardens, and the use of isocycloseram on nearby fields will harm these insects.

9. CFS members also have recreational, aesthetic, and personal interests in maintaining biodiversity and protecting sensitive species. These individuals

enjoy observing wild butterflies, bees, and other pollinators where they live. EPA itself acknowledges that isocycloseram is very highly toxic to bees and has been approved for many agricultural and non-agricultural uses across the country. EPA's decision to approve the registration of isocycloseram will thus harm CFS's conservationist members' aesthetic, cultural, recreational, and personal interests in pollinators, particularly native pollinators that support local ecosystems.

10. In sum, EPA's decision to approve the registration of isocycloseram harms CFS's organizational interests in protecting rural communities, public health, and the environment from the adverse effects of this pesticide. In addition, EPA's challenged decision harms the vocational, environmental, aesthetic, recreational, property, and personal interests of CFS's members.

11. CFS and its members' injuries would be redressed by a favorable ruling from this Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 17, 2026, in Berkeley, CA.

Sylvia Wu
Co-Executive Director