No. 26-298

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY
and CENTER FOR FOOD SAFETY,
Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
Respondents,

SYNGENTA CROP PROTECTION, LLC,
Respondent-Intervenor

Petition for Review of Action of the U.S. Environmental Protection Agency

# ANSWERING BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY (REDACTED)

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
BENJAMIN HAYES
*Deputy Assistant Attorney General*
ALVAND D. GHANDHARI
*Trial Attorney*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-3338
alvand.ghandhari@usdoj.gov

Of Counsel:
Forrest Pittman
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

GLOSSARY .......... vii

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 3

PERTINENT STATUTES AND REGULATIONS .......... 4

STATEMENT OF THE CASE .......... 4

I. Statutory background .......... 4

II. Factual Background .......... 5

A. Isocycloseram's effects and uses .......... 5

B. FIFRA registration process .......... 6

1. Syngenta application to register isocycloseram .......... 6

2. EPA's review of Syngenta's registration application .......... 8

a. Tier 1 review of effects on bees .......... 9

b. Tier 2 review of effects on bees .......... 12

c. EPA revokes its reduced-risk assessment .......... 14

d. EPA's discussions with Syngenta about rate reduction .......... 15

C. Proposed and final registration .......... 15

SUMMARY OF ARGUMENT .......... 17

STANDARD OF REVIEW ....................20

ARGUMENT ....................22

I. EPA's assessment of pollinator risks supports the Registration. ....................22

A. EPA refined conservative screening estimates with measured exposure and colony data. ....................23

B. EPA performed a robust analysis of the risks to pollinators. ....................24

1. EPA is afforded flexibility in determining the data required to assess environmental risk. ....................25

2. EPA reasonably considered the Tier 2 studies in assessing risk to pollinators. ....................29

3. EPA reasonably applied the honeybee data to assess risks to bumblebees and solitary bees. ....................38

a. Bumblebees ....................38

b. Solitary bees ....................42

C. The earlier reduced-risk determination does not undermine EPA's later risk assessment. ....................45

II. EPA's mitigation measures and risk-benefit analysis support the Registration. ....................47

A. EPA adequately determined that the mitigated risks were not unreasonable in light of the benefits. ....................48

B. EPA reasonably determined that isocycloseram's benefits outweighed its remaining risks. ....................55

III. If the Court finds legal error, the appropriate remedy is remand without vacatur. ....................61

CONCLUSION ....................62

## TABLE OF AUTHORITIES

Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .......... 62

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) .......... 45

*Arkansas v. Oklahoma*,
503 U.S. 91 (1992) .......... 21

*Ass'n of Pac. Fisheries v. EPA*,
615 F.2d 794 (9th Cir. 1980) .......... 57

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .......... 22

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .......... 62

*CBD v. EPA*,
851 F. App'x 718 (9th Cir. 2021) .......... 22

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 21

*Lands Council v. McNair*,
629 F.3d 1070 (9th Cir. 2010) .......... 22

*Latino Issues F. v. EPA*,
558 F.3d 936 (9th Cir. 2009) .......... 21

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 21

*Nat. Res. Def. Council v. EPA*,
735 F.3d 873 (9th Cir. 2013) ....................................................................20

*Nat'l Fam. Farm Coal. v. EPA*,
966 F. 3d 893 (9th Cir. 2020) ....................................................................4

*Nw. Food Processors Ass'n v. Reilly*,
886 F.2d 1075 (9th Cir. 1989) ....................................................................20

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .................................................................. 18, 44

*United Farm Workers of Am. v. EPA*,
592 F.3d 1080 (9th Cir. 2010) ....................................................................20

Statutes

7 U.S.C. § 136(bb) ....................................................................56

7 U.S.C. § 136(bb)(1)....................................................................48

7 U.S.C. § 136(bb)(2)....................................................................5

7 U.S.C. § 136(p) ....................................................................4

7 U.S.C. § 136a(a)....................................................................4

7 U.S.C. § 136a(c)(5) ....................................................................1, 4

7 U.S.C. § 136a(c)(10)(B)....................................................................46

7 U.S.C. § 136n(b) .................................................................... 20, 55

7 U.S.C. § 136w-8....................................................................46

7 U.S.C. § 136w-8(b)(3) ....................................................................8

7 U.S.C. § 136w-8(f)(4)(B)(iv)(III) ....................................................................7

7 U.S.C. § 136w-8(f)(4)(B)(i)(II)(bb)....................................................................7

Regulations

40 C.F.R. pt. 158 ....................................................................25

40 C.F.R. § 158.1(a) .......... 25

40 C.F.R. § 158.1(b)(3) .......... 25

## GLOSSARY

| | |
|---|---|
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| FFDCA | Federal Food, Drug, and Cosmetic Act |
| lb. a.i./acre | pounds of active ingredient per acre |
| $LD_{50}$ | Lethal Dose 50% (dose causing 50% mortality) |
| OECD | Organisation for Economic Co-operation and Development |
| EPPO | European and Mediterranean Plant Protection Organization |

# INTRODUCTION

This case concerns EPA's registration of isocycloseram, an insecticide that controls damaging pests on crops and other plants. Under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), EPA "shall" approve a registration request if certain requirements are met, including if the pesticide "will perform its intended function without unreasonable adverse effects on the environment" and "will not generally cause unreasonable adverse effects on the environment" "when used in accordance with widespread and commonly recognized practice." 7 U.S.C. § 136a(c)(5). Here, EPA did just that. Intervenor Syngenta Crop Protection, LLC ("Syngenta") submitted—and EPA reviewed—421 studies in support of its application to register products containing this new active ingredient. The Agency's assessment addressed product chemistry, product performance, hazard to humans, hazard to non-target plants and wildlife (including bees), post-application exposure, applicator exposure, pesticide spray drift, environmental fate, and residue chemistry, among other topics. With respect to assessment of risks to bees, the Agency followed its own detailed and longstanding guidance. EPA considered the economic, social, and environmental costs and benefits of using isocycloseram, weighed the relevant data, and imposed mitigating requirements. EPA found that isocycloseram performs comparably to, and sometimes better than, available treatments and offers growers

another way to manage pests whose resistance to alternative control measures and repeated infestations make effective control particularly difficult.

Petitioners do not challenge EPA's conclusion that isocycloseram does not present unreasonable human health risks. Nor do they challenge EPA's findings that isocycloseram effectively controls damaging pests, including several that are developing resistance to existing pesticides. Despite Petitioners' characterization of isocycloseram as a "toxic" "forever chemical," their challenge is narrow. Petitioners seek to set aside the registrations based on disagreements with EPA's scientific assessment of risks to bees and the mitigation measures imposed to address those risks. But the administrative record demonstrates that EPA carefully evaluated those risks, considered the available scientific evidence and its limitations, and imposed measures to reduce exposure. That evidence, considered as part of the record as a whole, supports EPA's registration decision under FIFRA.

EPA recognized that isocycloseram has the potential to harm bees and assessed the potential risks to honeybees and other insect pollinators using laboratory and field studies that it deemed scientifically sound. It carefully considered the available scientific evidence and its limitations, then adequately imposed restrictions to reduce exposure during application and limit the pesticide from moving beyond treated areas. EPA acknowledged that these protections did not eliminate *every* potential risk. But FIFRA does not require or authorize the

elimination of every risk. Rather, EPA "shall register a pesticide" when, considering restrictions imposed, and adverse effects are not "unreasonable." After weighing the remaining risks against the documented pest-control benefits, EPA concluded that registration satisfied FIFRA's standard, a determination supported by substantial evidence in the record as a whole.

Contrary to Petitioners' arguments, the record demonstrates that the measured exposure data, the usable colony studies, and the overlapping use restriction and mitigation measures EPA adopted with respect to bees and other pollinating insects support the registration of isocycloseram. Petitioners' criticism of the benefits analysis likewise overlooks the concrete pest-control needs and comparative performance evidence supporting EPA's judgment. The scientific assessment, mitigation requirements, and benefits determination together support EPA's decision, particularly under FIFRA's deferential standard of review.

The Court should deny the petition for review.

## STATEMENT OF THE ISSUES

1. Whether substantial evidence supports EPA's determination that registering isocycloseram, after assessing pollinator risks and imposing mitigation measures to reduce them, would not cause unreasonable adverse effects on the environment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are available in EPA's addendum.

## STATEMENT OF THE CASE

### I. Statutory background

FIFRA generally precludes the distribution or sale of any pesticide unless it is "registered" by EPA. 7 U.S.C. § 136a(a). EPA issues a license, referred to as a "registration," for each specific pesticide product allowed to be sold and distributed. *Id.* § 136a(a); *see also Nat'l Fam. Farm Coal. v. EPA*, 966 F. 3d 893, 912 (9th Cir. 2020). "The terms and conditions on the license include exactly what product can be sold, the specific packaging it must be sold in, and labeling that contains instructions on proper use." *Nat'l Fam. Farm*, 966 F.3d at 912 (citing 7 U.S.C. § 136(p)). FIFRA directs that EPA "shall register a pesticide" if the Agency determines that:

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material required to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).

As relevant here, the phrase "unreasonable adverse effects on the environment" is defined within FIFRA to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 136(bb)(1).[1] Furthermore, it is a violation of FIFRA for users of pesticides to use a registered pesticide in a manner inconsistent with its labeling. *Id.* § 136j(a)(2)(G).

## II. Factual Background

### A. Isocycloseram's effects and uses

Insecticides affect pests in different ways. For example, some insecticides act on sodium channels, which help carry signals along an insect's nerves.[2] Others act on receptors or enzymes involved in nerve signaling. *Id.* Over time, insecticides can become less effective as insect pests develop resistance, meaning they become less sensitive to treatments that previously controlled them. [3] To slow the development

---

[1] The second prong of the definition of "unreasonable adverse effects on the environment" addresses human dietary risk from pesticide residues in or on food for the determination of safety under the Federal Food, Drug, and Cosmetic Act ("FFDCA"). *See* 7 U.S.C. § 136(bb)(2). Neither pesticide residues in or on food, nor the determination of safety under the FFDCA are at issue in this case.

[2] IRAC, *Mode of Action Classification Scheme* Version 11.5, Insecticide Resistance Action Committee https://irac-online.org/documents/moa-classification [https://perma.cc/E234-QYWM].

[3] *See* EPA, *Notice to Manufacturers, Formulators, Producers and Registrants of Pesticide Products,* Pesticide Registration Notice 2001-5 https://19january2017snapshot.epa.gov/sites/production/files/2014-04/documents/pr2001-5.pdf [https://perma.cc/4T9G-JSAU].

of resistance, growers are advised to rotate insecticides with different *modes of action*, meaning different ways of affecting the pest. 1-ER-38. Isocycloseram controls a range of insect pests by targeting a receptor that normally restrains nerve activity, causing overexcitation and death. 2-ER-113. This is a novel mode of action for many of the uses for which it is approved and gives growers another option for that rotation. 1-ER-38.[4] Depending on the crop, growers may spray isocycloseram onto plants, coat seeds before planting, or apply it to soil when planting corn. 1-ER-6.

### B. FIFRA registration process

#### 1. Syngenta application to register isocycloseram

In June 2021, Syngenta submitted a registration application to EPA for the new pesticide active ingredient isocycloseram. 1-ER-5. Its proposed uses included agricultural crops and seed treatments, as well as nonagricultural uses including turf, outdoor nursery ornamental plants, greenhouses, and pest control in and around buildings. 1-ER-5; 2-ER-353–55. Syngenta initially proposed a maximum single application rate of 0.134 pounds of active ingredient per acre (“lb. a.i./acre”) with a maximum yearly rate of 0.32 lb. a.i./acre/year applied at a seven-day retreatment interval. 2-ER-354.

---

[4] See also *supra* n.2.

Syngenta claimed that isocycloseram would control numerous insects and mites across various crops, including pests that are difficult to control or prone to resistance, such as the Colorado potato beetle, diamondback moth, and tarnished plant bug. 3-ER-547. Syngenta also called isocycloseram a potential "resistance breaker" and claimed its broad range of target pests could sometimes spare growers from mixing multiple insecticides. *Id*. Its supporting materials included more than seventy field performance trials comparing isocycloseram with untreated controls and, in individual trials, with other registered products. 3-ER-549.

Separately, Syngenta also asked EPA to consider certain uses of isocycloseram under EPA's reduced-risk program. 3-ER-569–70. The reduced-risk program gives priority to registration applications for pesticide uses that may reduce health or environmental risks compared with existing alternatives.[5] A reduced-risk determination is an initial assessment made within the first 90 days of an application that EPA may revisit as its review progresses. 7 U.S.C. § 136w-8(f)(4)(B)(iv)(III), (f)(4)(B)(i)(II)(bb). It neither changes the substantive analysis required for registration nor determines whether the pesticide meets FIFRA's registration requirements. *Id*. Under the statutory framework applicable when Syngenta submitted its application, a reduced-risk designation shortened EPA's prescribed

[5] PR Notice 97-3 §§ IV, VI, https://www.epa.gov/pesticide-registration/prn-97-3-guidelines-expedited-review-conventional-pesticides-under-reduced [https://perma.cc/2YZS-8HFN].

decision review period from twenty-four months to eighteen months.[6] On November 23, 2021, EPA granted reduced-risk status for isocycloseram's use on cotton and soybeans and against cockroaches because it initially appeared to pose fewer risks to human health and the environment than the identified alternatives. 3-ER-569. EPA declined to grant that status for peanuts and outdoor nursery ornamentals because it found no clear advantage over alternatives, and for corn because the alternatives had more favorable environmental fate and ecotoxicity characteristics. *Id.* EPA emphasized that these initial comparisons remained subject to revision as its review progressed. *Id.*

### 2. EPA's review of Syngenta's registration application

In reviewing Syngenta's registration application, EPA assessed isocycloseram's risks to humans, plants, and animals, including, as relevant here, risks to bees. 1-ER-20–1; 2-ER-100. EPA found no human-health risks of concern from consuming residues in food and drinking water and addressed identified risks to seed-treatment workers through reduced application rates and protective equipment. 1-ER-25, 42. EPA also found a low likelihood of adverse effects to aquatic and terrestrial plants, with estimated risks below its level of concern for non-listed plants across all uses. 1-ER-33, 36. EPA identified risks to bees, required

6 [redacted]

mitigation measures to reduce exposure, and weighed the remaining risks against isocycloseram's benefits. 1-ER-41–3. Based on that evaluation, EPA concluded that registration would not cause unreasonable adverse effects on human health or the environment. *Id.*

To assess risks to bees, EPA used a tiered approach first described in a 2012 White Paper[7] and further refined in the Agency's 2014 Bee Guidance[8]: It began with Tier 1, a cautious first screen that estimated how much pesticide bees might encounter and compared that estimate with amounts known to harm bees in laboratory tests. 4-ER-646–7; 2-ER-150, 156–7. If that screen raised concern, EPA moved to Tier 2, examining pesticide residues measured in treated plants and how bee colonies responded in field and feeding studies. *Id.*

**a. Tier 1 review of effects on bees**

At Tier 1, EPA conservatively estimates how much pesticide a bee might encounter and compares that amount with doses tested on individual adult and larval bees in a laboratory. For short-term exposure, EPA divides the estimated dose by the

---

[7] EPA Office of Chemical Safety and Pollution Prevention, White Paper in Support of the Proposed Risk Assessment Process for Bees, September 11-14, 2012, 3-ER-659–63.

[8] U.S. Env't Prot. Agency et al., *Guidance for Assessing Pesticide Risks to Bees* (June 19, 2014), https://www.epa.gov/sites/default/files/2014-06/documents/pollinator_risk_assessment_guidance_06_19_14.pdf [https://perma.cc/7HCM-7882].

dose that killed half the bees tested. The ratio is called a risk quotient, and a higher risk quotient means the estimated exposure is greater. 4-ER-650–1. A risk quotient above 0.4 exceeds EPA's short-term risk level of concern. A level of concern of 0.4 is not a bright-line for assessment purposes. Rather, it "is intended to be conservative and serve as a reasonable screen for determining whether higher-tier testing is needed." 2014 Bee Guidance at 33, 1-SER-123. For longer-term risk exposure, EPA compares the estimated dose with a dose at which there was no observed adverse effect. The longer-term level of concern is 1.0. 4-ER-650–1. When a risk quotient exceeds a level of concern, EPA looks more closely at the likelihood of adverse effects from exposure. *Id*. That can include refining its Tier 1 estimate with measured pesticide residues in pollen and nectar of treated crops and examining Tier 2 studies of bee colonies. *Id*.

For isocycloseram, EPA conducted a Tier 1 assessment because bees could encounter isocycloseram while foraging on or near treated areas. 2-ER-148–50. EPA used laboratory studies to determine how much pesticide would be expected to harm bees. 2-ER-149–52. EPA then estimated how much pesticide bees might encounter when growers spray it onto plants, using conservative estimates designed to reflect higher levels of exposure than bees would typically experience. *Id*. The laboratory studies tested isocycloseram on individual adult honeybees and larvae. *Id*. Some studies measured the effects of a single dose ("acute"), while others measured the

effects of repeated exposure over several days ("chronic"). 2-ER-137–8. EPA used those honeybee study results to help assess risks to other bees, including solitary bees and bumblebees. 2-ER-150, 160; 4-ER-646. EPA also considered laboratory-based acute contact and acute oral toxicity studies of bumblebees. 2-ER-137.

EPA calculated three main kinds of risk quotients here: acute contact risk quotients for adult bees exposed when pesticide lands on them, acute oral risk quotients for adults and larvae eating contaminated food, and chronic oral risk quotients for adults and larvae eating contaminated food over a longer period. 2-ER-150–2.

EPA's initial estimates produced acute contact risk quotients ranging from 0.28 to 1.39 for adult[9] honeybees, with the lower end of the range not exceeding the level of concern of 0.4. 2-ER-150–1. For acute oral risk quotients, the range was from 10.8 to 53.8 for adult bees and 4.59 to 22.8 for larvae, all above the acute risk level of concern of 0.4. 2-ER-151–2. The chronic oral risk quotient range was 310 to 1,537 for adults and 91.8 to 455 for larvae, all above the chronic risk level of concern of 1.0. *Id.*

---

[9] Honeybee larvae were not tested for acute contact exposure because EPA calculated that only adults would be outside the hive and be exposed to isocycloseram via direct contact; furthermore, toxicity testing protocols have been developed only for acute contact exposures with adult bees. 2-ER-150–1.

**b. Tier 2 review of effects on bees**

Because most risk quotients exceeded their respective levels of concern, EPA proceeded to the more refined Tier 2 of the risk assessment framework and assessed measured isocycloseram residues in pollen and nectar from treated crops and the results of bee colony studies in which bees foraged on treated crops or received an isocycloseram-treated diet. 2-ER-152, 154–8. Whereas Tier 1 analysis is based on studies and statistical modeling of bees in the laboratory, Tier 2 studies are structured to evaluate the effects of an insecticide on bees in the environment. 2014 Bee Guidance at 6–7, 1-SER-096–7. And whereas the Tier 1 analysis focuses on the effects of the insecticide on individual bees, Tier 2 analyses attempt to document actual exposure based on measured residues from treated crops and to evaluate the effect on the bee colony as a whole. *Id*.

EPA reviewed the studies submitted by Syngenta with its application and identified seven that were usable[10] for its risk assessment: six tunnel studies

---

[10] EPA classifies studies according to their usefulness in assessing risk. An "acceptable" study is scientifically valid and follows established testing guidelines. A "supplemental" study is scientifically valid but does not meet every guideline specification; EPA may still use its findings after considering the study's limits. An "unacceptable" study is scientifically unsound. EPA, *Overview of the Ecological Risk Assessment Process in the Office of Pesticide Programs* 32-3 (Jan. 23, 2004), https://www3.epa.gov/pesticides/endanger/consultation/ecorisk-overview.pdf [https://perma.cc/8PM7-LQPM]. Professional judgment is used by the risk assessment team to determine the utility of the available supplemental data for the proposed risk assessment. *Id* at 33

involving flowering crops and one colony-feeding study. 2-ER-141–3. EPA also rejected scientifically unreliable studies.[11] The six tunnel studies tested five crops—buckwheat, lacy phacelia, niger, cotton in two separate studies, and soybeans—at application rates ranging from 0.03 to 0.11 lb. a.i./acre, which are below the initially proposed maximum of 0.134 lb. a.i./acre. *Id.* The lacy phacelia and buckwheat studies tested the highest rate, 0.11 lb. a.i./acre. *Id.* In the feeding study, colonies received a sugar solution diet containing measured concentrations of isocycloseram for nine consecutive days and were then monitored for another fifty-four days. 2-ER-234–5.

EPA classified these seven studies as supplemental because it recognized that they had limitations, including lower application rates and, in some studies, application when bees were not actively foraging. 2-ER-141–3, 157. It considered those limitations in evaluating bee mortality, foraging, the development of young bees, and overall colony condition. EPA observed temporary increases in mortality and reductions in foraging, as well as concerning results for developing bees in the

---

[11] EPA separately identified studies with problems that undermined their scientific reliability. For example, it classified a soybean study as "unacceptable" because the comparison pesticide produced little or no expected effect, the untreated colonies lacked food and developing young, and several problems made the bees' exposure uncertain. 2-ER-227. EPA concluded that this study was "not considered scientifically sound," while expressly finding the supplemental lacy phacelia study scientifically sound despite its limitations. 2-ER-226–7.

lacy phacelia study. 2-ER-142–3, 157–8, 171, 225–6. However, across the usable studies and at the rates tested, EPA did not find compelling evidence of colony loss or sustained impairment of overall colony condition. 2-ER-157–9.

EPA separately reviewed five acceptable studies examining bee contact with isocycloseram residues remaining on treated leaves. 2-ER-141. Those studies showed that contact toxicity fell below EPA's benchmark of 25% mortality within three hours after spraying. 2-ER-141, 156, 217–20. This finding concerned how long the residues remained harmful through contact, rather than whether the pesticide had disappeared from the leaves.

**c. EPA revokes its reduced-risk assessment.**

Before completing its assessment of whether to register isocycloseram, EPA revisited the reduced-risk designation it had granted in November 2021. 3-ER-566–9. On October 30, 2023, EPA decided to revoke that designation for uses on cotton and soybeans because its review had raised concerns about potential risks to aquatic and terrestrial invertebrates—including bees—that were not fully apparent when it made the initial designation. 3-ER-566. The reduced-risk designation for cockroach bait remained in place. *Id.* Following the withdrawal of reduced-risk designation for cotton and soybean uses, EPA continued evaluating isocycloseram's risks and benefits in deciding whether to approve registration. 3-ER-565; 1-ER-41–3.

#### d. EPA's discussions with Syngenta about rate reduction

On July 19, 2024, EPA asked Syngenta to consider lowering application rates for spraying isocycloseram on crops and other plants, explaining that rate reductions were one of the most effective ways to reduce chronic risks to terrestrial invertebrates, including bees, and would better align the proposed rates with those tested in the colony studies. 3-ER-563–4. EPA also explained that it was developing additional mitigation measures beyond rate reductions to address risks to terrestrial and aquatic invertebrates. 3-ER-563.

[redacted] After EPA sought further turf-rate reductions in September, Syngenta also agreed to lower the rate for the two remaining turf pests from 0.134 to 0.107 lb a.i./acre. 3-ER-557–8.

### C. Proposed and final registration

After completing the tiered review process, EPA announced its proposed registration decision on May 9, 2025. 2-ER-75; 3-ER-486. EPA held a 30-day public comment period on the proposed registration of isocycloseram and received 275 comments, including 246 favorable testimonials from growers and pest control professionals. 2-ER-75. Those commenters emphasized the need for another way to

control pests that had developed resistance to existing insecticides, and EPA found that isocycloseram would likely provide substantial benefits for many uses. 2-ER-76. EPA also received three negative testimonials and twenty-six more detailed comments—including from Petitioners—addressing its assessments, proposed restrictions, and labels. 1-ER-40–1; 2-ER-75–6. The Agency responded to the substantive concerns before issuing its final decision. 1-ER-40–1.

After reviewing public comments and the entire scientific record, EPA signed its final decision memorandum on November 18, 2025, and issued registrations for one technical and nine end-use isocycloseram products pursuant to Section 3(c)(5) of FIFRA (the "Registration"). 1-ER-3, 40–1. EPA acknowledged that the refined risk quotient values for bees still exceeded its levels of concern, even when calculated using measured pesticide residues. 1-ER-32.

In determining whether those risks were unreasonable, as required by the FIFRA registration standard, EPA considered the economic, social, and environmental costs and benefits of the approved uses. 1-ER-41–3. EPA identified benefits including effective pest control, an additional mode of action to slow pesticide resistance, and an alternative to other pesticides currently in use that may pose greater human health or environmental risks. 1-ER-38–9, 43. After requiring mitigation measures and weighing the remaining risks against benefits, EPA

concluded that the Registration would not cause unreasonable adverse effects on human health or the environment. 1-ER-41–3.

The Registration required mitigation measures, including restrictions on application rates, timing, and methods, as well as measures to reduce spray drift and protect pollinators during bloom. 1-ER-7–20, 42–3, 47–51. EPA also imposed restrictions on treating seeds and included advisory practices to reduce exposure to pesticide-containing dust during planting. 1-ER-42–3, 66–9; 2-ER-88. In addition, EPA adopted voluntary best management practices to further protect pollinators and their habitats. 1-ER-48.

## SUMMARY OF ARGUMENT

This Court should deny the petition. FIFRA requires the Court to decide whether substantial evidence supports the Registration on the record as a whole. That standard gives EPA room to exercise its scientific judgment and does not permit the Court to set aside the decision by isolating individual studies or drawing a different conclusion from the same record.

EPA followed a tiered process to assess isocycloseram's risks to pollinators because bees could be exposed during approved uses. The deliberately conservative Tier 1 estimates identified risks that warranted closer review. At Tier 2, EPA considered studies it found scientifically sound, including evidence on residues in treated crops, residue dissipation, and effects on honeybee colonies. That evidence

refined the initial estimates: measured residues lowered the oral risk estimates, isocycloseram residues declined rapidly after application, and contact toxicity on treated foliage fell below EPA's benchmark within three hours. Ultimately, the colony studies showed no consistent long-term impairment in the tested colonies. EPA acknowledged the studies' limitations, rejected those it found unreliable, and considered the usable evidence together. Neither the regulations nor the study guidance required the rigid pass-or-fail approach Petitioners propose.

EPA also assessed risks to bumblebees and solitary bees, whose exposure and biology differ from honeybees. For bumblebees, EPA considered species-specific toxicity and exposure data and used honeybee colony studies as relevant evidence, while recognizing their limits. For solitary bees, EPA used honeybee toxicity data as surrogates, assessed distinct exposure pathways, and acknowledged uncertainty. EPA expected the required mitigation measures and supplemental practices for isocycloseram to reduce exposure to both social and solitary bees. Petitioners' attempt to invoke this Court's decision in *Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015), fails for precisely this reason—here, EPA obtained and thoroughly analyzed ample data on risk to bees to inform its registration decision. Petitioners mischaracterize aspects of the record and take issue with EPA's application of scientific judgment but ultimately do not, and cannot, show that the Agency lacked substantial evidence for its assessment.

EPA's earlier reduced-risk designation does not undermine the Registration. That designation was a preliminary, comparative determination that provided expedited application review. It did not decide whether the pesticide satisfied FIFRA's separate registration standard. EPA revisited and withdrew the designation for certain uses as its review developed, then made the registration decision based on the fuller record. Rather than undermining the Registration, EPA's withdrawal of the preliminary reduced-risk designation demonstrates that the Agency continued to evaluate the available evidence and reconsidered its earlier conclusions before reaching its final decision.

To address remaining risk, EPA required mitigation measures and weighed any remaining risk against expected benefits. Mitigation measures include limiting application rates and timing, restricting application during bloom, spray drift controls, and addressing exposure from treated seeds and dust. Expected benefits include managing resistance, controlling damaging pests with limited effective alternatives, and giving growers greater treatment flexibility.

FIFRA required EPA to weigh the relevant costs and benefits, an inquiry that did not demand an exhaustive response to every possible consequence. Substantial evidence supports EPA's conclusion that the registered uses, with mitigation, would not cause unreasonable adverse effects on the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.

If the Court identifies an error, it should remand without vacatur. Petitioners' narrow and record-based arguments are precisely the type of concerns amenable to remediation on remand, whereas vacatur would remove a documented pest-control option, including for pests with resistance to existing insecticides.

## STANDARD OF REVIEW

Under FIFRA Section 16(b), an EPA registration issued after a public comment period "shall be sustained if it is supported by substantial evidence when considered on the record as a whole." 7 U.S.C. § 136n(b); *see Nw. Food Processors Ass'n v. Reilly*, 886 F.2d 1075, 1079 (9th Cir. 1989); *United Farm Workers of Am. v. EPA*, 592 F.3d 1080,1087 (9th Cir. 2010). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013) (citation modified). Under the substantial evidence standard, a court "must affirm" the agency's decision so long as there is "such relevant evidence as a reasonable mind might accept as adequate to support" it. *Nw. Food Processors*, 886 F.2d at 1079–80 (citation omitted). An agency decision must be upheld "'even if it is possible to draw two inconsistent conclusions from the evidence,'" *Id.* at 1080, and a reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could

be supported by substantial evidence," *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).

Where "a court reviews an agency action involv[ing] primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise," courts "defer to the informed discretion of the responsible federal agencies." *Latino Issues F. v. EPA*, 558 F.3d 936, 941 (9th Cir. 2009) (citation modified). A court should also uphold an agency's factual determinations when they are supported by the administrative record, even if alternative findings could be supported by the record. *Arkansas*, 503 U.S. at 112–3. While an "agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," this Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified); *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (holding that it "is not a proper role for a federal appellate court" to "act as a panel of scientists" that "instructs [a federal agency] how to validate its hypotheses," "chooses among scientific studies," or "orders the agency to explain every possible scientific uncertainty").

## ARGUMENT

### I. EPA's assessment of pollinator risks supports the Registration.

Petitioners' challenge implicates the type of technical judgment to which this Court affords agencies significant deference. "We owe significant deference to the agency when reviewing technical analyses." *CBD v. EPA*, 851 F. App'x 718, 722 (9th Cir. 2021) (citing *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010)). EPA reasonably concluded that the available evidence, considered as a whole, supports its assessment of isocycloseram's risk to pollinators. The question is not whether that assessment was proven correct, but whether EPA acted "within the bounds of reasoned decisionmaking" in making it. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983). The Agency met FIFRA's substantial evidence standard by considering the record as a whole.

Petitioners focus their challenge on one part of that record: EPA's assessment of risks to pollinators. They do not address EPA's separate assessments of risks to human health and non-target plants, which also supported its conclusion that the Registration would not cause unreasonable adverse effects on human health or the environment. 1-ER-25, 33, 36, 42. Additionally, Petitioners' contrary arguments mistake EPA's deliberately conservative screening estimates for its final risk assessment, discount the consistent evidence EPA drew from the usable colony studies because no single study was perfect, and overlook EPA's separate evaluation

of risk to solitary bees and bumblebees. Dkt. No. 31.1 ("Pet'rs' Br.") at 15–16, 29–40.

Petitioners' criticisms fail to undermine the record. Substantial evidence supports the Registration, and this Court should defer to EPA's technical judgment.

### A. EPA refined conservative screening estimates with measured exposure and colony data.

EPA assessed pollinator risk in tiers, beginning with a deliberately conservative screening assessment—Tier 1—and then considered increasingly refined exposure and effects data at Tier 2. During Tier 1, EPA combined laboratory toxicity results with high end, model-generated estimates of how much pesticide a bee might contact or consume. 3-ER-380–1. The model focused specifically on bees expected to receive the greatest exposure of isocycloseram: (1) adult foraging bees for contact exposure because they are expected to be outside the hive; and (2) nectar-foraging adults and in-hive larval workers for oral exposure. *Id*. By design, those estimates are built around the higher-exposure end of the bee population, rather than the average bee under average conditions. In fact, EPA described its modeled exposure estimates as "high end, yet reasonably conservative." 3-ER-379. Thus, Tier 1 identified risk and EPA further examined that risk by then evaluating the submitted Tier 2 studies. Once EPA incorporated the more refined Tier 2 studies in its analysis, the resulting risk estimates dropped substantially. *See infra* Section I.B.2. Thus,

Petitioners' emphasis on chronic risk quotients exceeding EPA's level of concern[12] by "three orders of magnitude," Pet'rs' Br. at 16, 29, focuses on the beginning of EPA's analysis, not the end. EPA continued beyond those Tier 1 estimates to evaluate measured exposure, residue dissipation, and colony-level effects.

### B. EPA performed a robust analysis of the risks to pollinators.

In addition to the Tier 1 modeling, EPA considered the semi-field studies in Tier 2, which provided measured data on isocycloseram residues in pollen, nectar, and leaves, as well as the resulting effects on bee colonies. 2-ER-141. Petitioners argue that those studies had "significant flaws," citing lower application rates than those initially proposed, deviation from test guidelines, concerns about study reliability, and limits in assessing exposure and risks to bumblebees and solitary bees. Pet'rs' Br. at 20–29. They also emphasize that EPA classified the studies as supplemental. *Id*. But neither FIFRA regulations nor Petitioners' cited guidelines prescribe the type of rigid approach Petitioners seek and a supplemental classification did not render the studies unusable. EPA still appropriately considered

---

[12] The acute risk level of concern of 0.4 is itself a conservative screening threshold. EPA selected 0.4 to correspond to approximately 10% mortality among foragers and worker larvae. 2014 Bee Guidance at 32–3, 1-SER-122–3. The FIFRA Science Advisory Panel concluded that even this threshold was "highly conservative," explaining that the science did not support the premise that 10% adult bee mortality would cause colony collapse or instability. *Id*.

the data the studies produced, while accounting for each study's limitations, as part of the overall weight of evidence supporting its risk assessment.

### 1. EPA is afforded flexibility in determining the data required to assess environmental risk.

EPA's data-requirement regulations provide it with flexibility to determine what data are necessary to evaluate the effects of isocycloseram on bees and to make regulatory judgments. *See generally* 40 C.F.R. pt. 158; 40 C.F.R. § 158.1(a). They do not prescribe study protocols or explain how EPA must evaluate the submitted information in its risk assessment, risk management, or registration decisions. 40 C.F.R. § 158.1(b)(3). Section 158.30(a) expressly provides that EPA may "establish or modify data needs for individual pesticide chemicals" and that "[t]he actual data required may be modified on an individual basis" to fully characterize specific products under review. Put plainly, EPA does not have to require the same studies for every pesticide. The regulation allows EPA to decide, case-by-case, what information is needed to evaluate a product.

EPA sufficiently considered the additional studies as part of its risk assessment despite their "supplemental" classification. It identified the studies' limitations and evaluated what conclusions they could support. 2-ER-141–3. EPA classified the Tier 2 semi-field studies as "supplemental" for reasons including unverified spray concentrations, testing below proposed maximum rates, and uncertainty about exposure. *Id.* That classification did not make the studies

worthless. EPA evaluated their scientific reliability, distinguishing studies that remained scientifically sound despite their limitations from those it classified as unsound and unreliable. *Id*. [redacted]

Petitioners' emphasis on the Organisation for Economic Co-operation and Development ("OECD") Guidance Document Number 75 concerning honeybee semi-field conditions overlooks fundamental limitations. As this Court has recognized, "EPA's regulations do not mandate that studies be performed in accordance with OECD guidelines." *Pollinator Stewardship Council*, 806 F.3d at 529. The document provides guidance, not mandatory testing requirements. *Contra* Pet'rs'. Br. at 32–33. Petitioners treat any departure from that guidance as rendering the resulting study scientifically worthless, despite the 2014 Bee Guidance's introduction of the OECD Guidance as merely "describe[ing] basic semi-field study elements that should be considered." 2014 Bee Guidance at 24, 1-SER-114. The OECD Guidance itself does not impose such a rule. The OECD deliberately issued

---

[13] [redacted] EPA nevertheless distinguished scientifically sound but supplemental studies from unacceptable studies and explained which conclusions the supplemental studies supported alongside the other evidence. 2-ER-157–9, 186. The laboratory concerns do not establish that EPA could draw no reliable information from those studies.

the methodology as a "Guidance Document" rather than a formal "Test Guideline" because the method's reproducibility and repeatability had not yet been thoroughly investigated.[14] The OECD therefore decided instead to develop a Guidance Document describing how honeybee brood tests should be conducted, with the expectation that additional data might eventually support further standardization. *Id.* The OECD Guidance therefore does not establish a rigid pass-or-fail protocol. It explains that different formulations and treatment methods may require "appropriate adaptation of the study design." *Id.* at 14. The same flexibility appears in the OECD Guidance's treatment of application timing: Although application "should normally" occur during full flowering and full bee flight, the OECD Guidance expressly allows timing to vary when required by the product's intended use pattern or when testing residual or delayed effects. *Id.* at 17; [redacted]. Several of the studies submitted by Syngenta followed colonies for thirty-five to fifty-four days after exposure to determine whether any effects persisted or translated into longer-term colony impairment. *See* 3-ER-428, 430–4, 461. Thus, Petitioners cannot establish that the studies lacked scientific value

---

[14] OECD, *Guidance Document on the Honey Bee (Apis Mellifera L.) Brood test Under Semi-field Conditions*, OECD Series on Testing and Assessment, No. 75 (2014) ("OECD Guidance") at 11, https://www.oecd.org/content/dam/oecd/en/publications/reports/2014/09/guidance-document-on-the-honey-bee-apis-mellifera-l-brood-test-under-semi-field-conditions_g1ghcc6e/9789264085510-en.pdf [https://perma.cc/8Z75-AFUK].

merely by identifying departures from the OECD Guidance, particularly where those departures do not necessarily undermine the reliability of the studies' findings.[15]

Petitioners' reliance on the European and Mediterranean Plant Protection Organization ("EPPO") Test Guideline No. 170(4) fares no better. Like the OECD Guidance, the EPPO Guidance recognizes that application timing may vary depending on a study's objectives, expressly permitting application before bees become active when evaluating mitigation measures.[16] Petitioners therefore cannot establish that the studies lacked scientific value merely by pointing to applications outside peak foraging hours because both guidance documents recognize that such timing may serve the study's objectives. Pet'rs' Br. at 32.

---

[15] Although the semi-field studies predated the 2024 revision of the OECD Guidance Document No. 75, they generally satisfied its validity criteria, which require demonstrating that the study can detect harmful effects and that bees were exposed to the pesticide. OECD, *Guidance Document on the Honey Bee (Apis Mellifera L.) Brood test Under Semi-field Conditions, Second Edition* at 24, OECD Series on Testing and Assessment (2024), https://www.oecd.org/content/dam/oecd/en/publications/reports/2024/09/guidance-document-on-the-honey-bee-apis-mellifera-l-brood-test-under-semi-field-conditions-second-edition_9e465537/542b7d72-en.pdf [https://perma.cc/ZM7Q-XR97]. EPA nevertheless subjected the studies to further scrutiny, classifying them as supplemental because limitations in application rates and timing affected their usefulness for assessing risk. 2-ER-141–3, 157.

[16] EPPO, *Efficacy Evaluation of Plant Protection Products, Side-Effects on Honeybees*, PP1/170 (4) at 314–5 (2010), https://pp1.eppo.int/standards/PP1-170-4 [https://perma.cc/K32L-AMJE].

### 2. EPA reasonably considered the Tier 2 studies in assessing risk to pollinators.

EPA considered the Tier 2 data as one component of its broader pollinator-risk assessment. The studies provided information about isocycloseram's effects on bees under more realistic exposure conditions, which EPA weighed with the rest of the record in reaching its registration decision. Exercising its technical expertise, EPA identified the strengths and limitations of the individual studies, determined what information could reliably be drawn from them, and evaluated that evidence alongside measured residue data and the other available pollinator data. 2-ER-157–9, 186. That analysis provided EPA with a reasoned basis to assess the nature, magnitude, and duration of the risks posed by isocycloseram. Thus, the relevant question is whether the Tier 2 studies, considered together, gave EPA a reliable basis to assess colony-level effects despite their individual limitations. Petitioners' contrary characterization of the Tier 2 evidence as inadequate overlooks both the information those studies provided and EPA's reasoned evaluation of their limitations. Pet'rs' Br. at 29–40.

Unlike the laboratory studies underlying Tier 1, the Tier 2 semi-field and colony-feeding studies accounted for exposure through bees' collection of pollen and nectar and contact with treated plants. In the semi-field studies, researchers placed honeybee colonies within outdoor tunnel enclosures containing flowering crops. 2-ER-225–31. The enclosures restricted the bees to foraging on the treated

crop inside, which included buckwheat, niger, lacy phacelia, cotton, and soybeans, allowing researchers to observe how the colonies responded after the crops were sprayed with isocycloseram. 2-ER-141–2. Researchers monitored bee mortality, flight and foraging activity, brood development, and the colonies' overall condition. 2-ER-225–31. After the exposure period, which varied by study but ranged from six to fourteen days, researchers moved the colonies to a separate, untreated site and continued monitoring them to determine whether any effects persisted or appeared later. *Id*. Those post-exposure observation periods lasted up to fifty-three days and allowed researchers to evaluate several brood cycles of worker bees. 2-ER-224–34. Such studies provide a more realistic characterization of potential adverse effects to colonies since the study design is intended to reflect actual exposure conditions. 2014 Bee Guidance at 33, 1-SER-123.

In the colony-feeding study, researchers gave honeybee colonies sugar solution containing measured amounts of isocycloseram for nine consecutive days, rather than exposing them through sprayed crops. 2-ER-234. They monitored the colonies during feeding and for another fifty-four days afterward, tracking bee deaths, unusual behavior, the development of young bees, and the colonies' populations, food stores, and their respective queens. *Id.* As Petitioners emphasize, EPA acknowledged that the colony feeding study exposed bees through contaminated sugar solution alone and therefore did not test prolonged exposure

through both contaminated pollen and nectar, which could occur in the field. Pet'rs' Br. at 33. EPA nevertheless evaluated that study alongside the six semi-field tunnel studies discussed above. 2-ER-141–3. It considered those colony findings together with measured pollen and nectar residues and evidence of how quickly those residues declined. 2-ER-156–9. Petitioners' criticism identifies a limitation EPA expressly recognized but does not explain why that limitation prevented EPA from drawing reliable conclusions from the combined evidence.

EPA also recognized the limitations of the tunnel studies and explicitly addressed them. 2-ER-185–6. First, because the bees were confined to the tunnels and could forage only on the treated crop during the exposure period, their exposure may differ from bees in an open environment, where bees typically forage on both treated and untreated plants.[17] 2-ER-156–7. Second, as Petitioners argue, four of the semi-field studies tested application rates below the final maximum foliar application rate, while the two that did apply approximately the final maximum single application rate of 0.11 lb a.i./acre applied isocycloseram did so when bees were not actively foraging. Pet'rs' Br. at 29-32. The first limitation reflects the controlled conditions inherent in semi-field testing, and in any event would tend to

[17] EPA's own guidance describes this confined-foraging design as a "worst-case exposure scenario" because, in the field, foraging on untreated plants can dilute a colony's exposure. 2014 Bee Guidance at 24, 39, 1-SER-114, 29.

overestimate risk as bees are forced to forage exclusively on the treated crop. However, the second did not prevent EPA from identifying a generally consistent pattern in colony performance across studies conducted at different application rates and under different exposure conditions.

The buckwheat study, which applied isocycloseram at 0.11 lb a.i./acre, presented additional uncertainty about bee exposure because the tunnel had been irrigated before application, potentially affecting how much pesticide adhered to the plants. *Id.* [redacted] But, contrary to Petitioners' argument, those limitations did not leave EPA without meaningful evidence. The studies tested different combinations of applications, crops, and exposure conditions. 2-ER-157. Although the highest-rate studies applied isocycloseram outside of active bee flight times, several studies applied isocycloseram at lower rates during active foraging. *Id.* One of those studies tested 0.07 lb a.i./acre, a rate equal to or greater than the maximum approved single-application rate for *all* agricultural foliar uses except bulb vegetables.[18] 1-ER-8. The two studies conducted at 0.11 lb a.i./acre likewise provided information about colony performance at approximately the final maximum rate that was approved. Thus, EPA

---

[18] *See* infra Section II.A, at 47, for discussion of bulb vegetables' harvest before flowering and its significance for pollinator exposure.

did not rely on a single, perfect study, but rather considered the studies collectively while acknowledging their limitations.

While in isolation the studies had limitations, when taken together they produced a consistent picture that contributed to the overall weight of evidence supporting EPA's conclusions. Across all the studies, there was no long-term harm to the colonies. EPA independently evaluated the results and found temporary increases in mortality or reduced foraging in some instances, but no consistent long-term impairment of colony size, brood, food stores, or overall colony condition. 3-ER-387–88, 426–38. There were no long-term adverse effects to any of the castes of bees represented in the colony. EPA noted several reasons explaining those results: (1) colony compensatory mechanisms; (2) actual nectar exposure was much lower than Tier 1 predicted; and (3) isocycloseram residues dissipated quickly.

A compensatory mechanism is a process by which a colony can recover from colony-level effects and mitigate what might otherwise be a population-level threat. One way this is measured is called the brood compensation index, 3-ER-373, which tracks whether brood cells that fail to develop are later refilled with new brood. The index therefore serves as an indicator of a colony's ability to recover from an impact on brood development. *Id.* In the colony-feeding study, EPA observed some differences in brood termination and compensation, but those differences lacked a clear dose response and were not considered treatment-related. 3-ER-437, 461. More

broadly, the colony studies showed that temporary changes in mortality, foraging, or brood development did not persist as long-term impairment of colony size, brood number, food stores, or queen performance. 3-ER-387, 428–9.

Regarding exposure, the Tier 2 studies also gave EPA actual residue measurements from lacy phacelia, niger, and cotton rather than requiring EPA to rely exclusively on Tier 1 estimates. 2-ER-143–6, 154–6. Of the three types of risk quotients estimated using the Tier 1 data—acute contact, acute oral, and chronic oral—two (acute oral and chronic oral) also changed dramatically once EPA incorporated measured pollen and nectar residues from the Tier 2 studies. As previously discussed, a risk quotient is calculated by comparing a bee's estimated exposure to the amount of pesticide shown to cause an adverse effect. Thus, when measured exposure is lower, the resulting risk quotient is correspondingly lower.

These measurements demonstrated the importance of refining exposure estimates in studies and why EPA does not rely only on Tier 1 estimates. In the lacy phacelia study, Tier 1 predicted 12,100 µg a.i./kg in both pollen and nectar while Tier 2 measured 15,200 µg a.i./kg in pollen but only 72 µg a.i./kg in nectar, making the nectar level 168 times lower than predicted. 2-ER-154. In one cotton study, Tier 1 predicted 4,400 µg a.i./kg in both pollen and nectar, while Tier 2 measured 414 µg a.i./kg in pollen and 833 µg a.i./kg in nectar. 2-ER-155. In the other cotton study, Tier 1 predicted 7,700 µg a.i./kg in both, while Tier 2 measured 103 µg a.i./kg in

pollen and 237 µg a.i./kg in nectar. 2-ER-156. The niger study showed the same general pattern. 2-ER-144, 155. Tier 1 estimated 7,700 µg a.i./kg in pollen and nectar, while Tier 2 measured 5,200 µg a.i./kg in pollen and only 44.4 µg a.i./kg in nectar. *Id*.

These differences mattered because EPA calculated the acute and chronic risk quotients in Tier 1 by comparing *estimated* exposure with the dose that harmed bees in laboratory tests. 4-ER-650–1; 2-ER-150–2. When EPA used *measured* residues from Tier 2, the resulting acute and chronic oral risk quotients dropped substantially. *Id*. For example, at the 0.11 lb a.i./acre rate tested on lacy phacelia, the refined acute oral risk quotients were 0.07 for adult foragers, 0.54 for nurse bees, and 0.79 for larvae, while the refined chronic oral risk quotients were 7.7, 56, and 16, respectively. 2-ER-154–5. The adult chronic risk quotient fell from 803 to 20 in the niger study, from 459 to 87 in one cotton study, and from 803 to 25 in the other cotton study, drops of about 40-fold, 5-fold, and 32-fold, respectively. 2-ER-155–6. As such, the measured residues provided a reliable and relevant line of evidence as to why effects detected in laboratory-based studies of individual bees were not resulting in long-term colony-level effects.

Those values did not eliminate every level of concern exceedance, but they gave EPA a materially different picture of risk than the conservative Tier 1 screening estimates. EPA could then evaluate those refined exposure estimates together with

how quickly the residues dissipated and what happened to the colonies that were actually exposed. Petitioners take issue with specific aspects of EPA's scientific judgment but fall well short of demonstrating that the agency lacked substantial evidence.

Finally, EPA considered another factor relevant to whether effects on bees would persist at the colony level: how long bees remained exposed to harmful levels of isocycloseram after application. The toxicity of residues on foliage studies, which were classified as acceptable, and the measured residues studies, which were classified as supplemental, were used to evaluate the dissipation of residues in pollen and nectar and the toxicity of residues remaining on sprayed leaves. 2-ER-141–5. The pollen and nectar studies showed that residues dissipated by more than 50% within two days after application, while residues in nectar were less than 2% of those measured in pollen. 2-ER-154–6. The studies with the sprayed leaves showed a similarly short period of harmful contact exposure concentrations. In five studies, researchers sprayed alfalfa with isocycloseram, let the leaves rest for up to twenty-four hours, and then exposed adult honeybees to the treated foliage. 2-ER-217–20. The researchers counted bee deaths after the exposure and measured how much pesticide remained on the leaves. *Id.* In tests using leaves that had been sprayed three hours earlier, fewer than 25% of the adult bees died after remaining in contact with the treated foliage for twenty-four hours. 2-ER-141, 156. EPA therefore reported

that contact with leaves weathered for three hours caused less than 25% mortality among the bees tested. 2-ER-141, 217–20.

EPA reasonably considered these findings because the effects predicted at Tier 1 assumed exposure but did not establish that bees would *continue* receiving that level of exposure over time. Tier 2 filled in the picture on this latter issue by establishing that residues from pollen, nectar, and leaves declined substantially within days and that the contact toxicity of residues on treated leaves declined in under three hours. 2-ER-143, 156, 158. That finding does not mean the pesticide disappeared from the leaves: One study still measured substantial residues twenty-four hours after spraying. 2-ER-217. But the studies demonstrated that both dietary residues and the toxicity associated with contact exposure declined relatively quickly after application. EPA thus had evidence not only about how much isocycloseram bees could encounter, but also about how long potentially harmful exposure persisted.

Taken together, the Tier 2 data gave EPA a consistent picture: actual exposure was lower and shorter-lived than the Tier 1 screening estimates suggested, and the honeybee colonies were able to recover from observed effects without lasting impairment to overall colony condition. EPA thus relied on multiple studies collectively to reasonably conclude that isocycloseram did not cause long-term adverse effects to honeybee colonies at the rates tested.

### 3. EPA reasonably applied the honeybee data to assess risks to bumblebees and solitary bees.

EPA did not assume that the honeybee colony studies applied equally to all bee species. Instead, EPA expressly considered how differences between honeybees, bumblebees, and solitary bees affected the risks posed by isocycloseram and evaluated the available evidence for each. Petitioners' contrary argument overlooks that analysis and treats EPA's reliance on the honeybee studies as far more exclusive than it was. Pet'rs' Br. at 36–40.

#### a. Bumblebees

EPA's bumblebee assessment drew on multiple lines of evidence, including species-specific toxicity and exposure data and an evaluation of how honeybee colony studies informed the risk analysis and ultimately supported the Registration. Contrary to Petitioners' argument, Pet'rs' Br. at 38, EPA did considerably more than extrapolate the honeybee colony studies to bumblebees. EPA (1) assumed bumblebees would be exposed, (2) evaluated toxicity studies conducted on bumblebees themselves, (3) compared bumblebee sensitivity and exposure characteristics with honeybees, (4) calculated bumblebee-specific risk using measured pollen and nectar residues and bumblebee consumption rates, and (5) considered both the relevance and limitations of applying honeybee colony evidence to bumblebees.

First, EPA assumed bumblebees would be exposed as isocycloseram would be used on crops that are attractive to honeybees and bumblebees. 3-ER-378–9. ("Based on the attractiveness of the crops and use sites, application method, and timing, there is a reasonable expectation that bees [honeybees and bumblebees] will be exposed to isocycloseram while foraging on or adjacent to the treated field."). EPA then considered studies Syngenta submitted with its registration application, including a laboratory study that tested isocycloseram's toxicity to adult bumblebees through ingestion and direct contact. 3-ER-389. EPA then compared the results of those studies with the results from similar tests conducted on honeybees to determine whether the two species were similarly sensitive to isocycloseram; they were. 3-ER-388–9. For oral exposure, after accounting for differences in body weight due to the bumblebee's larger size, the amount of isocycloseram causing 50% mortality ("$LD_{50}$") was 1.03 µg/g for bumblebees and 2.26 µg/g for honeybees. *Id*. For contact exposure, bumblebees were considerably less sensitive: the $LD_{50}$ was 11.9 µg/bee for bumblebees, compared to 0.26 µg/bee for honeybees. *Id*. EPA also explained why bumblebees may be less susceptible to contact exposure. Bumblebees are generally larger than honeybees,[19] meaning they receive a smaller dose of pesticide

---

[19] Bumblebee queens can weigh up to 1,160 mg, compared with 228 mg for honeybee queens, making them approximately five times heavier. Bumblebee workers can weigh up to 400 mg, compared with an average of 128 mg for honeybee workers. 3-ER-388–9.

relative to their bodyweight. *Id.* Another reason for the contact exposure resistance is that bumblebees are typically covered with dense pile that impedes isocycloseram from contacting and being absorbed by their epidermis. *Id.*

EPA next considered how much isocycloseram bumblebees would actually consume. 3-ER-389. Although bumblebees and honeybees showed relatively similar sensitivity[20]—honeybees with an $LD_{50}$ of 2.26 µg/g compared to bumblebees at 1.03 µg/g—risk also depends on the amount of pesticide a bee encounters. EPA therefore combined bumblebee-specific food consumption rates with the isocycloseram residues actually measured in pollen and nectar during the Tier 2 studies. *Id.* For an adult worker bumblebee, EPA used an average daily consumption of 237 mg of nectar and 25 mg of pollen. *Id.* Applying the measured pollen and nectar residues from the studies where 0.11 lb a.i./acre was applied resulted in an estimated daily dose of 0.397 µg of isocycloseram per bee and an acute risk quotient of 1.4. *Id.* EPA also expected the restrictions imposed on isocycloseram's use to further reduce bumblebee exposure and the associated risks, as discussed *infra* Section II.A. Although the risk quotient exceeded the acute risk level of concern of 0.4, it was

[20] EPA used the more toxic isocycloseram degradate (SYN549106) as the toxicity endpoint for the honeybee acute oral risk assessment, which produced 1.41 µg/g, much closer to the bumblebee's 1.03 µg/g. EPA therefore concluded that the honeybee data were "protective for bumblebees." 2-ER-365.

based on measured exposure rather than the higher residue levels initially predicted by Tier 1.

EPA separately considered the risk to bumblebee queens. *Id*. Unlike honeybee queens, bumblebee queens forage for food and can consume substantially more than worker bumblebees. *Id*. Therefore, EPA used a high-end nectar consumption rate of 1,310 mg per day and 49 mg of pollen per day. *Id*. EPA also accounted for the bumblebee queen's much larger body size, which increased the $LD_{50}$ to 1.38 µg per queen. *Id.* Combining that toxicity value with the same measured pollen and nectar residue from the studies where 0.11 lb a.i./acre was applied resulted in an estimated dose of 0.839 µg per queen and an acute risk quotient of 0.61. *Id*. That value also exceeded the acute risk level of concern of 0.4 but was substantially below the risk predicted from Tier 1. 3-ER-390.

Finally, EPA considered whether the honeybee colony studies provided useful information about effects on bumblebee colonies. EPA acknowledged that no colony-level studies had been submitted for bumblebees. *Id*. But bumblebees, like honeybees, are social insects, and EPA determined that the compensatory mechanisms that limited colony-level effects in honeybees—such as brood replacement—were relevant to bumblebees as well. *Id.* However, EPA did not treat the two species as interchangeable. It expressly recognized that only the bumblebee queen survives through the winter as a solitary bee and that there was uncertainty

about whether the honeybee colony studies were relevant during this solitary phase of the bumblebee queen life cycle. *Id.* However, EPA had bumblebee-specific toxicity data, bumblebee-specific consumption rates, measured residue data, and evidence concerning recovery in honeybee colonies. EPA considered each of those lines of evidence, as well as their limitations, in assessing the risk to bumblebees.

**b. Solitary bees**

EPA also evaluated the risks to solitary bees based on the evidence available to it, contrary to Petitioners' assertions. Pet'rs' Br. at 44–45. EPA expressly explained that its Tier 1 adult honeybee toxicity values serve as surrogates for solitary bees. 2-ER-158. Those Tier 1 estimates were then refined using the Tier 2 residue measurements. Although the Tier 2 studies focused on honeybee colonies, they generated toxicity and residue data that informed EPA's assessment of risk for *all* bees, including solitary species. The measured pollen and nectar residues showed how much isocycloseram an individual bee could encounter and how quickly that exposure would dissipate. 2-ER-158; 3-ER-390. At the same time, EPA acknowledged the limits of the record and stated that "the potential effects of isocycloseram on solitary . . . bees is uncertain." 3-ER-390. EPA also considered toxicity data for several other invertebrates and modeled contact exposure, concluding that the resulting mitigation measures, discussed *infra* Section II, were protective of all arthropods, including solitary bees. 2-ER-84. Although EPA

acknowledged uncertainty about potential effects on solitary bees, it expressly expected the mandatory restrictions and voluntary measures to reduce exposure to solitary as well as social bees. 2-ER-84–5.

EPA also considered several additional factors relevant to solitary-bee exposure pathways. First, EPA determined that isocycloseram is not systemic, meaning residues from treated seeds or soil are not expected to move through plants into pollen or nectar, thereby limiting one potential source of dietary exposure for solitary bees. 3-ER-390. Second, EPA recognized that handling and planting treated seeds could generate pesticide-containing dust that might expose foraging bees and therefore specifically developed mitigation measures to reduce that potential exposure, as discussed *infra* Section II. *Id*. Third, EPA evaluated the distinct risks faced by ground-nesting solitary bees. EPA expressly acknowledged that soil exposure may be more important for solitary bees but concluded, based on the available data and modeling, that isocycloseram's properties and application methods were not expected to produce ecologically significant soil concentrations. 2-ER-84. That conclusion was supported by laboratory and field studies showing the pesticide's limited mobility in soil, as well as modeling that incorporated its persistence and mobility characteristics. 2-ER-168–9.

These lines of evidence collectively demonstrate that EPA did not overlook solitary-bee risks. Rather, EPA applied scientifically accepted surrogates, refined its

exposure estimates using the most reliable data available, and evaluated all relevant exposure pathways. Accordingly, EPA's approach reflects a reasonable, evidence-based assessment of risks to solitary bees.

EPA did not disregard the Tier 1 exceedances or the limitations in the available data. It considered those exceedances alongside measured pollen and nectar residues, the rapid decline in exposure after application, multiple colony-level studies, and the available evidence concerning bumblebees and solitary bees. And where the evidence was uncertain, EPA said so. Petitioners largely isolate individual data points and study limitations from that broader assessment. But substantial evidence review considers the record as a whole, and that record provided EPA an adequate basis to conclude that the risks identified at Tiers 1 and 2 did not foreclose registration under FIFRA's statutory standard.

This case is also distinguishable from *Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015). There, EPA identified additional bee studies as necessary to address gaps in the available data but unconditionally registered sulfoxaflor without obtaining them. *Id.* at 526–30. The Court held that the record therefore lacked substantial evidence supporting EPA's determination that sulfoxaflor would not cause unreasonable adverse effects on bees. *Id.* at 532.

Here, by contrast, EPA had relevant and adequate information to evaluate risk to bees and concluded that isocycloseram's registered uses, with the required

mitigation measures, would not cause unreasonable adverse effects on the environment. 1-ER-39–41. EPA acknowledged the studies' limitations and evaluated their usable findings alongside measured residues and dissipation data to assess the likelihood and duration of adverse effects. 2-ER-154–9. Unlike in *Pollinator*, EPA did not identify additional studies as necessary and then proceeded without obtaining them. Instead, EPA determined that the available database was complete and that no additional data were required. 1-ER-39, 41. The relevant question is whether the studies' usable findings, considered with the other evidence in the record, support the Registration as a whole. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522–3 (1981) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (citation omitted)). Substantial evidence supports the Registration.

### C. The earlier reduced-risk determination does not undermine EPA's later risk assessment.

Petitioners misunderstand the significance of EPA's decision to withdraw isocycloseram's reduced-risk designation. Pet'rs' Br. at 18–20, 42. The Reduced Risk Pesticide Program does not determine whether a pesticide presents "low risk." Congress instead established the program as a mechanism for expedited review. *See* 7 U.S.C. § 136a(c)(10)(B) ("Any application for registration or an amendment, including biological and conventional pesticides, will be considered for expedited review."). An application may qualify for expedited review if the proposed use(s)

may reasonably be expected to accomplish one or more specified objectives, including reducing risks to human health or non-target organisms, reducing potential contamination of environmental resources, or broadening the availability or effectiveness of integrated pest-management strategies. *Id.*

EPA makes reduced-risk determinations for individual pesticide uses, rather than for the active ingredient as a whole.[21] In doing so, EPA considers, among other factors, whether the proposed use would reduce toxicity, exposure to humans or non-target organisms, or environmental harm compared with existing pesticides. *Id.* FIFRA requires that EPA make the reduced risk determination within the first ninety days in which an application is pending. 7 U.S.C. § 136w-8. Thus, reduced-risk status confers only a procedural benefit[22] based on a preliminary and comparative assessment. It is not a determination that a pesticide satisfies FIFRA's separate standard for registration, 1-ER-41, and revoking the status does not bar EPA from later granting a registration in the course of its review.

That distinction matters here because EPA made the reduced-risk determination early in the review process, before fully analyzing the Tier 1 and Tier 2 data that ultimately informed its assessment of ecological risk.[23] After additional

---

[21] *See* PR Notice 97-3.

[22] *Supra* n.18.

[23] EPA granted reduced-risk status for cotton, soybean, and cockroach uses on November 23, 2021, but revisited that determination on October 30, 2023, and

data became available, EPA scientists reconsidered whether isocycloseram continued to satisfy the criteria for reduced-risk treatment and concluded that the available information no longer supported that designation for certain uses. The consequence was that those uses no longer qualified the application for expedited treatment under the program—not that EPA had determined that isocycloseram caused unreasonable adverse effects under FIFRA. EPA subsequently evaluated the latter question through the registration process based on a substantially fuller record, including refined exposure estimates, colony-level studies, mitigation measures, and the pesticide's expected benefits. Thus, if EPA's revocation of the reduced-risk status means anything, it demonstrates that EPA did what it was supposed to do and thoroughly considered the developing evidence, revising its preliminary determination when the evidence warranted doing so.

## II. EPA's mitigation measures and risk-benefit analysis support the Registration.

Consistent with the tiered risk-assessment framework, EPA imposed labeling restrictions addressing the principal routes of bee exposure and then weighed the remaining risks against isocycloseram's expected benefits. 1-ER-41–3. Based on

---

subsequently revoked the designation for cotton and soybean uses. 3-ER-566–9. EPA's tiered ecological review came later, with a draft ecological risk assessment dated May 8, 2025, followed by the final ecological risk assessment and biological evaluation in November 2025. 2-ER-89–260, 335.

that record, EPA concluded that isocycloseram, as registered and subject to those restrictions, would not generally cause unreasonable adverse effects on the environment. Petitioners challenge that determination by attacking the adequacy of EPA's mitigation measures, Pet'rs' Br. at 44–54, but their arguments overlook both the extent of the restrictions EPA imposed and the role those measures played in EPA's broader risk-benefit analysis.

Although EPA's assessment identified remaining risk to bees, those risks did not preclude registration under FIFRA. FIFRA defines "unreasonable adverse effects on the environment" to require EPA to weigh "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb)(1). The ultimate registration decision thus requires EPA to weigh multiple considerations and exercise judgment in determining whether identified risks are unreasonable. The existence of uncertainty in the underlying risk assessment does not itself preclude registration. Rather, EPA may account for those uncertainties, consider the evidence as a whole, and determine whether the identified risks can be adequately addressed. As discussed below, that is what EPA did here.

### A. EPA adequately determined that the mitigated risks were not unreasonable in light of the benefits.

Under the tiered risk-assessment framework, using mitigation measures is an appropriate way to address uncertainties in risk. 2014 Bee Guidance at 6, 8, 26, 1-

SER-096, 8, 116. EPA followed the framework in evaluating the risks to bees and developing the mitigation measures for isocycloseram. EPA also adopted several compulsory and advisory mitigation measures, namely application rate limits, bloom restrictions, spray drift and runoff controls, dust-off measures, and additional measures to reduce potential exposure. As discussed *supra* Section I.B.3.b, EPA reasonably expected the mandatory restrictions and supplemental practices to reduce exposure to both solitary and social bees. 2-ER-84–5.

First, EPA reduced the maximum single agricultural foliar application rate from 0.134 to 0.11 lb a.i./acre, thereby reducing the amount of isocycloseram introduced into the environment with each application. 3-ER-401. The reduction also made the Tier 2 colony studies more directly applicable because the highest-rate studies tested isocycloseram at 0.11 lb a.i./acre. 2-ER-158; 3-ER-401. Importantly, the highest approved foliar application rate of 0.107 lb a.i./acre applies only to bulb vegetables, which are generally harvested before flowering. 1-ER-8, 43–9. Because these crops ordinarily do not flower before harvest, bees are unlikely to encounter isocycloseram through pollen or nectar from the treated crop at that higher application rate. For bulb vegetables grown for seed, which are allowed to flower and thus are more attractive to bees, EPA prohibited applications beginning three days before bloom and continuing through the flowering period. 1-ER-49. All other agricultural foliar uses are limited to single application rates of 0.07 lb a.i./acre or

less. 1-ER-8, 43–9. And two additional semi-field studies, involving cotton and niger, tested applications at 0.07 lb a.i./acre, providing further evidence relevant to these lower-rate uses. 2-ER-141–3, 157–8.

However, EPA did not suggest that the rate reduction eliminated all pollinator risk because its own calculations continued to report levels of concern exceedances at 0.11 lb a.i./acre. 2-ER-154-5. Rather, EPA treated rate reductions as one part of a broader mitigation package further discussed below. 3-ER-563; 1-ER-42–3. Petitioners argue that the reductions were too modest to sufficiently protect bees, but that criticism considers rate reductions in isolation. Pet'rs' Br. at 43. The question is whether substantial evidence supports the Registration as a whole, not whether rate reductions alone justified approval. EPA considered the combined protections and weighed the remaining risks against the benefits of the approved uses. 1-ER-42–3.

Petitioners also mischaracterize EPA's communications with Syngenta regarding potential reductions in the application rate. Pet'rs' Br. at 35–36. Those discussions do not establish that EPA considered further rate reductions necessary to address the identified risks. Rather, reducing the application rate was one potential mitigation measure among several available to the Agency. 3-ER-563 ("[EPA] are working on additional risk mitigations beyond rate reduction for both terrestrial and aquatic invertebrates."). Petitioners treat further rate reduction as the only permissible response to pollinator risk, overlooking that EPA ultimately addressed

those risks through a combination of measures. *Id*; 1-ER-42–3. That approach is consistent with the tiered risk-assessment framework, which evaluates risk based not simply on a pesticide's toxicity or application rate in isolation, but on the available exposure and effects data and the conditions under which the pesticide will actually be used. 2014 Bee Guidance at 7–8 (§ 1.1, Steps 4–5), 1-SER-097–8; 3-ER-651–2 (same).

Second, EPA restricted applications during bloom, when bees are likely to visit flowering crops for pollen and nectar. For crops with short bloom periods, EPA prohibited application throughout bloom. 1-ER-48–9. For crops that flower for longer periods, EPA restricted applications to times when bees are less likely to be actively foraging. *Id*. That restriction directly addresses an exposure concern Petitioners themselves emphasize. Petitioners criticize several colony studies because isocycloseram was applied at night when bees were not actively foraging, potentially reducing exposure. Pet'rs' Br. at 31–32; *see* 2-ER-158. But EPA incorporated that same exposure-reducing condition into the Registration itself. For example, cotton, soybean, and potato could be sprayed before 10:00 a.m. or after 3:00 p.m., while cucurbits, fruiting vegetables, peanuts, and other tuberous and corm vegetables had a narrower window for spraying extending from two hours before sunset to two hours after the following sunrise. 1-ER-48–9. For other specified crops, EPA restricted spraying during flowering to designated hours or temperatures

of 50 degrees Fahrenheit or lower, when pollinators were expected to be less active. 1-ER-43, 48–9.

Petitioners emphasize EPA's acknowledgment that application-timing restrictions for indeterminate-blooming crops have historically been more restrictive. Pet'rs' Br. at 48. But that comparison alone does not establish that the restrictions here were inadequate. Petitioners do not identify the risks, exposure data, or other circumstances underlying those prior registrations, much less establish that they were comparable to isocycloseram. Here, EPA restricted spraying when pollinators are most active and considered evidence that pesticide residues in pollen and nectar declined rapidly and that foliage weathered for three hours caused less than 25% bee mortality under the tested conditions. 1-ER-43; 2-ER-156. Comparing application windows alone overlooks that evidence concerning the extent and duration of exposure.

Third, EPA imposed measures designed to keep isocycloseram within the treated area by limiting spray drift. To reduce spray drift, EPA restricted applications based on wind conditions, required larger spray droplets that are less prone to drift off target, limited the height at which isocycloseram could be released, and required no-spray buffer zones between treated fields and surrounding non-managed areas, ranging from twenty-five to eighty-five feet for ground applications and extending to 300 feet for aerial applications. 1-ER-50–1. These buffers reduce the potential for

spray drift to reach neighboring habitats where bees and other non-target organisms may be exposed. 1-ER-47–51. For aerial applications, EPA also restricted boom length to minimize drift caused by the aircraft's wingtip or propeller vortices and required applicators to shift the spray path upwind of the field to account for wind carrying droplets off target. *Id.* EPA determined that by implementing these mitigation measures, the potential risk to terrestrial invertebrates decreases by approximately two orders of magnitude. 2-ER-108. That finding directly refutes Petitioners' assertion that EPA failed to explain the extent to which any of its mitigation measures would reduce the identified risks.[24] Pet'rs' Br. at 47.

EPA also addressed exposure from treated seeds, including pesticide-containing dust released when seed coatings rub off during handling and planting, a concern Petitioners raise for solitary ground-nesting bees. Pet'rs' Br. at 50; 2-ER-87. This "dust-off" can occur when treated seeds rub against one another or planting equipment, causing particles from the pesticide-containing seed coating to become airborne during planting and potentially settle on nearby soil, vegetation, or other areas where non-target organisms may be exposed.

EPA addressed that exposure pathway at multiple stages. During seed treatment, EPA required commercial equipment with closed transfer and application

---

[24] Furthermore, Petitioners identify no provision of FIFRA requiring EPA to re-calculate a separate numerical risk reduction to account for mitigation measures. Pet'rs' Br. at 41, 47.

systems and prohibited treating seeds in planter boxes at planting, thereby limiting the generation and release of treated-seed dust with mandatory requirements on the label. 2-ER-88. During planting, the labels advise growers to avoid dry, windy conditions near active pollinators, keep accumulated dust inside seed bags, direct planter exhaust toward the ground, and use lubricants or coatings that reduce dust release. 1-ER-67–9. EPA acknowledged that these planting practices are advisory but concluded that they—along with compulsory label restrictions—protect non-target organisms against exposure to seed dust. 2-ER-84, 88. And because treated seeds themselves can present another route of exposure after planting, the labels advise growers to cover planted seeds and cover or collect spilled treated seeds to protect wildlife. 1-ER-67–8.

Petitioners attempt to minimize this extensive mitigation package by characterizing some provisions as "voluntary." Pet'rs' Br. at 46–47, 49. However, that does not mean they will not be implemented. EPA, along with USDA and Canadian regulators have long relied on advisory practices and other practical ways to reduce dust-off exposure. 2-ER-87–8. EPA recognized that these practices could further reduce exposure while separately imposing mandatory restrictions on the seed-treatment process. *Id.* Thus, the advisory nature of certain planting practices does not negate the additional protections those recommendations were intended to provide. Petitioners' focus on these voluntary measures in isolation and refusal to

consider them as part of an overall package that included mandatory restrictions overlooks the broader inquiry under FIFRA. The Court's role is to assess whether substantial evidence supports the Registration when the record is considered as a whole, including the mandatory restrictions, remaining risks, and benefits EPA considered. 7 U.S.C. § 136n(b).

Taken together, EPA thoroughly assessed the risks associated with the Registration and reasonably relied on a combination of mitigation measures to address the identified risks to pollinators. It imposed various restrictions addressing how much isocycloseram could be applied, when it could be applied, and the ways it could move beyond the treated area, while also adopting additional measures directed at specific exposure pathways. EPA then weighed the remaining risks against the benefits of the approved uses in determining whether registration would cause unreasonable adverse effects on the environment.

### B. EPA reasonably determined that isocycloseram's benefits outweighed its remaining risks.

EPA reasonably weighed the risks and benefits of registering isocycloseram. Its assessment considered potential harm to pollinators and the measures imposed to reduce that risk, alongside four principal benefits: slowing insecticide resistance, effectively controlling target pests, providing advantages over available alternatives, and allowing timely aerial treatment when ground application is impracticable. 1-ER-38–43. After weighing those considerations, EPA concluded that the benefits

outweighed the remaining risks to non-listed species. 1-ER-43. Petitioners' assertion that EPA focused on grower benefits without adequately considering pollinator risk overlooks the extensive risk assessment and mitigation measures underlying that determination. Pet'rs' Br. at 52–53. Their insistence on a full accounting of all costs and benefits, *id.* at 53, likewise reads into the statute requirements that are not there. Under FIFRA, EPA must only take economic, social, and environmental costs and benefits into account, but nothing in FIFRA demands an exhaustive accounting quantifying every possible cost and benefit.[25] 7 U.S.C. § 136(bb); *see Michigan v. EPA*, 576 U.S. 743, 759 (2015) (explaining that consideration of costs does not necessarily require a formal cost-benefit analysis assigning monetary values to every advantage and disadvantage); *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 809 (9th Cir. 1980) (recognizing that EPA need not balance costs and benefits with "pinpoint precision" because many environmental benefits cannot be precisely quantified).

As a preliminary matter, isocycloseram is effective at controlling damaging pests. EPA compared its performance with insecticides recommended for the same pests, using trials submitted by Syngenta and studies published independently. 1-ER-39; 3-ER-553. In Brassica vegetables, isocycloseram controlled cabbage loopers

---

[25] Petitioners cite dollar figures illustrating pollinators' economic importance and discuss losses associated with "colony collapse disorder." Pet'rs' Br. at 53. But those figures do not estimate losses attributable to the registered uses of isocycloseram, and the discussion of colony collapse does not establish that those uses would cause comparable losses.

and imported cabbageworms as well as the alternatives tested. 3-ER-556. In one diamondback moth trial, it reduced caterpillar counts more than the alternative for up to twenty-two days after treatment; two other trials showed comparable results. *Id*. An independent cotton trial likewise found fewer tarnished plant bug nymphs fifteen days after treatment with isocycloseram than with three alternatives, and isocycloseram had comparable control to several others. EPA BEAD Memo at 25, 1-SER-026. For soybeans, EPA noted that managing redbanded stinkbugs is especially important because each bug can cause more crop damage than other stink bug species and commonly used insecticides are less effective against them. *Id*. at 34–5, 1-SER-035–6. With relatively few effective treatments available, isocycloseram offers growers another option for controlling this particularly damaging pest. *Id.* at 35–6, 1-SER-036–7.

EPA also appropriately explained why isocycloseram was important for slowing the resistance to insecticides. EPA considered the diamondback moth, which is the most destructive pest of Brassica vegetables, including cabbage, cauliflower, and broccoli, with management costs ranging annually from $8 to $30 million (2000 to 2009-dollar values). 3-ER-555. It is among the few pests worldwide to have developed field resistance to all major classes of insecticides, and some U.S. populations have reported resistance to several commonly used classes. *Id.* Intensive insecticide use and rapid reproduction contribute to that problem: In warm regions

such as the southeastern United States, the moth can breed continuously and produce as many as fifteen generations per year. *Id.* Adding isocycloseram—which has a new mode of action for these crops—to the rotation of chemical controls can slow development of resistance. 3-ER-544.

Other examples of resistance management that EPA recognized involve the tarnished plant bug and cotton fleahopper, which damage developing cotton bolls, the pods that contain cotton fibers and seeds. EPA BEAD Memo at 23, 1-SER-024. Controlling these pests can require repeated insecticide treatments—upwards of seven applications in some areas. *Id*. The estimated cost of these pests is upwards of $324 million annually in cotton losses and control costs. *Id*. Growers primarily control tarnished plant bugs and cotton fleahoppers by spraying insecticides onto cotton plants, but some tarnished plant bug populations have developed resistance to existing insecticide classes. *Id.* EPA recognized isocycloseram's benefit as another effective insecticide with a different mode of action for controlling these costly pests while managing resistance. *Id*.

EPA also identified a practical benefit from isocycloseram's ability to control several kinds of pests. Growers sometimes mix insecticides to address different pests occurring together, while isocycloseram could provide that control with one product. EPA BEAD Memo at 44–5, 1-SER-045–6; 1-ER-39. For example, trials showed comparable control of tarnished plant bugs in cotton and brown stink bugs in

soybeans using isocycloseram alone rather than a mixture of two other pesticides. EPA BEAD Memo at 25, 35, 1-SER-026, 36. EPA thus had evidence of effective control across several crops and pests, including pests for which existing options present particular challenges.

EPA also found that isocycloseram would likely offer growers more flexibility than some alternatives. For cucurbit vegetables, such as squash and cucumbers, EPA found that isocycloseram could give growers more opportunities to control pests during flowering, subject to pollinator-protection restrictions, than several alternative products with limits on spraying during bloom. EPA BEAD Memo at 42, 1-SER-043. Isocycloseram would also likely control both young and adult spider mites in corn and tree nuts, while some alternatives mainly control young mites, making the timing of treatment less restrictive. *Id.* at 20–1, 43, 1-SER-021–2, 44.

Finally, EPA identified significant benefits from allowing aerial application on corn, cotton, soybean, and potato. 1-ER-39. Tall crops can prevent ground spraying equipment from passing through fields, while rainfall and irrigation can leave soil too wet for that equipment to operate. *Id.* Spraying from aircraft allows growers to treat pest outbreaks promptly under those conditions, helping avoid crop losses that could occur while growers wait for fields to dry. EPA BEAD Memo at 10, 36, 1-SER-011, 37. EPA relied on these benefits in permitting aerial application

for those four crops in selected states and regions, subject to restrictions reducing spray drift and other exposure risks. 1-ER-42–3.

Petitioners again treat EPA's reduced-risk analysis as though it were the final FIFRA registration assessment. They quote the reduced-risk analysis's finding that isocycloseram is "more toxic or of similar toxicity to adult bees than 93% of alternatives on an acute contact exposure" to challenge EPA's risk-benefit determination. Pet'rs' Br. at 54; 3-ER-576. Like the initial Tier 1 screening, that early analysis preceded the fuller assessment informed by Tier 2 evidence. In the same analysis, EPA expressly acknowledged its limited scope, explaining that it "did not incorporate estimated environmental concentrations or residues of concern." 3-ER-576–7. EPA later considered the refined data discussed *supra* Section I.B.2 in deciding whether to register isocycloseram. Petitioners' selective quotation substitutes an early toxicity comparison for the completed assessment and does not undermine EPA's ultimate risk-benefit determination. Neither the early toxicity comparison nor the later withdrawal of the reduced-risk determination, discussed *supra* Section I.C, resolved whether isocycloseram's approved uses, with mitigation, would cause unreasonable adverse effects under FIFRA. Petitioners give undue weight to EPA's preliminary reduced-risk assessment and subsequent withdrawal of that designation, treating both as evidence against the Registration while overlooking EPA's more comprehensive risk assessment and risk-benefit analysis.

EPA considered the potential risk to pollinators, imposed measures to reduce that harm, and weighed the remaining risks against documented pest-control benefits. Substantial evidence supports EPA's conclusion that those benefits outweighed the remaining risks and that the Registration would not cause unreasonable adverse effects on the environment.

## III. If the Court finds legal error, the appropriate remedy is remand without vacatur.

EPA's decision to register isocycloseram is supported by substantial evidence and should be upheld. But even if the Court finds some error, vacatur would be inappropriate. *Contra* Pet'rs' Br. at 55–57. Instead, the Court should remand to EPA while allowing the Registration to remain in place pending completion of remand proceedings.

To determine whether vacatur is warranted in a particular case, the Court undertakes an equitable analysis. Whether agency action should be vacated depends on how serious the agency's errors are "and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Also relevant to the analysis is whether "by complying with procedural rules, [the agency] could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship*

*Council*, 806 F.3d at 532. Remand without vacatur would be proper here both because the Registration could be sustained on remand with additional explanation and because disruptive consequences might flow from vacatur. At bottom, Petitioners criticize particular details of EPA's analysis with respect to bees, classic record-based arguments amenable to remand. Unlike in *Pollinator Stewardship Council*, this is not a case in which EPA lacked sufficient data to support its registration decision. Moreover, seriously disruptive consequences would flow from vacatur. Vacatur would withdraw a valuable pest-control option while EPA addresses any identified deficiency. As explained *supra* Section II.B, EPA documented the benefit of isocycloseram for managing pests that have developed resistance to existing pesticides, including diamondback moth and the tarnished plant bug. Removing those products would deprive growers of an effective option for managing resistant pests and treating outbreaks under difficult field conditions. Those consequences warrant consideration alongside the potential risks of retaining the Registration during remand.

## CONCLUSION

For the foregoing reasons, this Court should deny the petition.

Respectfully submitted,

/s/ *Alvand D. Ghandhari*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
BENJAMIN HAYES
*Deputy Assistant Attorney General*
ALVAND D. GHANDHARI
*Trial Attorney*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-3338
alvand.ghandhari@usdoj.gov

Of Counsel:
Forrest Pittman
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

November 19, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-298

I am the attorney or self-represented party.

**This brief contains** 13,822 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ________.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Alvand Ghandhari **Date** 11-19-2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

No. 26-298

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY
and CENTER FOR FOOD SAFETY,
Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
Respondents,

SYNGENTA CROP PROTECTION, LLC,
Respondent-Intervenor

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**ADDENDUM FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
BENJAMIN HAYES
*Deputy Assistant Attorney General*
ALVAND D. GHANDHARI
*Trial Attorney*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 598-3338
alvand.ghandhari@usdoj.gov

Of Counsel:
Forrest Pittman
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

## TABLE OF CONTENTS

7 U.S.C. §136 .......... Add. 001
7 U.S.C. §136a .......... Add. 009
7 U.S.C. §136n .......... Add. 026
7 U.S.C. §136w-8 .......... Add. 028
40 C.F.R. pt. 158 .......... Add. 068

with respect to any violations, liabilities incurred, or appeals taken prior to such date of repeal or to sales, shipments, or deliveries of insecticides and fungicides exempted by the Secretary.

## SUBCHAPTER II—ENVIRONMENTAL PESTICIDE CONTROL

### §§ 135 to 135k. Omitted

#### Editorial Notes

CODIFICATION

Sections 135 to 135k, acts June 25, 1947, ch. 125, §§ 2–13, 61 Stat. 163–172; Aug. 7, 1959, Pub. L. 86–139, § 2, 73 Stat. 286; May 12, 1964, Pub. L. 88–305, §§ 1–6, 78 Stat. 190–193; Oct. 15, 1970, Pub. L. 91–452, title II, § 204, 84 Stat. 928; Dec. 30, 1970, Pub. L. 91–601, § 6(b), formerly § 7(b), 84 Stat. 1673, renumbered, Aug. 13, 1981, Pub. L. 97–35, title XII, § 1205(c), 95 Stat. 716, which related to economic poison control, were superseded by the amendments made to act June 25, 1947, by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 975. See section 4 of Pub. L. 92–516, set out as a note under section 136 of this title. The provisions of act June 25, 1947, as amended by Pub. L. 92–516, are set out in section 136 et seq. of this title.

Section 135 provided definitions for the purposes of this subchapter.

Section 135a related to prohibited acts.

Section 135b related to registration of economic poisons.

Section 135c related to access, inspection, and use in criminal prosecutions of books and records.

Section 135d related to rules and regulations, examination of economic poisons or devices, notification to violators, certification to United States attorney, duty of attorney, and publication of judgments.

Section 135e related to exemptions from penalties.

Section 135f provided for penalties.

Section 135g related to seizure, disposal, and award of costs against claimant.

Section 135h related to refusal of admission of imports.

Section 135i related to delegation of duties.

Section 135j related to authorization of appropriations and expenditure of funds.

Section 135k related to cooperation between departments and agencies.

### § 136. Definitions

For purposes of this subchapter—

#### (a) Active ingredient

The term ''active ingredient'' means—

(1) in the case of a pesticide other than a plant regulator, defoliant, desiccant, or nitrogen stabilizer, an ingredient which will prevent, destroy, repel, or mitigate any pest;

(2) in the case of a plant regulator, an ingredient which, through physiological action, will accelerate or retard the rate of growth or rate of maturation or otherwise alter the behavior of ornamental or crop plants or the product thereof;

(3) in the case of a defoliant, an ingredient which will cause the leaves or foliage to drop from a plant;

(4) in the case of a desiccant, an ingredient which will artificially accelerate the drying of plant tissue; and

(5) in the case of a nitrogen stabilizer, an ingredient which will prevent or hinder the process of nitrification, denitrification, ammonia volatilization, or urease production through action affecting soil bacteria.

#### (b) Administrator

The term ''Administrator'' means the Administrator of the Environmental Protection Agency.

#### (c) Adulterated

The term ''adulterated'' applies to any pesticide if—

(1) its strength or purity falls below the professed standard of quality as expressed on its labeling under which it is sold;

(2) any substance has been substituted wholly or in part for the pesticide; or

(3) any valuable constituent of the pesticide has been wholly or in part abstracted.

#### (d) Animal

The term ''animal'' means all vertebrate and invertebrate species, including but not limited to man and other mammals, birds, fish, and shellfish.

#### (e) Certified applicator, etc.

##### (1) Certified applicator

The term ''certified applicator'' means any individual who is certified under section 136i of this title as authorized to use or supervise the use of any pesticide which is classified for restricted use. Any applicator who holds or applies registered pesticides, or uses dilutions of registered pesticides consistent with subsection (ee), only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served is not deemed to be a seller or distributor of pesticides under this subchapter.

##### (2) Private applicator

The term ''private applicator'' means a certified applicator who uses or supervises the use of any pesticide which is classified for restricted use for purposes of producing any agricultural commodity on property owned or rented by the applicator or the applicator's employer or (if applied without compensation other than trading of personal services between producers of agricultural commodities) on the property of another person.

##### (3) Commercial applicator

The term ''commercial applicator'' means an applicator (whether or not the applicator is a private applicator with respect to some uses) who uses or supervises the use of any pesticide which is classified for restricted use for any purpose or on any property other than as provided by paragraph (2).

##### (4) Under the direct supervision of a certified applicator

Unless otherwise prescribed by its labeling, a pesticide shall be considered to be applied under the direct supervision of a certified applicator if it is applied by a competent person acting under the instructions and control of a certified applicator who is available if and when needed, even though such certified applicator is not physically present at the time and place the pesticide is applied.

#### (f) Defoliant

The term ''defoliant'' means any substance or mixture of substances intended for causing the

leaves or foliage to drop from a plant, with or without causing abscission.

**(g) Desiccant**

The term ''desiccant'' means any substance or mixture of substances intended for artificially accelerating the drying of plant tissue.

**(h) Device**

The term ''device'' means any instrument or contrivance (other than a firearm) which is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life (other than man and other than bacteria, virus, or other microorganism on or in living man or other living animals); but not including equipment used for the application of pesticides when sold separately therefrom.

**(i) District court**

The term ''district court'' means a United States district court, the District Court of Guam, the District Court of the Virgin Islands, and the highest court of American Samoa.

**(j) Environment**

The term ''environment'' includes water, air, land, and all plants and man and other animals living therein, and the interrelationships which exist among these.

**(k) Fungus**

The term ''fungus'' means any non-chlorophyll-bearing thallophyte (that is, any non-chlorophyll-bearing plant of a lower order than mosses and liverworts), as for example, rust, smut, mildew, mold, yeast, and bacteria, except those on or in living man or other animals and those on or in processed food, beverages, or pharmaceuticals.

**(*l*) Imminent hazard**

The term ''imminent hazard'' means a situation which exists when the continued use of a pesticide during the time required for cancellation proceeding would be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a species declared endangered or threatened by the Secretary pursuant to the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

**(m) Inert ingredient**

The term ''inert ingredient'' means an ingredient which is not active.

**(n) Ingredient statement**

The term ''ingredient statement'' means a statement which contains—

(1) the name and percentage of each active ingredient, and the total percentage of all inert ingredients, in the pesticide; and

(2) if the pesticide contains arsenic in any form, a statement of the percentages of total and water soluble arsenic, calculated as elementary arsenic.

**(*o*) Insect**

The term ''insect'' means any of the numerous small invertebrate animals generally having the body more or less obviously segmented, for the most part belonging to the class insecta, comprising six-legged, usually winged forms, as for example, beetles, bugs, bees, flies, and to other allied classes of arthropods whose members are wingless and usually have more than six legs, as for example, spiders, mites, ticks, centipedes, and wood lice.

**(p) Label and labeling**

**(1) Label**

The term ''label'' means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers.

**(2) Labeling**

The term ''labeling'' means all labels and all other written, printed, or graphic matter—

(A) accompanying the pesticide or device at any time; or

(B) to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

**(q) Misbranded**

(1) A pesticide is misbranded if—

(A) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

(B) it is contained in a package or other container or wrapping which does not conform to the standards established by the Administrator pursuant to section 136w(c)(3) of this title;

(C) it is an imitation of, or is offered for sale under the name of, another pesticide;

(D) its label does not bear the registration number assigned under section 136e of this title to each establishment in which it was produced;

(E) any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

(F) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment;

(G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment; or

(H) in the case of a pesticide not registered in accordance with section 136a of this title

and intended for export, the label does not contain, in words prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) as to render it likely to be noted by the ordinary individual under customary conditions of purchase and use, the following: ''Not Registered for Use in the United States of America''.

(2) A pesticide is misbranded if—

(A) the label does not bear an ingredient statement on that part of the immediate container (and on the outside container or wrapper of the retail package, if there be one, through which the ingredient statement on the immediate container cannot be clearly read) which is presented or displayed under customary conditions of purchase, except that a pesticide is not misbranded under this subparagraph if—

(i) the size or form of the immediate container, or the outside container or wrapper of the retail package, makes it impracticable to place the ingredient statement on the part which is presented or displayed under customary conditions of purchase; and

(ii) the ingredient statement appears prominently on another part of the immediate container, or outside container or wrapper, permitted by the Administrator;

(B) the labeling does not contain a statement of the use classification under which the product is registered;

(C) there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot be clearly read, a label bearing—

(i) the name and address of the producer, registrant, or person for whom produced;

(ii) the name, brand, or trademark under which the pesticide is sold;

(iii) the net weight or measure of the content, except that the Administrator may permit reasonable variations; and

(iv) when required by regulation of the Administrator to effectuate the purposes of this subchapter, the registration number assigned to the pesticide under this subchapter, and the use classification; and

(D) the pesticide contains any substance or substances in quantities highly toxic to man, unless the label shall bear, in addition to any other matter required by this subchapter—

(i) the skull and crossbones;

(ii) the word ''poison'' prominently in red on a background of distinctly contrasting color; and

(iii) a statement of a practical treatment (first aid or otherwise) in case of poisoning by the pesticide.

**(r) Nematode**

The term ''nematode'' means invertebrate animals of the phylum nemathelminthes and class nematoda, that is, unsegmented round worms with elongated, fusiform, or saclike bodies covered with cuticle, and inhabiting soil, water, plants, or plant parts; may also be called nemas or eelworms.

**(s) Person**

The term ''person'' means any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not.

**(t) Pest**

The term ''pest'' means (1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organisms on or in living man or other living animals) which the Administrator declares to be a pest under section 136w(c)(1) of this title.

**(u) Pesticide**

The term ''pesticide'' means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer, except that the term ''pesticide'' shall not include any article that is a ''new animal drug'' within the meaning of section 321(w)[1] of title 21, that has been determined by the Secretary of Health and Human Services not to be a new animal drug by a regulation establishing conditions of use for the article, or that is an animal feed within the meaning of section 321(x)[1] of title 21 bearing or containing a new animal drug. The term ''pesticide'' does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of title 21. For purposes of the preceding sentence, the term ''critical device'' includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term ''semi-critical device'' includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body.

**(v) Plant regulator**

The term ''plant regulator'' means any substance or mixture of substances intended, through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof, but shall not include substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments. Also, the term ''plant regulator'' shall not be required to include any of such of those nutrient mixtures or soil amendments as are commonly known as vitamin-hormone horticultural products, intended for improvement, maintenance, survival, health, and propagation of plants, and as are not for pest destruction and

[1] See References in Text note below.

are nontoxic, nonpoisonous in the undiluted packaged concentration.

**(w) Producer and produce**

The term "producer" means the person who manufactures, prepares, compounds, propagates, or processes any pesticide or device or active ingredient used in producing a pesticide. The term "produce" means to manufacture, prepare, compound, propagate, or process any pesticide or device or active ingredient used in producing a pesticide. The dilution by individuals of formulated pesticides for their own use and according to the directions on registered labels shall not of itself result in such individuals being included in the definition of "producer" for the purposes of this subchapter.

**(x) Protect health and the environment**

The terms "protect health and the environment" and "protection of health and the environment" mean protection against any unreasonable adverse effects on the environment.

**(y) Registrant**

The term "registrant" means a person who has registered any pesticide pursuant to the provisions of this subchapter.

**(z) Registration**

The term "registration" includes reregistration.

**(aa) State**

The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa.

**(bb) Unreasonable adverse effects on the environment**

The term "unreasonable adverse effects on the environment" means (1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 346a of title 21. The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide.

**(cc) Weed**

The term "weed" means any plant which grows where not wanted.

**(dd) Establishment**

The term "establishment" means any place where a pesticide or device or active ingredient used in producing a pesticide is produced, or held, for distribution or sale.

**(ee) To use any registered pesticide in a manner inconsistent with its labeling**

The term "to use any registered pesticide in a manner inconsistent with its labeling" means to use any registered pesticide in a manner not permitted by the labeling, except that the term shall not include (1) applying a pesticide at any dosage, concentration, or frequency less than that specified on the labeling unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency, (2) applying a pesticide against any target pest not specified on the labeling if the application is to the crop, animal, or site specified on the labeling, unless the Administrator has required that the labeling specifically state that the pesticide may be used only for the pests specified on the labeling after the Administrator has determined that the use of the pesticide against other pests would cause an unreasonable adverse effect on the environment, (3) employing any method of application not prohibited by the labeling unless the labeling specifically states that the product may be applied only by the methods specified on the labeling, (4) mixing a pesticide or pesticides with a fertilizer when such mixture is not prohibited by the labeling, (5) any use of a pesticide in conformance with section 136c, 136p, or 136v of this title, or (6) any use of a pesticide in a manner that the Administrator determines to be consistent with the purposes of this subchapter. After March 31, 1979, the term shall not include the use of a pesticide for agricultural or forestry purposes at a dilution less than label dosage unless before or after that date the Administrator issues a regulation or advisory opinion consistent with the study provided for in section 27(b) of the Federal Pesticide Act of 1978, which regulation or advisory opinion specifically requires the use of definite amounts of dilution.

**(ff) Outstanding data requirement**

**(1) In general**

The term "outstanding data requirement" means a requirement for any study, information, or data that is necessary to make a determination under section 136a(c)(5) of this title and which study, information, or data—

(A) has not been submitted to the Administrator; or

(B) if submitted to the Administrator, the Administrator has determined must be resubmitted because it is not valid, complete, or adequate to make a determination under section 136a(c)(5) of this title and the regulations and guidelines issued under such section.

**(2) Factors**

In making a determination under paragraph (1)(B) respecting a study, the Administrator shall examine, at a minimum, relevant protocols, documentation of the conduct and analysis of the study, and the results of the study to determine whether the study and the results of the study fulfill the data requirement for which the study was submitted to the Administrator.

**(gg) To distribute or sell**

The term "to distribute or sell" means to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver. The term does not include the holding or application of registered pesticides or use dilutions

thereof by any applicator who provides a service of controlling pests without delivering any unapplied pesticide to any person so served.

**(hh) Nitrogen stabilizer**

The term ''nitrogen stabilizer'' means any substance or mixture of substances intended for preventing or hindering the process of nitrification, denitrification, ammonia volatilization, or urease production through action upon soil bacteria. Such term shall not include—

(1) dicyandiamide;

(2) ammonium thiosulfate; or

(3) any substance or mixture of substances.—[2]

(A) that was not registered pursuant to section 136a of this title prior to January 1, 1992; and

(B) that was in commercial agronomic use prior to January 1, 1992, with respect to which after January 1, 1992, the distributor or seller of the substance or mixture has made no specific claim of prevention or hindering of the process of nitrification, denitrification, ammonia volatilization[3] urease production regardless of the actual use or purpose for, or future use or purpose for, the substance or mixture.

Statements made in materials required to be submitted to any State legislative or regulatory authority, or required by such authority to be included in the labeling or other literature accompanying any such substance or mixture shall not be deemed a specific claim within the meaning of this subsection.

**(jj)[4] Maintenance applicator**

The term ''maintenance applicator'' means any individual who, in the principal course of such individual's employment, uses, or supervises the use of, a pesticide not classified for restricted use (other than a ready to use consumer products pesticide); for the purpose of providing structural pest control or lawn pest control including janitors, general maintenance personnel, sanitation personnel, and grounds maintenance personnel. The term ''maintenance applicator'' does not include private applicators as defined in subsection (e)(2); individuals who use antimicrobial pesticides, sanitizers or disinfectants; individuals employed by Federal, State, and local governments or any political subdivisions thereof, or individuals who use pesticides not classified for restricted use in or around their homes, boats, sod farms, nurseries, greenhouses, or other noncommercial property.

**(kk) Service technician**

The term ''service technician'' means any individual who uses or supervises the use of pesticides (other than a ready to use consumer products pesticide) for the purpose of providing structural pest control or lawn pest control on the property of another for a fee. The term ''service technician'' does not include individuals who use antimicrobial pesticides, sanitizers or disinfectants; or who otherwise apply ready to use consumer products pesticides.

[2] So in original. Period probably should not appear.

[3] So in original. Probably should be followed by '', or''.

[4] So in original. No subsec. (ii) was enacted.

**(*ll*) Minor use**

The term ''minor use'' means the use of a pesticide on an animal, on a commercial agricultural crop or site, or for the protection of public health where—

(1) the total United States acreage for the crop is less than 300,000 acres, as determined by the Secretary of Agriculture; or

(2) the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, the use does not provide sufficient economic incentive to support the initial registration or continuing registration of a pesticide for such use and—

(A) there are insufficient efficacious alternative registered pesticides available for the use;

(B) the alternatives to the pesticide use pose greater risks to the environment or human health;

(C) the minor use pesticide plays or will play a significant part in managing pest resistance; or

(D) the minor use pesticide plays or will play a significant part in an integrated pest management program.

The status as a minor use under this subsection shall continue as long as the Administrator has not determined that, based on existing data, such use may cause an unreasonable adverse effect on the environment and the use otherwise qualifies for such status.

**(mm) Antimicrobial pesticide**

**(1) In general**

The term ''antimicrobial pesticide'' means a pesticide that—

(A) is intended to—

(i) disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms; or

(ii) protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime; and

(B) in the intended use is exempt from, or otherwise not subject to, a tolerance under section 346a of title 21 or a food additive regulation under section 348 of title 21.

**(2) Excluded products**

The term ''antimicrobial pesticide'' does not include—

(A) a wood preservative or antifouling paint product for which a claim of pesticidal activity other than or in addition to an activity described in paragraph (1) is made;

(B) an agricultural fungicide product; or

(C) an aquatic herbicide product.

**(3) Included products**

The term ''antimicrobial pesticide'' does include any other chemical sterilant product (other than liquid chemical sterilant products exempt under subsection (u)), any other disinfectant product, any other industrial microbiocide product, and any other preserva-

Case: 26-298, 11/19/2026, DktEntry: 41.1, (80 of 142)



tive product that is not excluded by paragraph (2).

**(nn) Public health pesticide**

The term ''public health pesticide'' means any minor use pesticide product registered for use and used predominantly in public health programs for vector control or for other recognized health protection uses, including the prevention or mitigation of viruses, bacteria, or other microorganisms (other than viruses, bacteria, or other microorganisms on or in living man or other living animal) that pose a threat to public health.

**(*oo*) Vector**

The term ''vector'' means any organism capable of transmitting the causative agent of human disease or capable of producing human discomfort or injury, including mosquitoes, flies, fleas, cockroaches, or other insects and ticks, mites, or rats.

(June 25, 1947, ch. 125, §2, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 975; amended Pub. L. 93–205, §13(f), Dec. 28, 1973, 87 Stat. 903; Pub. L. 94–140, §9, Nov. 28, 1975, 89 Stat. 754; Pub. L. 95–396, §1, Sept. 30, 1978, 92 Stat. 819; Pub. L. 100–532, title I, §101, title VI, §601(a), title VIII, §801(a), Oct. 25, 1988, 102 Stat. 2655, 2677, 2679; Pub. L. 102–237, title X, §1006(a)(1), (2), (b)(3)(A), (B), Dec. 13, 1991, 105 Stat. 1894, 1895; Pub. L. 104–170, title I, §§105(a), 120, title II, §§210(a), 221, 230, title III, §304, Aug. 3, 1996, 110 Stat. 1490, 1492, 1493, 1502, 1508, 1512.)

**Editorial Notes**

References in Text

The Endangered Species Act of 1973, referred to in subsec. (*l*), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified generally to chapter 35 (§1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

Section 321 of title 21, referred to in subsec. (u), was subsequently amended, and subsecs. (w) and (x) of section 321 no longer define the terms ''new animal drug'' and ''animal feed'', respectively. However, such terms are defined elsewhere in that section.

Section 27(b) of Federal Pesticide Act of 1978, referred to in subsec. (ee), is section 27(b) of Pub. L. 95–396, Sept. 30, 1978, 92 Stat. 841, which was formerly set out as a note under section 136w–4 of this title.

Prior Provisions

A prior section 2 of act June 25, 1947, was classified to section 135 of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

Amendments

1996—Subsec. (a)(1). Pub. L. 104–170, §105(a)(1)(A), substituted ''defoliant, desiccant, or nitrogen stabilizer'' for ''defoliant, or desiccant''.

Subsec. (a)(5). Pub. L. 104–170, §105(a)(1)(B)–(D), added par. (5).

Subsec. (u). Pub. L. 104–170, §§105(a)(2), 221(1), struck out ''and'' before ''(2)'', inserted ''and (3) any nitrogen stabilizer,'' after ''desiccant,'', and inserted at end ''The term 'pesticide' does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of title 21. For purposes of the preceding sentence, the term 'critical device' includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term 'semi-critical device' includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body.''

Subsec. (bb). Pub. L. 104–170, §304, which directed amendment of section 2(bb) by inserting ''(1)'' after ''means'' and adding cl. (2), without specifying the Act being amended, was executed to this subsection, which is section 2(bb) of the Federal Insecticide, Fungicide, and Rodenticide Act, to reflect the probable intent of Congress.

Pub. L. 104–170, §230(a), inserted at end ''The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide.''

Subsec. (hh). Pub. L. 104–170, §105(a)(3), added subsec. (hh).

Subsecs. (jj), (kk). Pub. L. 104–170, §120, added subsecs. (jj) and (kk).

Subsec. (*ll*). Pub. L. 104–170, §210(a), added subsec. (*ll*).

Subsec. (mm). Pub. L. 104–170, §221(2), added subsec. (mm).

Subsecs. (nn), (*oo*). Pub. L. 104–170, §230(b), added subsecs. (nn) and (*oo*).

1991—Subsec. (e)(1). Pub. L. 102–237, §1006(a)(1), substituted ''section 136i'' for ''section 136b'' and ''uses dilutions'' for ''use dilutions'' and made technical amendment to reference to subsection (ee) of this section involving corresponding provision of original act.

Subsec. (e)(2). Pub. L. 102–237, §1006(b)(3)(A), substituted ''the applicator or the applicator's'' for ''him or his''.

Subsec. (e)(3). Pub. L. 102–237, §1006(b)(3)(B), substituted ''the applicator'' for ''he''.

Subsec. (q)(2)(A)(i). Pub. L. 102–237, §1006(a)(2), substituted ''size or form'' for ''size of form''.

1988—Subsec. (c). Pub. L. 100–532, §801(a)(1), substituted ''if—'' for ''if:''.

Subsec. (p)(2)(B). Pub. L. 100–532, §801(a)(2), substituted ''Health and Human Services'' for ''Health, Education, and Welfare''.

Subsec. (q)(2)(A). Pub. L. 100–532, §801(a)(3), substituted ''if—'' for ''if:''.

Subsec. (q)(2)(C)(iii). Pub. L. 100–532, §801(a)(4), substituted '', except that'' for '': *Provided*, That''.

Subsec. (u). Pub. L. 100–532, §801(a)(5), substituted '', except that'' for '': *Provided*, That'', struck out ''(1)(a)'' after ''include any article'' and ''or (b)'' after ''section 321(w) of title 21,'', and substituted ''Health and Human Services'' for ''Health, Education, and Welfare'', ''or that is'' for ''or (2) that is'', and ''a new animal drug'' for ''an article covered by clause (1) of this proviso''.

Subsec. (ee). Pub. L. 100–532, §§601(a)(1), 801(a)(6), substituted '', except that'' for '': *Provided*, That'', inserted ''unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency'' and ''unless the labeling specifically states that the product may be applied only by the methods specified on the labeling'', substituted ''labeling, (4) mixing'' for ''labeling, or (4) mixing'', '', (5)'' for '': *Provided further*, That the term also shall not include'', ''or (6) any use'' for ''or any use'', and ''. After'' for '': *And provided further*, That after''.

Subsec. (ff). Pub. L. 100–532, §101, added subsec. (ff).

Subsec. (gg). Pub. L. 100–532, §601(a)(2), added subsec. (gg).

1978—Subsec. (e)(1). Pub. L. 95–396, §1(1), inserted provision deeming an applicator not a seller or distributor of pesticides when providing a service of controlling pests.

Subsec. (e)(3). Pub. L. 95–396, §1(2), substituted ''an applicator'' for ''a certified applicator''.

Subsec. (q)(1)(H). Pub. L. 95–396, § 1(3), added subpar. (H).

Subsec. (w). Pub. L. 95–396, § 1(4), (5), amended definition of ''producer'' and ''produce'' to include reference to active ingredient used in producing a pesticide and inserted provision that an individual did not become a producer when there was dilution of a pesticide for personal use according to directions on registered labels.

Subsec. (dd). Pub. L. 95–396, § 1(6), inserted ''or active ingredient used in producing a pesticide''.

Subsec. (ee). Pub. L. 95–396, § 1(7), added subsec. (ee).

1975—Subsec. (u). Pub. L. 94–140 inserted proviso which excluded from term ''pesticide'' any article designated as ''new animal drug'' and any article denominated as animal feed.

1973—Subsec. (*l*). Pub. L. 93–205 substituted ''or threatened by the Secretary pursuant to the Endangered Species Act of 1973'' for ''by the Secretary of the Interior under Public Law 91–135''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–532, title IX, § 901, Oct. 25, 1988, 102 Stat. 2688, provided that: ''Except as otherwise provided in this Act, the amendments made by this Act [see Short Title of 1988 Amendment note below] shall take effect on the expiration of 60 days after the date of enactment of this Act [Oct. 25, 1988].''

EFFECTIVE DATE OF 1973 AMENDMENT

Amendment by Pub. L. 93–205 effective Dec. 28, 1973, see section 16 of Pub. L. 93–205, set out as an Effective Date note under section 1531 of Title 16, Conservation.

EFFECTIVE DATE

Pub. L. 92–516, § 4, Oct. 21, 1972, 86 Stat. 998, as amended by Pub. L. 94–140, § 4, Nov. 28, 1975, 89 Stat. 752; Pub. L. 95–396, § 28, Sept. 30, 1978, 92 Stat. 842, provided that:

''(a) Except as otherwise provided in the Federal Insecticide, Fungicide, and Rodenticide Act [this subchapter], as amended by this Act and as otherwise provided by this section, the amendments made by this Act [see Short Title note set out below] shall take effect at the close of the date of the enactment of this Act [Oct. 21, 1972], provided if regulations are necessary for the implementation of any provision that becomes effective on the date of enactment, such regulations shall be promulgated and shall become effective within 90 days from the date of enactment of this Act.

''(b) The provisions of the Federal Insecticide, Fungicide, and Rodenticide Act [this subchapter] and the regulations thereunder as such existed prior to the enactment of this Act shall remain in effect until superseded by the amendments made by this Act and regulations thereunder.

''(c)(1) Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

''(2) Any requirements that a pesticide be registered for use only by a certified applicator shall not be effective until five years from the date of enactment of this Act.

''(3) A period of five years from date of enactment shall be provided for certification of applicators.

''(A) One year after the enactment of this Act the Administrator shall have prescribed the standards for the certification of applicators.

''(B) Each State desiring to certify applicators shall submit a State plan to the Administrator for the purpose provided by section 4(b).

''(C) As promptly as possible but in no event more than one year after submission of a State plan, the Administrator shall approve the State plan or disapprove it and indicate the reasons for disapproval. Consideration of plans resubmitted by States shall be expedited.

''(4) One year after the enactment of this Act the Administrator shall have promulgated and shall make effective regulations relating to the registration of establishments, permits for experimental use, and the keeping of books and records under the provisions of this Act.

''(d) No person shall be subject to any criminal or civil penalty imposed by the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by this Act, for any act (or failure to act) occurring before the expiration of 60 days after the Administrator has published effective regulations in the Federal Register and taken such other action as may be necessary to permit compliance with the provisions under which the penalty is to be imposed.

''(e) For purposes of determining any criminal or civil penalty or liability to any third person in respect of any act or omission occurring before the expiration of the periods referred to in this section, the Federal Insecticide, Fungicide, and Rodenticide Act shall be treated as continuing in effect as if this Act had not been enacted.''

SHORT TITLE OF 2022 AMENDMENT

Pub. L. 117–328, div. HH, title VI, § 701, Dec. 29, 2022, 136 Stat. 5996, provided that: ''This title [amending sections 136a, 136a–1, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under sections 136a, 136a–1, and 136w of this title] may be cited as the 'Pesticide Registration Improvement Act of 2022'.''

SHORT TITLE OF 2019 AMENDMENT

Pub. L. 116–8, § 1(a), Mar. 8, 2019, 133 Stat. 484, provided that: ''This Act [amending sections 136a–1, 136c, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under section 136w of this title] may be cited as the 'Pesticide Registration Improvement Extension Act of 2018'.''

SHORT TITLE OF 2012 AMENDMENT

Pub. L. 112–177, § 1, Sept. 28, 2012, 126 Stat. 1327, provided that: ''This Act [amending sections 136a–1 and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under section 136a–1 of this title] may be cited as the 'Pesticide Registration Improvement Extension Act of 2012'.''

SHORT TITLE OF 2007 AMENDMENT

Pub. L. 110–94, § 1, Oct. 9, 2007, 121 Stat. 1000, provided that: ''This Act [amending sections 136a, 136a–1, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under section 136a of this title] may be cited as the 'Pesticide Registration Improvement Renewal Act'.''

SHORT TITLE OF 2004 AMENDMENT

Pub. L. 108–199, div. G, title V, § 501(a), Jan. 23, 2004, 118 Stat. 419, provided that: ''This section [enacting section 136w–8 of this title, amending sections 136a, 136a–1, 136x, and 136y of this title, and enacting provisions set out as notes under section 136a of this title and section 346a of Title 21, Food and Drugs] may be cited as the 'Pesticide Registration Improvement Act of 2003'.''

SHORT TITLE OF 1996 AMENDMENT

Pub. L. 104–170, § 1, Aug. 3, 1996, 110 Stat. 1489, provided that: ''This Act [enacting sections 136i–2, 136r–1, and 136w–5 to 136w–7 of this title, amending this section, sections 136a, 136a–1, 136d, 136q, 136s, 136w, 136w–3, 136x, and 136y of this title, and sections 321, 331, 333, 342, and 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under section 136i–2 of this title and sections 301 and 346a of Title 21] may be cited as the 'Food Quality Protection Act of 1996'.''

[Another Food Quality Protection Act of 1996 was enacted by Pub. L. 104–170, title IV, 110 Stat. 1513, see section 401(a) of Pub. L. 104–170, set out as a note under section 301 of Title 21, Food and Drugs.]

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–532, §1(a), Oct. 25, 1988, 102 Stat. 2654, provided that: "This Act [enacting section 136a–1 of this title, amending this section and sections 136a to 136d, 136f to 136q, 136s, 136v to 136w–2, and 136y of this title, and enacting provisions set out as notes under this section and sections 136m and 136y of this title] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act Amendments of 1988'."

SHORT TITLE OF 1978 AMENDMENT

Pub. L. 95–396, §29, Sept. 30, 1978, 92 Stat. 842, provided that: "This Act [enacting sections 136w–1 to 136w–4 of this title, amending this section and sections 136a to 136f, 136h, 136j, 136*l*, 136*o*, 136q, 136r, 136u to 136w, 136x, and 136y of this title, enacting provisions set out as notes under sections 136a, 136*o*, and 136w–4 of this title, and amending provisions set out as a note under this section] may be cited as the 'Federal Pesticide Act of 1978'."

SHORT TITLE

Pub. L. 92–516, §1, Oct. 21, 1972, 86 Stat. 973, provided: "That this Act [amending this subchapter generally, enacting notes set out under this section, and amending sections 1261 and 1471 of Title 15, Commerce and Trade, and sections 321 and 346a of Title 21, Foods and Drugs] may be cited as the 'Federal Environmental Pesticide Control Act of 1972'."

Act June 25, 1947, ch. 125, §1(a), as added by Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 973, provided that: "This Act [enacting this subchapter] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act'."

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

FEDERAL COMPLIANCE WITH POLLUTION CONTROL STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

## § 136a. Registration of pesticides

### (a) Requirement of registration

Except as provided by this subchapter, no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter. To the extent necessary to prevent unreasonable adverse effects on the environment, the Administrator may by regulation limit the distribution, sale, or use in any State of any pesticide that is not registered under this subchapter and that is not the subject of an experimental use permit under section 136c of this title or an emergency exemption under section 136p of this title.

### (b) Exemptions

A pesticide which is not registered with the Administrator may be transferred if—

(1) the transfer is from one registered establishment to another registered establishment operated by the same producer solely for packaging at the second establishment or for use as a constituent part of another pesticide produced at the second establishment; or

(2) the transfer is pursuant to and in accordance with the requirements of an experimental use permit.

### (c) Procedure for registration

#### (1) Statement required

Each applicant for registration of a pesticide shall file with the Administrator a statement which includes—

(A) the name and address of the applicant and of any other person whose name will appear on the labeling;

(B) the name of the pesticide;

(C) a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;

(D) the complete formula of the pesticide;

(E) a request that the pesticide be classified for general use or for restricted use, or for both; and

(F) except as otherwise provided in paragraph (2)(D), if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

(i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide, except that such permission shall not be required in the case of defensive data.

(ii) The period of exclusive data use provided under clause (i) shall be extended 1 additional year for each 3 minor uses registered after August 3, 1996, and within 7 years of the commencement of the exclusive use period, up to a total of 3 additional years for all minor uses registered by the Administrator if the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, that—

(I) there are insufficient efficacious alternative registered pesticides available for the use;

(II) the alternatives to the minor use pesticide pose greater risks to the environment or human health;

(III) the minor use pesticide plays or will play a significant part in managing pest resistance; or

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





[Another Food Quality Protection Act of 1996 was enacted by Pub. L. 104–170, title IV, 110 Stat. 1513, see section 401(a) of Pub. L. 104–170, set out as a note under section 301 of Title 21, Food and Drugs.]

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–532, §1(a), Oct. 25, 1988, 102 Stat. 2654, provided that: "This Act [enacting section 136a–1 of this title, amending this section and sections 136a to 136d, 136f to 136q, 136s, 136v to 136w–2, and 136y of this title, and enacting provisions set out as notes under this section and sections 136m and 136y of this title] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act Amendments of 1988'."

SHORT TITLE OF 1978 AMENDMENT

Pub. L. 95–396, §29, Sept. 30, 1978, 92 Stat. 842, provided that: "This Act [enacting sections 136w–1 to 136w–4 of this title, amending this section and sections 136a to 136f, 136h, 136j, 136*l*, 136*o*, 136q, 136r, 136u to 136w, 136x, and 136y of this title, enacting provisions set out as notes under sections 136a, 136*o*, and 136w–4 of this title, and amending provisions set out as a note under this section] may be cited as the 'Federal Pesticide Act of 1978'."

SHORT TITLE

Pub. L. 92–516, §1, Oct. 21, 1972, 86 Stat. 973, provided: "That this Act [amending this subchapter generally, enacting notes set out under this section, and amending sections 1261 and 1471 of Title 15, Commerce and Trade, and sections 321 and 346a of Title 21, Foods and Drugs] may be cited as the 'Federal Environmental Pesticide Control Act of 1972'."

Act June 25, 1947, ch. 125, §1(a), as added by Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 973, provided that: "This Act [enacting this subchapter] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act'."

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

FEDERAL COMPLIANCE WITH POLLUTION CONTROL STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

## § 136a. Registration of pesticides

### (a) Requirement of registration

Except as provided by this subchapter, no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter. To the extent necessary to prevent unreasonable adverse effects on the environment, the Administrator may by regulation limit the distribution, sale, or use in any State of any pesticide that is not registered under this subchapter and that is not the subject of an experimental use permit under section 136c of this title or an emergency exemption under section 136p of this title.

### (b) Exemptions

A pesticide which is not registered with the Administrator may be transferred if—

(1) the transfer is from one registered establishment to another registered establishment operated by the same producer solely for packaging at the second establishment or for use as a constituent part of another pesticide produced at the second establishment; or

(2) the transfer is pursuant to and in accordance with the requirements of an experimental use permit.

### (c) Procedure for registration

#### (1) Statement required

Each applicant for registration of a pesticide shall file with the Administrator a statement which includes—

(A) the name and address of the applicant and of any other person whose name will appear on the labeling;

(B) the name of the pesticide;

(C) a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;

(D) the complete formula of the pesticide;

(E) a request that the pesticide be classified for general use or for restricted use, or for both; and

(F) except as otherwise provided in paragraph (2)(D), if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

(i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide, except that such permission shall not be required in the case of defensive data.

(ii) The period of exclusive data use provided under clause (i) shall be extended 1 additional year for each 3 minor uses registered after August 3, 1996, and within 7 years of the commencement of the exclusive use period, up to a total of 3 additional years for all minor uses registered by the Administrator if the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, that—

(I) there are insufficient efficacious alternative registered pesticides available for the use;

(II) the alternatives to the minor use pesticide pose greater risks to the environment or human health;

(III) the minor use pesticide plays or will play a significant part in managing pest resistance; or

(IV) the minor use pesticide plays or will play a significant part in an integrated pest management program.

The registration of a pesticide for a minor use on a crop grouping established by the Administrator shall be considered for purposes of this clause 1 minor use for each representative crop for which data are provided in the crop grouping. Any additional exclusive use period under this clause shall be modified as appropriate or terminated if the registrant voluntarily cancels the product or deletes from the registration the minor uses which formed the basis for the extension of the additional exclusive use period or if the Administrator determines that the registrant is not actually marketing the product for such minor uses.

(iii) Except as otherwise provided in clause (i), with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the ''applicant'') within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application. Notwithstanding any other provision of this subchapter, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation.

(iv) After expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under clauses (i), (ii), and (iii), the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data.

(v) The period of exclusive use provided under clause (ii) shall not take effect until 1 year after August 3, 1996, except where an applicant or registrant is applying for the registration of a pesticide containing an active ingredient not previously registered.

(vi) With respect to data submitted after August 3, 1996, by an applicant or registrant to support an amendment adding a new use to an existing registration that does not retain any period of exclusive use, if such data relates solely to a minor use of a pesticide, such data shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application for a minor use by another person during the pe-

Case: 26-298, 11/19/2026, DktEntry: 41.1, (85 of 142)



riod of 10 years following the date of submission of such data. The applicant or registrant at the time the new minor use is requested shall notify the Administrator that to the best of their knowledge the exclusive use period for the pesticide has expired and that the data pertaining solely to the minor use of a pesticide is eligible for the provisions of this paragraph. If the minor use registration which is supported by data submitted pursuant to this subsection is voluntarily canceled or if such data are subsequently used to support a nonminor use, the data shall no longer be subject to the exclusive use provisions of this clause but shall instead be considered by the Administrator in accordance with the provisions of clause (i), as appropriate.

(G) If the applicant is requesting that the registration or amendment to the registration of a pesticide be expedited, an explanation of the basis for the request must be submitted, in accordance with paragraph (10) of this subsection.

**(2) Data in support of registration**

**(A) In general**

The Administrator shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time. If thereafter the Administrator requires any additional kind of information under subparagraph (B) of this paragraph, the Administrator shall permit sufficient time for applicants to obtain such additional information. The Administrator, in establishing standards for data requirements for the registration of pesticides with respect to minor uses, shall make such standards commensurate with the anticipated extent of use, pattern of use, the public health and agricultural need for such minor use, and the level and degree of potential beneficial or adverse effects on man and the environment. The Administrator shall not require a person to submit, in relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use. In the development of these standards, the Administrator shall consider the economic factors of potential national volume of use, extent of distribution, and the impact of the cost of meeting the requirements on the incentives for any potential registrant to undertake the development of the required data. Except as provided by section 136h of this title, within 30 days after the Administrator registers a pesticide under this subchapter the Administrator shall make available to the public the data called for in the registration statement together with such other scientific information as the Administrator deems relevant to the Administrator's decision.

**(B) Additional data**

(i) If the Administrator determines that additional data are required to maintain in effect an existing registration of a pesticide, the Administrator shall notify all existing registrants of the pesticide to which the determination relates and provide a list of such registrants to any interested person.

(ii) Each registrant of such pesticide shall provide evidence within ninety days after receipt of notification that it is taking appropriate steps to secure the additional data that are required. Two or more registrants may agree to develop jointly, or to share in the cost of developing, such data if they agree and advise the Administrator of their intent within ninety days after notification. Any registrant who agrees to share in the cost of producing the data shall be entitled to examine and rely upon such data in support of maintenance of such registration. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

(iii) If, at the end of sixty days after advising the Administrator of their agreement to develop jointly, or share in the cost of developing, data, the registrants have not further agreed on the terms of the data development arrangement or on a procedure for reaching such agreement, any of such registrants may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. All parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

(iv) Notwithstanding any other provision of this subchapter, if the Administrator determines that a registrant, within the time required by the Administrator, has failed to take appropriate steps to secure the data required under this subparagraph, to participate in a procedure for reaching agreement concerning a joint data development arrangement under this subparagraph or in an arbitration proceeding as required by this subparagraph, or to comply with the terms of an agreement or arbitration decision concerning a joint data development arrangement under this subparagraph, the Administrator may issue a notice of intent to sus-

pend such registrant's registration of the pesticide for which additional data is required. The Administrator may include in the notice of intent to suspend such provisions as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Any suspension proposed under this subparagraph shall become final and effective at the end of thirty days from receipt by the registrant of the notice of intent to suspend, unless during that time a request for hearing is made by a person adversely affected by the notice or the registrant has satisfied the Administrator that the registrant has complied fully with the requirements that served as a basis for the notice of intent to suspend. If a hearing is requested, a hearing shall be conducted under section 136d(d) of this title. The only matters for resolution at that hearing shall be whether the registrant has failed to take the action that served as the basis for the notice of intent to suspend the registration of the pesticide for which additional data is required, and whether the Administrator's determination with respect to the disposition of existing stocks is consistent with this subchapter. If a hearing is held, a decision after completion of such hearing shall be final. Notwithstanding any other provision of this subchapter, a hearing shall be held and a determination made within seventy-five days after receipt of a request for such hearing. Any registration suspended under this subparagraph shall be reinstated by the Administrator if the Administrator determines that the registrant has complied fully with the requirements that served as a basis for the suspension of the registration.

(v) Any data submitted under this subparagraph shall be subject to the provisions of paragraph (1)(D). Whenever such data are submitted jointly by two or more registrants, an agent shall be agreed on at the time of the joint submission to handle any subsequent data compensation matters for the joint submitters of such data.

(vi) Upon the request of a registrant the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under section 136a–1 of this title for the other uses of the pesticide established as of August 3, 1996, if—

(I) the data to support other uses of the pesticide on a food are being provided;

(II) the registrant, in submitting a request for such an extension, provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

(III) the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under section 136a–1 of this title; and

(IV) the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this clause, the Administrator may take action to modify or revoke the extension under this clause if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide, in writing to the registrant, a notice revoking the extension of time for submission of data. Such data shall instead be due in accordance with the date established by the Administrator for the submission of the data.

(vii) If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this clause in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under section 136a–1 of this title for the supported uses identified pursuant to this clause unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On the basis of such determination, the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in ac-

Case: 26-298, 11/19/2026, DktEntry: 41.1, (87 of 142)



cordance with clause (iv) of this subparagraph regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding the provisions of this clause, the Administrator may deny, modify, or revoke the temporary extension under this subparagraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

(viii)(I) If data required to support registration of a pesticide under subparagraph (A) is requested by a Federal or State regulatory authority, the Administrator shall, to the extent practicable, coordinate data requirements, test protocols, timetables, and standards of review and reduce burdens and redundancy caused to the registrant by multiple requirements on the registrant.

(II) The Administrator may enter into a cooperative agreement with a State to carry out subclause (I).

(III) Not later than 1 year after August 3, 1996, the Administrator shall develop a process to identify and assist in alleviating future disparities between Federal and State data requirements.

**(C) Simplified procedures**

Within nine months after September 30, 1978, the Administrator shall, by regulation, prescribe simplified procedures for the registration of pesticides, which shall include the provisions of subparagraph (D) of this paragraph.

**(D) Exemption**

No applicant for registration of a pesticide who proposes to purchase a registered pesticide from another producer in order to formulate such purchased pesticide into the pesticide that is the subject of the application shall be required to—

(i) submit or cite data pertaining to such purchased product; or

(ii) offer to pay reasonable compensation otherwise required by paragraph (1)(D) of this subsection for the use of any such data.

**(E) Minor use waiver**

In handling the registration of a pesticide for a minor use, the Administrator may waive otherwise applicable data requirements if the Administrator determines that the absence of such data will not prevent the Administrator from determining—

(i) the incremental risk presented by the minor use of the pesticide; and

(ii) that such risk, if any, would not be an unreasonable adverse effect on the environment.

**(3) Application**

**(A) In general**

The Administrator shall review the data after receipt of the application and shall, as expeditiously as possible, either register the pesticide in accordance with paragraph (5), or notify the applicant of the Administrator's determination that it does not comply with the provisions of the subchapter in accordance with paragraph (6).

**(B) Identical or substantially similar**

(i) The Administrator shall, as expeditiously as possible, review and act on any application received by the Administrator that—

(I) proposes the initial or amended registration of an end-use pesticide that, if registered as proposed, would be identical or substantially similar in composition and labeling to a currently-registered pesticide identified in the application, or that would differ in composition and labeling from such currently-registered pesticide only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment; or

(II) proposes an amendment to the registration of a registered pesticide that does not require scientific review of data.

(ii) In expediting the review of an application for an action described in clause (i), the Administrator shall—

(I) review the application in accordance with section 136w–8(f)(4)(B) of this title and, if the application is found to be incomplete, reject the application;

(II) not later than the applicable decision review time established pursuant to section 136w–8(f)(4)(B) of this title, or, if no review time is established, not later than 90 days after receiving a complete application, notify the registrant if the application has been granted or denied; and

(III) if the application is denied, notify the registrant in writing of the specific reasons for the denial of the application.

**(C) Minor use registration**

(i) The Administrator shall, as expeditiously as possible, review and act on any complete application—

(I) that proposes the initial registration of a new pesticide active ingredient if the active ingredient is proposed to be registered solely for minor uses, or proposes a registration amendment solely for minor uses to an existing registration; or

(II) for a registration or a registration amendment that proposes significant minor uses.

(ii) For the purposes of clause (i)—

(I) the term "as expeditiously as possible" means that the Administrator shall, to the greatest extent practicable, complete a review and evaluation of all data, submitted with a complete application, within 12 months after the submission of the complete application, and the failure of the Administrator to complete such a

review and evaluation under clause (i) shall not be subject to judicial review; and

(II) the term ''significant minor uses'' means 3 or more minor uses proposed for every nonminor use, a minor use that would, in the judgment of the Administrator, serve as a replacement for any use which has been canceled in the 5 years preceding the receipt of the application, or a minor use that in the opinion of the Administrator would avoid the reissuance of an emergency exemption under section 136p of this title for that minor use.

**(D) Adequate time for submission of minor use data**

If a registrant makes a request for a minor use waiver, regarding data required by the Administrator, pursuant to paragraph (2)(E), and if the Administrator denies in whole or in part such data waiver request, the registrant shall have a full-time period for providing such data. For purposes of this subparagraph, the term ''full-time period'' means the time period originally established by the Administrator for submission of such data, beginning with the date of receipt by the registrant of the Administrator's notice of denial.

**(4) Notice of application**

The Administrator shall publish in the Federal Register, promptly after receipt of the statement and other data required pursuant to paragraphs (1) and (2), a notice of each application for registration of any pesticide if it contains any new active ingredient or if it would entail a changed use pattern. The notice shall provide for a period of 30 days in which any Federal agency or any other interested person may comment.

**(5) Approval of registration**

The Administrator shall register a pesticide if the Administrator determines that, when considered with any restrictions imposed under subsection (d)—

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material required to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

The Administrator shall not make any lack of essentiality a criterion for denying registration of any pesticide. Where two pesticides meet the requirements of this paragraph, one should not be registered in preference to the other. In considering an application for the registration of a pesticide, the Administrator may waive data requirements pertaining to efficacy, in which event the Administrator may register the pesticide without determining that the pesticide's composition is such as to warrant proposed claims of efficacy. If a pesticide is found to be efficacious by any State under section 136v(c) of this title, a presumption is established that the Administrator shall waive data requirements pertaining to efficacy for use of the pesticide in such State.

**(6) Denial of registration**

If the Administrator determines that the requirements of paragraph (5) for registration are not satisfied, the Administrator shall notify the applicant for registration of the Administrator's determination and of the Administrator's reasons (including the factual basis) therefor, and that, unless the applicant corrects the conditions and notifies the Administrator thereof during the 30-day period beginning with the day after the date on which the applicant receives the notice, the Administrator may refuse to register the pesticide. Whenever the Administrator refuses to register a pesticide, the Administrator shall notify the applicant of the Administrator's decision and of the Administrator's reasons (including the factual basis) therefor. The Administrator shall promptly publish in the Federal Register notice of such denial of registration and the reasons therefor. Upon such notification, the applicant for registration or other interested person with the concurrence of the applicant shall have the same remedies as provided for in section 136d of this title.

**(7) Registration under special circumstances**

Notwithstanding the provisions of paragraph (5)—

(A) The Administrator may conditionally register or amend the registration of a pesticide if the Administrator determines that (i) the pesticide and proposed use are identical or substantially similar to any currently registered pesticide and use thereof, or differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, and (ii) approving the registration or amendment in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. An applicant seeking conditional registration or amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data because it has not yet been generated, the Administrator may register or amend the registration of the pesticide under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.

(B) The Administrator may conditionally amend the registration of a pesticide to permit additional uses of such pesticide notwithstanding that data concerning the pesticide may be insufficient to support an unconditional amendment, if the Administrator determines that (i) the applicant has submitted satisfactory data pertaining to the proposed additional use, and (ii) amending the registration in the manner proposed by the applicant would not significantly in-

crease the risk of any unreasonable adverse effect on the environment. Notwithstanding the foregoing provisions of this subparagraph, no registration of a pesticide may be amended to permit an additional use of such pesticide if the Administrator has issued a notice stating that such pesticide, or any ingredient thereof, meets or exceeds risk criteria associated in whole or in part with human dietary exposure enumerated in regulations issued under this subchapter, and during the pendency of any risk-benefit evaluation initiated by such notice, if (I) the additional use of such pesticide involves a major food or feed crop, or (II) the additional use of such pesticide involves a minor food or feed crop and the Administrator determines, with the concurrence of the Secretary of Agriculture, there is available an effective alternative pesticide that does not meet or exceed such risk criteria. An applicant seeking amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data (other than data pertaining to the proposed additional use) because it has not yet been generated, the Administrator may amend the registration under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.

(C) The Administrator may conditionally register a pesticide containing an active ingredient not contained in any currently registered pesticide for a period reasonably sufficient for the generation and submission of required data (which are lacking because a period reasonably sufficient for generation of the data has not elapsed since the Administrator first imposed the data requirement) on the condition that by the end of such period the Administrator receives such data and the data do not meet or exceed risk criteria enumerated in regulations issued under this subchapter, and on such other conditions as the Administrator may prescribe. A conditional registration under this subparagraph shall be granted only if the Administrator determines that use of the pesticide during such period will not cause any unreasonable adverse effect on the environment, and that use of the pesticide is in the public interest.

**(8) Interim administrative review**

Notwithstanding any other provision of this subchapter, the Administrator may not initiate a public interim administrative review process to develop a risk-benefit evaluation of the ingredients of a pesticide or any of its uses prior to initiating a formal action to cancel, suspend, or deny registration of such pesticide, required under this subchapter, unless such interim administrative process is based on a validated test or other significant evidence raising prudent concerns of unreasonable adverse risk to man or to the environment. Notice of the definition of the terms "validated test" and "other significant evidence" as used herein shall be published by the Administrator in the Federal Register.

**(9) Labeling**

**(A) Additional statements**

Subject to subparagraphs (B) and (C), it shall not be a violation of this subchapter for a registrant to modify the labeling of an antimicrobial pesticide product to include relevant information on product efficacy, product composition, container composition or design, or other characteristics that do not relate to any pesticidal claim or pesticidal activity.

**(B) Requirements**

Proposed labeling information under subparagraph (A) shall not be false or misleading, shall not conflict with or detract from any statement required by law or the Administrator as a condition of registration, and shall be substantiated on the request of the Administrator.

**(C) Notification and disapproval**

**(i) Notification**

A registration may be modified under subparagraph (A) if—

(I) the registrant notifies the Administrator in writing not later than 60 days prior to distribution or sale of a product bearing the modified labeling; and

(II) the Administrator does not disapprove of the modification under clause (ii).

**(ii) Disapproval**

Not later than 30 days after receipt of a notification under clause (i), the Administrator may disapprove the modification by sending the registrant notification in writing stating that the proposed language is not acceptable and stating the reasons why the Administrator finds the proposed modification unacceptable.

**(iii) Restriction on sale**

A registrant may not sell or distribute a product bearing a disapproved modification.

**(iv) Objection**

A registrant may file an objection in writing to a disapproval under clause (ii) not later than 30 days after receipt of notification of the disapproval.

**(v) Final action**

A decision by the Administrator following receipt and consideration of an objection filed under clause (iv) shall be considered a final agency action.

**(D) Use dilution**

The label or labeling required under this subchapter for an antimicrobial pesticide that is or may be diluted for use may have a different statement of caution or protective measures for use of the recommended diluted solution of the pesticide than for use of a concentrate of the pesticide if the Administrator determines that—

(i) adequate data have been submitted to support the statement proposed for the diluted solution uses; and

(ii) the label or labeling provides adequate protection for exposure to the diluted solution of the pesticide.

**(10) Expedited registration of pesticides**

(A) Not later than 1 year after August 3, 1996, the Administrator shall, utilizing public comment, develop procedures and guidelines, and expedite the review of an application for registration of a pesticide or an amendment to a registration that satisfies such guidelines.

(B) Any application for registration or an amendment, including biological and conventional pesticides, will be considered for expedited review under this paragraph. An application for registration or an amendment shall qualify for expedited review if use of the pesticide proposed by the application may reasonably be expected to accomplish 1 or more of the following:

(i) Reduce the risks of pesticides to human health.

(ii) Reduce the risks of pesticides to nontarget organisms.

(iii) Reduce the potential for contamination of groundwater, surface water, or other valued environmental resources.

(iv) Broaden the adoption of integrated pest management strategies, or make such strategies more available or more effective.

(C) The Administrator, not later than 30 days after receipt of an application for expedited review, shall notify the applicant whether the application is complete. If it is found to be incomplete, the Administrator may either reject the request for expedited review or ask the applicant for additional information to satisfy the guidelines developed under subparagraph (A).

**(11) Interagency working group**

**(A) Definition of covered agency**

In this paragraph, the term ''covered agency'' means any of the following:

(i) The Department of Agriculture.

(ii) The Department of Commerce.

(iii) The Department of the Interior.

(iv) The Council on Environmental Quality.

(v) The Environmental Protection Agency.

**(B) Establishment**

The Administrator shall establish an interagency working group, to be comprised of representatives from each covered agency, to provide recommendations regarding, and to implement a strategy for improving, the consultation process required under section 7 of the Endangered Species Act of 1973 (16 U.S.C. 1536) for pesticide registration and registration review.

**(C) Duties**

The interagency working group established under subparagraph (B) shall—

(i) analyze relevant Federal law (including regulations) and case law for purposes of providing an outline of the legal and regulatory framework for the consultation process referred to in that subparagraph, including—

(I) requirements under this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(II) Federal case law regarding the intersection of this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); and

(III) Federal regulations relating to the pesticide consultation process;

(ii) provide advice regarding methods of—

(I) defining the scope of actions of the covered agencies that are subject to the consultation requirement referred to in subparagraph (B); and

(II) properly identifying and classifying effects of actions of the covered agencies with respect to that consultation requirement;

(iii) identify the obligations and limitations under Federal law of each covered agency for purposes of providing a legal and regulatory framework for developing the recommendations referred to in subparagraph (B);

(iv) review practices for the consultation referred to in subparagraph (B) to identify problem areas, areas for improvement, and best practices for conducting that consultation among the covered agencies;

(v) develop scientific and policy approaches to increase the accuracy and timeliness of the process for that consultation, in accordance with requirements of this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), including—

(I) processes to efficiently share data and coordinate analyses among the Department of Agriculture, the Department of Commerce, the Department of the Interior, and the Environmental Protection Agency;

(II) a streamlined process for identifying which actions require no consultation, informal consultation, or formal consultation;

(III) an approach that will provide clarity with respect to what constitutes the best scientific and commercial data available in the fields of pesticide use and ecological risk assessment, pursuant to section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)); and

(IV) approaches that enable the Environmental Protection Agency to better assist the Department of the Interior and the Department of Commerce in carrying out obligations under that section in a timely and efficient manner; and

(vi) propose and implement a strategy to implement approaches to consultations under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) and document that strategy in a memorandum of understanding, revised regulations, or another appropriate format to promote durable cooperation among the covered agencies.

**(D) Reports**

**(i) Progress reports**

**(I) In general**

Not later than 18 months after December 20, 2018, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing the progress of the working group in developing the recommendations under subparagraph (B).

**(II) Requirements**

The report under this clause shall—

(aa) reflect the perspectives of each covered agency; and

(bb) identify areas of new consensus and continuing topics of disagreement and debate.

**(ii) Results**

**(I) In general**

Not later than 1 year after December 20, 2018, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—

(aa) the recommendations developed under subparagraph (B); and

(bb) plans for implementation of those recommendations.

**(II) Requirements**

The report under this clause shall—

(aa) reflect the perspectives of each covered agency; and

(bb) identify areas of consensus and continuing topics of disagreement and debate, if any.

**(iii) Implementation**

Not later than 1 year after the date of submission of the report under clause (i), the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—

(I) the implementation of the recommendations referred to in that clause;

(II) the extent to which that implementation improved the consultation process referred to in subparagraph (B); and

(III) any additional recommendations for improvements to the process described in subparagraph (B).

**(iv) Other reports**

Not later than the date that is 180 days after the date of submission of the report under clause (iii), and not less frequently than once every 180 days thereafter during the 5-year period beginning on that date, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—

(I) the implementation of the recommendations referred to in that clause;

(II) the extent to which that implementation improved the consultation process referred to in subparagraph (B); and

(III) any additional recommendations for improvements to the process described in subparagraph (B).

**(E) Consultation with private sector**

In carrying out the duties under this paragraph, the working group shall, as appropriate—

(i) consult with, representatives of interested industry stakeholders and nongovernmental organizations; and

(ii) take into consideration factors, such as actual and potential differences in interest between, and the views of, those stakeholders and organizations.

**(F) Chapter 10 of title 5**

Chapter 10 of title 5 shall not apply to the working group established under this paragraph.

**(G) Savings clause**

Nothing in this paragraph supersedes any provision of—

(i) this subchapter; or

(ii) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), including the requirements under section 7 of that Act (16 U.S.C. 1536).

**(d) Classification of pesticides**

**(1) Classification for general use, restricted use, or both**

(A) As a part of the registration of a pesticide the Administrator shall classify it as being for general use or for restricted use. If the Administrator determines that some of the uses for which the pesticide is registered should be for general use and that other uses for which it is registered should be for restricted use, the Administrator shall classify it for both general use and restricted use. Pesticide uses may be classified by regulation on the initial classification, and registered pesticides may be classified prior to reregistration. If some of the uses of the pesticide are classified for general use, and other uses are classified for restricted use, the directions relating to its general uses shall be clearly separated and distinguished from those directions relating to its restricted uses. The Administrator may require that its packaging and labeling for restricted uses shall be clearly distinguishable from its packaging and labeling for general uses.

(B) If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and

for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, will not generally cause unreasonable adverse effects on the environment, the Administrator will classify the pesticide, or the particular use or uses of the pesticide to which the determination applies, for general use.

(C) If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, may generally cause, without additional regulatory restrictions, unreasonable adverse effects on the environment, including injury to the applicator, the Administrator shall classify the pesticide, or the particular use or uses to which the determination applies, for restricted use:

(i) If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that the acute dermal or inhalation toxicity of the pesticide presents a hazard to the applicator or other persons, the pesticide shall be applied for any use to which the restricted classification applies only by or under the direct supervision of a certified applicator.

(ii) If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that its use without additional regulatory restriction may cause unreasonable adverse effects on the environment, the pesticide shall be applied for any use to which the determination applies only by or under the direct supervision of a certified applicator, or subject to such other restrictions as the Administrator may provide by regulation. Any such regulation shall be reviewable in the appropriate court of appeals upon petition of a person adversely affected filed within 60 days of the publication of the regulation in final form.

**(2) Change in classification**

If the Administrator determines that a change in the classification of any use of a pesticide from general use to restricted use is necessary to prevent unreasonable adverse effects on the environment, the Administrator shall notify the registrant of such pesticide of such determination at least forty-five days before making the change and shall publish the proposed change in the Federal Register. The registrant, or other interested person with the concurrence of the registrant, may seek relief from such determination under section 136d(b) of this title.

**(3) Change in classification from restricted use to general use**

The registrant of any pesticide with one or more uses classified for restricted use may petition the Administrator to change any such classification from restricted to general use. Such petition shall set out the basis for the registrant's position that restricted use classification is unnecessary because classification of the pesticide for general use would not cause unreasonable adverse effects on the environment. The Administrator, within sixty days after receiving such petition, shall notify the registrant whether the petition has been granted or denied. Any denial shall contain an explanation therefor and any such denial shall be subject to judicial review under section 136n of this title.

**(e) Products with same formulation and claims**

Products which have the same formulation, are manufactured by the same person, the labeling of which contains the same claims, and the labels of which bear a designation identifying the product as the same pesticide may be registered as a single pesticide; and additional names and labels shall be added to the registration by supplemental statements.

**(f) Miscellaneous**

**(1) Effect of change of labeling or formulation**

If the labeling or formulation for a pesticide is changed, the registration shall be amended to reflect such change if the Administrator determines that the change will not violate any provision of this subchapter.

**(2) Registration not a defense**

In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter.

**(3) Authority to consult other Federal agencies**

In connection with consideration of any registration or application for registration under this section, the Administrator may consult with any other Federal agency.

**(4) Mixtures of nitrogen stabilizers and fertilizer products**

Any mixture or other combination of—

(A) 1 or more nitrogen stabilizers registered under this subchapter; and

(B) 1 or more fertilizer products,

shall not be subject to the provisions of this section or sections 136a–1, 136c, 136e, 136m, and 136*o*(a)(2) of this title if the mixture or other combination is accompanied by the labeling required under this subchapter for the nitrogen stabilizer contained in the mixture or other combination, the mixture or combination is mixed or combined in accordance with such labeling, and the mixture or combination does not contain any active ingredient other than the nitrogen stabilizer.

**(5) Bilingual labeling**

**(A) Requirement**

**(i) In general**

Subject to clause (ii), not later than the applicable deadline described in subparagraph (B), each registered pesticide product released for shipment shall include—

(I) the translation of the parts of the labeling contained in the Spanish Trans-

lation Guide described in subparagraph (G) on the product container; or

(II) a link to such translation via scannable technology or other electronic methods readily accessible on the product label.

**(ii) Exceptions**

Notwithstanding clause (i)—

(I) an antimicrobial pesticide product may, in lieu of including a translation or a link under clause (i), provide a link to the safety data sheets in Spanish via scannable technology or other electronic methods readily accessible on the product label; or

(II) a non-agricultural pesticide product that is not classified by the Administrator as restricted use under subsection (d)(1)(A) may, in lieu of including a translation or a link under clause (i), provide a link to the safety data sheets in Spanish via scannable technology or other electronic methods readily accessible on the product label.

**(B) Deadlines for bilingual labeling**

**(i) Pesticide products classified as restricted use**

In the case of pesticide products classified by the Administrator as restricted use under subsection (d)(1)(A), the deadline specified in this subparagraph is the date that is 3 years following December 29, 2022.

**(ii) Pesticide products not classified as restricted use**

In the case of pesticide products not classified by the Administrator as restricted use under subsection (d)(1)(A), the deadline specified in this subparagraph shall be as follows:

**(I) Agricultural**

**(aa) Acute Toxicity Category I**

For agricultural pesticides classified as Acute Toxicity Category I, the date that is 3 years after December 29, 2022.

**(bb) Acute Toxicity Category II**

For agricultural pesticides classified as Acute Toxicity Category II, the date that is 5 years after December 29, 2022.

**(II) Antimicrobial and non-agricultural**

**(aa) Acute Toxicity Category I**

For antimicrobial and non-agricultural pesticide products classified as Acute Toxicity Category I, the date that is 4 years after December 29, 2022.

**(bb) Acute Toxicity Category II**

For antimicrobial and non-agricultural pesticide products classified as Acute Toxicity Category II, the date that is 6 years after December 29, 2022.

**(III) Other pesticide products**

With respect to pesticide products not described in subclause (I) or (II), the date that is 8 years after December 29, 2022.

**(C) Implementation**

**(i) Non-notification**

**(I) In general**

In carrying out this paragraph, the Administrator shall allow translations of the parts of the label of a pesticide contained in the Spanish Translation Guide described in subparagraph (G) and scannable technology or other electronic methods to be added using non-notification procedures.

**(II) Non-notification procedure defined**

In this clause, the term ''non-notification procedure'' refers to a procedure under which a change may be made to a pesticide label without notifying the Administrator.

**(ii) Cooperation and consultation**

In carrying out this paragraph, the Administrator shall cooperate and consult with State lead agencies for pesticide regulation for the purpose of implementing bilingual labeling as provided in this paragraph as expeditiously as possible.

**(iii) End use labeling**

The labeling requirements of this paragraph shall apply to end use product labels.

**(iv) Incorporation timeframe**

After initial translation deadlines provided in subparagraph (B), updates to the Spanish Translation Guide described in subparagraph (G) shall be incorporated into labeling on the earlier of—

(I) in the case of agricultural use pesticide labels, as determined by the Administrator—

(aa) 1 year after the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); or

(bb) the released for shipment date specified on the EPA Stamped Approved Label after the pesticide label is next changed or amended following the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); and

(II) in the case of antimicrobial and non-agricultural use pesticide labels, as determined by the Administrator—

(aa) 2 years after the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); or

(bb) the released for shipment date specified on the EPA Stamped Approved Label after the pesticide label is next changed or amended following the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G).

**(v) Notification of updates to the Spanish Translation Guide for Pesticide Labeling**

Not later than 10 days after updating the Spanish Translation Guide described in

subparagraph (G), the Administrator shall notify registrants of the update to such guide.

**(D) Accessibility of bilingual labeling for farm workers**

Not later than 180 days after December 29, 2022, to the maximum extent practicable, the Administrator shall seek stakeholder input on ways to make bilingual labeling required under this paragraph accessible to farm workers.

**(E) Plan**

Not later than 3 years after December 29, 2022, the Administrator shall implement a plan to ensure that farm workers have access to the bilingual labeling required under this paragraph.

**(F) Reporting**

Not later than 2 years after December 29, 2022, the Administrator shall develop and implement, and make publicly available, a plan for tracking the adoption of the bilingual labeling required under this paragraph.

**(G) Spanish Translation Guide described**

The Spanish Translation Guide described in this subparagraph is the Spanish Translation Guide for Pesticide Labeling issued in October 2019, as in effect on December 29, 2022, and any successor guides or amendments to such guide.

**(g) Registration review**

**(1) General rule**

**(A) Periodic review**

**(i) In general**

The registrations of pesticides are to be periodically reviewed.

**(ii) Regulations**

In accordance with this subparagraph, the Administrator shall by regulation establish a procedure for accomplishing the periodic review of registrations.

**(iii) Initial registration review**

The Administrator shall complete the registration review of each pesticide or pesticide case, which may be composed of 1 or more active ingredients and the products associated with the active ingredients, not later than the later of—

(I) October 1, 2022; or

(II) the date that is 15 years after the date on which the first pesticide containing a new active ingredient is registered.

**(iv) Subsequent registration review**

Not later than 15 years after the date on which the initial registration review is completed under clause (iii) and each 15 years thereafter, the Administrator shall complete a subsequent registration review for each pesticide or pesticide case.

**(v) Cancellation**

No registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title.

**(B) Docketing**

**(i) In general**

Subject to clause (ii), after meeting with 1 or more individuals that are not government employees to discuss matters relating to a registration review, the Administrator shall place in the docket minutes of the meeting, a list of attendees, and any documents exchanged at the meeting, not later than the earlier of—

(I) the date that is 45 days after the meeting; or

(II) the date of issuance of the registration review decision.

**(ii) Protected information**

The Administrator shall identify, but not include in the docket, any confidential business information the disclosure of which is prohibited by section 136h of this title.

**(C) Limitation**

Nothing in this subsection shall prohibit the Administrator from undertaking any other review of a pesticide pursuant to this subchapter.

**(2) Data**

**(A) Submission required**

The Administrator shall use the authority in subsection (c)(2)(B) to require the submission of data when such data are necessary for a registration review.

**(B) Data submission, compensation, and exemption**

For purposes of this subsection, the provisions of subsections (c)(1), (c)(2)(B), and (c)(2)(D) shall be utilized for and be applicable to any data required for registration review.

**(h) Registration requirements for antimicrobial pesticides**

**(1) Evaluation of process**

To the maximum extent practicable consistent with the degrees of risk presented by an antimicrobial pesticide and the type of review appropriate to evaluate the risks, the Administrator shall identify and evaluate reforms to the antimicrobial registration process that would reduce review periods existing as of August 3, 1996, for antimicrobial pesticide product registration applications and applications for amended registration of antimicrobial pesticide products, including—

(A) new antimicrobial active ingredients;

(B) new antimicrobial end-use products;

(C) substantially similar or identical antimicrobial pesticides; and

(D) amendments to antimicrobial pesticide registrations.

**(2) Review time period reduction goal**

Each reform identified under paragraph (1) shall be designed to achieve the goal of reducing the review period following submission of a complete application, consistent with the degree of risk, to a period of not more than—

(A) 540 days for a new antimicrobial active ingredient pesticide registration;

(B) 270 days for a new antimicrobial use of a registered active ingredient;

(C) 120 days for any other new antimicrobial product;

(D) 90 days for a substantially similar or identical antimicrobial product;

(E) 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and

(F) 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this paragraph.

**(3) Implementation**

**(A) Proposed rulemaking**

**(i) Issuance**

Not later than 270 days after August 3, 1996, the Administrator shall publish in the Federal Register proposed regulations to accelerate and improve the review of antimicrobial pesticide products designed to implement, to the extent practicable, the goals set forth in paragraph (2).

**(ii) Requirements**

Proposed regulations issued under clause (i) shall—

(I) define the various classes of antimicrobial use patterns, including household, industrial, and institutional disinfectants and sanitizing pesticides, preservatives, water treatment, and pulp and paper mill additives, and other such products intended to disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms, or protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime;

(II) differentiate the types of review undertaken for antimicrobial pesticides;

(III) conform the degree and type of review to the risks and benefits presented by antimicrobial pesticides and the function of review under this subchapter, considering the use patterns of the product, toxicity, expected exposure, and product type;

(IV) ensure that the registration process is sufficient to maintain antimicrobial pesticide efficacy and that antimicrobial pesticide products continue to meet product performance standards and effectiveness levels for each type of label claim made; and

(V) implement effective and reliable deadlines for process management.

**(iii) Comments**

In developing the proposed regulations, the Administrator shall solicit the views from registrants and other affected parties to maximize the effectiveness of the rule development process.

**(B) Final regulations**

**(i) Issuance**

The Administrator shall issue final regulations not later than 240 days after the close of the comment period for the proposed regulations.

**(ii) Failure to meet goal**

If a goal described in paragraph (2) is not met by the final regulations, the Administrator shall identify the goal, explain why the goal was not attained, describe the element of the regulations included instead, and identify future steps to attain the goal.

**(iii) Requirements**

In issuing final regulations, the Administrator shall—

(I) consider the establishment of a certification process for regulatory actions involving risks that can be responsibly managed, consistent with the degree of risk, in the most cost-efficient manner;

(II) consider the establishment of a certification process by approved laboratories as an adjunct to the review process;

(III) use all appropriate and cost-effective review mechanisms, including—

(aa) expanded use of notification and non-notification procedures;

(bb) revised procedures for application review; and

(cc) allocation of appropriate resources to ensure streamlined management of antimicrobial pesticide registrations; and

(IV) clarify criteria for determination of the completeness of an application.

**(C) Expedited review**

This subsection does not affect the requirements or extend the deadlines or review periods contained in subsection (c)(3).

**(D) Alternative review periods**

If the final regulations to carry out this paragraph are not effective 630 days after August 3, 1996, until the final regulations become effective, the review period, beginning on the date of receipt by the Agency of a complete application, shall be—

(i) 2 years for a new antimicrobial active ingredient pesticide registration;

(ii) 1 year for a new antimicrobial use of a registered active ingredient;

(iii) 180 days for any other new antimicrobial product;

(iv) 90 days for a substantially similar or identical antimicrobial product;

(v) 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and

(vi) 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this subparagraph.

**(E) Wood preservatives**

An application for the registration, or for an amendment to the registration, of a wood

preservative product for which a claim of pesticidal activity listed in section 136(mm) of this title is made (regardless of any other pesticidal claim that is made with respect to the product) shall be reviewed by the Administrator within the same period as that established under this paragraph for an antimicrobial pesticide product application, consistent with the degree of risk posed by the use of the wood preservative product, if the application requires the applicant to satisfy the same data requirements as are required to support an application for a wood preservative product that is an antimicrobial pesticide.

**(F) Notification**

**(i) In general**

Subject to clause (iii), the Administrator shall notify an applicant whether an application has been granted or denied not later than the final day of the appropriate review period under this paragraph, unless the applicant and the Administrator agree to a later date.

**(ii) Final decision**

If the Administrator fails to notify an applicant within the period of time required under clause (i), the failure shall be considered an agency action unlawfully withheld or unreasonably delayed for purposes of judicial review under chapter 7 of title 5.

**(iii) Exemption**

This subparagraph does not apply to an application for an antimicrobial pesticide that is filed under subsection (c)(3)(B) prior to 90 days after August 3, 1996.

**(iv) Limitation**

Notwithstanding clause (ii), the failure of the Administrator to notify an applicant for an amendment to a registration for an antimicrobial pesticide shall not be judicially reviewable in a Federal or State court if the amendment requires scientific review of data within—

(I) the time period specified in subparagraph (D)(vi), in the absence of a final regulation under subparagraph (B); or

(II) the time period specified in paragraph (2)(F), if adopted in a final regulation under subparagraph (B).

**(4) Annual report**

**(A) Submission**

Beginning on August 3, 1996, and ending on the date that the goals under paragraph (2) are achieved, the Administrator shall, not later than March 1 of each year, prepare and submit an annual report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

**(B) Requirements**

A report submitted under subparagraph (A) shall include a description of—

(i) measures taken to reduce the backlog of pending registration applications;

(ii) progress toward achieving reforms under this subsection; and

(iii) recommendations to improve the activities of the Agency pertaining to antimicrobial registrations.

(June 25, 1947, ch. 125, § 3, as added Pub. L. 92–516, § 2, Oct. 21, 1972, 86 Stat. 979; amended Pub. L. 94–140, § 12, Nov. 28, 1975, 89 Stat. 755; Pub. L. 95–396, §§ 2(a), 3–8, Sept. 30, 1978, 92 Stat. 820, 824–827; Pub. L. 100–532, title I, §§ 102(b), 103, title VI, § 601(b)(1), title VIII, § 801(b), Oct. 25, 1988, 102 Stat. 2667, 2677, 2680; Pub. L. 101–624, title XIV, § 1492, Nov. 28, 1990, 104 Stat. 3628; Pub. L. 102–237, title X, § 1006(a)(3), (b)(1), (2), (c), Dec. 13, 1991, 105 Stat. 1894–1896; Pub. L. 104–170, title I, §§ 105(b), 106(b), title II, §§ 210(b), (c)(1), (d), (e), (f)(2), 222–224, 231, 250, Aug. 3, 1996, 110 Stat. 1491, 1494–1497, 1499, 1503, 1504, 1508, 1510; Pub. L. 108–199, div. G, title V, § 501(b), Jan. 23, 2004, 118 Stat. 419; Pub. L. 110–94, §§ 2, 3, Oct. 9, 2007, 121 Stat. 1000; Pub. L. 115–334, title X, § 10115, Dec. 20, 2018, 132 Stat. 4914; Pub. L. 117–286, § 4(a)(21), Dec. 27, 2022, 136 Stat. 4307; Pub. L. 117–328, div. HH, title VI, § 702, Dec. 29, 2022, 136 Stat. 5996.)

### Editorial Notes

#### References in Text

The Endangered Species Act of 1973, referred to in subsec. (c)(11)(C)(i)(I), (II), (v), (vi), (G)(ii), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified generally to chapter 35 (§ 1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

#### Prior Provisions

A prior section 3 of act June 25, 1947, was classified to section 135a of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

#### Amendments

2022—Subsec. (c)(11)(F). Pub. L. 117–286 substituted “Chapter 10 of title 5” for “Federal Advisory Committee Act” in heading and “Chapter 10 of title 5” for “The Federal Advisory Committee Act (5 U.S.C. App.)” in text.

Subsec. (f)(5). Pub. L. 117–328 added par. (5).

2018—Subsec. (c)(11). Pub. L. 115–334 added par. (11).

2007—Subsec. (c)(3)(B)(ii)(I). Pub. L. 110–94, § 2(1), substituted “review the application in accordance with section 136w–8(f)(4)(B) of this title and,” for “within 45 days after receiving the application, notify the registrant whether or not the application is complete and,”.

Subsec. (c)(3)(B)(ii)(II). Pub. L. 110–94, § 2(2), substituted “not later than the applicable decision review time established pursuant to section 136w–8(f)(4)(B) of this title, or, if no review time is established, not later than” for “within”.

Subsec. (g)(1)(A). Pub. L. 110–94, § 3(1), designated first sentence as cl. (i) and inserted heading, designated second sentence as cl. (ii), inserted heading, and substituted “In accordance with this subparagraph, the Administrator” for “The Administrator”, added cls. (iii) and (iv), designated fourth sentence as cl. (v) and inserted heading, and struck out third sentence which read as follows: “The goal of these regulations shall be a review of a pesticide’s registration every 15 years.”

Subsec. (g)(1)(B), (C). Pub. L. 110–94, § 3(2), (3), added subpar. (B) and redesignated former subpar. (B) as (C).

2004—Subsec. (h)(2)(F). Pub. L. 108–199, § 501(b)(1), substituted “120 days” for “90 to 180 days”.

Subsec. (h)(3)(D)(vi). Pub. L. 108–199, § 501(b)(2)(A), substituted “120 days” for “240 days”.

Case: 26-298, 11/19/2026, DktEntry: 41.1, (97 of 142)



Subsec. (h)(3)(F)(iv). Pub. L. 108–199, § 501(b)(2)(B), added cl. (iv).

1996—Subsec. (c)(1)(F)(ii) to (vi). Pub. L. 104–170, § 210(b), added cls. (ii), (v), and (vi), redesignated former cls. (ii) and (iii) as (iii) and (iv), respectively, and in cl. (iv) substituted ''(i), (ii), and (iii)'' for ''(i) and (ii)''.

Subsec. (c)(1)(G). Pub. L. 104–170, § 250(1), added subpar. (G).

Subsec. (c)(2)(A). Pub. L. 104–170, §§ 210(d)(1), 231, inserted heading, inserted ''the public health and agricultural need for such minor use,'' after ''pattern of use,'', and substituted ''potential beneficial or adverse effects on man and the environment'' for ''potential exposure of man and the environment to the pesticide''.

Subsec. (c)(2)(B). Pub. L. 104–170, § 210(d)(2), inserted heading.

Subsec. (c)(2)(B)(vi). Pub. L. 104–170, § 210(c)(1), added cl. (vi).

Subsec. (c)(2)(B)(vii). Pub. L. 104–170, § 210(f)(2), added cl. (vii).

Subsec. (c)(2)(B)(viii). Pub. L. 104–170, § 222, added cl. (viii).

Subsec. (c)(2)(C). Pub. L. 104–170, § 210(d)(3), inserted heading.

Subsec. (c)(2)(E). Pub. L. 104–170, § 210(d)(4), added subpar. (E).

Subsec. (c)(3)(A), (B). Pub. L. 104–170, § 210(e)(1), (2), inserted headings.

Subsec. (c)(3)(C), (D). Pub. L. 104–170, § 210(e)(3), added subpars. (C) and (D).

Subsec. (c)(9). Pub. L. 104–170, § 223, added par. (9).

Subsec. (c)(10). Pub. L. 104–170, § 250(2), added par. (10).

Subsec. (f)(4). Pub. L. 104–170, § 105(b), added par. (4).

Subsec. (g). Pub. L. 104–170, § 106(b), added subsec. (g).

Subsec. (h). Pub. L. 104–170, § 224, added subsec. (h).

1991—Subsec. (c)(1)(D). Pub. L. 102–237, § 1006(a)(3)(B), (C), added subpar. (D) and redesignated former subpar. (D) as (F).

Subsec. (c)(1)(E). Pub. L. 102–237, § 1006(a)(3)(A), (C), added subpar. (E) and struck out former subpar. (E) which read as follows: ''the complete formula of the pesticide; and''.

Subsec. (c)(1)(F). Pub. L. 102–237, § 1006(a)(3)(A), (B), (D), redesignated former subpar. (D) as (F), in cl. (i) substituted ''With'' for ''with'' and a period for semicolon at end, in cl. (ii) substituted ''Except'' for ''except'' and a period for semicolon at end, in cl. (iii) substituted ''After'' for ''after'' and a period for semicolon at end, and struck out former subpar. (F) which read as follows: ''a request that the pesticide be classified for general use, for restricted use, or for both.''

Subsec. (c)(2)(A). Pub. L. 102–237, § 1006(b)(1), (2), substituted ''the Administrator'' for ''he'' before ''requires'', ''shall permit'', ''shall make'', and ''deems'', and substituted ''the Administrator's'' for ''his''.

Subsec. (c)(2)(D). Pub. L. 102–237, § 1006(c), clarified amendment made by Pub. L. 100–532, § 102(b)(2)(A). See 1988 Amendment note below.

Subsec. (c)(3)(A). Pub. L. 102–237, § 1006(b)(2), substituted ''the Administrator's'' for ''his''.

Subsec. (c)(5). Pub. L. 102–237, § 1006(b)(1), substituted ''the Administrator'' for ''he'' before ''determines''.

Subsec. (c)(6). Pub. L. 102–237, § 1006(b)(1), (2), substituted ''the Administrator'' for ''he'' before ''shall notify'' in two places and ''the Administrator's'' for ''his'' in four places.

Subsec. (d)(1). Pub. L. 102–237, § 1006(b)(1), substituted ''the Administrator'' for ''he'' before ''shall classify it for both'' in subpar. (A), before ''will classify'' in subpar. (B), and before ''shall classify'' in subpar. (C).

Subsec. (d)(2). Pub. L. 102–237, § 1006(b)(1), substituted ''the Administrator'' for ''he'' before ''shall notify''.

1990—Subsec. (c)(2)(A). Pub. L. 101–624 inserted after third sentence ''The Administrator shall not require a person to submit, in relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use.''

1988—Subsec. (a). Pub. L. 100–532, § 601(b)(1), substituted ''Requirement of registration'' for ''Requirement'' in heading and amended text generally. Prior to amendment, text read as follows: ''Except as otherwise provided by this subchapter, no person in any State may distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or receive and (having so received) deliver or offer to deliver, to any person any pesticide which is not registered with the Administrator.''

Subsec. (c)(1)(D). Pub. L. 100–532, § 801(b)(1)–(4), in introductory provisions, substituted ''paragraph (2)(D)'' for ''subsection (c)(2)(D) of this section'', in cl. (i), substituted ''(i) with'' for ''(i) With'' and '', except that'' for '': *Provided*, That'', in cl. (ii), substituted ''clause (i)'' for ''subparagraph (D)(i) of this paragraph'', and in cl. (iii), substituted ''clauses (i) and (ii)'' for ''subparagraphs (D)(i) and (D)(ii) of this paragraph''.

Subsec. (c)(2)(A). Pub. L. 100–532, § 801(b)(5)(A), (B), substituted ''(2) Data in support of registration.—

''(A) The''

for ''(2)(A) Data in support of registration.—The'', and directed that subpar. (A) be aligned with left margin of subsec. (d)(1)(A) of this section.

Subsec. (c)(2)(B). Pub. L. 100–532, §§ 102(b)(1), 801(b)(5)(C)–(F), substituted ''(B)(i) If'' for ''(B) Additional data to support existing registration.—(i) If'', directed that cls. (ii) to (v) be aligned with left margin of subpar. (A), in cls. (ii) and (iii), inserted ''The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.'', in cl. (iv), substituted ''title. The only'' for ''title: *Provided*, that the only'', and in cl. (v), substituted ''paragraph (1)(D)'' for ''subsection (c)(1)(D) of this section''.

Subsec. (c)(2)(C). Pub. L. 100–532, § 801(b)(5)(G), (H), struck out ''Simplified procedures'' after ''(C)'' and directed that text be aligned with left margin of subpar. (A).

Subsec. (c)(2)(D). Pub. L. 100–532, § 102(b)(2)(A), and Pub. L. 102–237, § 1006(c), substituted ''the pesticide that is the subject of the application'' for ''an end-use product''.

Subsec. (c)(2)(D)(i). Pub. L. 100–532, § 102(b)(2)(B), struck out ''the safety of'' after ''data pertaining to''.

Subsec. (c)(3). Pub. L. 100–532, § 103, substituted ''(A) The Administrator'' for ''The Administrator'' and added subpar. (B).

Subsec. (c)(7). Pub. L. 100–532, § 801(b)(6), in introductory provisions, substituted ''paragraph (5)'' for ''subsection (c)(5) of this section'', in subpars. (A) and (B), substituted ''paragraph (5). If'' for ''subsection (c)(5) of this section: *Provided*, That, if'', and in subpar. (C), substituted ''prescribe. A'' for ''prescribe: *Provided*, that a''.

Subsec. (d)(1)(A). Pub. L. 100–532, § 801(b)(7), substituted ''restricted use. If'' for ''restricted use, provided that if'' and ''restricted uses. The Administrator'' for ''restricted uses: *Provided, however*, That the Administrator''.

Subsec. (f)(2). Pub. L. 100–532, § 801(b)(8), substituted ''this subchapter. As'' for ''this subchapter: *Provided*, That as''.

Subsec. (g). Pub. L. 100–532, § 801(b)(9), struck out subsec. (g) which read as follows: ''The Administrator shall accomplish the reregistration of all pesticides in the most expeditious manner practicable: *Provided*, That, to the extent appropriate, any pesticide that results in a postharvest residue in or on food or feed crops shall be given priority in the reregistration process.''

1978—Subsec. (c)(1)(D). Pub. L. 95–396, § 2(a)(1), added subpar. (D), and struck out provisions which required the applicant for registration of a pesticide to file with the Administrator a statement containing ''if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall

Case: 26-298, 11/19/2026, DktEntry: 41.1, (98 of 142)



have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 136h(b) of this title. This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972. If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If either party does not agree with said determination, he may, within thirty days, take an appeal to the Federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. Registration shall not be delayed pending the determination of reasonable compensation between the applicants, by the Administrator or by the court.''.

Subsec. (c)(2). Pub. L. 95–396, §§ 2(a)(2)(A)–(D), 3, 4, designated existing provisions as subpar. (A), inserted in second sentence ''under subparagraph (B) of this paragraph'' after ''kind of information'', struck out from introductory text of third sentence ''subsection (c)(1)(D) of this section and'' after ''Except as provided by'', and inserted provisions relating to establishment of standards for data requirements for registration of pesticides with respect to minor uses and consideration of economic factors in development of standards and cost of development, and added subpars. (B) to (D).

Subsec. (c)(5). Pub. L. 95–396, § 5, provided for waiver of data requirements pertaining to efficacy.

Subsec. (c)(7), (8). Pub. L. 95–396, § 6, added pars. (7) and (8).

Subsec. (d)(1)(A). Pub. L. 95–396, § 7(1), authorized classification of pesticide uses by regulation on the initial classification and registered pesticides prior to reregistration.

Subsec. (d)(2). Pub. L. 95–396, § 7(2), substituted ''forty-five days'' for ''30 days''.

Subsec. (d)(3). Pub. L. 95–396, § 7(3), added par. (3).

Subsec. (g). Pub. L. 95–396, § 8, added subsec. (g).

1975—Subsec. (c)(1)(D). Pub. L. 94–140 inserted exception relating to test data submitted on or after January 1, 1970, in support of application, inserted provision that compensation for producing test data shall apply to all applications submitted on or after October 21, 1972, and provision relating to delay of registration pending determination of reasonable compensation, struck out requirement that payment determined by court not be less than amount determined by Administrator, and substituted ''If either party'' for ''If the owner of the test data''.

## Statutory Notes and Related Subsidiaries

### Effective Date of 2007 Amendment

Pub. L. 110–94, § 6, Oct. 9, 2007, 121 Stat. 1007, provided that: ''This Act [see Short Title of 2007 Amendment note set out under section 136 of this title] and the amendments made by this Act take effect on October 1, 2007.''

### Effective Date of 2004 Amendment

Pub. L. 108–199, div. G, title V, § 501(h), Jan. 23, 2004, 118 Stat. 434, provided that: ''Except as otherwise provided in this section [enacting section 136w–8 of this title, amending this section and sections 136a–1, 136x, and 136y of this title, and enacting provisions set out as notes under sections 136 of this title and section 346a of Title 21, Food and Drugs] and the amendments made by this section, this section and the amendments made by this section take effect on the date that is 60 days after the date of enactment of this Act [Jan. 23, 2004].''

### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### Effective Date of 1978 Amendment

Pub. L. 95–396, § 2(b), Sept. 30, 1978, 92 Stat. 824, provided that: ''The amendment to section 3(c)(1)(D) of the Federal Insecticide, Fungicide, and Rodenticide Act [subsec. (c)(1)(D) of this section] made by [subsec. (a)(1) of] this section shall apply with respect to all applications for registration approved after the date of enactment of this Act [Sept. 30, 1978].''

### Effective Date

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

### Registration Review Deadline Extension

Pub. L. 117–328, div. HH, title VI, § 711, Dec. 29, 2022, 136 Stat. 6083, provided that:

''(a) In General.—Notwithstanding section 3(g)(1)(A)(iii)(I) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a(g)(1)(A)(iii)(I)), the Administrator of the Environmental Protection Agency (referred to in this section as the 'Administrator') shall complete the initial registration review of each pesticide or pesticide case covered by that section not later than October 1, 2026.

''(b) Interim Registration Review Decision Requirements.—

''(1) Definition of covered interim registration review decision.—In this subsection, the term 'covered interim registration review decision' means an interim registration review decision—

''(A) that is associated with an initial registration review described in subsection (a);

''(B) that is noticed in the Federal Register during the period beginning on the date of enactment of this Act [Dec. 29, 2022] and ending on October 1, 2026; and

''(C) for which the Administrator has not, as of the date on which the decision is noticed in the Federal Register, made effects determinations or completed any necessary consultation under section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)).

''(2) Requirements.—Any covered interim registration review decision shall include, where applicable, measures to reduce the effects of the applicable pesticide on—

''(A) species listed under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); or

''(B) any designated critical habitat.

''(3) Consultation.—In developing measures described in paragraph (2), the Administrator shall take into account the input received from the Secretary of Agriculture and other members of the interagency working group established under section 3(c)(11) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a(c)(11)).''

### Biological Pesticide Handling Study

Pub. L. 101–624, title XIV, § 1498, Nov. 28, 1990, 104 Stat. 3631, provided that the National Academy of Sciences would conduct a study of the biological control programs and registration procedures utilized by the Food and Drug Administration, the Animal and Plant Health Inspection Service, and the Environmental Protection Agency, and within 1 year after completion of the study, develop and implement a common process for reviewing and approving biological control applications submitted to such agencies and offices based on the study conducted, the recommendation of the National Academy of Sciences, and other public comment.

### Education, Study, and Report

Pub. L. 100–478, title I, § 1010, Oct. 7, 1988, 102 Stat. 2313, provided that:

''(a) Education.—The Administrator of the Environmental Protection Agency in cooperation with the Secretary of Agriculture and the Secretary of the Interior,

promptly upon enactment of this Act [Oct. 7, 1988], shall conduct a program to inform and educate fully persons engaged in agricultural food and fiber commodity production of any proposed pesticide labeling program or requirements that may be imposed by the Administrator in compliance with the Endangered Species Act [of 1973] (16 U.S.C. 1531 et seq.). The Administrator also shall provide the public with notice of, and opportunity for comment on, the elements of any such program and requirements based on compliance with the Endangered Species Act [of 1973], including (but not limited to) an identification of any pesticides affected by the program; an explanation of the restriction or prohibition on the user or applicator of any such pesticide; an identification of those geographic areas affected by any pesticide restriction or prohibition; an identification of the effects of any restricted or prohibited pesticide on endangered or threatened species; and an identification of the endangered or threatened species along with a general description of the geographic areas in which such species are located wherein the application of a pesticide will be restricted, prohibited, or its use otherwise limited, unless the Secretary of the Interior determines that the disclosure of such information may create a substantial risk of harm to such species or its habitat.

"(b) STUDY.—The Administrator of the Environmental Protection Agency, jointly with the Secretary of Agriculture and the Secretary of the Interior, shall conduct a study to identify reasonable and prudent means available to the Administrator to implement the endangered species pesticides labeling program which would comply with the Endangered Species Act of 1973, as amended, and which would allow persons to continue production of agricultural food and fiber commodities. Such study shall include investigation by the Administrator of the best available methods to develop maps and the best available alternatives to mapping as means of identifying those circumstances in which use of pesticides may be restricted; identification of alternatives to prohibitions on pesticide use, including, but not limited to, alternative pesticides and application methods and other agricultural practices which can be used in lieu of any pesticides whose use may be restricted by the labeling program; examination of methods to improve coordination among the Environmental Protection Agency, Department of Agriculture, and Department of the Interior in administration of the labeling program; and analysis of the means of implementing the endangered species pesticides labeling program or alternatives to such a program, if any, to promote the conservation of endangered or threatened species and to minimize the impacts to persons engaged in agricultural food and fiber commodity production and other affected pesticide users and applicators.

"(c) REPORT.—The Administrator of the Environmental Protection Agency in cooperation with the Secretary of Agriculture and the Secretary of the Interior shall submit a report within one year of the date of enactment of this Act [Oct. 7, 1988], presenting the results of the study conducted pursuant to subsection (b) of this section to the Committee on Merchant Marine and Fisheries and the Committee on Agriculture of the United States House of Representatives, and the Committee on Environment and Public Works and the Committee on Agriculture, Nutrition, and Forestry of the United States Senate."

## § 136a–1. Reregistration of registered pesticides

### (a) General rule

The Administrator shall reregister, in accordance with this section, each registered pesticide containing any active ingredient contained in any pesticide first registered before November 1, 1984, except for any pesticide as to which the Administrator has determined, after November 1, 1984, and before the effective date of this section, that—

(1) there are no outstanding data requirements; and

(2) the requirements of section 136a(c)(5) of this title have been satisfied.

### (b) Reregistration phases

Reregistrations of pesticides under this section shall be carried out in the following phases:

(1) The first phase shall include the listing under subsection (c) of the active ingredients of the pesticides that will be reregistered.

(2) The second phase shall include the submission to the Administrator under subsection (d) of notices by registrants respecting their intention to seek reregistration, identification by registrants of missing and inadequate data for such pesticides, and commitments by registrants to replace such missing or inadequate data within the applicable time period.

(3) The third phase shall include submission to the Administrator by registrants of the information required under subsection (e).

(4) The fourth phase shall include an independent, initial review by the Administrator under subsection (f) of submissions under phases two and three, identification of outstanding data requirements, and the issuance, as necessary, of requests for additional data.

(5) The fifth phase shall include the review by the Administrator under subsection (g) of data submitted for reregistration and appropriate regulatory action by the Administrator.

### (c) Phase one

#### (1) Priority for reregistration

For purposes of the reregistration of the pesticides described in subsection (a), the Administrator shall list the active ingredients of pesticides and shall give priority to, among others, active ingredients (other than active ingredients for which registration standards have been issued before the effective date of this section) that—

(A) are in use on or in food or feed and may result in postharvest residues;

(B) may result in residues of potential toxicological concern in potable ground water, edible fish, or shellfish;

(C) have been determined by the Administrator before the effective date of this section to have significant outstanding data requirements; or

(D) are used on crops, including in greenhouses and nurseries, where worker exposure is most likely to occur.

#### (2) Reregistration lists

For purposes of reregistration under this section, the Administrator shall by order—

(A) not later than 70 days after the effective date of this section, list pesticide active ingredients for which registration standards have been issued before such effective date;

(B) not later than 4 months after such effective date, list the first 150 pesticide active ingredients, as determined under paragraph (1);

(C) not later than 7 months after such effective date, list the second 150 pesticide active ingredients, as determined under paragraph (1); and

(D) not later than 10 months after such effective date, list the remainder of the pes-

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





the pesticide is not subject to reimbursement by the seller.

(B) If—

(i) the Administrator notifies a registrant under section 136d(c)(1) of this title that the Administrator intends to suspend a registration or that an emergency order of suspension of a registration under section 136d(c)(3) of this title has been issued;

(ii) the registration in question is suspended under section 136d(c) of this title, and thereafter is canceled under section 136d(b), 136d(d), or 136d(f) of this title;

(iii) any person who, immediately before the notice to the registrant under clause (i)—

(I) had not been notified in writing by the seller, as provided under subparagraph (A), that any quantity of the pesticide owned by such person is not subject to reimbursement by the seller in the event of suspension or cancellation of the pesticide; and

(II) owned any quantity of the pesticide for purposes of—

(aa) distributing or selling it; or

(bb) further processing it for distribution or sale directly to an end user;

suffered a loss by reason of the suspension or cancellation of the pesticide; and

(iv) the Administrator determines on the basis of a claim of loss submitted to the Administrator by the person, that the seller—

(I) did not provide the notice specified in subparagraph (A) to such person; and

(II) is and will continue to be unable to provide reimbursement to such person, as provided under subparagraph (A), for the loss referred to in clause (iii), as a result of the insolvency or bankruptcy of the seller and the seller's resulting inability to provide such reimbursement;

the person shall be entitled to an indemnity payment under this subsection for such quantity of the pesticide.

(C) If an indemnity payment is made by the United States under this paragraph, the United States shall be subrogated to any right that would otherwise be held under this paragraph by a seller who is unable to make a reimbursement in accordance with this paragraph with regard to reimbursements that otherwise would have been made by the seller.

**(3) Source**

Any payment required to be made under paragraph (1) or (2) shall be made from the appropriation provided under section 1304 of title 31.

**(4) Administrative settlement**

An administrative settlement of a claim for such indemnity may be made in accordance with the third paragraph of section 2414 of title 28 and shall be regarded as if it were made under that section for purposes of section 1304 of title 31.

**(c) Amount of payment**

**(1) In general**

The amount of an indemnity payment under subsection (a) or (b) to any person shall be determined on the basis of the cost of the pesticide owned by the person (other than the cost of transportation, if any) immediately before the issuance of the notice to the registrant referred to in subsection (a)(1)(A), (b)(1)(A), or (b)(2)(B)(i), except that in no event shall an indemnity payment to any person exceed the fair market value of the pesticide owned by the person immediately before the issuance of the notice.

**(2) Special rule**

Notwithstanding any other provision of this subchapter, the Administrator may provide a reasonable time for use or other disposal of the pesticide. In determining the quantity of any pesticide for which indemnity shall be paid under this section, proper adjustment shall be made for any pesticide used or otherwise disposed of by the owner.

(June 25, 1947, ch. 125, § 15, as added Pub. L. 92–516, § 2, Oct. 21, 1972, 86 Stat. 993; amended Pub. L. 100–532, title V, § 501(a), Oct. 25, 1988, 102 Stat. 2674.)

### Editorial Notes

AMENDMENTS

1988—Pub. L. 100–532 amended section generally, in subsec. (a), substituting provisions relating to general indemnification for provisions relating to requirements for payment, adding subsec. (b), and redesignating provisions of former subsec. (b), with further amendment, as subsec. (c).

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–532, title V, § 501(a), Oct. 25, 1988, 102 Stat. 2674, provided that amendment made by Pub. L. 100–532 is effective 180 days after Oct. 25, 1988.

EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

INTERIM PAYMENTS

Pub. L. 100–532, title V, § 501(b), Oct. 25, 1988, 102 Stat. 2676, provided that:

"(1) SOURCE.—Any obligation of the Administrator to pay an indemnity arising under section 15 [this section], as it existed prior to the effective date of the amendment made by this section [see Effective Date of 1988 Amendment note above], shall be made from the appropriation provided under section 1304 of title 31, United States Code.

"(2) ADMINISTRATIVE SETTLEMENT.—An administrative settlement of a claim for such indemnity may be made in accordance with the third paragraph of section 2414 of title 28, United States Code, and shall be regarded as if it were made under that section for purposes of section 1304 of title 31, United States Code."

## § 136n. Administrative procedure; judicial review

**(a) District court review**

Except as otherwise provided in this subchapter, the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.

**(b) Review by court of appeals**

In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or any officer designated by the Administrator for that purpose, and thereupon the Administrator shall file in the court the record of the proceedings on which the Administrator based the Administrator's order, as provided in section 2112 of title 28. Upon the filing of such petition the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part. The court shall consider all evidence of record. The order of the Administrator shall be sustained if it is supported by substantial evidence when considered on the record as a whole. The judgment of the court affirming or setting aside, in whole or in part, any order under this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28. The commencement of proceedings under this section shall not, unless specifically ordered by the court to the contrary, operate as a stay of an order.

**(c) Jurisdiction of district courts**

The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this subchapter.

**(d) Notice of judgments**

The Administrator shall, by publication in such manner as the Administrator may prescribe, give notice of all judgments entered in actions instituted under the authority of this subchapter.

(June 25, 1947, ch. 125, §16, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 994; amended Pub. L. 98–620, title IV, §402(4)(C), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 100–532, title VIII, §801(i), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(b)(1), (2), (3)(P), Dec. 13, 1991, 105 Stat. 1895, 1896.)

**Editorial Notes**

AMENDMENTS

1991—Subsec. (b). Pub. L. 102–237, §1006(b)(1), (2), (3)(P), substituted "the Administrator" for "he" before "based", "the Administrator's" for "his", and "the Administrator" for "him" after "designated by".

Subsec. (d). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "may".

1988—Subsec. (a). Pub. L. 100–532 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "Except as is otherwise provided in this subchapter, Agency refusals to cancel or suspend registrations or change classifications not following a hearing and other final Agency actions not committed to Agency discretion by law are judicially reviewable in the district courts."

1984—Subsec. (b). Pub. L. 98–620 struck out provisions requiring the court to advance on the docket and expedite the disposition of all cases filed pursuant to this section.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

**§ 136*o*. Imports and exports**

**(a) Pesticides and devices intended for export**

Notwithstanding any other provision of this subchapter, no pesticide or device or active ingredient used in producing a pesticide intended solely for export to any foreign country shall be deemed in violation of this subchapter—

(1) when prepared or packed according to the specifications or directions of the foreign purchaser, except that producers of such pesticides and devices and active ingredients used in producing pesticides shall be subject to sections 136(p), 136(q)(1)(A), (C), (D), (E), (G), and (H), 136(q)(2)(A), (B), (C)(i) and (iii), and (D), 136e, and 136f of this title; and

(2) in the case of any pesticide other than a pesticide registered under section 136a or sold under section 136d(a)(1) of this title, if, prior to export, the foreign purchaser has signed a statement acknowledging that the purchaser understands that such pesticide is not registered for use in the United States and cannot be sold in the United States under this subchapter.

A copy of that statement shall be transmitted to an appropriate official of the government of the importing country.

**(b) Cancellation notices furnished to foreign governments**

Whenever a registration, or a cancellation or suspension of the registration of a pesticide becomes effective, or ceases to be effective, the Administrator shall transmit through the State Department notification thereof to the governments of other countries and to appropriate international agencies. Such notification shall, upon request, include all information related to the cancellation or suspension of the registration of the pesticide and information concerning other pesticides that are registered under section 136a of this title and that could be used in lieu of such pesticide.

**(c) Importation of pesticides and devices**

**(1) In general**

The Secretary of the Treasury shall notify the Administrator of the arrival of pesticides and devices and shall deliver to the Administrator, upon the Administrator's request, sam-

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





**Editorial Notes**

REFERENCES IN TEXT

Section 2 of Public Law 89–106, referred to in subsec. (a)(1), was formerly classified to secton 450i of this title prior to editorial reclassification and renumbering as section 3157 of this title.

Section 1651 of the Food, Agriculture, Conservation, and Trade Act of 1990, referred to in subsec. (a)(1), was classified to section 5882 of this title prior to repeal by Pub. L. 104–127, title VIII, § 862(a), Apr. 4, 1996, 110 Stat. 1174.

## § 136w–8. Pesticide registration service fees

**(a) Definition of costs**

In this section, the term ''costs'', when used with respect to review and decisionmaking pertaining to an application for which registration service fees are paid under this section, means—

(1) costs to the extent that—

(A) officers and employees provide direct support for the review and decisionmaking for covered pesticide applications, associated tolerances, and corresponding risk and benefits information and analyses;

(B) persons and organizations under contract with the Administrator engage in the review of the applications, and corresponding risk and benefits information and assessments; and

(C) advisory committees and other accredited persons or organizations, on the request of the Administrator, engage in the peer review of risk or benefits information associated with covered pesticide applications;

(2) costs of management of information, and the acquisition, maintenance, and repair of computer and telecommunication resources (including software), used to support review of pesticide applications, associated tolerances, and corresponding risk and benefits information and analyses; and

(3) costs of collecting registration service fees under subsections (b) and (c) and reporting, auditing, and accounting under this section.

**(b) Fees**

**(1) In general**

Effective beginning on the effective date of the Pesticide Registration Improvement Act of 2003, the Administrator shall assess and collect covered pesticide registration service fees in accordance with this section.

**(2) Covered applications**

**(A) In general**

An application for the registration of a pesticide covered by this subchapter that is received by the Administrator on or after the effective date of the Pesticide Registration Improvement Act of 2003 or for any other action covered by a table specified in paragraph (3)(B) shall be subject to a registration service fee under this section.

**(B) Existing applications**

**(i) In general**

Subject to clause (ii), an application for the registration of a pesticide that was submitted to the Administrator before the effective date of the Pesticide Registration Improvement Act of 2003 and is pending on that effective date shall be subject to a service fee under this section if the application is for the registration of a new active ingredient that is not listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency.

**(ii) Tolerance or exemption fees**

The amount of any fee otherwise payable for an application described in clause (i) under this section shall be reduced by the amount of any fees paid to support the related petition for a pesticide tolerance or exemption under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.).

**(C) Documentation**

An application subject to a registration service fee under this section shall be submitted with documentation certifying—

(i) payment of the registration service fee; or

(ii) payment of at least 25 percent of the registration service fee and a request for a waiver from or reduction of the remaining amount of the registration service fee.

**(D) Payment**

The registration service fee required under this subsection shall be due upon submission of the application.

**(E) Applications subject to additional fees**

An application may be subject to additional fees if—

(i) the applicant identified the incorrect registration service fee and decision review period;

(ii) after review of a waiver request, the Administrator denies the waiver request; or

(iii) on completion of, where appropriate, the initial screening of the contents of the application or the preliminary technical screening of the application, the Administrator determines that a different registration service fee and decision review period apply to the application.

**(F) Effect of failure to pay fees**

The Administrator shall reject any application submitted without the required registration service fee.

**(G) Non-refundable portion of fees**

**(i) In general**

The Administrator shall retain 25 percent of the applicable registration service fee.

**(ii) Limitation**

Any waiver, refund, credit or other reduction in the registration service fee shall not exceed 75 percent of the registration service fee.

**(H) Collection of unpaid fees**

In any case in which the Administrator does not receive payment of a registration service fee (or applicable portion of the reg-

istration service fee) by the date that is 30 days after the fee is due, the fee shall be treated as a claim of the United States Government subject to subchapter II of chapter 37 of title 31.

**(3) Schedule of covered applications and other actions and their registration service fees**

**(A) Data evaluation records**

At the decision review time under a fee table specified in subparagraph (B) or as agreed upon under subsection (f)(5), for each covered application under a fee table specified in such subparagraph (B), the Administrator shall—

(i) complete data evaluation records for studies submitted by the applicant in support of the application; and

(ii) release those data evaluation records to the applicant, using appropriate protections for confidential business information.

**(B) Schedule, actions, and fees**

Subject to paragraph (6), the schedule of registration applications and other covered actions and their corresponding registration service fees shall be as follows:

TABLE 1. — REGISTRATION DIVISION (RD) — NEW ACTIVE INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R010 | 1 | New Active Ingredient, Food use. (2)(3) | 36 | 1,079,356 |
| R020 | 2 | New Active Ingredient, Food use; reduced risk. (2)(3) | 27 | 899,464 |
| R040 | 3 | New Active Ingredient, Food use; Experimental Use Permit application; establish temporary tolerance; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 18 | 662,883 |
| R060 | 4 | New Active Ingredient, Non-food use; outdoor. (2)(3) | 30 | 749,886 |
| R070 | 5 | New Active Ingredient, Non-food use; outdoor; reduced risk. (2)(3) | 24 | 624,905 |
| R090 | 6 | New Active Ingredient, Non-food use; outdoor; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 16 | 463,930 |
| R110 | 7 | New Active Ingredient, Non-food use; indoor. (2)(3)(4) | 20 | 417,069 |
| R120 | 8 | New Active Ingredient, Non-food use; indoor; reduced risk. (2)(3)(4) | 14 | 347,556 |
| R121 | 9 | New Active Ingredient, Non-food use; indoor; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 18 | 261,322 |
| R122 | 10 | Enriched isomer(s) of registered mixed-isomer active ingredient. (2)(3) | 27 | 454,526 |
| R123 | 11 | New Active Ingredient, Seed treatment only; includes agricultural and non-agricultural seeds; non-food use, not requiring a tolerance. (2)(3) | 27 | 676,296 |
| R126 | 12 (new) | New Active Ingredient, Seed treatment only; limited uptake into raw agricultural commodities; use requiring a tolerance. (2)(3) | 31 | 743,925 |
| R125 | 13 | New Active Ingredient, Seed treatment; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 16 | 463,930 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 2. — REGISTRATION DIVISION (RD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R130 | 14 | First food use; indoor; food/food handling. (2)(3)(5) | 23 | 274,388 |
| R140 | 15 | Additional food use; Indoor; food/food handling. (3)(4)(5) | 17 | 64,028 |
| R150 | 16 | First food use. (2)(3)(5) | 23 | 454,490 |
| R155 | 17 | First food use, Experimental Use Permit application; active ingredient registered for non-food use. (3)(4)(5) | 21 | 378,742 |
| R160 | 18 | First food use; reduced risk. (2)(3)(5) | 18 | 378,742 |
| R170 | 19 | Additional food use. (3)(4)(5) | 17 | 113,728 |
| R175 | 20 | Additional food uses covered within a crop group resulting from the conversion of existing approved crop group(s) to one or more revised crop groups. (3)(4)(5) | 14 | 94,774 |
| R180 | 21 | Additional food use; reduced risk. (3)(4)(5) | 12 | 94,774 |
| R190 | 22 | Additional food uses; 6 or more submitted in one application. (3)(4)(5) | 17 | 682,357 |
| R200 | 23 | Additional Food Use; 6 or more submitted in one application; Reduced Risk. (3)(4)(5) | 12 | 568,632 |
| R210 | 24 | Additional food use; Experimental Use Permit application; establish temporary tolerance; no credit toward new use registration. (3)(4)(5) | 12 | 70,210 |
| R220 | 25 | Additional food use; Experimental Use Permit application; crop destruct basis; no credit toward new use registration. (3)(4)(5) | 6 | 28,434 |
| R230 | 26 | Additional use; non-food; outdoor. (3)(4)(5) | 16 | 45,453 |
| R240 | 27 | Additional use; non-food; outdoor; reduced risk. (3)(4)(5) | 10 | 37,878 |

TABLE 2. — REGISTRATION DIVISION (RD) — NEW USES—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R250 | 28 | Additional use; non-food; outdoor; Experimental Use Permit application; no credit toward new use registration. (3)(4)(5) | 6 | 28,434 |
| R251 | 29 | Experimental Use Permit application which requires no changes to the tolerance(s); non-crop destruct basis. (3)(5) | 8 | 28,434 |
| R260 | 30 | New use; non-food; indoor. (3)(4)(5) | 12 | 21,954 |
| R270 | 31 | New use; non-food; indoor; reduced risk. (3)(4)(5) | 9 | 18,296 |
| R271 | 32 | New use; non-food; indoor; Experimental Use Permit application; no credit toward new use registration. (3)(4)(5) | 6 | 13,940 |
| R273 | 33 | Additional use; seed treatment only; use not requiring a new tolerance; includes crops with established tolerances (e.g., for soil or foliar application). (3)(4)(5) | 12 | 72,302 |
| R274 | 34 | Additional use; seed treatment only; 6 or more submitted in one application; uses not requiring new tolerances; includes crops with established tolerances (e.g., for soil or foliar application). (3)(4)(5) | 12 | 433,793 |
| R276 | 35 (new) | Additional use, seed treatment only; limited uptake into raw agricultural commodities; use requiring a tolerance. (3)(4)(5) | 14 | 79,560 |
| R277 | 36 (new) | Additional use, seed treatment only; 6 or more submitted in one application; limited uptake into raw agricultural commodities; use requiring a tolerance. (3)(4)(5) | 14 | 477,360 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 3. — REGISTRATION DIVISION (RD) — IMPORT AND OTHER TOLERANCES

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R280 | 37 | Establish tolerances for residues in imported commodities; new active ingredient or first food use. (2) | 22 | 457,311 |
| R290 | 38 | Establish tolerances for residues in imported commodities; Additional new food use. | 16 | 91,465 |
| R291 | 39 | Establish tolerances for residues in imported commodities; additional food uses; 6 or more crops submitted in one petition. | 16 | 548,773 |
| R292 | 40 | Amend an established tolerance (e.g., decrease or increase) and/or harmonize established tolerances with Codex Maximum Residue Limits; domestic or import; applicant-initiated. | 12 | 64,987 |
| R293 | 41 | Establish tolerance(s) for inadvertent residues in one crop; applicant-initiated. | 13 | 76,656 |
| R294 | 42 | Establish tolerances for inadvertent residues; 6 or more crops submitted in one application; applicant-initiated. | 13 | 459,922 |
| R295 | 43 | Establish tolerance(s) for residues in one rotational crop in response to a specific rotational crop application; submission of corresponding label amendments which specify the necessary plant-back restrictions; applicant-initiated. (3)(4) | 16 | 94,774 |
| R296 | 44 | Establish tolerances for residues in rotational crops in response to a specific rotational crop petition; 6 or more crops submitted in one application; submission of corresponding label amendments which specify the necessary plant-back restrictions; applicant-initiated. (3)(4) | 16 | 568,632 |
| R297 | 45 | Amend 6 or more established tolerances (e.g., decrease or increase) in one petition; domestic or import; applicant-initiated. | 12 | 389,897 |
| R298 | 46 | Amend an established tolerance (e.g., decrease or increase); domestic or import; submission of corresponding amended labels (requiring science review). (3)(4) | 14 | 83,940 |
| R299 | 47 | Amend 6 or more established tolerances (e.g., decrease or increase); domestic or import; submission of corresponding amended labels (requiring science review). (3)(4) | 14 | 408,853 |

TABLE 3. — REGISTRATION DIVISION (RD) — IMPORT AND OTHER TOLERANCES—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R281 | 48 (new) | Establish tolerances for residues in imported commodities; additional new food use; submission of residue chemistry data review conducted by Codex or other competent national regulatory authority. | 12 | 68,599 |
| R282 | 49 (new) | Establish tolerances for residues in imported commodities; additional new food uses; 6 or more crops submitted in one petition; submission of residue chemistry data review conducted by Codex or other competent national regulatory authority. | 12 | 411,580 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) Amendment applications to add the revised use pattern(s) to registered product labels are covered by the base fee for the category. All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the amendment application package is subject to the registration service fee for a new product or a new inert approval. However, if an amendment application only proposes to register the amendment for a new product and there are no amendments in the application, then review of one new product application is covered by the base fee. All such associated applications that are submitted together will be subject to the category decision review time.

TABLE 4. — REGISTRATION DIVISION (RD) — NEW PRODUCTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R300 | 50 | New product; or similar combination product (already registered) to an identical or substantially similar in composition and use to a registered product; registered source of active ingredient; no data review on acute toxicity, efficacy or child-resistant packaging — only product chemistry data; cite-all data citation, or selective data citation where applicant owns all required data, or applicant submits specific authorization letter from data owner. Category also includes 100% re-package of registered end-use or manufacturing-use product that requires no data submission nor data matrix. (2)(3) | 4 | 2,270 |

TABLE 4. — REGISTRATION DIVISION (RD) — NEW PRODUCTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R301 | 51 | New product; or similar combination product (already registered) to an identical or substantially similar in composition and use to a registered product; registered source of active ingredient; selective data citation only for data on product chemistry and/or acute toxicity and/or public health pest efficacy (identical data citation and claims to cited product(s)), where applicant does not own all required data and does not have a specific authorization letter from data owner. (2)(3) | 4 | 2,720 |
| R310 | 52 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s); includes products containing two or more registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>4.[sic] Child-resistant packaging and/or<br>4. pest(s) requiring efficacy – for up to 3 target pests. (2)(3)(4) | 7 | 10,466 |
| R314 | 53 | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy (4) for up to 3 target pests. (2)(3) | 8 | 12,364 |
| R319 | 54 | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy (4) - for 4 to 7 target pests. (2)(3) | 10 | 18,097 |

TABLE 4. — REGISTRATION DIVISION (RD) — NEW PRODUCTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R318 | 55 | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy – for up to 3 target pests. (2)(3)(4) | 9 | 18,994 |
| R321 | 56 | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy (4) - for 4 to 7 target pests. (2)(3) | 11 | 24,727 |
| R315 | 57 | New end-use on-animal product, registered source of active ingredient(s) with submission of data and/or waivers for only:<br>1. animal safety and<br>2. pest(s) requiring efficacy and/or<br>3. product chemistry and/or<br>4. acute toxicity and/or<br>5. child resistant packaging. (2)(3)(4) | 9 | 14,075 |
| R316 | 58 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s) including products containing two or more registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; and requires review of data and/or waivers for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy - for 4 to 7 target pests. (2)(3)(4) | 9 | 16,199 |
| R317 | 59 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s) including products containing two or more registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; and requires review of data and/or waivers for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. Pest(s) requiring efficacy - for greater than 7 target pests, (2)(3)(4) | 10 | 21,932 |
| R320 | 60 | New product; new physical form; requires data review in science divisions. (2)(3)(5) | 12 | 18,958 |

TABLE 4. — REGISTRATION DIVISION (RD) — NEW PRODUCTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R331 | 61 | New product; repack of identical registered end-use product as a manufacturing-use product; same registered uses only. (2)(3) | 3 | 3,627 |
| R332 | 62 | New manufacturing-use product; registered active ingredient; unregistered source of active ingredient; submission of completely new generic data package; registered uses only; requires review in RD and science divisions. (2)(3) | 24 | 405,919 |
| R333 | 63 | New product; manufacturing-use product or end-use product with unregistered source of active ingredient; requires science data review; new physical form; etc. Cite-all or selective data citation where applicant owns all required data. (2)(3) | 11 | 28,434 |
| R334 | 64 | New product; manufacturing-use product or end-use product with unregistered source of the active ingredient; requires science data review; new physical form; etc. Selective data citation. (2)(3) | 12 | 33,108 |
| R361 | 65 (new) | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. Child resistant packaging and/or<br>4. pest(s) requiring efficacy – for more than 7 target pests. (2)(3)(4) | 12 | 23,400 |
| R362 | 66 (new) | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. Child resistant packaging and/or<br>4. pest(s) requiring efficacy – for more than 7 target pests. (2)(3)(4) | 13 | 25,350 |
| R363 | 67 (new) | New product; repack of identical registered manufacturing-use product as an end-use product; same registered uses only, with no additional data. (2)(3) | 6 | 7,800 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) For the purposes of classifying proposed registration actions into PRIA categories, ''pest(s) requiring efficacy'' are both invertebrate and vertebrate pests. Invertebrate public health pests (e.g., ticks, mosquitoes, cockroaches, flies, etc.), structural pests (e.g., termites, carpenter ants, and wood-boring beetles) and certain invasive invertebrate species (e.g., Asian Longhorned beetle, Emerald Ashborer) are listed in the product performance rule, subpart R of part 158 of title 40, Code of Federal Regulations. This list may be updated/refined as invasive pest needs arise. All other pests (e.g., vertebrates) are listed in the Pesticide Registration Notice 2002-1. To determine the number of pests for the PRIA categories, pest groups, subgroups, and pest specific claims as listed in part 158 of title 40, Code of Federal Regulations, should be counted as follows. If seeking a label claim against a general pest group (e.g., cockroaches, mosquitoes, termites, etc.), each group will count as 1. If seeking a claim against a pest subgroup (e.g., small biting flies, filth flies, etc.) or specific pests (e.g., smokybrown cockroach, house fly, etc.) without a general claim, then each subgroup or specific pest will count as 1.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 5. — REGISTRATION DIVISION (RD) — AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R340 | 68 | Amendment requiring data review within RD (e.g., changes to precautionary label statements); includes adding/modifying pest(s) claims for up to 2 target pests; excludes products requiring or citing an animal safety study. (2)(3) | 4 | 7,150 |
| R341 | 69 | Amendment requiring data review within RD (e.g., changes to precautionary label statements), includes adding/modifying pest(s) claims for greater than 2 target pests; excludes products requiring or citing an animal safety study. (2)(3) | 6 | 8,584 |
| R345 | 70 | Amending on-animal products previously registered, with the submission of data and/or waivers for only:<br>1. animal safety and<br>2. pest(s) requiring efficacy and/or<br>3. product chemistry and/or<br>4. acute toxicity and/or<br>5. child resistant packaging. (2)(3)(4) | 7 | 12,643 |
| R350 | 71 | Amendment requiring data review in science divisions (e.g., changes to Restricted Entry Interval, or Personal Protective Equipment, or Preharvest Interval, or use rate, or number of applications; or add aerial application; or modify Ground Water/Surface Water advisory statement). (2)(3)(5) | 9 | 18,958 |
| R351 | 72 | Amendment adding a new unregistered source of active ingredient. (2)(3) | 8 | 18,958 |
| R352 | 73 | Amendment adding already approved uses; selective method of support; does not apply if the applicant owns all cited data. (2)(3) | 8 | 18,958 |
| R371 | 74 | Amendment to Experimental Use Permit; (does not include extending a permit's time period). (3) | 6 | 14,463 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under PR Notices, such as PR Notice 98–10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) For the purposes of classifying proposed registration actions into PRIA categories, ''pest(s) requiring efficacy'' are both invertebrate and vertebrate pests. Invertebrate public health pests (e.g., ticks, mosquitoes, cockroaches, flies, etc.), structural pests (e.g., termites, carpenter ants, and wood-boring beetles) and certain invasive invertebrate species (e.g., Asian Longhorned beetle, Emerald Ashborer) are listed in the product performance rule, subpart R of part 158 of title 40, Code of Federal Regulations. This list may be updated/refined as invasive pest needs arise. All other pests (e.g., vertebrates) are listed in the Pesticide Registration Notice 2002-1. To determine the number of pests for the PRIA categories, pest groups, subgroups, and pest specific claims as listed in part 158 of title 40, Code of Federal Regulations, should be counted as follows. If seeking a label claim against a general pest group (e.g., cockroaches, mosquitoes, termites, etc.), each group will count as 1. If seeking a claim against a pest subgroup (e.g., small biting flies, filth flies, etc.) or specific pests (e.g., smokybrown cockroach, house fly, etc.) without a general claim, then each subgroup or specific pest will count as 1.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 6. — REGISTRATION DIVISION (RD) — OTHER ACTIONS

| **EPA No.** | **New CR No.** | **Action** | **Decision Review Time (Months)(1)** | **Registration Service Fee ($)** |
|---|---|---|---|---|
| R124 | 75 | Conditional Ruling on Pre-application Study Waivers; applicant-initiated. | 6 | 3,627 |
| R272 | 76 | Review of Study Protocol applicant-initiated; excludes Data Analysis Reporting Tool, pre-registration conference, Rapid Response review, developmental neurotoxicity protocol review, protocol needing Human Studies Review Board review, companion animal safety protocol. | 3 | 3,627 |
| R275 | 77 | Rebuttal of Agency reviewed protocol, applicant initiated. | 3 | 3,627 |
| R278 | 78 (new) | Review of Protocol for companion animal safety study. | 5 | 4,927 |
| R279 | 79 (new) | Comparative product determination for reduced risk submission, applicant initiated; submitted before application for reduced risk new active ingredient or reduced risk new use. | 3 | 5,200 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

TABLE 7. — ANTIMICROBIAL DIVISION (AD) — NEW ACTIVE INGREDIENTS

| **EPA No.** | **New CR No.** | **Action** | **Decision Review Time (Months)(1)** | **Registration Service Fee ($)** |
|---|---|---|---|---|
| A380 | 80 | New Active Ingredient; Indirect Food use; establish tolerance or tolerance exemption if required. (2)(3)(4) | 26 | 227,957 |
| A390 | 81 | New Active Ingredient; Direct Food use; establish tolerance or tolerance exemption if required. (2)(3)(4) | 26 | 329,265 |
| A410 | 82 | New Active Ingredient Non-food use. (2)(3)(4) | 23 | 278,659 |
| A431 | 83 | New Active Ingredient, Non-food use; low-risk. (2)(3)(4) | 14 | 114,984 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 8. — ANTIMICROBIAL DIVISION (AD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A440 | 84 | New Use, Indirect Food Use, establish tolerance or tolerance exemption. (2)(3)(4)(6) | 23 | 45,737 |
| A441 | 85 | Additional Indirect food uses; establish tolerances or tolerance exemptions if required; 6 or more submitted in one application. (3)(4)(5)(6) | 23 | 164,639 |
| A450 | 86 | New use, Direct food use, establish tolerance or tolerance exemption. (2)(3)(4)(6) | 23 | 137,198 |
| A451 | 87 | Additional Direct food uses; establish tolerances or tolerance exemptions if required; 6 or more submitted in one application. (3)(4)(5)(6) | 22 | 261,333 |
| A500 | 88 | New use, non-food. (4)(5)(6) | 15 | 45,737 |
| A501 | 89 | New use, non-food; 6 or more submitted in one application. (4)(5)(6) | 17 | 109,764 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) If EPA data rules are amended to newly require clearance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a) for an ingredient of an antimicrobial product where such ingredient was not previously subject to such a clearance, then review of the data for such clearance of such product is not subject to a registration service fee for the tolerance action for two years from the effective date of the rule.

(4) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(5) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(6) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 9. — ANTIMICROBIAL DIVISION (AD) — NEW PRODUCTS AND AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A530 | 90 | New product, identical or substantially similar in composition and use to a registered product; no data review or only product chemistry data; cite all data citation or selective data citation where applicant owns all required data; or applicant submits specific authorization letter from data owner. Category also includes 100% re-package of registered end-use or manufacturing-use product that requires no data submission nor data matrix. (2)(3) | 4 | 1,833 |
| A531 | 91 | New product; identical or substantially similar in composition and use to a registered product; registered source of active ingredient: selective data citation only for data on product chemistry and/or acute toxicity and/or public health pest efficacy, where applicant does not own all required data and does not have a specific authorization letter from data owner. (2)(3) | 4 | 2,616 |
| A532 | 92 | New product; identical or substantially similar in composition and use to a registered product; registered active ingredient; unregistered source of active ingredient; cite-all data citation except for product chemistry; product chemistry data submitted. (2)(3) | 5 | 7,322 |
| A550 | 93 | New end-use product; uses other than FIFRA § 2(mm); non-FQPA product. (2)(3)(5) | 9 | 18,958 |
| A560 | 94 | New manufacturing-use product; registered active ingredient; selective data citation. (2)(3) | 6 | 18,054 |
| A565 | 95 | New manufacturing-use product; registered active ingredient; unregistered source of active ingredient; submission of new generic data package; registered uses only; requires science review. (2)(3) | 18 | 26,135 |
| A572 | 96 | New Product or amendment requiring data review for risk assessment by Science Branch (e.g., changes to Restricted Entry Interval, or Personal Protective Equipment, or use rate). (2)(3)(4)(7) | 9 | 18,958 |

TABLE 9. — ANTIMICROBIAL DIVISION (AD) — NEW PRODUCTS AND AMENDMENTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A460 | 97 (new) | New end-use product; FIFRA §2(mm) uses only; 0 to 10 public health organisms. (2)(3)(5)(6) | 5 | 7,322 |
| A461 | 98 (new) | New end-use product; FIFRA §2(mm) uses only; 11 to 20 public health organisms. (2)(3)(5)(6) | 6 | 10,158 |
| A462 | 99 (new) | New end-use product; FIFRA §2(mm) uses only; 21 to 30 public health organisms. (2)(3)(5)(6) | 7 | 12,995 |
| A463 | 100 (new) | New end-use product; FIFRA §2(mm) uses only; 31 to 40 public health organisms. (2)(3)(5)(6) | 9 | 15,831 |
| A464 | 101 (new) | New end-use product; FIFRA §2(mm) uses only; 41 to 50 public health organisms. (2)(3)(5)(6) | 10 | 18,668 |
| A465 | 102 (new) | New end-use product; FIFRA §2(mm) uses only; 51 or more public health organisms. (2)(3)(5)(6) | 11 | 21,505 |
| A470 | 103 (new) | Label amendment requiring data review; 0 to 10 public health organisms. (3)(4)(5)(6) | 4 | 5,493 |
| A471 | 104 (new) | Label amendment requiring data review; 11 to 20 public health organisms. (3)(4)(5)(6) | 5 | 8,506 |
| A472 | 105 (new) | Label amendment requiring data review; 21 to 30 public health organisms. (3)(4)(5)(6) | 6 | 10,219 |
| A473 | 106 (new) | Label amendment requiring data review; 31 to 40 public health organisms. (3)(4)(5)(6) | 7 | 11,933 |
| A474 | 107 (new) | Label amendment requiring data review; 41 to 50 public health organisms. (3)(4)(5)(6) | 8 | 13,646 |
| A475 | 108 (new) | Label amendment requiring data review; 51 or more public health organisms. (3)(4)(5)(6) | 9 | 15,766 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98–10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(5) The applicant must identify the substantially similar product if opting to use cite-all or the selective method to support acute toxicity data requirements.

(6) Once an application for an amendment or a new product with public health organisms has been submitted and classified into any of categories A460 through A465 or A470 through A475, additional organisms submitted for the same product before the first application is granted will result in combination and reclassification of both the original and subsequent submissions into the appropriate new category based on the sum of the number of organisms in both submissions. Submission of additional organisms would result in a new PRIA start date and may require additional fees to meet the fee of a new category.

(7) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 10. — ANTIMICROBIAL DIVISION (AD) — EXPERIMENTAL USE PERMITS AND OTHER ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A520 | 109 | Experimental Use Permit application, non-food use. (2)(3) | 9 | 9,151 |
| A521 | 110 | Review of public health efficacy study protocol within AD, per AD Internal Guidance for the Efficacy Protocol Review Process; Code will also include review of public health efficacy study protocol; applicant-initiated; Tier 1. | 6 | 6,776 |
| A522 | 111 | Review of public health efficacy study protocol outside AD by members of AD Efficacy Protocol Review Expert Panel; Code will also include review of public health efficacy study protocol; applicant-initiated; Tier 2. | 12 | 17,424 |
| A537 | 112 | New Active Ingredient/New Use, Experimental Use Permit application; Direct food use; Establish tolerance or tolerance exemption if required. Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 18 | 219,512 |
| A538 | 113 | New Active Ingredient/New Use, Experimental Use Permit application; Indirect food use; Establish tolerance or tolerance exemption if required Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 18 | 137,198 |
| A539 | 114 | New Active Ingredient/New Use, Experimental Use Permit application; Nonfood use. Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 15 | 132,094 |
| A529 | 115 | Amendment to Experimental Use Permit; requires data review or risk assessment. (2)(3) | 9 | 16,383 |
| A523 | 116 | Review of protocol other than a public health efficacy study (i.e., Toxicology or Exposure Protocols). | 9 | 17,424 |
| A571 | 117 | Science reassessment: refined ecological risk, and/or endangered species; applicant-initiated. (3) | 18 | 137,198 |
| A533 | 118 | Exemption from the requirement of an Experimental Use Permit. (2) | 4 | 3,559 |
| A534 | 119 | Rebuttal of Agency reviewed protocol, applicant initiated. | 4 | 6,776 |
| A535 | 120 | Conditional ruling on pre-application study waiver or data bridging argument; applicant-initiated. | 6 | 3,454 |
| A536 | 121 | Conditional ruling on pre-application direct food, indirect food, nonfood use determination; applicant-initiated. | 4 | 3,559 |
| A575 | 122 (new) | Efficacy similarity determination; if two products can be bridged or if confirmatory efficacy data are needed. | 4 | 3,389 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

3) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 11. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW ACTIVE INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B580 | 123 | New active ingredient; petition to establish a tolerance. (2)(3)(4) | 22 | 73,173 |
| B590 | 124 | New active ingredient; petition to establish a tolerance exemption. (2)(3)(4) | 20 | 45,737 |
| B600 | 125 | New active ingredient; no change to a permanent tolerance or tolerance exemption (includes non-food uses). (2)(3)(4) | 15 | 27,443 |
| B610 | 126 | New active ingredient; Experimental Use Permit application; petition to establish a permanent or temporary tolerance or temporary tolerance exemption. (3)(4) | 12 | 18,296 |
| B620 | 127 | New active ingredient; Experimental Use Permit application; non-food use (includes crop destruct). (3)(4) | 9 | 9,151 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 12. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B630 | 128 | First food use; petition to establish/amend a tolerance exemption. (2)(4)(5) | 13 | 18,296 |
| B640 | 129 | First food use; petition to establish/amend a tolerance. (2)(4)(5) | 19 | 27,443 |

TABLE 12. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW USES—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B644 | 130 | New use, no change to an established tolerance or tolerance exemption (includes non-food uses). (3)(4)(5) | 8 | 18,296 |
| B645 | 131 | New use; Experimental Use Permit; petition to establish a permanent or temporary tolerance or tolerance exemption. (4)(5) | 12 | 18,296 |
| B646 | 132 | New use; Experimental Use Permit; non-food use (includes crop destruct). (4)(5) | 7 | 9,151 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screen, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(4) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 13. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW PRODUCTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B660 | 133 | New product; registered source of active ingredient(s); identical or substantially similar in composition and use to a registered product; no change in an established tolerance or tolerance exemption; no data submission or data matrix (or submission of product chemistry data only). (2)(3) | 6 | 1,833 |

TABLE 13. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW PRODUCTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B670 | 134 | New product; registered source of active ingredient(s); no change in an established tolerance or tolerance exemption; (including non-food); Must address Product-Specific Data Requirements. (2)(3) | 9 | 7,322 |
| B672 | 135 | New product; unregistered source of at least one active ingredient (or registered source with new generic data package); no change in an established tolerance or tolerance exemption (including non-food); must address Product-Specific and Generic Data Requirements. (2)(3) | 15 | 13,069 |
| B673 | 136 | New product; unregistered source of active ingredient(s); citation of Technical Grade Active Ingredient (TGAI) data previously reviewed and accepted by the Agency; requires an Agency determination that the cited data support the new product. (2)(3) | 12 | 7,322 |
| B674 | 137 | New product; repack of identical registered end-use product or repack of an end-use product as a manufacturing-use product; same registered uses only. (2)(3) | 4 | 1,833 |
| B677 | 138 | New end-use non-food animal product with submission of two or more target animal safety studies; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. public health pest efficacy and/or<br>4. animal safety studies and/or<br>5. child resistant packaging. (2)(3) | 12 | 12,643 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

TABLE 14. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B621 | 139 | Amendment; Experimental Use Permit; no change to an established temporary or permanent tolerance or tolerance exemption. (3) (4) | 7 | 7,322 |
| B622 | 140 | Amendment; Experimental Use Permit; petition to amend a permanent or temporary tolerance or tolerance exemption. (3)(4) | 11 | 18,296 |
| B641 | 141 | Amendment; changes to an established tolerance or tolerance exemption. (4) | 13 | 18,296 |
| B680 | 142 | Amendment; registered sources of active ingredient(s); no new use(s); no changes to an established tolerance or tolerance exemption; requires data submission. (2)(3) | 5 | 7,322 |

TABLE 14. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — AMENDMENTS—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B681 | 143 | Amendment; unregistered source of active ingredient(s); no change to an established tolerance or tolerance exemption; requires data submission. (2)(3) | 7 | 8,714 |
| B683 | 144 | Amendment; no change to an established tolerance or tolerance exemption; requires review/update of previous risk assessment(s) without data submission (e.g., labeling changes to Restricted Entry Interval, Personal Protective Equipment, Preharvest Interval). (2)(3) | 6 | 7,322 |
| B684 | 145 | Amending non-food animal product that includes submission of target animal safety data; previously registered. (2)(3) | 8 | 12,643 |
| B685 | 146 | Amendment; add a new biochemical unregistered source of active ingredient or a new microbial production site; requires submission of analysis of samples data and source/production site-specific manufacturing process description. (3) | 5 | 7,322 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 15. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — STRAIGHT-CHAIN LEPIDOPTERAN PHEROMONES (SCLP)

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B690 | 147 | SCLP; new active ingredient; food or non-food use. (2)(6)(7) | 7 | 3,662 |
| B700 | 148 | SCLP; Experimental Use Permit application; new active ingredient or new use. (6)(7) | 7 | 1,833 |
| B701 | 149 | SCLP; Extend or amend Experimental Use Permit. (6)(7) | 4 | 1,833 |
| B710 | 150 | SCLP; new product; registered source of active ingredient(s); identical or substantially similar in composition and use to a registered product; no change in an established tolerance or tolerance exemption; no data submission or data matrix (or only product chemistry data); (Includes 100% re-pack; repack of registered end-use product as a manufacturing-use product). (3)(6) | 4 | 1,833 |

TABLE 15. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — STRAIGHT-CHAIN LEPIDOPTERAN PHEROMONES (SCLP)—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B720 | 151 | SCLP; new product; registered source of active ingredient(s); no change in an established tolerance or tolerance exemption (including non-food); Must address Product-Specific Data Requirements. (3)(6) | 5 | 1,833 |
| B721 | 152 | SCLP: new product; unregistered source of active ingredient; no change in an established tolerance or tolerance exemption (including non-food); must address Product-Specific and Generic Data Requirements. (3)(6) | 7 | 3,836 |
| B722 | 153 | SCLP; new use and/or amendment; petition to establish a tolerance or tolerance exemption. (4)(5)(6)(7) | 7 | 3,552 |
| B730 | 154 | SCLP; amendment requiring data submission. (4)(6) | 5 | 1,833 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(4) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(5) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(6) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(7) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 16. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — OTHER ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B614 | 155 | Pre-application; Conditional Ruling on rationales for addressing a data requirement in lieu of data; applicant-initiated; applies to one (1) rationale at a time. | 3 | 3,627 |
| B682 | 156 | Protocol review; applicant initiated; excludes time for Human Studies Review Board review (Includes rebuttal of protocol review). | 3 | 3,487 |
| B616 | 157 (new) | Pre-application; Conditional Ruling on a non-food use determination. | 5 | 4,715 |
| B617 | 158 (new) | Pre-application; biochemical classification determination. | 5 | 4,715 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

TABLE 17. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — PLANT-INCORPORATED PROTECTANTS (PIP)

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B740 | 159 | Experimental Use Permit application; no petition for tolerance/tolerance exemption; includes:<br>1. non-food/feed use(s) for a new (2) or registered (3) PIP (12);<br>2. food/feed use(s) for a new or registered PIP with crop destruct;<br>3. food/feed use(s) for a new or registered PIP in which an established tolerance/tolerance exemption exists for the intended use(s). (4)(5)(12) | 9 | 137,198 |
| B750 | 160 | Experimental Use Permit application; with a petition to establish a temporary or permanent tolerance/tolerance exemption for the active ingredient. Includes new food/feed use for a registered (3) PIP. (4)(12) | 12 | 182,927 |
| B771 | 161 | Experimental Use Permit application; new (2) PIP; with petition to establish a temporary tolerance/tolerance exemption for the active ingredient; credit 75% of B771 fee toward registration application for a new active ingredient that follows. (5)(12) | 13 | 182,927 |
| B772 | 162 | Application to amend or extend a PIP Experimental Use Permit; no petition since the established tolerance/tolerance exemption for the active ingredient is unaffected. (12) | 3 | 18,296 |
| B773 | 163 | Application to amend or extend a PIP Experimental Use Permit; with petition to extend a temporary tolerance/tolerance exemption for the active ingredient. (12) | 9 | 45,737 |
| B780 | 164 | Registration application; new (2) PIP; non-food/feed or food/feed without tolerance petition based on an existing permanent tolerance exemption. (5)(12)(14) | 16 | 228,657 |
| B800 | 165 | Registration application; new (2) PIP; with petition to establish permanent tolerance/tolerance exemption for the active ingredient based on an existing temporary tolerance/tolerance exemption. (5)(12)(14) | 17 | 246,949 |
| B820 | 166 | Registration application; new (2) PIP; with petition to establish or amend a permanent tolerance/tolerance exemption of an active ingredient. (5)(12)(14) | 19 | 292,682 |

TABLE 17. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — PLANT-INCORPORATED PROTECTANTS (PIP)—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B851 | 167 | Registration application; new event of a previously registered PIP active ingredient(s); no petition since permanent tolerance/tolerance exemption is already established for the active ingredient(s). (12) | 9 | 182,927 |
| B870 | 168 | Registration application; registered (3) PIP; new product; new use; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (4)(12)(14) | 9 | 54,881 |
| B880 | 169 | Registration application; registered (3) PIP; new product or new terms of registration; additional data submitted; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(6)(7)(12)(14) | 9 | 45,737 |
| B883 | 170 | Registration application; new (2) PIP, seed increase with negotiated acreage cap and time-limited registration; with petition to establish a permanent tolerance/tolerance exemption for the active ingredient based on an existing temporary tolerance/tolerance exemption. (5)(8)(12)(14) | 13 | 182,927 |
| B884 | 171 | Registration application; new (2) PIP, seed increase with negotiated acreage cap and time-limited registration; with petition to establish a permanent tolerance/tolerance exemption for the active ingredient. (5)(8)(12)(14) | 19 | 228,657 |
| B885 | 172 | Registration application; registered (2) PIP, seed increase; breeding stack of previously approved PIPs, same crop; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (9)(12) | 6 | 45,737 |
| B890 | 173 | Application to amend a seed increase registration; converts registration to commercial registration; no petition since permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(12)(14) | 9 | 91,465 |
| B900 | 174 | Application to amend a registration, including actions such as modifying an IRM plan, or adding an insect to be controlled. (5)(10)(11)(12) | 6 | 18,296 |
| B902 | 175 | PIP Protocol review. | 3 | 9,151 |
| B903 | 176 | Inert ingredient permanent tolerance exemption; e.g., a marker such as NPT II; reviewed in BPPD. | 12 | 91,465 |
| B904 | 177 | Import tolerance or tolerance exemption; processed commodities/food only (inert or active ingredient). | 12 | 182,927 |
| B905 | 178 | FIFRA Scientific Advisory Panel Review. | 6 | 91,465 |
| B906 | 179 | Petition to establish a temporary tolerance/tolerance exemption for one or more active ingredients. | 9 | 45,733 |
| B907 | 180 | Petition to establish a permanent tolerance/tolerance exemption for one or more active ingredients based on an existing temporary tolerance/tolerance exemption. | 9 | 18,296 |
| B909 | 181 (new) | PIP tolerance exemption determination; applicant-initiated; request to determine if an existing tolerance exemption applies to a PIP. | 6 | 18,296 |
| B910 | 182 (new) | Biotechnology Notification for small-scale field testing of genetically engineered microbes. | 3 | 9,151 |

TABLE 17. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — PLANT-INCORPORATED PROTECTANTS (PIP)—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B921 | 183 (new) | Experimental Use Permit application; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); non-food/feed. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. Credit 75% of B921 fee toward registration application for the new active ingredient that follows (B922). (5)(12)(13) | 12 | 182,927 |
| B922 | 184 (new) | Registration application; new active ingredient; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); non-food/feed. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. (5)(12)(13)(14) | 16 | 228,657 |
| B923 | 185 (new) | Experimental Use Permit application; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); with petition to establish a temporary or permanent tolerance/tolerance exemption of an active ingredient. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. Credit 75% of B923 fee toward registration application for the new active ingredient that follows (B924). (5)(12)(13)(14) | 15 | 228,658 |
| B924 | 186 (new) | Registration application; new active ingredient; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); with petition to establish a permanent tolerance/tolerance exemption of an active ingredient. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. (5)(12)(13)(14) | 19 | 292,682 |
| B925 | 187 (new) | Experimental Use Permit application; exogenous applications of RNA to elicit the RNA interference pathway in pests; non-food/feed; credit 75% of B925 fee toward registration application for the new active ingredient that follows (B926). (5)(12) | 11 | 27,452 |
| B926 | 188 (new) | Registration application; new active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; non-food/feed. (5)(12)(14) | 17 | 82,329 |
| B927 | 189 (new) | Experimental Use Permit application; exogenous applications of RNA to elicit the RNA interference pathway in pests; with petition to establish a temporary or permanent tolerance/tolerance exemption of an active ingredient; credit 75% of B927 fee toward registration application for the new active ingredient that follows (B928). (5)(12) | 14 | 54,889 |
| B928 | 190 (new) | Registration application; new active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; with petition to establish a permanent tolerance/tolerance exemption of an active ingredient. (5)(12)(14) | 22 | 137,210 |

TABLE 17. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — PLANT-INCORPORATED PROTECTANTS (PIP)—Continued

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B929 | 191 (new) | Registration application; new product, registered active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(12) | 10 | 7,322 |
| B930 | 192 (new) | Application to amend or extend a non-PIP Emerging Technologies Experimental Use Permit; no petition since the established tolerance/tolerance exemption for the active ingredient is unaffected. (12) | 3 | 18,296 |
| B931 | 193 (new) | Application to amend or extend a non-PIP Emerging Technologies Experimental Use Permit; with petition to extend a temporary tolerance/tolerance exemption for the active ingredient. (12) | 9 | 45,737 |
| B932 | 194 (new) | Amendment; application to amend a non-PIP Emerging Technologies registration. (4)(5)(12) | 6 | 18,296 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) ''New PIP'' means a PIP with an active ingredient that has not been registered.

(3) ''Registered PIP'' means a PIP with an active ingredient that is currently registered.

(4) Transfer registered PIP through conventional breeding for new food/feed use, such as from field corn to sweet corn.

(5) If, during review of the application, it is determined that review by the FIFRA Scientific Advisory Panel (SAP) is needed, the applicant will submit an application for category B905, which will be processed concurrently, and the decision review time for both applications will be the longer of the two associated applications. The scientific data involved in this category are complex. EPA often seeks technical advice from the SAP on risks that pesticides pose to wildlife, farm workers, pesticide applicators, non-target species, insect resistance, and novel scientific issues surrounding new technologies. The scientists of the SAP neither make nor recommend policy decisions. They provide advice on the science used to make these decisions. Their advice is invaluable to the EPA as it strives to protect humans and the environment from risks posed by pesticides. Due to the time it takes to schedule and prepare for meetings with the SAP, additional time and costs are needed.

(6) Registered PIPs stacked through conventional breeding.

(7) Deployment of a registered PIP with a different Insecticide Resistance Management (IRM) plan (e.g., seed blend).

(8) The negotiated acreage cap will depend upon EPA's determination of the potential environmental exposure, risk(s) to non-target organisms, and the risk of targeted pest developing resistance to the pesticidal substance. The uncertainty of these risks may reduce the allowable acreage, based upon the quantity and type of non-target organism data submitted and the lack of insect resistance management data, which is usually not required for seed-increase registrations. Registrants are encouraged to consult with EPA prior to submission of a registration application in this category.

(9) Application can be submitted prior to or concurrently with an application for commercial registration.

(10) For example, IRM plan modifications that are applicant-initiated.

(11) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(12) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(13) This category does not include genetic modifications in animals not intended for use as a pesticide, e.g., genetic modifications in animals intended for food use or animals intended for use as companion animals.

(14) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 18. — INERT INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| I001 | 195 | Approval of new food use inert ingredient. (2)(3) | 15 | 38,698 |
| I002 | 196 | Amend currently approved inert ingredient tolerance or exemption from tolerance; new data. (2) | 13 | 10,750 |
| I003 | 197 | Amend currently approved inert ingredient tolerance or exemption from tolerance; no new data. (2) | 11 | 4,742 |
| I004 | 198 | Approval of new non-food use inert ingredient. (2) | 6 | 15,803 |
| I005 | 199 | Amend currently approved non-food use inert ingredient with new use pattern; new data. (2) | 6 | 7,903 |
| I006 | 200 | Amend currently approved non-food use inert ingredient with new use pattern; no new data. (2) | 4 | 4,742 |
| I007 | 201 | Approval of substantially similar non-food use inert ingredients when original inert is compositionally similar with similar use pattern. (2) | 5 | 2,371 |
| I008 | 202 | Approval of new or amended polymer inert ingredient, food use. (2) | 7 | 5,374 |
| I009 | 203 | Approval of new or amended polymer inert ingredient, non-food use. (2) | 4 | 4,427 |
| I010 | 204 | Petition to amend a single tolerance exemption descriptor, or single non-food use descriptor, to add ≤ 10 CASRNs; no new data. (2) | 7 | 2,371 |
| I011 | 205 | Approval of new food use safener with tolerance or exemption from tolerance. (2) | 26 | 856,631 |
| I012 | 206 | Approval of new non-food use safener. (2) | 21 | 595,147 |
| I013 | 207 | Approval of additional food use for previously approved safener with tolerance or exemption from tolerance. (2) | 17 | 90,260 |
| I014 | 208 | Approval of additional non-food use for previously approved safener. (2) | 15 | 36,074 |
| I015 | 209 | Approval of new generic data for previously approved food use safener. (2) | 26 | 386,589 |
| I016 | 210 | Approval of amendment(s) to tolerance and label for previously approved safener. (2) | 15 | 79,942 |
| I017 | 211 (new) | Add new source of previously approved safener. | 8 | 18,958 |
| I018 | 212 (new) | Petition to add one approved inert ingredient (CASRN) to the Commodity Inert Ingredient List; no data. (4) | 3 | 2,371 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) If another covered application is submitted that depends upon an application to approve an inert ingredient, each application will be subject to its respective registration service fee. The decision review time for both submissions will be the longest of the associated applications. If the application covers multiple ingredients grouped by EPA into one chemical class, a single registration service fee will be assessed for approval of those ingredients.

(3) If EPA data rules are amended to newly require clearance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a) for an ingredient of an antimicrobial product where such ingredient was not previously subject to such a clearance, then review of the data for such clearance of such product is not subject to a registration service fee for the tolerance action for two years from the effective date of the rule.

(4) Due to low fee and short time frame this category is not eligible for small business waivers.

TABLE 19. — EXTERNAL REVIEW AND MISCELLANEOUS ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months)(1) | Registration Service Fee ($) |
|---|---|---|---|---|
| M001 | 213 | Study protocol requiring Human Studies Review Board review as defined in 40 CFR Part 26 in support of a currently registered active ingredient. | 14 | 11,378 |
| M002 | 214 | Completed study requiring Human Studies Review Board review as defined in 40 CFR Part 26 in support of an active ingredient. (2) | 14 | 11,378 |
| M003 | 215 | External technical peer review of new active ingredient, product, or amendment (e.g., consultation with FIFRA Scientific Advisory Panel) for an action with a decision timeframe of less than 12 months. Applicant initiated request based on a requirement of the Administrator, as defined by FIFRA §25(d), in support of a novel active ingredient, or unique use pattern or application technology. Excludes PIP active .ingredients. (3) | 12 | 91,651 |
| M004 | 216 | External technical peer review of new active ingredient, product, or amendment (e.g., consultation with FIFRA Scientific Advisory Panel) for an action with a decision timeframe of greater than 12 months. Applicant initiated request based on a requirement of the Administrator, as defined by FIFRA §25(d), in support of a novel active ingredient, or unique use pattern or application technology. Excludes PIP active ingredients. (3) | 18 | 91,651 |
| M005 | 217 | New Product: Combination, Contains a combination of active ingredients from a registered and/or unregistered source; conventional, antimicrobial and/or biopesticide. Requires coordination with other regulatory divisions to conduct review of data, label and/or verify the validity of existing data as cited. Only existing uses for each active ingredient in the combination product. (4)(5)(6) | 9 | 31,604 |
| M006 | 218 | Request for up to 5 letters of certification (Gold Seal) for one actively registered product (excludes distributor products). (7) | 1 | 398 |
| M007 | 219 | Request to extend Exclusive Use of data as provided by FIFRA Section 3(c)(1)(F)(ii). | 12 | 7,903 |
| M008 | 220 | Request to grant Exclusive Use of data as provided by FIFRA Section 3(c)(1)(F)(vi) for a minor use, when a FIFRA Section 2(ll)(2) determination is required. | 15 | 2,371 |
| M009 | 221 | Non-FIFRA Regulated Determination; applicant-initiated, per product. | 6 | 3,389 |
| M010 | 222 | Conditional ruling on pre-application, product substantial similarity. | 4 | 3,389 |
| M011 | 223 | Label amendment to add the DfE logo; requires data review; no other label changes. (8) | 4 | 5,230 |
| M012 | 224 (new) | Request for up to 5 letters of certification (Certificate of Establishment) for one actively registered product or one product produced for export (excludes distributor products). (7) | 1 | 398 |
| M013 | 225 (new) | Cancer reassessment; applicant-initiated. | 18 | 284,144 |
| M014 | 227 (new) | Pre-application nano-particle determination. | 8 | 17,424 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) Any other covered application that is associated with and dependent on the review by the Human Studies Review Board will be subject to its separate registration service fee. The decision review times for the associated actions run concurrently, but will end at the date of the latest review time.

(3) Any other covered application that is associated with and dependent on the FIFRA Scientific Advisory Panel review will be subject to its separate registration service fee. The decision review time for the associated action will be extended by the decision review time for the SAP review.

(4) If another covered application is submitted that depends upon an application to approve an inert ingredient, each application will be subject to its respective registration service fee. The decision review time for both submissions will be the longest of the associated applications. If the application covers multiple ingredients grouped by EPA into one chemical class, a single registration service fee will be assessed for approval of those ingredients.

(5) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(6) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(7) Due to low fee and short time frame this category is not eligible for small business waivers.

(8) This category includes amendments the sole purpose of which is to add ''Design for the Environment'' (DfE) (or equivalent terms that do not use ''safe'' or derivatives of ''safe'') logos to a label. DfE is a voluntary program. A label bearing a DfE logo is not considered an Agency endorsement because the ingredients in the qualifying product must meet objective, scientific criteria established and widely publicized by EPA.

**(4) Pending pesticide registration applications**

**(A) In general**

An applicant that submitted a registration application to the Administrator before the effective date of the Pesticide Registration Improvement Act of 2003, but that is not required to pay a registration service fee under paragraph (2)(B), may, on a voluntary basis, pay a registration service fee in accordance with paragraph (2)(B).

**(B) Voluntary fee**

The Administrator may not compel payment of a registration service fee for an application described in subparagraph (A).

**(C) Documentation**

An application for which a voluntary registration service fee is paid under this paragraph shall be submitted with documentation certifying—

(i) payment of the registration service fee; or

(ii) a request for a waiver from or reduction of the registration service fee.

**(5) Resubmission of covered applications**

If a covered application is submitted by a person that paid the fee for the application under paragraph (2), is determined by the Administrator to be complete, and is not approved or is withdrawn (without a waiver or refund), the submission of the same covered application by the same person (or a licensee, assignee, or successor of the person) shall not be subject to a fee under paragraph (2).

**(6) Fee adjustment**

**(A) In general**

Subject to the following sentence, effective for a covered application received during the period beginning on October 1, 2024, and ending on September 30, 2026, the Administrator may increase by 5 percent the registration service fee payable for the application under paragraph (3).[1] No adjustment may be made under the preceding sentence until the date on which the Administrator begins to implement clauses (i) and (ii) of subsection (k)(2)(A).

**(B) Additional adjustment**

Subject to the following sentence, effective for a covered application received on or after October 1, 2026, the Administrator may increase by an additional 5 percent the registration service fee in effect as of September 30, 2026. No adjustment may be made under the preceding sentence until the date on which the Administrator begins to implement any recommendations for process improvements contained in the report under subsection (c)(4), as appropriate.

**(C) Publication**

The Administrator shall publish in the Federal Register the service fee schedules revised pursuant to this paragraph.

**(7) Waivers and reductions**

**(A) In general**

An applicant for a covered application may request the Administrator to waive or reduce the amount of a registration service fee payable under this section under the circumstances described in subparagraphs (D) through (G), except that no waiver or fee reduction shall be provided in connection with a request for a letter of certification (including a Gold Seal letter and a Certificate of Establishment).

**(B) Documentation**

**(i) In general**

A request for a waiver from or reduction of the registration service fee shall be accompanied by appropriate documentation demonstrating the basis for the waiver or reduction.

**(ii) Certification**

The applicant shall provide to the Administrator a written certification, signed by a responsible officer, that the documentation submitted to support the waiver or reduction request is accurate.

[1] See References in Text note below.

Case: 26-298, 11/19/2026, DktEntry: 41.1, (129 of 142)



**(iii) Inaccurate documentation**

An application shall be subject to the applicable registration service fee payable under paragraph (3)(B) if, at any time, the Administrator determines that—

(I) the documentation supporting the waiver or reduction request is not accurate; or

(II) based on the documentation or any other information, the waiver or reduction should not have been granted or should not be granted.

**(C) Determination to grant or deny request**

As soon as practicable, but not later than 60 days, after the date on which the Administrator receives a request for a waiver or reduction of a registration service fee under this paragraph, the Administrator shall—

(i) determine whether to grant or deny the request; and

(ii) notify the applicant of the determination.

**(D) Minor uses**

**(i) In general**

The Administrator may exempt from, or waive a portion of, the registration service fee for an application for minor uses for a pesticide.

**(ii) Supporting documentation**

An applicant requesting a waiver or exemption under this subparagraph shall provide supporting documentation that demonstrates, to the satisfaction of the Administrator, that anticipated revenues from the uses that are the subject of the application would be insufficient to justify imposition of the full application fee.

**(E) IR–4 exemption**

The Administrator shall exempt an application from the registration service fee if the Administrator determines that—

(i) the application is solely associated with a tolerance petition submitted in connection with the Inter-Regional Project Number 4 (IR–4) as described in section 2 of Public Law 89–106 (7 U.S.C. 450i(e));[1] and

(ii) the exemption is in the public interest.

**(F) Small businesses**

**(i) In general**

The Administrator shall waive 50 percent of the registration service fees payable by an entity for a covered application under this section if the entity is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application.

**(ii) Waiver of fees**

The Administrator shall waive 75 percent of the registration service fees payable by an entity under this section if the entity—

(I) is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application; and

(II) has average annual global gross revenues described in section 136a–1(i)(1)(E)(ii)(I)(bb) of this title that does not exceed $10,000,000, at the time of application.

**(iii) Formation for waiver**

The Administrator shall not grant a waiver under this subparagraph if the Administrator determines that the entity submitting the application has been formed or manipulated primarily for the purpose of qualifying for the waiver.

**(iv) Documentation**

An entity requesting a waiver under this subparagraph shall provide to the Administrator—

(I) documentation demonstrating that the entity is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application; and

(II) if the entity is requesting a waiver of 75 percent of the applicable registration service fees payable under this section, documentation demonstrating that the entity has an average annual global gross revenue described in section 136a–1(i)(1)(E)(ii)(I)(bb) of this title that does not exceed $10,000,000, at the time of application.

**(G) Federal and State agency exemptions**

An agency of the Federal Government or a State government shall be exempt from covered registration service fees under this section.

**(8) Refunds**

**(A) Early withdrawals**

If, during the first 60 days after the beginning of the applicable decision time review period under subsection (f)(3), a covered application is withdrawn by the applicant, the Administrator shall refund all but 25 percent.[2] of the total registration service fee payable under paragraph (3)(B) for the application.

**(B) Withdrawals after the first 60 days of decision review time period**

**(i) In general**

If a covered application is withdrawn after the first 60 days of the applicable decision time review period, the Administrator shall determine what portion, if any, of the total registration service fee payable under paragraph (3)(B) for the application may be refunded based on the proportion of the work completed at the time of withdrawal.

**(ii) Timing**

The Administrator shall—

(I) make the determination described in clause (i) not later than 90 days after the date the application is withdrawn; and

(II) provide any refund as soon as practicable after the determination.

**(C) Discretionary refunds**

**(i) In general**

In the case of a covered application that has been filed with the Administrator and

---

[2] So in original. The period probably should not appear.

has not been withdrawn by the applicant, but for which the Administrator has not yet made a final determination, the Administrator may refund a portion of a covered registration service fee if the Administrator determines that the refund is justified.

**(ii) Basis**

The Administrator may provide a refund for an application under this subparagraph—

(I) on the basis that, in reviewing the application, the Administrator has considered data submitted in support of another covered application;

(II) on the basis that the Administrator completed portions of the review of the application before the effective date of this section; or

(III) on the basis that the Administrator rejected the application under subsection (f)(4)(B).

**(D) Credited fees**

In determining whether to grant a refund under this paragraph, the Administrator shall take into account any portion of the registration service fees credited under paragraph (2) or (4).

**(c) Pesticide Registration Fund**

**(1) Establishment**

There is established in the Treasury of the United States a Pesticide Registration Fund to be used in carrying out this section (referred to in this section as the ''Fund''), consisting of—

(A) such amounts as are deposited in the Fund under paragraph (2);

(B) any interest earned on investment of amounts in the Fund under paragraph (5); and

(C) any proceeds from the sale or redemption of investments held in the Fund.

**(2) Deposits in Fund**

Subject to paragraph (4), the Administrator shall deposit fees collected under this section in the Fund.

**(3) Expenditures from Fund**

**(A) In general**

Subject to subparagraphs (B) and (C) and paragraph (4), the Administrator may make expenditures from the Fund—

(i) to cover the costs associated with the review and decisionmaking pertaining to all applications for which registration service fees have been paid under this section; and

(ii) to otherwise carry out this section.

**(B) Endangered species review of outdoor use of pesticide products**

**(i) In general**

The Administrator shall use the amounts made available in the Fund to develop, receive comments with respect to, and finalize, guidance to registrants regarding analysis necessary to support the review of outdoor uses of pesticide products under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

**(ii) Deadlines for guidance**

The Administrator shall issue final guidance required by clause (i) in accordance with the following:

(I) With respect to new active ingredients or any registration review decision proposed for 1 or more outdoor uses, not later than 9 months after December 29, 2022.

(II) With respect to new outdoor uses of a registered pesticide, not later than 1 year after December 29, 2022.

(III) With respect to antimicrobial pesticide products, not later than 3 years after December 29, 2022.

**(C) Independent third party assessments**

**(i) In general**

The Administrator shall use the amounts made available in the Fund to carry out the activities described in clauses (ii) and (iii).

**(ii) Workforce assessment**

**(I) In general**

The Administrator shall procure a competitive contract with a qualified, independent contractor with expertise in assessing public sector workforce data analysis and reporting to conduct an assessment of current methodologies and data or metrics available to represent the workforce implementing the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act, including an assessment of filled and vacant positions and full-time equivalent employees relating to that implementation.

**(II) Report**

Not later than 2 years after December 29, 2022—

(aa) the contractor selected under subclause (I) shall submit to the Administrator a report describing—

(AA) the findings from the assessment under that subclause; and

(BB) recommendations for improved methodologies to represent full-time equivalent resources described in that subclause; and

(bb) the Administrator shall publish the report submitted under item (aa) on the website of the Environmental Protection Agency.

**(iii) Process assessment**

**(I) In general**

**(aa) Contracts**

Within 1 year of December 29, 2022, to the extent practicable, the Administrator shall issue a competitive contract to a private, independent consulting firm—

(AA) to conduct the assessment described in subclause (II); and

(BB) to submit to the Administrator a report describing the find-

ings of the assessment and the processes and performance of the Environmental Protection Agency relating to the implementation of the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act.

**(bb) Eligibility**

The firm described in item (aa) shall be capable of performing the technical analysis, management assessment, and program evaluation tasks required to address the scope of the assessment under subclause (II).

**(II) Assessment**

**(aa) In general**

The Administrator, applicants, and registrants shall participate in a targeted assessment of the process for the review of applications submitted under this subchapter.

**(bb) Consultation**

The firm selected under subclause (I) shall consult with the Administrator and applicants at the start of the assessment under item (aa) and prior to submission of the report under subclause (I)(aa)(BB).

**(cc) Requirements**

The assessment under item (aa) shall evaluate and make recommendations regarding—

(AA) the initial content screen;

(BB) the preliminary technical screen;

(CC) performance, processes, and progress toward reducing renegotiation rates and the average length of renegotiations;

(DD) performance, processes, and progress toward eliminating the backlog of registrant submissions not covered by subsection (b)(3);

(EE) performance, processes, and progress toward ensuring that all registrant submissions not covered by subsection (b)(3) are completed by the applicable deadlines described in the notice of the Administrator entitled ''Pesticide Registration Notice (PR) 98–10: Notifications, Non-Notifications and Minor Formulation Amendments'' and dated October 22, 1998 (and any successor amendments to that notice) and described in subsections (c)(3)(B) and (h) of section 136a of this title;

(FF) compliance with the provisions of this subchapter relating to renegotiations and registrant submissions not covered by subsection (b)(3);

(GG) information technology systems;

(HH) recommended improvements to employee training;

(II) performance, progress, and processes in completing registration review; and

(JJ) other appropriate issues, such as submissions by inert suppliers and fast-track amendments under subsections (c)(3)(B) and (h) of section 136a of this title.

**(III) Report to Congress**

Not later than 1 year after the receipt of an assessment required under this section, the Administrator shall submit to the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives—

(aa) a copy of each such assessment; and

(bb) the Administrator's evaluation of the findings and recommendations contained in each such assessment.

**(IV) Recommendations**

The Administrator shall include with the report submitted under subclause (III) a classification of each recommendation described in the report as—

(aa) can be implemented through administrative action of the Administrator; or

(bb) requires a statutory change.

**(4) Collections and appropriations Acts**

The fees authorized by this section and amounts deposited in the Fund—

(A) shall be collected and made available for obligation only to the extent provided in advance in appropriations Acts;

(B) shall be available during periods in which Environmental Protection Agency employees are on shutdown or emergency furlough as a result of a lapse in appropriations; and

(C) shall be available without fiscal year limitation.

**(5) Unused funds**

**(A) In general**

Amounts in the Fund not currently needed to carry out this section shall be—

(i) maintained readily available or on deposit;

(ii) invested in obligations of the United States or guaranteed by the United States; or

(iii) invested in obligations, participations, or other instruments that are lawful investments for fiduciary, trust, or public funds.

**(B) Use of investment income**

After consultation with the Secretary of the Treasury, the Administrator may use income from investments described in clauses (ii) and (iii) of subparagraph (A) to carry out this section.

**(d) Assessment of fees**

**(1) Definition of covered functions**

In this subsection, the term ''covered functions'' means functions of the Office of Pesticide Programs of the Environmental Protection Agency, as identified in key programs and

projects of the final operating plan for the Environmental Protection Agency submitted as part of the budget process for fiscal year 2002, regardless of any subsequent transfer of 1 or more of the functions to another office or agency or the subsequent transfer of a new function to the Office of Pesticide Programs.

**(2) Minimum amount of appropriations**

Registration service fees may not be assessed for a fiscal year under this section unless the amount of appropriations for salaries, contracts, and expenses for the functions of the Office of Pesticide Programs of the Environmental Protection Agency for the fiscal year (excluding the amount of any fees appropriated for the fiscal year) are equal to or greater than $166,000,000.

**(3) Use of fees**

Registration service fees authorized by this section shall be available, in the aggregate, only to defray increases in the costs associated with the review and decisionmaking for the review of pesticide registration applications and associated tolerances (including increases in the number of full-time equivalent positions in the Environmental Protection Agency engaged in those activities) over the costs for fiscal year 2002, excluding costs paid from fees appropriated for the fiscal year.

**(4) Subsequent authority**

If the Administrator does not assess registration service fees under subsection (b) during any portion of a fiscal year as the result of paragraph (2) and is subsequently permitted to assess the fees under subsection (b) during the fiscal year, the Administrator shall assess and collect the fees, without any modification in rate, at any time during the fiscal year, notwithstanding any provisions of subsection (b) relating to the date fees are to be paid.

**(e) Reforms to reduce decision time review periods and prevent double payment of registration fees**

**(1) Reduction of decision time review periods**

To the maximum extent practicable consistent with the degrees of risk presented by pesticides and the type of review appropriate to evaluate risks, the Administrator shall identify and evaluate reforms to the pesticide registration process under this subchapter with the goal of reducing decision review periods in effect on the effective date of the Pesticide Registration Improvement Extension Act of 2018 for pesticide registration actions for covered pesticide registration applications (including reduced risk applications). Such reforms shall include identifying opportunities for streamlining review processes for applications for a new active ingredient or a new use and providing prompt feedback to applicants during such review process.

**(2) Prevention of double payment of registration service fees**

The Administrator shall develop and implement a process to determine the appropriate fee category or categories for an application that qualifies for more than one fee category in order to assist applicants and prevent unnecessary payment of fees for multiple categories for a single application.

**(f) Decision time review periods**

**(1) In general**

Not later than 30 days after the effective date of the Pesticide Registration Improvement Act of 2022, the Administrator shall make publicly available a schedule of decision review periods for covered pesticide registration actions or for any other action covered by a table specified in subsection (b)(3)(B) and corresponding registration service fees under this subchapter.

**(2) Report**

The schedule shall be the same as the applicable schedule provided under subsection (b)(3)(B).

**(3) Applications subject to decision time review periods**

The decision time review periods specified in paragraph (1) shall apply to—

(A) covered pesticide registration applications subject to registration service fees under subsection (b)(2);

(B) covered pesticide registration applications for which an applicant has voluntarily paid registration service fees under subsection (b)(4); and

(C) applications for any other action covered by a table specified in subsection (b)(3)(B).

**(4) Start of decision time review period**

**(A) In general**

Except as provided in subparagraphs (C), (D), and (E), in the case of a covered application accompanied by the registration service fee required under this section, the decision time review period begins 21 days after the date on which the Administrator receives the covered application and fee.

**(B) Initial content and preliminary technical screenings**

**(i) Screenings**

**(I) Initial content**

Not later than 21 days after receiving an application and the required registration service fee, the Administrator shall conduct an initial screening of the contents of the application in accordance with clause (iii).

**(II) Preliminary technical screening**

After conducting the initial content screening described in subclause (I) and in accordance with clause (iv), the Administrator shall conduct a preliminary technical screening—

(aa) not later than 45 days after the date on which the decision time review period begins (for applications with decision time review periods of not more than 180 days); and

(bb) not later than 90 days after the date on which the decision time review period begins (for applications with decision time review periods greater than 180 days).

**(III) Final fee category**

The fee category of a covered application or other actions may not be changed, without providing the information to the applicant, after completion of the preliminary technical screening described in clause (iv).

**(ii) Rejection**

**(I) In general**

If the Administrator determines at any time before the Administrator completes the preliminary technical screening under clause (i)(II) that the application failed the initial content or preliminary technical screening and the applicant does not correct the failure before the date that is 10 business days after the applicant receives a notification of the failure, the Administrator shall reject the application.

**(II) Written notification**

The Administrator shall make every effort to provide a written notification of a rejection under subclause (I) during the 10-day period that begins on the date the Administrator completes the preliminary technical screening.

**(iii) Requirements of initial content screening**

In conducting an initial content screening of an application, the Administrator shall automate the process, to the maximum extent practicable, and determine whether—

(I)(aa) the applicable registration service fee has been paid; or

(bb) at least 25 percent of the applicable registration service fee has been paid and the application contains a waiver or refund request for the outstanding amount and documentation establishing the basis for the waiver request; and

(II) the application appears to contain all the necessary forms, data, and draft labeling, formatted in accordance with guidance published by the Administrator.

**(iv) Requirements of preliminary technical screening**

In conducting a preliminary technical screening of an application, the Administrator shall—

(I) determine if the application and the data and information submitted with the application are accurate and complete;

(II) determine if the application, data, and information are consistent with the proposed labeling and any proposal for a tolerance or exemption from the requirement for a tolerance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a), and are such that, subject to full review under the standards of this subchapter, could result in the granting of the application;

(III) determine, if applicable, whether an application qualifies for a reduced risk determination under subsection (c)(10) or (h) of section 136a of this title;

(IV) grant or deny any data waiver requests submitted by the applicant with the application;

(V) verify and validate the accuracy of the fee category selected by the applicant; and

(VI) notify the applicant, in writing, if a new or different fee category is required and calculate the new decision review time based on the original submission date.

**(C) Applications with waiver or reduction requests**

**(i) In general**

In the case of an application submitted with a request for a waiver or reduction of registration service fees under subsection (b)(7), the decision time review period shall be determined in accordance with this subparagraph.

**(ii) Request granted with no additional fees required**

If the Administrator grants the waiver or reduction request and no additional fee is required, the decision time review period begins on the earlier of—

(I) the date on which the Administrator grants the request; or

(II) the date that is 60 days after the date of receipt of the application.

**(iii) Request granted with additional fees required**

If the Administrator grants the waiver or reduction request, in whole or in part, but an additional registration service fee is required, the decision time review period begins on the date on which the Administrator receives certification of payment of the applicable registration service fee.

**(iv) Request denied**

If the Administrator denies the waiver or reduction request, the decision time review period begins on the date on which the Administrator receives certification of payment of the applicable registration service fee.

**(D) Pending applications**

**(i) In general**

The start of the decision time review period for applications described in clause (ii) shall be the date on which the Administrator receives certification of payment of the applicable registration service fee.

**(ii) Applications**

Clause (i) applies to—

(I) covered pesticide registration applications for which voluntary fees have been paid under subsection (b)(4); and

(II) covered pesticide registration applications received on or after the effective date of the Pesticide Registration Improvement Act of 2003 but submitted without the applicable registration service fee required under this section due to the inability of the Administrator to assess fees under subsection (d)(1).

**(E) Applications for reduced risk**

**(i) Fee**

If an application for a reduced risk new active ingredient or a reduced risk new use is determined not to qualify as reduced risk, the applicant shall pay the difference in fee for the corresponding non-reduced risk application.

**(ii) Decision review time period**

After receipt by the Administrator of the original covered reduced risk application and fee, the decision time review period for the corresponding non-reduced risk application shall begin within the time periods described in subparagraph (A), based on the submission date of the original covered reduced risk application.

**(5) Extension of decision time review period**

**(A) Notification**

If the Administrator cannot meet a decision time review period under this subsection, the Administrator shall notify the applicant, in writing, of—

(i) the reasons why additional time is needed; and

(ii) the number of days needed that would allow the Administrator to make a regulatory decision.

**(B) Extension by negotiation or mutual agreement**

The Administrator, acting solely through the Director of the Office of Pesticide Programs, and the applicant may mutually agree, in writing, to extend a decision time review period under this subsection if—

(i) there is new or additional data or information from the applicant that is necessary for the Administrator to make a decision on the application that cannot be made available within the original decision time review period; or

(ii) a public comment period associated with the application generates significant comments that cannot be addressed within the original decision time review period.

**(C) Priority**

Once a decision time review period for a covered action described in subsection (b)(3)(B) is missed or extended, the Administrator shall make any action on the application a priority.

**(g) Judicial review**

**(1) In general**

Any applicant adversely affected by the failure of the Administrator to make a determination on the application of the applicant for registration of a new active ingredient or new use for which a registration service fee is paid under this section may obtain judicial review of the failure solely under this section.

**(2) Scope**

**(A) In general**

In an action brought under this subsection, the only issue on review is whether the Administrator failed to make a determination on the application specified in paragraph (1) by the end of the applicable decision time review period required under subsection (f) for the application.

**(B) Other actions**

No other action authorized or required under this section shall be judicially reviewable by a Federal or State court.

**(3) Timing**

**(A) In general**

A person may not obtain judicial review of the failure of the Administrator to make a determination on the application specified in paragraph (1) before the expiration of the 2-year period that begins on the date on which the decision time review period for the application ends.

**(B) Meeting with Administrator**

To be eligible to seek judicial review under this subsection, a person seeking the review shall first request in writing, at least 120 days before filing the complaint for judicial review, a decision review meeting with the Administrator.

**(4) Remedies**

The Administrator may not be required or permitted to refund any portion of a registration service fee paid in response to a complaint that the Administrator has failed to make a determination on the covered pesticide registration application specified in paragraph (1) by the end of the applicable decision review period.

**(h) Accounting**

The Administrator shall—

(1) provide an annual accounting of the registration service fees paid to the Administrator and disbursed from the Fund, by providing financial statements in accordance with—

(A) the Chief Financial Officers Act of 1990 (Public Law 101–576; 104 Stat. 2838) and amendments made by that Act; and

(B) the Government Management Reform Act of 1994 (Public Law 103–356; 108 Stat. 3410) and amendments made by that Act;

(2) provide an accounting describing expenditures from the Fund authorized under subsection (c); and

(3) provide an annual accounting describing collections and expenditures authorized under subsection (d).

**(i) Auditing**

**(1) Financial statements of agencies**

For the purpose of section 3515(c) of title 31, the Fund shall be considered a component of an executive agency.

**(2) Components**

The annual audit required under sections 3515(b) and 3521 of that title of the financial statements of activities under this section shall include an analysis of—

(A) the fees collected under subsection (b) and disbursed;

(B) compliance with subsection (f);

(C) the amount appropriated to meet the requirements of subsection (d)(1); and

(D) the reasonableness of the allocation of the overhead allocation of costs associated with the review and decisionmaking pertaining to applications under this section.

**(3) Inspector General**

The Inspector General of the Environmental Protection Agency shall—

(A) conduct the annual audit required under this subsection; and

(B) report the findings and recommendations of the audit to the Administrator and to the appropriate committees of Congress.

**(j) Personnel levels**

All full-time equivalent positions supported by fees authorized and collected under this section shall not be counted against the agency-wide personnel level goals of the Environmental Protection Agency.

**(k) Reports and information technology**

**(1) Reports**

**(A) In general**

Not later than 120 days after the last day of each of fiscal years 2023 through 2027, the Administrator shall publish an annual report describing—

(i) actions taken under this section;

(ii) registrant submissions not covered by subsection (b)(3)(B);

(iii) the initial content and preliminary technical screenings required in subsection (f)(4)(B); and

(iv) staffing relating to implementing the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act.

**(B) Contents**

Each report published under subparagraph (A) shall include a summary of the following information:

**(i) Actions under this section**

To the extent practicable, data for each action taken under this section that is completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

(I) the Action Code;

(II) the application receipt date;

(III) the electronic portal tracking number assigned to the application at the time of submission to the electronic submission portal or the Environmental Protection Agency tracking number;

(IV) the original decision due date based on the Action Code;

(V) the dates of any renegotiations and the renegotiated due dates, if applicable;

(VI) the reasons for each renegotiation, if applicable;

(VII) if the submission had to be recoded, reassigned codes, if applicable;

(VIII) the date that the submission was recoded, if applicable;

(IX) the decision completion date, if the action has been completed;

(X) the status of the action, which may be—

(aa) failed initial content screen;

(bb) failed preliminary technical screen;

(cc) approved;

(dd) withdrawn;

(ee) denied;

(ff) do not grant; or

(gg) pending;

(XI) the reason for any denial or do not grant decision, if applicable;

(XII) a review of the progress made in carrying out each requirement of subsections (e) and (f), including, to the extent determined appropriate by the Administrator and consistent with the authorities of the Administrator and limitations on delegation of functions by the Administrator, recommendations for the allowance and use of summaries of acute toxicity studies;

(XIII) a review of the progress in carrying out section 136a(g) of this title, including—

(aa)[3] the number of pesticides or pesticide cases reviewed and the number of registration review decisions completed, including—

(AA) the number of cases cancelled;

(BB) the number of cases requiring risk mitigation measures;

(CC) the number of cases removing risk mitigation measures;

(DD) the number of cases with no risk mitigation needed; and

(EE) the number of cases in which risk mitigation has been fully implemented;

(XIV) a review of the progress made toward implementing enhancements to—

(aa) the electronic tracking of conditional registrations; and

(bb) the endangered species database;

(XV) a review of the progress made in updating the Pesticide Incident Data System, including progress toward making the information contained in the System available to the public (as the Administrator determines is appropriate);

(XVI) an assessment of the public availability of summary pesticide usage data;

(XVII) the number of the active ingredients approved, new uses, and pesticide end use products granted in connection with the Design for the Environment program (or any successor program) of the Environmental Protection Agency;

(XVIII) with respect to funds in the Reregistration and Expedited Processing Fund described under section 136a–1(k) of this title, a review that includes—

(aa) a description of the amount and use of such funds—

(AA) to carry out activities relating to worker protection under sub-

[3] So in original. There is no item (bb).

Case: 26-298, 11/19/2026, DktEntry: 41.1, (136 of 142)



paragraphs (G) and (H) of section 136a–1(i)(1) of this title;

(BB) to award partnership grants under subparagraph (I) of such section; and

(CC) to carry out the pesticide safety education program under subparagraph (J) of such section;

(bb) an evaluation of the appropriateness and effectiveness of the activities, grants, and program under subparagraphs (G), (H), (I), and (J) of such section;

(cc) a description of how stakeholders are engaged in the decision to fund such activities, grants, and program in accordance with the stakeholder input provided under such subparagraphs; and

(dd) with respect to activities relating to worker protection carried out under subparagraphs (G) and (H) of section 136a–1(i)(1) of this title, a summary of the analyses from stakeholders, including from worker community-based organizations, on the appropriateness and effectiveness of such activities.

(XIX) beginning two years after enactment, report on the progress of meeting the deadlines listed in paragraph (5) of section 136a(f) of this title; and

(XX) a review of progress made in implementing the pesticide surveillance program referred to in paragraph (8) of section 136a–1(k) of this title.

**(ii) Registrant submissions not covered by subsection (b)(3)(B)**

Each registrant submission not covered by subsection (b)(3)(B), that is completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

(I) the submission date;

(II) the electronic portal tracking number assigned to the application at the time of the submission of the application to the electronic submission portal;

(III) the type of regulatory action, as defined by statute or guidance document, and the specific label action;

(IV) the status of the action;

(V) the due date;

(VI) the reason for the outcome; and

(VII) the completion date, if applicable.

**(iii) Screening process**

Data for the initial content screens and preliminary technical screens that are completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

(I) the number of applications successfully passing each type of screen;

(II) the number of applications that failed the screening process for each type of screen;

(III) the number of notifications issued by the Administrator under subsection (f)(4)(B)(ii)(II);

(IV) the number of notifications issued by the Administrator under subsection (f)(4)(B)(ii)(I) and the number of applications resulting in a rejection; and

(V) the number of notifications issued under section 152.105 of title 40, Code of Federal Regulations (or successor regulations), and to the extent practicable, the reasons for that issuance.

**(iv) Staffing**

Data on the staffing relating to work covered under the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act, organized by registering division, including—

(I) the number of new hires and personnel departures;

(II) the number of full-time equivalents at the end of each fiscal year;

(III) the number of full-time equivalents working on registration review activities; and

(IV) the number of full-time equivalents working on registrant submissions not covered by subsection (b)(3)(B).

**(C) Publication**

The Administrator shall publish each report under subparagraph (A)—

(i) on the website of the Environmental Protection Agency; and

(ii) by such other methods as the Administrator determines to be the most effective for efficiently disseminating the report.

**(2) Information technology**

**(A) System**

Not later than 1 year after December 29, 2022, the Administrator shall establish an information technology system that—

(i) includes all registering divisions in the Office of Pesticide Programs;

(ii) provides a real-time, accurate, tracking system for all regulatory submissions to the Office of Pesticide Programs;

(iii) provides a [4] real-time, accessible information [4] that provides each applicant confidential, online access to the status and progress of the regulatory submissions of the applicant; and

(iv) updates the electronic submission portal—

(I) to ensure that label reviews are limited to current label changes, to the maximum extent practicable;

(II) to automate, to the extent practicable, minor, low risk regulatory actions; and

(III) to allow self-certification of certain regulatory actions, as determined by the Administrator.

**(B) Access to registration data and decisions**

The Administrator shall implement efforts to expand existing, and develop new, infor-

[4] So in original.

mation technology tools and databases to improve access by Environmental Protection Agency employees to data used to fulfill registrations, and public access to information about regulatory decisionmaking tools, including opportunities for—

(i) analysis of the impact of submitted studies on Environmental Protection Agency assessments and decisions;

(ii) facilitation of read-across or computational model development to help fill information gaps;

(iii) tracking and reporting submission and decision metrics relating to the use and acceptance of test methods; and

(iv) drafting and publication of policies communicating Environmental Protection Agency acceptance of novel technologies or approaches.

**(*l*) Savings clause**

Nothing in this section affects any other duties, obligations, or authorities established by any other section of this subchapter, including the right to judicial review of duties, obligations, or authorities established by any other section of this subchapter.

**(m) Termination of effectiveness**

**(1) In general**

Except as provided in paragraph (2), the authority provided by this section terminates on September 30, 2027.

**(2) Phase out**

**(A) Fiscal year 2028**

During fiscal year 2028, the requirement to pay and collect registration service fees applies, except that the level of registration service fees payable under this section shall be reduced 40 percent below the level in effect on September 30, 2027.

**(B) Fiscal year 2029**

During fiscal year 2029, the requirement to pay and collect registration service fees applies, except that the level of registration service fees payable under this section shall be reduced 70 percent below the level in effect on September 30, 2027.

**(C) September 30, 2029**

Effective September 30, 2029, the requirement to pay and collect registration service fees terminates.

**(D) Decision review periods**

**(i) Pending applications**

In the case of an application received under this section before September 30, 2027, the application shall be reviewed in accordance with subsection (f).

**(ii) New applications**

In the case of an application received under this section on or after September 30, 2027, subsection (f) shall not apply to the application.

(June 25, 1947, ch. 125, § 33, as added Pub. L. 108–199, div. G, title V, § 501(f)(2), Jan. 23, 2004, 118 Stat. 422; amended Pub. L. 110–94, § 5, Oct. 9, 2007, 121 Stat. 1002; Pub. L. 110–193, § 1(a), Mar. 6, 2008, 122 Stat. 649; Pub. L. 112–177, § 2(a)(2)(B), (b), Sept. 28, 2012, 126 Stat. 1328, 1330; Pub. L. 116–8, §§ 5, 6, Mar. 8, 2019, 133 Stat. 487, 491; Pub. L. 117–328, div. HH, title VI, §§ 705, 706, Dec. 29, 2022, 136 Stat. 6008, 6018.)

### Editorial Notes

#### References in Text

The effective date of the Pesticide Registration Improvement Act of 2003, and the effective date of this section, referred to in text, is the effective date of section 501 of Pub. L. 108–199, which is the date that is 60 days after Jan. 23, 2004, unless otherwise provided, see section 501(h) of Pub. L. 108–199, set out as an Effective Date of 2004 Amendment note under section 136a of this title.

The Federal Food, Drug, and Cosmetic Act, referred to in subsec. (b)(2)(B)(ii), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§ 301 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

Paragraph (3), referred to in subsec. (b)(6)(A), probably should be a reference to paragraph (3)(B). Amendment by section 705(a)(1)(B) of Pub. L. 117–328 substituting "paragraph (3)(B)" for "paragraph (3)" wherever appearing in subsec. (b) was followed by the general amendment of subsec. (b)(6)(A) by section 705(a)(1)(D)(i) of Pub. L. 117–328, which contained the reference to paragraph (3).

Section 2 of Public Law 89–106, referred to in subsec. (b)(7)(E)(i), was formerly classified to secton 450i of this title prior to editorial reclassification and renumbering as section 3157 of this title.

The Endangered Species Act of 1973, referred to in subsec. (c)(3)(B)(i), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§ 1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

The Pesticide Registration Improvement Act of 2022, referred to in subsecs. (c)(3)(C)(ii)(I), (iii)(I)(aa)(BB) and (k)(1)(A)(iv), (B)(iv), is title VI (§ 701 et seq.) of div. HH of Pub. L. 117–328, Dec. 29, 2022, 136 Stat. 5996. For complete classification of this Act to the Code, see Short Title of 2022 Amendment note set out under section 136 of this title and Tables.

The effective date of the Pesticide Registration Improvement Extension Act of 2018, referred to in subsec. (e)(1), means the effective date of Pub. L. 116–8, which was approved Mar. 8, 2019.

The effective date of the Pesticide Registration Improvement Act of 2022, referred to in subsec. (f)(1), means the effective date of title VI of div. HH of Pub. L. 117–328, which was approved Dec. 29, 2022.

The Chief Financial Officers Act of 1990, referred to in subsec. (h)(1)(A), is Pub. L. 101–576, Nov. 15, 1990, 104 Stat. 2838. For complete classification of this Act to the Code, see Short Title of 1990 Amendment note set out under section 501 of Title 31, Money and Finance, and Tables.

The Government Management Reform Act of 1994, referred to in subsec. (h)(1)(B), is Pub. L. 103–356, Oct. 13, 1994, 108 Stat. 3410. For complete classification of this Act to the Code, see Short Title of 1994 Amendment note set out under section 3301 of Title 31, Money and Finance, and Tables.

Two years after enactment, referred to in subsec. (k)(1)(B)(i)(XIX), means two years after the enactment of section 136a(f)(5) of this title, as enacted by Pub. L. 117–328, which was approved Dec. 29, 2022.

#### Prior Provisions

A prior section 33 of act June 25, 1947, ch. 125, was renumbered section 34 and is classified to section 136x of this title.

#### Amendments

2022—Subsec. (b). Pub. L. 117–328, § 705(a)(1)(B), substituted "paragraph (3)(B)" for "paragraph (3)" wher-

ever appearing. Subsec. (b)(6)(A) was subsequently amended generally by Pub. L. 117–328, § 705(a)(1)(D)(i), after which ''paragraph (3)'' appeared in text.

Subsec. (b)(2)(E)(iii). Pub. L. 117–328, § 705(a)(1)(A), substituted ''on completion of, where appropriate, the initial screening of the contents of the application or the preliminary technical screening'' for ''after review''.

Subsec. (b)(3). Pub. L. 117–328, § 705(a)(1)(C), designated existing provisions as subpar. (B), inserted heading, and added subpar. (A).

Subsec. (b)(3)(B). Pub. L. 117–328, § 706, added subpar. (B) and struck out former subpar. (B), as designated by section 705(a)(1)(C) of Pub. L. 117–328, which set out the schedule of covered applications and other actions and their registration service fees.

Subsec. (b)(6)(A), (B). Pub. L. 117–328, § 705(a)(1)(D), which directed amendment of subpars. (A) and (B) ''to read as follows'' but did not include subpar. designations or headings, was executed by amending the text only and retaining the existing designations and headings, to reflect the probable intent of Congress. Prior to amendment, subpars. (A) and (B) related to fee adjustment between Oct. 1, 2019, and Sept. 30, 2021, and an additional fee adjustment starting on Oct. 1, 2021.

Subsec. (b)(7)(A). Pub. L. 117–328, § 705(a)(1)(E), substituted ''(including a Gold Seal letter and a Certificate of Establishment)'' for ''(commonly referred to as a Gold Seal letter)''.

Subsec. (c)(3)(B), (C). Pub. L. 117–328, § 705(b)(1), added subpars. (B) and (C) and struck out former subpar. (B). Prior to amendment, text of subpar. (B) read as follows:

''(i) IN GENERAL.—For each of fiscal years 2013 through 2023, the Administrator shall use approximately 1/17 of the amount in the Fund (but not less than $1,000,000) to enhance scientific and regulatory activities relating to worker protection, with an emphasis on field-worker populations in the United States.

''(ii) PARTNERSHIP GRANTS.—Of the amounts in the Fund, the Administrator shall use for partnership grants, for each of fiscal years 2013 through 2023, $500,000.

''(iii) PESTICIDE SAFETY EDUCATION PROGRAM.—Of the amounts in the Fund, the Administrator shall use $500,000 for each of fiscal years 2013 through 2023 to carry out the pesticide safety education program.''

Subsec. (c)(4)(B), (C). Pub. L. 117–328, § 705(b)(2), added subpar. (B) and redesignated former subpar. (B) as (C).

Subsec. (d)(2). Pub. L. 117–328, § 705(c), struck out ''(as in existence in fiscal year 2012)'' after ''for the functions'' and substituted ''$166,000,000.'' for ''the amount of appropriations for covered functions for fiscal year 2012 (excluding the amount of any fees appropriated for the fiscal year).''

Subsec. (e). Pub. L. 117–328, § 705(d), substituted ''Reforms to reduce decision time review periods and prevent double payment of registration fees'' for ''Reforms to reduce decision time review periods'' in subsec. heading, designated existing provisions as par. (1) and inserted par. heading, and added par. (2).

Subsec. (f). Pub. L. 117–328, § 705(a)(2), substituted ''subsection (b)(3)(B)'' for ''subsection (b)(3)'' wherever appearing.

Subsec. (f)(1). Pub. L. 117–328, § 705(e)(1), substituted ''Pesticide Registration Improvement Act of 2022'' for ''Pesticide Registration Improvement Extension Act of 2018''.

Subsec. (f)(4)(B)(i)(III). Pub. L. 117–328, § 705(e)(2)(A)(i), added subcl. (III).

Subsec. (f)(4)(B)(iii). Pub. L. 117–328, § 705(e)(2)(A)(ii), inserted ''automate the process, to the maximum extent practicable, and'' before ''determine'' in introductory provisions.

Subsec. (f)(4)(B)(iv). Pub. L. 117–328, § 705(e)(2)(A)(iii), struck out ''determine if'' after ''shall'' in introductory provisions, inserted ''determine if'' at beginning of subcls. (I) and (II), and added subcls. (III) to (VI).

Subsec. (f)(4)(E). Pub. L. 117–328, § 705(e)(2)(B), added subpar. (E) and struck out former subpar. (E). Prior to amendment, text read as follows: ''In the case of a covered pesticide registration application listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency, the decision time review period begins on the date that is 30 days after the effective date of the Pesticide Registration Improvement Act of 2003.''

Subsec. (f)(5). Pub. L. 117–328, § 705(e)(3), added par. (5) and struck out former par. (5). Prior to amendment, text read as follows: ''The Administrator and the applicant may mutually agree in writing to extend a decision time review period under this subsection.''

Subsec. (k). Pub. L. 117–328, § 705(f), added subsec. (k) and struck out former subsec. (k) which related to publication of annual reports and submission of another report to Congress.

Subsec. (m). Pub. L. 117–328, § 705(g)(1), substituted ''2027'' for ''2023'' wherever appearing.

Subsec. (m)(2)(A). Pub. L. 117–328, § 705(g)(2)(A), substituted ''2028'' for ''2024'' in heading and text.

Subsec. (m)(2)(B), (C). Pub. L. 117–328, § 705(g)(2)(B), substituted ''2029'' for ''2025'' in heading and text.

2019—Subsec. (b)(2). Pub. L. 116–8, § 5(a)(1)(A), struck out ''pesticide registration'' after ''Covered'' in heading.

Subsec. (b)(2)(A). Pub. L. 116–8, § 5(a)(1)(B), inserted ''or for any other action covered by a table specified in paragraph (3)'' after ''Pesticide Registration Improvement Act of 2003''.

Subsec. (b)(3). Pub. L. 116–8, § 6, amended par. (3) generally. Prior to amendment, par. (3) related to schedule of covered applications and registration service fees.

Subsec. (b)(5). Pub. L. 116–8, § 5(a)(2), substituted ''covered applications'' for ''pesticide registration applications'' in heading and ''covered application'' for ''pesticide registration application'' in two places in text.

Subsec. (b)(6)(A). Pub. L. 116–8, § 5(a)(3)(A), struck out ''pesticide registration'' after ''Effective for a covered'' and substituted ''October 1, 2019, and ending on September 30, 2021'' for ''October 1, 2013, and ending on September 30, 2015''.

Subsec. (b)(6)(B). Pub. L. 116–8, § 5(a)(3)(B), struck out ''pesticide registration'' after ''Effective for a covered'' and substituted ''2021'' for ''2015'' in two places.

Subsec. (b)(6)(C). Pub. L. 116–8, § 5(a)(3)(C), substituted ''service fee schedules revised pursuant to this paragraph'' for ''revised registration service fee schedules''.

Subsec. (b)(7)(A). Pub. L. 116–8, § 5(a)(4)(A), substituted ''covered application'' for ''covered pesticide registration'' and inserted before period at end '', except that no waiver or fee reduction shall be provided in connection with a request for a letter of certification (commonly referred to as a Gold Seal letter)''.

Subsec. (b)(7)(F)(i). Pub. L. 116–8, § 5(a)(4)(B), struck out ''pesticide registration'' after ''for a covered''.

Subsec. (b)(8)(A). Pub. L. 116–8, § 5(a)(5)(A), struck out ''pesticide registration'' after ''a covered''.

Subsec. (b)(8)(B)(i). Pub. L. 116–8, § 5(a)(5)(B), struck out ''pesticide registration'' after ''If a covered''.

Subsec. (b)(8)(C)(i). Pub. L. 116–8, § 5(a)(5)(C)(i), substituted ''case of a covered'' for ''case of a pesticide registration''.

Subsec. (b)(8)(C)(ii)(I). Pub. L. 116–8, § 5(a)(5)(C)(ii), substituted ''covered'' for ''pesticide registration''.

Subsec. (c)(3)(B). Pub. L. 116–8, § 5(b)(1), inserted '', partnership grants, and pesticide safety education'' after ''Worker protection'' in heading.

Subsec. (c)(3)(B)(i). Pub. L. 116–8, § 5(b)(2), substituted ''2023'' for ''2017'' and inserted before period at end '', with an emphasis on field-worker populations in the United States''.

Subsec. (c)(3)(B)(ii). Pub. L. 116–8, § 5(b)(3), substituted ''2023'' for ''2017''.

Subsec. (c)(3)(B)(iii). Pub. L. 116–8, § 5(b)(4), substituted ''2023'' for ''2017''.

Subsec. (e). Pub. L. 116–8, § 5(c), substituted ''Pesticide Registration Improvement Extension Act of 2018'' for ''Pesticide Registration Improvement Extension Act of 2012'' and inserted at end ''Such reforms

shall include identifying opportunities for streamlining review processes for applications for a new active ingredient or a new use and providing prompt feedback to applicants during such review process.''

Subsec. (f)(1). Pub. L. 116–8, § 5(d)(1), substituted ''Pesticide Registration Improvement Extension Act of 2018'' for ''Pesticide Registration Improvement Extension Act of 2012'' and inserted ''or for any other action covered by a table specified in subsection (b)(3)'' after ''covered pesticide registration actions''.

Subsec. (f)(3)(C). Pub. L. 116–8, § 5(d)(2), added subpar. (C) and struck out former subpar. (C) which read as follows: ''covered pesticide registration applications listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency.''

Subsec. (f)(4)(A). Pub. L. 116–8, § 5(d)(3), substituted ''a covered application'' for ''a pesticide registration application'' and ''the covered application'' for ''the covered pesticide registration application''.

Subsec. (k)(1). Pub. L. 116–8, § 5(e)(1), substituted ''2023'' for ''2017''.

Subsec. (k)(2)(D)(i). Pub. L. 116–8, § 5(e)(2)(A), added cl. (i) and struck out former cl. (i) which read as follows: ''the number of pesticides or pesticide cases reviewed;''.

Subsec. (k)(2)(G)(i). Pub. L. 116–8, § 5(e)(2)(B)(i), substituted ''paragraphs (4) and (5) of section 136a–1(k) of this title'' for ''section 136a–1(k)(4) of this title'' and ''such paragraphs'' for ''that section''.

Subsec. (k)(2)(G)(ii) to (vii). Pub. L. 116–8, § 5(e)(2)(B)(ii)–(iv), added cl. (ii), redesignated cl. (vii) as (iii), and struck out former cls. (ii) to (vi) which read as follows:

''(ii) implementing systems for the electronic tracking of registration submissions by December 31, 2013;

''(iii) implementing a system for tracking the status of conditional registrations, including making nonconfidential information related to the conditional registrations publicly available by December 31, 2013;

''(iv) implementing enhancements to the endangered species knowledge database, including making nonconfidential information related to the database publicly available;

''(v) implementing the capability to electronically submit and review labels submitted with registration actions;

''(vi) acquiring and implementing the capability to electronically assess and evaluate confidential statements of formula submitted with registration actions by December 31, 2014; and''.

Subsec. (k)(2)(K) to (O). Pub. L. 116–8, § 5(e)(2)(C)–(E), added subpars. (K) to (O).

Subsec. (m)(1). Pub. L. 116–8, § 5(f)(1), substituted ''2023'' for ''2017''.

Subsec. (m)(2)(A). Pub. L. 116–8, § 5(f)(2)(A), in heading, substituted ''Fiscal year 2024'' for ''Fiscal year 2018'' and in text, substituted ''2024'' for ''2018'' and ''2023'' for ''2017''.

Subsec. (m)(2)(B). Pub. L. 116–8, § 5(f)(2)(B), in heading, substituted ''Fiscal year 2025'' for ''Fiscal year 2019'' and in text, substituted ''2025'' for ''2019'' and ''2023'' for ''2017''.

Subsec. (m)(2)(C). Pub. L. 116–8, § 5(f)(2)(C), substituted ''2025'' for ''2019'' in heading and text.

Subsec. (m)(2)(D). Pub. L. 116–8, § 5(f)(2)(D), substituted ''2023'' for ''2017'' in cls. (i) and (ii).

2012—Subsec. (b)(3). Pub. L. 112–177, § 2(b)(1)(A), added par. (3) and struck out former par. (3) which related to schedule of covered applications and registration service fees.

Subsec. (b)(6)(A). Pub. L. 112–177, § 2(b)(1)(B)(i), substituted ''October 1, 2013'' for ''October 1, 2008'' and ''September 30, 2015'' for ''September 30, 2010''.

Subsec. (b)(6)(B). Pub. L. 112–177, § 2(b)(1)(B)(ii), substituted ''October 1, 2015'' for ''October 1, 2010'' and ''September 30, 2015'' for ''September 30, 2010''.

Subsec. (b)(7)(F)(i). Pub. L. 112–177, § 2(a)(2)(B)(i), substituted ''section 136a–1 (i)(1)(E)(ii)'' for ''section 136a–1(i)(5)(E)(ii)''.

Subsec. (b)(7)(F)(ii). Pub. L. 112–177, § 2(a)(2)(B)(i), (ii), substituted ''section 136a–1 (i)(1)(E)(ii)'' for ''section 136a–1(i)(5)(E)(ii)'' in subcl. (I) and ''section 136a–1(i)(1)(E)(ii)(I)(bb)'' for ''136a–1(i)(5)(E)(ii)(I)(bb)'' in subcl. (II).

Subsec. (b)(7)(F)(iv)(I). Pub. L. 112–177, § 2(a)(2)(B)(i), substituted ''section 136a–1 (i)(1)(E)(ii)'' for ''section 136a–1(i)(5)(E)(ii)''.

Subsec. (b)(7)(F)(iv)(II). Pub. L. 112–177, § 2(a)(2)(B)(ii), (iii), substituted ''applicable'' for ''applicable.'', ''revenue'' for ''revenues'', and ''section 136a–1(i)(1)(E)(ii)(I)(bb)'' for ''section 136a–1(i)(5)(E)(ii)(I)(bb)''.

Subsec. (b)(8)(C)(ii)(III). Pub. L. 112–177, § 2(b)(1)(C), added subcl. (III).

Subsec. (c)(3)(B)(i). Pub. L. 112–177, § 2(b)(2)(A), substituted ''2013 through 2017'' for ''2008 through 2012''.

Subsec. (c)(3)(B)(ii). Pub. L. 112–177, § 2(b)(2)(B), substituted ''grants, for each of fiscal years 2013 through 2017, $500,000.'' for ''grants—

''(I) for each of fiscal years 2008 and 2009, $750,000; and

''(II) for each of fiscal years 2010 through 2012, $500,000.''

Subsec. (c)(3)(B)(iii). Pub. L. 112–177, § 2(b)(2)(C), substituted ''2013 through 2017'' for ''2008 through 2012''.

Subsec. (d)(2). Pub. L. 112–177, § 2(b)(3)(A), substituted ''2012'' for ''2002'' in two places.

Subsec. (d)(4), (5). Pub. L. 112–177, § 2(b)(3)(B), (C), redesignated par. (5) as (4) and struck out former par. (4). Prior to amendment, text of par. (4) read as follows: ''The requirements of paragraph (2) shall have been considered to have been met for any fiscal year if the amount of appropriations for salaries, contracts, and expenses for the functions (as in existence in fiscal year 2002) of the Office of Pesticide Programs of the Environmental Protection Agency for the fiscal year (excluding the amount of any fees appropriated for the fiscal year) is not more than 3 percent below the amount of appropriations for covered functions for fiscal year 2002 (excluding the amount of any fees appropriated for the fiscal year).''

Subsec. (e). Pub. L. 112–177, § 2(b)(4), substituted ''Pesticide Registration Improvement Extension Act of 2012'' for ''Pesticide Registration Improvement Act of 2003''.

Subsec. (f)(1). Pub. L. 112–177, § 2(b)(5)(A), substituted ''Pesticide Registration Improvement Extension Act of 2012, the Administrator shall make publicly available'' for ''Pesticide Registration Improvement Renewal Act, the Administrator shall publish in the Federal Register''.

Subsec. (f)(2). Pub. L. 112–177, § 2(b)(5)(B), substituted ''provided under subsection (b)(3).'' for ''appearing in the Congressional Record on pages S10409 through S10411, dated July 31, 2007.''

Subsec. (f)(4)(A). Pub. L. 112–177, § 2(b)(5)(C)(i), inserted ''and fee'' before period at end.

Subsec. (f)(4)(B). Pub. L. 112–177, § 2(b)(5)(C)(ii)(I), substituted ''Initial content and preliminary technical screenings'' for ''Completeness of application'' in heading.

Subsec. (f)(4)(B)(i). Pub. L. 112–177, § 2(b)(5)(C)(ii)(I), (II), substituted ''Screenings'' for ''In general'' in cl. heading, designated existing provisions as subcl. (I) and inserted subcl. heading, and added subcl. (II).

Subsec. (f)(4)(B)(ii). Pub. L. 112–177, § 2(b)(5)(C)(ii)(III), added cl. (ii) and struck out former cl. (ii). Prior to amendment, text read as follows: ''If the Administrator determines under clause (i) that the application does not pass the initial screening and cannot be corrected within the 21-day period, the Administrator shall reject the application not later than 10 days after making the determination.''

Subsec. (f)(4)(B)(iii). Pub. L. 112–177, § 2(b)(5)(C)(ii)(IV), inserted ''initial content'' before ''screening'' in heading, ''content'' before ''screening'' in introductory provisions, and substituted ''appears to contain'' for ''contains'' in subcl. (II).

Subsec. (f)(4)(B)(iv). Pub. L. 112–177, § 2(b)(5)(C)(ii)(V), added cl. (iv).

Subsec. (k)(1). Pub. L. 112–177, § 2(b)(6)(A), substituted ''March 1, 2017'' for ''March 1, 2014''.

Subsec. (k)(2)(A)(viii). Pub. L. 112–177, § 2(b)(6)(B)(i), added cl. (viii).

Subsec. (k)(2)(G) to (J). Pub. L. 112–177, § 2(b)(6)(B)(ii)–(iv), added subpars. (G) to (J).

Subsec. (k)(4). Pub. L. 112–177, § 2(b)(6)(C), added par. (4).

Subsec. (m)(1). Pub. L. 112–177, § 2(b)(7)(A), substituted ''2017'' for ''2012''.

Subsec. (m)(2)(A). Pub. L. 112–177, § 2(b)(7)(B)(i), substituted ''2018'' for ''2013'' in heading and ''2018,'' for ''2013,'' and ''September 30, 2017'' for ''September 30, 2012'' in text.

Subsec. (m)(2)(B). Pub. L. 112–177, § 2(b)(7)(B)(ii), substituted ''2019'' for ''2014'' in heading and ''2019,'' for ''2014,'' and ''September 30, 2017'' for ''September 30, 2012'' in text.

Subsec. (m)(2)(C). Pub. L. 112–177, § 2(b)(7)(B)(iii), substituted ''2019'' for ''2014'' in heading and ''September 30, 2019'' for ''September 30, 2014'' in text.

Subsec. (m)(2)(D). Pub. L. 112–177, § 2(b)(7)(B)(iv), substituted ''2017'' for ''2012'' in cls. (i) and (ii).

2008—Subsec. (b)(7)(D)(i). Pub. L. 110–193, § 1(a)(1)(A)(i), added cl. (i) and struck out former cl. (i). Prior to amendment, text read as follows: ''The Administrator may waive or reduce a registration service fee for an application for minor uses for a pesticide.''

Subsec. (b)(7)(D)(ii). Pub. L. 110–193, § 1(a)(1)(A)(ii), inserted ''or exemption'' after ''waiver''.

Subsec. (b)(7)(E). Pub. L. 110–193, § 1(a)(1)(B)(ii), substituted ''exempt an application from the registration service fee'' for ''waive the registration service fee for an application'' in introductory provisions.

Pub. L. 110–193, § 1(a)(1)(B)(i), substituted ''exemption'' for ''waiver'' in heading.

Subsec. (b)(7)(E)(ii). Pub. L. 110–193, § 1(a)(1)(B)(iii), substituted ''exemption'' for ''waiver''.

Subsec. (m)(2)(A), (B). Pub. L. 110–193, § 1(a)(2), substituted ''2012'' for ''2008''.

2007—Subsec. (b)(2)(C)(ii). Pub. L. 110–94, § 5(a)(1), added cl. (ii) and struck out former cl. (ii) which read as follows: ''a request for a waiver from or reduction of the registration service fee.''

Subsec. (b)(2)(D) to (H). Pub. L. 110–94, § 5(a)(2), added subpars. (D) to (H).

Subsec. (b)(3)(A). Pub. L. 110–94, § 5(b)(1)(A), substituted ''Pesticide Registration Improvement Renewal Act'' for ''Pesticide Registration Improvement Act of 2003''.

Subsec. (b)(3)(B). Pub. L. 110–94, § 5(b)(1)(B), substituted ''S10409 through S10411, dated July 31, 2007.'' for ''S11631 through S11633, dated September 17, 2003.''

Subsec. (b)(6). Pub. L. 110–94, § 5(b)(2), added par. (6) and struck out former par. (6). Prior to amendment, text of par. (6) read as follows: ''Effective for a covered pesticide registration application received on or after October 1, 2005, the Administrator shall—

''(A) increase by 5 percent the service fee payable for the application under paragraph (3); and

''(B) publish in the Federal Register the revised registration service fee schedule.''

Subsec. (b)(7)(F)(ii). Pub. L. 110–94, § 5(c)(1), substituted ''75 percent'' for ''all'' in introductory provisions.

Subsec. (b)(7)(F)(iv)(II). Pub. L. 110–94, § 5(c)(2), substituted ''75 percent of the applicable.'' for ''all''.

Subsec. (b)(8)(A). Pub. L. 110–94, § 5(d), substituted ''25 percent.'' for ''10 percent''.

Subsec. (c)(1)(B). Pub. L. 110–94, § 5(e)(1), substituted ''paragraph (5)'' for ''paragraph (4)''.

Subsec. (c)(3)(B). Pub. L. 110–94, § 5(e)(2)(A), added subpar. (B) and struck out former subpar. (B). Prior to amendment, text of subpar. (B) read as follows: ''For each of fiscal years 2004 through 2008, the Administrator shall use approximately 1⁄17 of the amount in the Fund (but not more than $1,000,000, and not less than $750,000, for any fiscal year) to enhance current scientific and regulatory activities related to worker protection.''

Subsec. (c)(3)(C). Pub. L. 110–94, § 5(e)(2)(B), struck out subpar. (C). Text read as follows: ''For each of fiscal years 2004 and 2005, the Administrator shall use approximately 1⁄34 of the amount in the Fund (but not to exceed $500,000 for any fiscal year) for the review and evaluation of new inert ingredients.''

Subsec. (c)(5). Pub. L. 110–94, § 5(e)(3), designated existing provisions as subpar. (A), inserted heading, redesignated former subpars. (A) to (C) as cls. (i) to (iii), respectively, of subpar. (A) and added subpar. (B).

Subsec. (d)(2). Pub. L. 110–94, § 5(f), which directed substitution of ''Registration'' for ''For fiscal years 2004, 2005 and 2006 only, registration'', was executed by making the substitution for text which contained a comma after ''2005'' to reflect the probable intent of Congress.

Subsec. (f)(1). Pub. L. 110–94, § 5(g)(1), substituted ''Pesticide Registration Improvement Renewal Act'' for ''Pesticide Registration Improvement Act of 2003''.

Subsec. (f)(2). Pub. L. 110–94, § 5(g)(2), substituted ''S10409 through S10411, dated July 31, 2007.'' for ''S11631 through S11633, dated September 17, 2003.''

Subsec. (f)(4)(B). Pub. L. 110–94, § 5(g)(3), added subpar. (B) and struck out former subpar. (B) which provided criteria for determining completeness of pesticide registration applications.

Subsec. (k)(1). Pub. L. 110–94, § 5(h)(1), substituted ''March 1, 2014'' for ''March 1, 2009''.

Subsec. (k)(2)(A)(ii) to (v). Pub. L. 110–94, § 5(h)(2)(A)(i), (ii), added cls. (ii) to (iv) and redesignated former cl. (ii) as (v). Former cls. (iii) and (iv) redesignated (vi) and (vii), respectively.

Subsec. (k)(2)(A)(vi). Pub. L. 110–94, § 5(h)(2)(A)(i), (iii), redesignated cl. (iii) as (vi) and added subcls. (IV) and (V).

Subsec. (k)(2)(A)(vii). Pub. L. 110–94, § 5(h)(2)(A)(i), redesignated cl. (iv) as (vii).

Subsec. (k)(2)(D) to (F). Pub. L. 110–94, § 5(h)(2)(B)–(D), added subpars. (D) to (F).

Subsec. (m)(1). Pub. L. 110–94, § 5(i)(1), substituted ''2012'' for ''2008''.

Subsec. (m)(2)(A). Pub. L. 110–94, § 5(i)(2)(A), substituted ''2013'' for ''2009'' in heading and text.

Subsec. (m)(2)(B), (C). Pub. L. 110–94, § 5(i)(2)(B), substituted ''2014'' for ''2010'' in headings and text.

Subsec. (m)(2)(D). Pub. L. 110–94, § 5(i)(2)(C), substituted ''2012'' for ''2008'' in two places.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2012 Amendment

Amendment by Pub. L. 112–177 effective Oct. 1, 2012, see section 2(c) of Pub. L. 112–177, set out as a note under section 136a–1 of this title.

#### Effective Date of 2008 Amendment

Pub. L. 110–193, § 1(b), Mar. 6, 2008, 122 Stat. 650, provided that: ''The amendments made by subsection (a) [amending this section] take effect on October 1, 2007.''

#### Effective Date of 2007 Amendment

Amendment by Pub. L. 110–94 effective Oct. 1, 2007, see section 6 of Pub. L. 110–94, set out as a note under section 136a of this title.

#### Effective Date

Section effective on the date that is 60 days after Jan. 23, 2004, except as otherwise provided, see section 501(h) of Pub. L. 108–199, set out as an Effective Date of 2004 Amendment note under section 136a of this title.

#### Implementation Dates With Respect to Fees

Increases in registration service fees specified in this section, as amended by title VI of div. HH of Pub. L. 117–328, not effective until 60 days after Dec. 29, 2022, regardless of whether this section specifies such increases to be effective for fiscal year 2023, see section 708(a)(1) of Pub. L. 117–328, set out in a note under section 136a–1 of this title.

Case: 26-298, 11/19/2026, DktEntry: 41.1, (141 of 142)



EXTENSION OF LIMITATIONS ON FEE AMOUNTS AND USAGE OF FEES

Subsection (c)(3)(B) of this section to continue in effect through Sept. 30, 2018, see section 401(a) of Pub. L. 115–141, formerly set out as a note under section 136a–1 of this title.

Pub. L. 115–141, div. M, title IV, §401(b)(2), Mar. 23, 2018, 132 Stat. 1050, extended the authority provided by this section until Sept. 30, 2018.

### §136x. Severability

If any provision of this subchapter or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this subchapter which can be given effect without regard to the invalid provision or application, and to this end the provisions of this subchapter are severable.

(June 25, 1947, ch. 125, §34, formerly §26, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 998; renumbered §30, Pub. L. 95–396, §24(1), Sept. 30, 1978, 92 Stat. 836; renumbered §33, Pub. L. 104–170, title I, §121(1), Aug. 3, 1996, 110 Stat. 1492; renumbered §34, Pub. L. 108–199, div. G, title V, §501(f)(1), Jan. 23, 2004, 118 Stat. 422.)

**Editorial Notes**

PRIOR PROVISIONS

A prior section 34 of act June 25, 1947, ch. 125, was renumbered section 35 and is classified to section 136y of this title.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

### §136y. Authorization of appropriations

There is authorized to be appropriated to carry out this subchapter (other than section 136u(a) of this title)—

(1) $83,000,000 for fiscal year 1989, of which not more than $13,735,500 shall be available for research under this subchapter;

(2) $95,000,000 for fiscal year 1990, of which not more than $14,343,600 shall be available for research under this subchapter; and

(3) $95,000,000 for fiscal year 1991, of which not more than $14,978,200 shall be available for research under this subchapter.

(June 25, 1947, ch. 125, §35, formerly §27, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 998; amended Pub. L. 94–51, July 2, 1975, 89 Stat. 257; Pub. L. 94–109, Oct. 10, 1975, 89 Stat. 571; Pub. L. 94–140, §3, Nov. 28, 1975, 89 Stat. 752; renumbered §31 and amended Pub. L. 95–396, §§24(1), 25, Sept. 30, 1978, 92 Stat. 836, 838; Pub. L. 96–539, §3, Dec. 17, 1980, 94 Stat. 3195; Pub. L. 98–201, §2, Dec. 2, 1983, 97 Stat. 1380; Pub. L. 99–198, title XVII, §1768, Dec. 23, 1985, 99 Stat. 1656; Pub. L. 100–532, title VII, §701, Oct. 25, 1988, 102 Stat. 2679; renumbered §34, Pub. L. 104–170, title I, §121(1), Aug. 3, 1996, 110 Stat. 1492; renumbered §35, Pub. L. 108–199, div. G, title V, §501(f)(1), Jan. 23, 2004, 118 Stat. 422.)

**Editorial Notes**

CODIFICATION

Another section 1768 of Pub. L. 99–198 enacted sections 154a and 159 and amended sections 151, 154, and 157 of Title 21, Food and Drugs.

AMENDMENTS

1988—Pub. L. 100–532 amended section generally. Prior to amendment, section read as follows: ‘‘There is authorized to be appropriated to carry out this subchapter for the period beginning October 1, 1985, and ending September 30, 1986, $68,604,200 of which not more than $11,993,100 shall be available for research under this subchapter.’’

1985—Pub. L. 99–198 substituted provisions authorizing appropriations of $68,604,200 for fiscal year 1986 of which not more than $11,993,100 shall be available for research for former provisions which had authorized appropriations for fiscal years 1973 through 1984.

1983—Pub. L. 98–201 authorized necessary appropriations for period beginning Oct. 1, 1983, and ending Sept. 30, 1984, not in excess of $64,200,000.

1980—Pub. L. 96–539 inserted provisions authorizing appropriations for period beginning Oct. 1, 1979, and ending Sept. 30, 1980, and for period beginning Oct. 1, 1980, and ending Sept. 30, 1981.

1978—Pub. L. 95–396, §25, substituted appropriations authorization of $46,636,000 for period beginning Oct. 1, 1976, and ending Sept. 30, 1977, for prior authorization of $23,600,000 for period beginning Oct. 1, 1976, and ending Mar. 31, 1977, and authorized appropriations of $54,500,000 for period beginning Oct. 1, 1977, and ending Sept. 30, 1978, and such sums as may be necessary, limited to $70,000,000, for period beginning Oct. 1, 1978, and ending Sept. 30, 1979.

1975—Pub. L. 94–140 authorized appropriation of $47,868,000 to carry out provisions of this subchapter for period beginning Oct. 1, 1975, and ending Sept. 30, 1976, and $23,600,000 for period beginning Oct. 1, 1976, and ending Mar. 31, 1977.

Pub. L. 94–109 inserted provisions authorizing appropriation of $5,983,500 for period beginning Oct. 1, 1975 and ending Nov. 15, 1975.

Pub. L. 94–51 authorized appropriation of $11,967,000 to carry out provisions of this subchapter for period beginning July 1, 1975, and ending Sept. 30, 1975.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–532, title VII, §701, Oct. 25, 1988, 102 Stat. 2679, provided that amendment made by Pub. L. 100–532 is effective Oct. 1, 1988.

EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## CHAPTER 6A—NATIONAL LABORATORY ACCREDITATION

Sec.

138. Definitions.
138a. National Laboratory Accreditation Program.
138b. Accreditation.
138c. Samples.
138d. Application.
138e. Reporting.
138f. Fees.
138g. Public disclosure.
138h. Regulations.
138i. Effect of other laws.

### §138. Definitions

As used in this chapter:

**(1) Agricultural product**

The term ‘‘agricultural product’’ means any fresh fruit or vegetable or any commodity or

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO





## Subpart A—General Provisions

**§ 158.1 Purpose and scope.**

(a) *Purpose.* The purpose of this part is to specify the kinds of data and information EPA requires in order to make regulatory judgments under FIFRA secs. 3, 4, and 5 about the risks and benefits of pesticide products. Further, this part specifies the data and information needed to determine the safety of pesticide chemical residues under FFDCA sec. 408.

(b) *Scope.* (1) This part describes the minimum data and information EPA typically requires to support an application for pesticide registration or amendment; support the reregistration of a pesticide product; support the maintenance of a pesticide registration by means of the data call-in process, e.g., as used in the registration review program; or establish or maintain a tolerance or exemption from the requirements of a tolerance for a pesticide chemical residue.

(2) This part establishes general policies and procedures associated with the submission of data in support of a pesticide regulatory action.

(3) This part does not include study protocols, methodology, or standards for conducting or reporting test results; nor does this part describe how the Agency uses or evaluates the data and information in its risk assessment and risk management decisions, or the regulatory determinations that may be based upon the data.

(c) *Scope of individual subparts.* (1) *Conventional pesticides.* Subparts A, B, C, D, E, F, G, K, L, N, O, and R apply to conventional pesticides.

(2) *Biochemical pesticides.* Subparts A, B, E, R, and U apply to biochemical pesticides.

(3) *Microbial pesticides.* Subparts A, B, E, R, and V apply to microbial pesticides.

(4) *Antimicrobial pesticides.* Subparts A, B, C, D, E, R, and W of this part apply to antimicrobial pesticides.

[72 FR 60957, Oct. 26, 2007, as amended at 78 FR 26978, May 8, 2013; 87 FR 22474, Apr. 15, 2022]

**§ 158.3 Definitions.**

All terms defined in sec. 2 of the Federal Insecticide, Fungicide, and Rodenticide Act apply to this part and are used with the meaning given in the Act. Applicable terms from the Federal Food, Drug, and Cosmetic Act also apply to this part. Individual subparts may contain definitions that pertain solely to that subpart. The following additional terms apply to this part:

*Applicant* means any person or entity, including for the purposes of this part a registrant, who submits, or is required to submit, to the Agency any application, petition, or submission intended to persuade EPA to grant, modify, or leave unmodified a registration or other approval required as a condition of sale or distribution of a pesticide. Such submissions may include, but are not limited to, the following:

(1) An application for registration or amended registration of a pesticide product under FIFRA sec. 3 or 24.

(2) A submission of data required in conjunction with reregistration of a currently registered product under FIFRA sec. 4.

(3) An application for an experimental use permit under FIFRA sec. 5.

(4) A submission of data in response to a notice issued by EPA under FIFRA sec. 3(c)(2)(B).

(5) A petition to establish or modify a tolerance or an exemption from the requirement of a tolerance for a pesticide chemical residue under FFDCA sec. 408.

*Registration* includes a new registration, amended registration and reregistration, unless stated otherwise.

**§ 158.5 Applicability.**

(a) The requirements of this part apply to the following submissions:

(1) An application for new or amended registration under FIFRA sec. 3 or 24.

(2) An application for experimental use permit under FIFRA sec. 5.

(3) A submission of data or information to support the continuation of a registration under FIFRA sec. 3, 4, or 24.

(4) A petition to establish, modify or revoke a tolerance or exemption from a tolerance under FFDCA sec. 408.

(b) The information specified in this part must be furnished with each submission described in paragraph (a) of